**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF WEST VIRGINIA,<br>STATE OF OKLAHOMA,<br>STATE OF ALABAMA,<br>STATE OF ALASKA,<br>STATE OF ARKANSAS,<br>STATE OF GEORGIA,<br>STATE OF IDAHO,<br>STATE OF INDIANA,<br>STATE OF IOWA,<br>STATE OF KANSAS<br>COMMONWEALTH OF<br>KENTUCKY,<br>STATE OF LOUISIANA,<br>STATE OF MISSISSIPPI,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF NORTH DAKOTA,<br>STATE OF OHIO,<br>STATE OF SOUTH CAROLINA,<br>STATE OF SOUTH DAKOTA,<br>STATE OF TENNESEE,<br>STATE OF TEXAS,<br>STATE OF UTAH,<br>COMMONWEALTH OF<br>VIRGINIA,<br>STATE OF WYOMING,<br>the ARIZONA<br>LEGISLATURE, and<br>the TEXAS COMMISSION ON<br>ENVIRONMENTAL QUALITY,<br><br>               Petitioners,<br><br>v. | No. 24-1009 |

| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | |
|---|---|
| Respondents. | |

## PETITION FOR REVIEW

Under Clean Air Act § 3071(b)(1) (42 U.S.C. § 7607(b)(1)), 5 U.S.C. §§ 702 and 706, Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Local Rule 15, the States of West Virginia, Oklahoma, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming, along with the Arizona Legislature and the Texas Commission on Environmental Quality, petition this Court for review of the final agency action taken by Respondents United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency, entitled "Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d)," 88

Fed. Reg. 80480 (Nov. 17, 2023). Petitioners have attached a copy of that final rule.

Petitioners will show that the final rule exceeds the agency's statutory authority and otherwise is arbitrary, capricious, an abuse of discretion, and not in accordance with law. Petitioners thus ask that this Court declare unlawful and vacate the Administrator's final action.

Respectfully submitted,

PATRICK MORRISEY
  ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams
 *Principal Deputy Solicitor General*
Spencer J. Davenport
 *Assistant Solicitor General*

Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

GENTNER DRUMMOND
  ATTORNEY GENERAL

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
 *Solicitor General*
Jennifer L. Lewis
 *Deputy Attorney General*

Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

STEVE MARSHALL
  ATTORNEY GENERAL

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
 *Solicitor General*

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
 (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

TIM GRIFFIN
  ATTORNEY GENERAL

/s/ Nicholas J. Bronni
Nicholas J. Bronni
 *Solicitor General*
Dylan Jacobs
 *Deputy Solicitor General*

Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007 (main)
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for State of Arkansas*

TREG TAYLOR
  ATTORNEY GENERAL

/s/ Garrison Todd
Garrison Todd
 *Assistant Attorney General*

Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
garrison.todd@alaska.gov

*Counsel for State of Alaska*

CHRISTOPHER M. CARR
  ATTORNEY GENERAL

/s/ Stephen J. Petrany
Stephen J. Petrany
 *Solicitor General*

Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
    ATTORNEY GENERAL

/s/ Joshua N. Turner
Joshua N. Turner
  *Acting Solicitor General*
Idaho Bar No. 12193
Scott L. Campbell
  *Deputy Attorney General*
  *Chief, Energy and Natural*
*Resources Division*

Office of the Attorney
General of Idaho
P.O. Box 83720
Boise, ID 83720-0010
Tel:  (208) 334-2400
Fax:  (208) 854-8071
josh.turner@ag.idaho.gov
scott.campbell@ag.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
    ATTORNEY GENERAL

/s/ James A. Barta
Stephen J. Petrany
  *Solicitor General*

Office of the
Attorney General of Indiana
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
ATTORNEY GENERAL

/s/ Eric H. Wessan
Eric H. Wessan
  Solicitor General

Office of the Attorney General of
Iowa
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

Counsel for State of Iowa

RUSSELL COLEMAN
  ATTORNEY GENERAL

/s/ Matthew F. Kuhn
Matthew F. Kuhn
  Solicitor General

Office of Kentucky Attorney
General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Matt.Kuhn@ky.gov

Counsel for the Commonwealth of
Kentucky

KRIS KOBACH
ATTORNEY GENERAL

/s/ Anthony J. Powell
Anthony J. Powell
  Solicitor General

Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
anthony.powell@ag.ks.gov

Counsel for State of Kansas

LIZ MURRILL
  ATTORNEY GENERAL

/s/ J. Scott St. John
J. Scott St. John
  Deputy Solicitor General
Tracy Short
  Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

Counsel for State of Louisiana

LYNN FITCH
  ATTORNEY GENERAL

/s/ Justin L. Matheny
Justin L. Matheny
  *Deputy Solicitor General*

Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


AUSTIN KNUDSEN
  ATTORNEY GENERAL

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*


ANDREW BAILEY
  ATTORNEY GENERAL

/s/ Joshua M. Divine
Joshua M. Divine
  *Solicitor General*
Samuel C. Freedlund
  *Deputy Solicitor General*

Missouri Attorney General's Office
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*


MICHAEL T. HILGERS
  ATTORNEY GENERAL

/s/ Lincoln J. Korell
Lincoln J. Korell
  *Assistant Solicitor General*

Office of the Attorney General of
Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for State of Nebraska*

DREW H. WRIGLEY
  ATTORNEY GENERAL

/s/ Philip Axt
Philip Axt
  *Solicitor General*

Office of Attorney General of
North Dakota
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

DAVE YOST
  ATTORNEY GENERAL

/s/ T. Elliot Gaiser
T. Elliot Gaiser
  *Solicitor General*
Mathura Sridharan
  *Deputy Solicitor General*

Ohio Attorney General's Office
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 466-8980
Thomas.Gaiser@OhioAGO.gov
Mathura.Sridharan@OhioAGO.gov

*Counsel for State of Ohio*

ALAN WILSON
ATTORNEY GENERAL

Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*

/s/ Joseph D. Spate
Joseph D. Spate
  *Assistant Deputy Solicitor General*

Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for State of South Carolina*

MARTY J. JACKLEY
ATTORNEY GENERAL

/s/ Steven Blair
Steven Blair
  *Deputy Attorney General*

South Dakota Attorney General's
Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
  ATTORNEY GENERAL AND
REPORTER

/s/ Whitney Hermandorfer
Whitney Hermandorfer
  *Director of Strategic Litigation
and Assistant Solicitor General*

Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*

KEN PAXTON
ATTORNEY GENERAL

Brent Webster
  *First Assistant Attorney General*

Grant Dorfman
  *Deputy First Assistant Attorney
General*

James Lloyd
  *Deputy Attorney General for Civil
Litigation*

Kellie E. Billings-Ray
  *Chief, Environmental Protection
Division*

/s/ Wesley E. Williams
Wesley E. Williams
  *Assistant Attorney General*
State Bar No. 24108009

Office of the Attorney General of
Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas and the
Texas Commission on
Environmental Quality*

SEAN REYES
ATTORNEY GENERAL

/s/ Christopher A. Bates
Christopher A. Bates
  *Deputy Solicitor General*

Utah Attorney General's Office
160 East 300 South, 6th Floor
P.O. Box 140854
Salt Lake City, UT 84114
(801) 366-0260
chrisbates@agutah.gov

*Counsel for State of Utah*

BRIDGET HILL
ATTORNEY GENERAL

/s/ D. David DeWald
D. David DeWald
  *Deputy Attorney General*

Office of the Attorney General of
Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*

JASON MIYARES
  ATTORNEY GENERAL

/s/ Andrew N. Ferguson
Andrew N. Ferguson
  *Solicitor General*
Kevin M. Gallagher
  *Deputy Solicitor General*

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Commonwealth of
Virginia*

WARREN PETERSEN
PRESIDENT OF THE ARIZONA STATE
SENATE

By counsel:

/s/ Rusty D. Crandell
Rusty D. Crandell
  *Majority General Counsel*

Arizona State Senate
1700 W. Washington St.
Phoenix, Arizona 85007
rcrandell@azleg.gov
(602) 926-3137

*Counsel for Arizona Legislature*

BEN TOMA
SPEAKER OF THE ARIZONA HOUSE
OF REPRESENTATIVES

By counsel:

/s/ Linley Wilson
Linley Wilson
  *Majority General Counsel*

Arizona House of Representatives
1700 W. Washington St.
Phoenix, Arizona 85007
LWilson@azleg.gov
(602) 926-5418

*Counsel for Arizona Legislature*

Dated: January 16, 2024

# CERTIFICATE OF SERVICE

I certify that I have caused a true and correct copy of this Petition to be

served on the following Respondents by U.S. Mail on January 16, 2024:

Hon. Michael S. Regan
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Hon. Merrick Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Todd Kim
Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-00001

/s/ Michael R. Williams
Michael R. Williams

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 60**

**[EPA-HQ-OAR-2021-0527; FRL-8606-01-OAR]**

**RIN 2060-AV48**

**Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing amendments to the regulations that govern the processes and timelines for state and Federal plans to implement emission guidelines under Clean Air Act (CAA) New Source Performance Standards for existing sources (the "implementing regulations"). The amendments include revisions to the timing requirements for state and the EPA actions related to plans; the addition of mechanisms to improve flexibility and efficiency in plan processes; and new requirements for demonstration of timely meaningful engagement with pertinent stakeholders—including, but not limited to, industry, small businesses, and communities most affected by and vulnerable to the impacts of the plan. This action additionally provides a process for states' consideration of 'remaining useful life and other factors' (RULOF) in applying a standard of performance; amends the definition of standard of performance in the implementing regulations; and clarifies compliance flexibilities that states may choose to incorporate into state plans, including trading or averaging. Finally, this action adds requirements for the electronic submission of state plans and provides several other clarifications and minor revisions to the implementing regulations.

**DATES:** This final rule is effective on December 18, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA-HQ-OAR-2021-0527. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Publicly available docket materials are available electronically through *https://www.regulations.gov/*.

**FOR FURTHER INFORMATION CONTACT:** For questions about this action contact Dr. Michelle Bergin, Sector Policies and Programs Division (Mail Code D205-01), Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina 27711; telephone number: (919) 541-2726; email address: *bergin.michelle@epa.gov*.

**SUPPLEMENTARY INFORMATION:** *Preamble acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

ACE   Affordable Clean Energy Rule
ALA   American Lung Association
BSER   Best System of Emission Reduction
CAA   Clean Air Act
CBI   confidential business information
CDX   Central Data Exchange
CFR   Code of Federal Regulations
EG   Emission Guideline
EGU   electric generating unit
EJ   environmental justice
EPA   Environmental Protection Agency
FIP   Federal Implementation Plan
ICR   Information Collection Request
IoP   Increments of Progress
NAAQS   National Ambient Air Quality Standards
OAQPS   Office of Air Quality Planning and Standards
OMB   Office of Management and Budget
PRA   Paperwork Reduction Act
$PM_{2.5}$   fine particulate matter (2.5 microns and less)
RTC   Response to Comments document
RFA   Regulatory Flexibility Act
RIN   Regulatory Information Number
RULOF   remaining useful life and other factors
SIP   State Implementation Plan
SpeCS   State Planning Electronic Collaboration System
TAR   Tribal Authority Rule
TAS   Treatment as a State
TIP   Tribal Implementation Plan
UMRA   Unfunded Mandates Reform Act
U.S.C.   United States Code

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Does this action apply to me?
  B. Where can I get a copy of this document and other related information?
  C. Judicial Review and Administrative Review
II. Background
  A. What is the statutory authority for this action?
  B. What is the background for this action?
  C. What changes did we propose?
  D. What outreach and engagement did the EPA conduct?
III. What actions are we finalizing and what is our rationale for such decisions?
  A. Revised Implementing Timelines
  B. Federal Plan Authority and Timeline Upon Failure to Submit a Plan
  C. Outreach and Meaningful Engagement
  D. Regulatory Mechanisms for State Plan Implementation
  E. Remaining Useful Life and Other Factors (RULOF) Provisions
  F. Provision for Electronic Submission of State Plans
  G. Other Proposed Modifications and Clarifications
IV. Summary of Cost, Environmental, and Economic Impacts
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review; Executive Order 13563: Improving Regulation and Regulatory Review; and Executive Order 14094: Modernizing Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act (NTTAA)
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)

## I. General Information

*A. Does this action apply to me?*

This action applies for the development and adoption of plans for implementation of CAA section 111(d) final emission guidelines (EGs) published in the **Federal Register** after July 8, 2019. In particular, this action applies to states in the development and submittal of state plans and to the EPA in processing state plan submissions and to the EPA in promulgating Federal plans. After the EPA promulgates a final EG, each state that has one or more designated facilities must develop, adopt, and submit to the EPA a state plan under CAA section 111(d). The term "designated facility" means "any existing facility . . . which emits a designated pollutant and which would be subject to a standard of performance for that pollutant if the existing facility were an affected facility [*i.e.,* a new source]." *See* 40 CFR 60.21a(b). If a state fails to submit a plan or if the EPA determines that a state plan is not

satisfactory, the EPA has the authority to establish a Federal CAA section 111(d) plan for designated facilities located in the state.

Under the Tribal Authority Rule (TAR), eligible tribes may seek approval to implement a plan under CAA section 111(d) in a manner similar to a state. See 40 CFR part 49, subpart A. Tribes may, but are not required to, seek approval for treatment in a manner similar to a state (treatment as a state; TAS) for purposes of developing a Tribal Implementation Plan (TIP) implementing an EG. If a tribe obtains approval and submits a TIP, the EPA will use similar timelines and criteria and will follow similar procedures as those for state plans. Tribes that choose to develop plans will have the same flexibilities available to states in this process. The TAR authorizes tribes to develop and implement one or more of its own air quality programs, or portions thereof, under the CAA; however, it does not require tribes to develop a CAA program. Tribes may implement programs that are most relevant to their air quality needs. A tribe with an approved TAS under TAR for CAA 111(d) is not required to resubmit TAS approval to implement an EG subject to subpart Ba.[1] If a tribe does not seek and obtain the authority from the EPA to establish a TIP, the EPA has the authority to establish a Federal CAA section 111(d) plan for designated facilities that are located in areas of Indian country. A Federal plan would apply to all designated facilities located in the areas of Indian country covered by the Federal plan unless and until the EPA approves a TIP applicable to those facilities.

## B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of this action is available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at *https://www.epa.gov/stationary-sources-air-pollution/adoption-and-submittal-state-plans-designated-facilities-40-cfr.* Following publication in the **Federal Register**, the EPA will post the **Federal Register** version of the final rule, a memorandum showing the rule edits finalized in this action, and key supporting documents at this same website.

## C. Judicial Review and Administrative Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii) described in the preceding sentence.[2]

This action is "nationally applicable" within the meaning of CAA section 307(b)(1). The final rule governs the EPA's promulgation of emission guidelines under CAA section 111(d), which are nationally applicable regulations for which judicial review is available only in the U.S. Court of Appeals for the District of Columbia (D.C. Circuit) pursuant to CAA section 307(b)(1).[3] Moreover, it revises the generally applicable, nationally consistent implementing regulations that govern the development and submission for all states of state plans and the EPA's development of Federal plans pursuant to EGs under CAA section 111(d), as well as the EPA's review of states' plans.

In the alternative, to the extent a court finds this final action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1).[4] As explained above, this final action is revising a single set of nationally consistent implementing regulations that apply to every state that must develop a state plan submission pursuant to CAA section 111(d) and an EPA-issued EG, as well as apply to the EPA when it reviews state plan submissions. The regulations also govern the EPA's development of EGs pursuant to CAA section 111(d), which apply to every state that contains designated facilities.

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results, and that a nationally consistent approach to implementation of EGs pursuant to CAA section 111(d) constitutes the best use of agency resources.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by January 16, 2024. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

Additionally, pursuant to CAA section 307(d)(1)(V), the Administrator determines that this action is subject to the provisions of CAA section 307(d). The EPA made this determination at proposal and has complied with the applicable procedural requirements in the course of this rulemaking. Section 307(d)(1)(V) of the CAA provides that the provisions of CAA section 307(d) apply to "such other actions as the Administrator may determine." Section 307(d)(7)(B) of the CAA further provides that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period

---

[1] See the EPA website, *https://www.epa.gov/tribal/tribes-approved-treatment-state-tas,* for information on those tribes that have treatment as a state for specific environmental regulatory programs, administrative functions, and grant programs.

[2] *Sierra Club* v. *EPA,* 47 F.4th 738, 745 (D.C. Cir. 2022) ("EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable"); *Texas* v. *EPA,* 983 F.3d 826, 834–35 (5th Cir. 2020).

[3] See, *e.g., Nat'l Waste & Recyling Ass'n* v. *EPA,* No. 16–1371 (D.C. Cir. 2016) (consolidated challenges to the CAA section 111(d) emissions guidelines for municipal solid waste landfills in the D.C. Circuit); *Am. Lung Ass'n* v. *EPA,* 985 F.3d 914 (D.C. Cir. 2021) (consolidated challenges to, among other things, the CAA section 111(d) emission guidelines for fossil-fired electric generating units known as the Affordable Clean Energy Rule).

[4] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

for public comment (including any public hearing) may be raised during judicial review.'' This section also provides a mechanism for the EPA to convene a proceeding for reconsideration, ''[i]f the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within [the period for public comment] or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule.'' Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. Environmental Protection Agency, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

The EPA notes that the individual regulatory provisions it is revising or finalizing in this action are severable from one another because each is supported by an independent rationale. That is, the individual subsections within each of the sections of subpart Ba are generally justified independently and are therefore severable for purposes of judicial review.

## II. Background

### A. What is the statutory authority for this action?

The statutory authority for this action is provided by CAA section 111 (42 U.S.C. 7411). As described further in the next section, CAA section 111 requires the EPA to establish standards of performance for certain categories of stationary sources that, in the Administrator's judgment, ''cause[ ], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' CAA section 111(b) provides the EPA's authority to regulate new and modified sources, while CAA section 111(d) directs the EPA to ''prescribe regulations which shall establish a procedure'' for states to submit plans to the EPA that establish standards of performance for existing sources of certain air pollutants to which a standard would apply if such existing source were a new source. The EPA addresses its obligation under CAA

section 111(d) to establish a procedure for states to submit plans both through its promulgation of general implementing regulations, including those addressed by this action, and through promulgation of EGs for specific source categories. Additional statutory authority for this action is provided by section 301 of the CAA (42 U.S.C. 7601), which contains general provisions for the administration of the CAA, including the authority for the Administrator to ''prescribe such regulations as are necessary to carry out [the] functions'' of the CAA under section 301(a)(1).

### B. What is the background for this action?

Clean Air Act section 111(d) governs the establishment of standards of performance for existing stationary sources. CAA section 111(d) directs the EPA to ''prescribe regulations which shall establish a procedure similar to that provided by [CAA section 110]'' for states to submit state plans that establish standards of performance for existing sources of certain air pollutants to which a standard of performance would apply if such an existing source were a new source under CAA section 111(b). Therefore, an existing source can only be regulated under CAA section 111(d) if it belongs to a source category that is regulated under CAA section 111(b). The EPA's implementing regulations use the term ''designated facility'' to identify those existing sources. *See* 40 CFR 60.21a(b).

CAA section 111(b)(1)(A) requires that a source category be included on the list for regulation if, ''in [the EPA Administrator's] judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' Once a source category is listed, CAA section 111(b)(1)(B) requires that the EPA propose and then promulgate ''standards of performance'' for new sources in such source category. CAA section 111(a)(1) defines a ''standard of performance'' as ''a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.'' This provision requires the EPA to determine both the best system of emission reduction (BSER) for the regulated source category and the degree of emission limitation achievable

through application of the BSER. The EPA must then, under CAA section 111(b)(1)(B), promulgate standards of performance for new sources that reflect that level of stringency.

Once the EPA promulgates standards of performance for new sources within a particular source category, the EPA is required, in certain circumstances, to regulate emissions from existing sources in that same source category.[5] Under CAA section 111(d), the Agency has, to date, issued EGs regulating five pollutants from six source categories that are currently in effect (*i.e.,* sulfuric acid plants (acid mist), phosphate fertilizer plants (fluorides), primary aluminum plants (fluorides), kraft pulp plants (total reduced sulfur), municipal solid waste landfills (landfill gases)), and fossil fuel-fired electric generating units (greenhouse gases [GHGs]). *See* ''Phosphate Fertilizer Plants; Final Guideline Document Availability,'' 42 FR 12022 (March 1, 1977); ''Standards of Performance for New Stationary Sources; Emission Guideline for Sulfuric Acid Mist,'' 42 FR 55796 (October 18, 1977); ''Kraft Pulp Mills, Notice of Availability of Final Guideline Document,'' 44 FR 29828 (May 22, 1979); ''Primary Aluminum Plants; Availability of Final Guideline Document,'' 45 FR 26294 (April 17, 1980); ''Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills,'' 81 FR 59276 (August 29, 2016); ''Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations,'' 84 FR 32520 (July 8, 2019) (Affordable Clean Energy (ACE) Rule).[6][7] Additionally, the

---

[5] In accordance with CAA section 111(d), states are required to submit plans to establish standards of performance for existing sources for any air pollutant: (1) the emission of which is subject to a Federal New Source Performance Standard; and (2) which is neither a pollutant regulated under CAA section 108(a) (*i.e.,* criteria air pollutants such as ground-level ozone and particulate matter, and their precursors, like volatile organic compound) or a hazardous air pollutant regulated from the same source category under CAA section 112. See also definition of ''designated pollutant'' in 40 CFR 60.21a(a).

[6] The EPA has also issued several EGs that have subsequently been repealed or vacated by the courts. The EPA regulated mercury from coal-fired electric power plants in a 2005 rule that was vacated by the D.C. Circuit, ''Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units; Final Rule,'' 70 FR 28606 (May 18, 2005) (Clean Air Mercury Rule), vacated by *New Jersey* v. *EPA,* 517 F.3d 574 (D.C. Cir. 2008). The EPA also issued CAA section 111(d) EGs regulating GHG emissions from fossil fuel-fired electric power plants in a 2015 rule, ''Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units; Final Rule,'' 80 FR 64662 (October 23, 2015)

EPA recently proposed EGs addressing GHG emissions from two different source categories. On November 15, 2021, the EPA proposed EGs to regulate GHG emissions (in the form of methane limitations) from sources in the oil and natural gas source category (86 FR 63110) and provided a supplemental proposal for that sector on December 6, 2022 (87 FR 74702). On May 23, 2023, the EPA proposed to repeal the existing EG for GHG emissions from certain fossil fuel-fired electric generating units (the ACE Rule) and to promulgate a new EG in order to regulate GHG emissions (in the form of carbon dioxide limitations) from existing fossil fuel-fired electric generating units. 88 FR 33240. Finally, the Agency has regulated additional pollutants from solid waste incineration units under CAA section 129 and in accordance with CAA section 111(d).[8]

The mechanism for regulating designated facilities[9] under CAA section 111(d) differs from the mechanism for regulating new facilities under CAA section 111(b). Pursuant to CAA section 111(b), the EPA promulgates standards of performance that are directly applicable to new, modified, and reconstructed facilities in a specified source category. In contrast, CAA section 111(d) operates together with CAA section 111(a)(1) to collectively establish and define roles and responsibilities for both the EPA and the states in the regulation of designated facilities. Under the statutory framework, the EPA has the responsibility to determine the BSER for designated facilities, as well as the degree of emission limitation achievable through application of that BSER. The EPA identifies both the BSER and the degree of emission limitation as part of an EG, which it may typically reflect as

a presumptive standard of performance or methodology for calculating a presumptive standard of performance for designated facilities. States use the EPA's presumptive standards of performance as the basis for establishing requirements for designated facilities in their state plans. In addition to standards of performance, CAA section 111(d)(1) requires state plans to include provisions for the implementation and enforcement of such standards. CAA section 111(d)(1) also requires the EPA's regulations to permit states, in applying a standard of performance to particular sources, to take into account the source's remaining useful life and other factors, a process addressed in more detail in section III.E of this preamble.

CAA section 111(d) directs the EPA to establish a procedure for the submission of state plans, which the EPA addresses both through its promulgation of general implementing regulations for section 111(d) and through promulgation of EGs for specific source categories. While CAA section 111(d)(1) authorizes states to develop state plans that establish standards of performance and provides states with certain discretion in determining the appropriate standards, CAA section 111(d)(2) provides the EPA a specific oversight role with respect to such state plans. The states must submit their plans to the EPA, and the EPA must evaluate each state plan to determine whether each plan is "satisfactory." If a state fails to submit a plan or the EPA determines that a state plan is not satisfactory, the EPA has the "same authority" to prescribe a Federal plan as it has to promulgate a Federal Implementation Plan (FIP) under CAA section 110(c).

In 1975, the EPA issued the first general implementing regulations to prescribe the process for the adoption and submittal of state plans for designated facilities under CAA section 111(d) (codified at 40 CFR part 60, subpart B (subpart B)). 40 FR 53340 (November 17, 1975). Responding to the direction to "establish a procedure similar to that provided by" CAA section 110, in promulgating subpart B, the EPA aligned the timing requirements for state and Federal plans under CAA section 111(d) with the then-applicable timeframes for State Implementation Plans (SIPs) and FIPs prescribed in CAA section 110, as established by the 1970 CAA Amendments. The implementing regulations were not significantly revised after their original promulgation in 1975[10] until 2019, when the EPA

promulgated a new set of implementing regulations codified at 40 CFR part 60, subpart Ba (subpart Ba). 84 FR 32520 (July 8, 2019).

In promulgating subpart Ba in 2019, the EPA intended to update and modernize the implementing regulations to align the procedures for CAA section 111(d) state and Federal plans with CAA amendments made after subpart B was first promulgated in 1975. Notably, subpart B did not align either with CAA section 111(d) as amended by Congress in 1977 or with the timelines in CAA section 110 as amended by Congress in 1990. The EPA therefore considered it appropriate to update the implementing regulations for CAA section 111(d) to make changes similar to CAA section 110, given that section 111(d)(1) of the CAA directs the EPA to "prescribe regulations which shall establish a procedure similar to that provided by section 110" of the CAA for states to submit plans to the EPA. In promulgating subpart Ba, the EPA directly aligned the timing requirements for CAA section 111(d) state and Federal plans (40 CFR 60.23a(a)(1) and 60.27a(c), respectively) with the timing requirements for SIPs and FIPs under CAA section 110 (see CAA section 110(a)(1) and 110(c)(1), respectively).

In promulgating subpart Ba, the EPA also added the definition of "standard of performance" (40 CFR 60.21a(f)) (defined under subpart B as "emission standard" (40 CFR 60.21(f))) and the "remaining useful life" provision (40 CFR 60.24a(e)) (referred under subpart B as the "variance" provision (40 CFR 60.24(f))). The EPA further added required minimum administrative and technical criteria for inclusion in state plans (40 CFR 60.27a(g)). Applying these criteria, the EPA determines whether a state plan or portion of a plan submitted is complete (referred to as a completeness review). Once a state plan or portion of a plan is determined to be complete, the EPA must approve or disapprove the plan or portions of the plan. For details on the EPA's rationale for the promulgation of these provisions, see 84 FR 32520 (July 8, 2019).

The EPA proposed minor revisions to the subpart Ba applicability provision and is finalizing those revisions largely as proposed (see section III.G.2.a. of this preamble). As finalized in 2019, subpart Ba was applicable to any final 111(d) EG published, or the implementation of which was ongoing, after July 8, 2019. The EPA proposed revisions to this provision for clarity, including to

---

(Clean Power Plan). The EPA subsequently repealed and replaced the 2015 rule with the ACE Rule.

[7] The ACE Rule was initially vacated by *Am. Lung Ass'n* v. *EPA*, 985 F.3d 914 (D.C. Cir. 2021). The Supreme Court subsequently reversed and remanded the D.C. Circuit's opinion, *West Virginia* v. *EPA*, 142 S. Ct. 2587 (June 30, 2022). On October 27, 2022, the D.C. Circuit amended its judgement and recalled the partial mandate vacating the ACE Rule, effectively reinstating ACE. Order, *ALA* v. *EPA*, No. 19–1140, ECF No. 1970895.

[8] CAA section 129 directs the EPA Administrator to develop regulations under CAA section 111 limiting emissions of nine air pollutants from four categories of solid waste incineration units.

[9] A "designated facility" is any existing facility which emits an air pollutant, the emissions of which are subject to a standard of performance for new stationary sources but for which air quality criteria have not been issued and that is not included on a list published under CAA section 108(a) or 112, and which would be subject to a standard of performance for that pollutant if the existing facility were a new facility. See 40 CFR 60.21a.

[10] In 2012, the EPA revised several provisions of subpart B, mainly to include allowance systems as

a form of standard of performance. 77 FR 9303 (February 16, 2012).

remove the phrase "if implementation of such final guideline is ongoing." [11] It did not propose to change the already-established applicability date. At the time of promulgation of this rule, there are no final EGs that have been published after July 8, 2019, so subpart Ba will not retroactively apply to the implementation of any EG. Specifically, the final EG for greenhouse gas emissions from existing electric utility generating units that was included in the ACE Rule was published on July 8, 2019; [12] thus, subpart Ba as revised will not apply to that EG. Regardless, the EPA proposed to repeal the ACE Rule on May 23, 2023, [13] and intends to finalize its repeal, at which point neither states nor the EPA will have any obligations under the ACE Rule and the potential applicability of subpart Ba to this EG will be moot. In contrast, the EPA has recently proposed two EGs that would regulate GHG emissions from designated facilities in the oil and natural gas industry (86 FR 63110, November 15, 2021; 87 FR 74702, December 6, 2022) and in the power sector (88 FR 33240, May 23, 2023). If those EGs are finalized and to the extent that the final EGs do not contain EG-specific requirements superseding subpart Ba provisions, subpart Ba as revised in this action will apply. Subpart B continues to apply to CAA section 111 EGs promulgated on or prior to July 8, 2019, and to EGs issued pursuant to CAA section 129.

In January 2021, the D.C. Circuit vacated several provisions of subpart Ba related to timelines for state plans and Federal plans. *Am. Lung Ass'n* v. *EPA,* 985 F.3d 914, 991. (D.C. Cir. 2021) (*ALA*). [14] In this vacatur, the court identified several flaws in the EPA's rationale for extending CAA section 111(d) state and Federal plan timelines. First, the court found that the EPA erred

in adopting the timelines for SIPs and FIPs in CAA section 110 without meaningfully addressing the differences in the scale of effort required for development and evaluation of CAA section 110 SIPs, as compared with the scale of effort needed for CAA section 111(d) state plans. *Id.* at 992–93. The court also concluded that in promulgating the timelines in subpart Ba, the EPA failed to justify why the shorter deadlines under subpart B were unworkable. *Id.* at 993. Further, the court held that the EPA was required to consider the effect of its subpart Ba timelines on public health and welfare, consistent with the statutory purpose of CAA section 111(d). In the court's view, the EPA's "complete failure to say anything at all about the public health and welfare implications of the extended timeframes" meant that the EPA failed to consider an important aspect of the problem. *Id.* at 992 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 43 (1983)).

Based on these reasons, the court vacated the timeline for state plan submissions after publication of a final EG (40 CFR 60.23a(a)(1)), the EPA's deadline for taking action on state plan submissions (40 CFR 60.27a(b)), the EPA's deadline for promulgating a Federal plan (40 CFR 60.27a(c)), and the timeline associated with requirements for increments of progress (IoPs; 40 CFR 60.24 (a(d)). Because of the vacatur, subpart Ba currently does not provide generally applicable timelines for state plan submissions, a deadline for the EPA's action on state plan submissions, a deadline for the EPA's promulgation of a Federal plan, or a timeline associated with requirements for IoPs. The EPA notes that while it is finalizing generally applicable timelines for the implementing regulations, a particular EG may supersede those generally applicable timelines with its own specific timelines. 40 CFR 60.20a(a)(1). This may be appropriate, for example, based on the complexity of regulating a particular source category, such as a category with a large number of disparate facilities to be regulated.

## C. What changes did we propose?

On December 23, 2022, the EPA proposed several revisions to subpart Ba both to address the vacatur of the timing provisions by the D.C. Circuit in *ALA* and to further improve the state and Federal plan development and implementation process. See 87 FR 79176 (December 23, 2022). In response to the *ALA* decision, the EPA proposed timeframes for (1) state plan submittal, (2) the timeline for the EPA to

determine completeness of state plans, (3) the EPA's action on state plan submissions, (4) the EPA's promulgation of a Federal plan, and (5) requirements to establish IoPs. Additionally, the EPA proposed to remove the publication in the **Federal Register** of a "finding of failure to submit" as the starting point for the clock to promulgate a Federal plan.

In addition, the EPA proposed revisions to subpart Ba that would enhance the provision of reasonable notice and opportunity for public participation by requiring that states, as part of the state plan development or revision process, undertake outreach and meaningful engagement with a broad range of pertinent stakeholders. The EPA proposed to define pertinent stakeholders as including communities most affected by and vulnerable to the impacts of the plan or plan revision. Increased vulnerability, as described in the proposal, may be attributable, among other reasons, to both an accumulation of negative and lack of positive environmental, health, economic, or social conditions within these populations or communities.

To improve flexibility and efficiency in the submission, review, approval, and implementation of state plans, the EPA proposed to include the following mechanisms in subpart Ba, all of which currently exist under CAA section 110: (1) partial approval/disapproval, (2) conditional approval, (3) allowance for parallel processing, (4) a mechanism for the EPA to call for plan revisions, and (5) an error correction mechanism.

The EPA also proposed revisions to the existing regulations governing the "remaining useful life and other factors" (RULOF) provision of the statute. These proposed revisions were intended to promote clarity and increase consistency in situations where states or the EPA consider RULOF when applying standards of performance to individual sources and to ensure that such standards fulfill the statutory requirements of CAA section 111(d).

Finally, the EPA proposed to require electronic submissions of state plans, as well as additional modifications and clarifications to subpart Ba. In particular, the EPA proposed clarifying amendments to the subpart Ba definition of standard of performance, along with a revised interpretation of CAA section 111(d) with respect to permissible compliance flexibilities. The EPA proposed to determine that, under appropriate circumstances, the Agency may approve state plans that authorize sources to meet their emission limits in the aggregate, such as through standards that permit compliance via

---

[11] 87 FR 79176, 79208–09 (Dec. 23, 2022). As explained in section III.G.2.a. of this preamble, the EPA is finalizing the removal of this phrase from 40 CFR 60.20a(a).

[12] 84 FR 32520 (July 8, 2019).

[13] "New source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," 88 FR 33240 (May 23, 2023).

[14] The Supreme Court subsequently reversed and remanded the D.C. Circuit's opinion. *West Virginia* v. *EPA,* 142 S.Ct. 2587 (June 30, 2022). However, no Petitioner sought certiorari on, and the Supreme Court's *West Virginia* decision did not implicate, the D.C. Circuit's vacatur of portions of subpart Ba. *See* Amended Judgment, *ALA* v. *EPA,* No. 19–1140 (D.C. Cir. October 27, 2022), ECF No. 1970898 (ordering that petitions for review challenging the timing portion of implementing regulations be granted).

trading or averaging. In doing so, the EPA also proposed to conclude that CAA section 111 does not limit the BSER to controls that can be applied at and to the source.

The EPA did not reopen any subpart Ba requirements other than the specific provisions that the EPA explicitly proposed to revise in the December 2022 notice of proposed rulemaking. Any comments received on the proposal that did not relate to the proposed revisions or additions are considered out of the scope of this action.

*D. What outreach and engagement did the EPA conduct?*

The EPA conducted both pre- and post-proposal outreach and meaningful engagement events with environmental justice (EJ) communities, small businesses, states, and Tribes. On July 7 and July 11, 2022, the EPA conducted two pre-proposal webinars for states addressing meaningful engagement for pertinent stakeholders, and on July 26, 2022, the Agency conducted a pre-proposal webinar for EJ communities and other key stakeholders about potential requirements for states to conduct meaningful engagement in developing their state plans. The EPA emailed an announcement of the subpart Ba proposal to Tribal nations and environmental justice communities via existing listservs on December 15, 2022. Post-proposal outreach during the public comment period with environmental justice communities included participation on the January 24, 2023 Environmental Justice National call and the January 26, 2023 National Tribal Air Association call. The EPA also conducted a public training webinar on January 31, 2023, for environmental justice community members and their representatives. Additionally, the EPA conducted post-proposal outreach with small businesses through the Small Business Environmental Assistance Program call on February 21, 2023, and with state environmental protection associations including the Association of Air Pollution Control Agencies on January 10, 2023, and the National Association of Clean Air Agencies on February 8, 2023.

**III. What actions are we finalizing and what is our rationale for such decisions?**

This action finalizes amendments to subpart Ba, including the timing requirements for state plan submittal, the EPA's action on state plan submissions, the EPA's promulgation of a Federal plan, and the establishment of IoPs; the addition of five regulatory

mechanisms to improve state plan processing: (1) partial approval/disapproval, (2) conditional approval, (3) allowance for parallel processing, (4) a mechanism for the EPA to call for plan revisions, and (5) an error correction mechanism; new requirements for meaningful engagement with pertinent stakeholders; and amended requirements for states' and the EPA's consideration of RULOF in applying a standard of performance in certain circumstances. This action also finalizes amendments to the subpart Ba definition of ''standard of performance'' and finalizes clarifications associated with CAA section 111(d) compliance flexibilities. Finally, this action finalizes requirements for the electronic submission of state plans and several other clarifications and minor revisions to the implementing regulations. While the EPA is finalizing most amendments as proposed, in response to comments submitted on the proposal, the EPA is extending the state plan submittal timeline and the timeline for requirement of IoPs; providing for additional flexibility and guidance for meaningful engagement; as well as revising and streamlining the requirements for accounting for RULOF in applying a less-stringent standard. There are also other provisions that we are finalizing with slight revisions relative to proposal. Further detail is provided in the following sections of this preamble and additional detailed responses to comments are located in the response to comment document (RTC).

While this action amends the generally applicable requirements of subpart Ba, the EPA has recognized that, under certain circumstances, some provisions of the implementing regulations may not fit the needs of a specific EG. Therefore, the existing implementing regulations provide that each EG may include specific implementing provisions in addition to or that supersede the requirements of subpart Ba. 40 CFR 60.20a(a)(1). The EPA will address source category-specific circumstances or facts that are not accommodated by the general provisions of subpart Ba through a specific EG, as the time and processes needed for development and adoption of state plans to implement the EG may be affected by unique characteristics of a source category. For example, if a proposed EG addresses a particularly large and complex source category that necessitates a relatively long timeframe for state planning, the EPA may provide a state plan submission deadline that is

longer than the 18 months being finalized for subpart Ba.[15]

*A. Revised Implementing Timelines*

As described in section II.A. of this preamble, the subpart Ba timing requirements were vacated by the D.C. Circuit in the *ALA* decision. These vacated timing requirements include: the timeline for state plan submissions, the timeline for the EPA to act on a state plan, the timeline for the EPA to promulgate a Federal plan, and the timeline that dictates when state plans must include IoPs. These timelines are all critical to ensuring that the emission reductions anticipated by the EPA when promulgating an EG become federally enforceable measures that are timely implemented by the designated facilities.

The EPA proposed the following timelines to replace those vacated in *ALA* (87 FR 79176, Dec. 23, 2022): 15 months for state plan submissions after publication of a final EG; 60 days after submission for the EPA to determine if a plan is complete; 12 months for the EPA to take final action on a complete state plan (*i.e.,* approve, disapprove); 12 months for the EPA to promulgate a Federal plan either after the state plan submission deadline if a state has failed to submit a complete plan, or after the EPA's disapproval of a state plan submission; and requiring state plans to include IoPs if the plan requires final compliance with standards of performance later than 16 months after the plan submission deadline.[16]

The EPA received numerous comments on these proposed timelines, most of which expressed support for timelines longer than those proposed. Some commenters asserted that the *ALA* decision does not direct the EPA to necessarily reduce timelines from those vacated, only to justify the timelines more fully. In particular, most commenters expressed the need for a longer state plan submittal timeline in order to accommodate state regulatory processes associated with plan submittals (*i.e.,* legislative and/or administrative state processes), as well as to accommodate technical development of the plans and to implement the proposed meaningful engagement requirements. However, a few commenters noted that the EPA should not accommodate all lengthy state administrative processes that would unnecessarily postpone emission-reduction obligations. Some

---

[15] See, *e.g.,* 88 FR 33240, 33402–03 (May 23, 2023) (proposing a 24-month state plan submission deadline for the EG for GHG emissions from fossil fuel-fired electric generating units).

[16] See 87 FR 79176, 79181–90 (Dec. 23, 2022).

**80486**    **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

commenters asserted that if the EPA were to finalize the state plan submittal timeline as proposed, the EPA should include a mechanism in the rule for states to request for extensions for state plan submittals.

While some commenters also asserted the need for longer timelines associated with the EPA's obligations to take action on a state plan submittal and to promulgate a Federal plan when required, as well as allowing a longer timeline before IoPs are required in the state plans, other commenters supported the proposed timelines for these milestones, among other concerns, on the need for timely protection of health and welfare and in consideration of the EPA's ability to extend timelines if warranted in a particular EG.

In consideration of these comments and for the reasons described in detail in the sections that follow, the EPA is finalizing extended timelines from those proposed for submission of state plans, for significant state plan revisions, and for when IoPs must be considered for inclusion in state plans. The EPA is finalizing the remaining timelines as proposed. The EPA determined that these timelines will appropriately balance the need to reasonably accommodate the processes generally required by states and the EPA to develop, evaluate, and adopt plans to effectuate the EG with the need to ensure that designated facilities control emissions of dangerous pollutants as expeditiously as reasonably possible, consistent with the health and welfare-based objectives of CAA section 111(d). A summary of the timelines finalized in this action is shown in Table 1.

The final subpart Ba timelines are applicable to any final EG published pursuant to CAA section 111(d) after July 8, 2019, including, if finalized, those recently proposed to regulate GHG emissions from sources in the oil and natural gas industry (86 FR 63110, November 15, 202187 and FR 74702, December 6, 2022) and those proposed to regulate GHG emissions from fossil fuel-fired electric generating units (88 FR 33240, May 23, 2023), to the extent that the final EGs do not contain provisions superseding any of these timelines in subpart Ba.[17]

TABLE 1—FINAL 40 CFR PART 60, SUBPART BA, TIMELINE COMPARED WITH THOSE INITIALLY PROPOSED, VACATED FROM SUBPART BA, AND FROM SUBPART B

| Process step | 2023 Subpart Ba final | 2022 Subpart Ba proposal | Subpart Ba (2019) vacated timelines | Subpart B (1975) |
|---|---|---|---|---|
| State Plan submittal after publication of EG in the **Federal Register**. | 18 months ........................ | 15 months ........................ | 36 months ........................ | 9 months. |
| State Plan completeness determination. | 60 days after State Plan submission. | 60 days after State Plan submission. | *6 months after State Plan submission. | N/A. |
| State Plan evaluation ........ | 12 months after completeness. | 12 months after completeness. | 12 months after completeness. | 4 months after State Plan submittal deadline. |
| EPA Federal Plan promulgation. | 12 months after failure to submit or disapproval. | 12 months after failure to submit or disapproval. | 24 months after finding of failure to submit or disapproval. | 6 months after State Plan submittal deadline. |
| Requirements for Increments of Progress after submittal deadline. | If compliance is >20 months. | If compliance is >16 months. | If compliance is >24 months. | If compliance is >12 months. |

*Although the timeline for the state plan completeness determinations was not vacated, the EPA has evaluated this timeline light of the court vacatur of the related timelines.

As described in greater detail in section II. of this preamble, the D.C. Circuit's vacatur of the extended timelines in subpart Ba was based both on the EPA's failure to substantiate the necessity for the additional time at each step of the administrative process, and the EPA's failure to address how those extended implementation timelines would impact public health and welfare. Accordingly, the EPA has evaluated these factors and is finalizing timelines, as described in the following sections, based on the minimum administrative time reasonably necessary for each step in the implementation process, thus minimizing impacts on public health and welfare by proceeding as expeditiously as reasonably possible while accommodating the time needed for states or the EPA to develop an effective plan. This approach addresses both aspects of the *ALA* decision because the EPA and states will take no longer than necessary to develop and adopt plans that impose requirements consistent with the overall objectives of CAA section 111(d).

The EPA acknowledges these timelines are not identical to those for SIPs under CAA section 110. This is consistent with the requirement of CAA section 111(d) that the EPA promulgate a procedure "similar" to that of CAA section 110, rather than an identical procedure. This is also consistent with the *ALA* decision, which requires the EPA to "engage meaningfully with the different scale" of CAA section 111(d) and 110 plans. 985 F.3d at 993. In proposing the revised timelines, the EPA evaluated each step of the state plan implementation process to independently determine the appropriate duration needed to accomplish a given step as part of the overall process. After receiving comments on the proposed timelines, the EPA again evaluated each step in light of the new information; the timelines being finalized in this action represent the Agency's revised assessment of the most reasonably expeditious timelines that are appropriate to provide as a default for EGs under these generally applicable implementing regulations.

The EPA recognizes that, under certain circumstances, the timelines being finalized in this action may not fit the needs of a specific EG because of the specific characteristics of an EG. The EPA will address source category-specific circumstances or facts that are not accommodated by the timelines of subpart Ba through a specific EG. Examples of circumstances that may require consideration for different

[17] Under each of these EGs the EPA proposed to supersede the 15-month state plan submittal timeline in proposed subpart Ba based on the size and complexity of the source sectors at issue.

timelines could include EGs that require states to perform extensive engineering and/or economic analyses before submitting their plans; EGs with an exceptional need to expedite implementation (*e.g.,* in order to address immediate health and welfare impacts); EGs that apply to an extraordinary number of disparate designated facilities; or EGs that are novel and/or unusually complex. For situations like these, 40 CFR 60.20a(a)(1) provides that an EG may supersede any aspect of the implementing regulations, including the implementation timelines. It is within the EPA's discretion to determine whether a proposed change in implementation time may be justified within an individual EG based on these or other appropriate factors. For EGs that supersede implementation timelines, the EPA will, in the EG, both provide a justification for the differing timelines and address how the change in timeline will impact health and welfare.

1. State Plan Submission Timelines

This section discusses the amount of time states will have to submit plans and plan revisions to the EPA following the publication of a final or revised EG in the **Federal Register**. As described in further detail in section III.E of this preamble, under CAA section 111(d), the EPA first determines a BSER and the degree of emission limitation for designated facilities and promulgates these determinations in an EG. CAA section 111(a)(1), 40 CFR 60.22a(b)(5). It is then each state's obligation to submit a plan to the EPA which establishes standards of performance based on the EG for each designated facility. See CAA section 111(d)(1), 40 CFR 60.24a(c). The implementing regulations promulgated in 1975 under subpart B provide that states have 9 months to submit a state plan after publication of a final EG. 40 CFR 60.23a(1). In 2019, the EPA promulgated subpart Ba and provided 3 years for states to submit plans or plan revisions for subsequently promulgated or revised EGs, consistent with the timelines provided for submission of SIPs pursuant to CAA section 110(a)(1). This 3-year timeframe was vacated by the D.C. Circuit in the *ALA* decision, and thus currently there is no applicable deadline for state plan submissions and revisions required under EGs subject to subpart Ba.

As laid out in the notice of proposed rulemaking and summarized below, in evaluating the appropriate timeline for plan submittal to replace the vacated provisions in subpart Ba, the EPA reviewed steps that states need to carry out to develop, adopt, and submit a state plan to the EPA, and its history in implementing EGs under the timing provisions of subpart B. The EPA further evaluated the statutory deadlines and processes for relatively comparable state plans under CAA section 129, and attainment planning SIPs submitted pursuant CAA sections 189(a)(2)(B) and 189(b)(2) for the 2012 National Ambient Air Quality Standards (NAAQS) for fine particulate matter ($PM_{2.5}$). 78 FR 3085 (January 15, 2013). Finally, the EPA incorporated consideration of the *ALA* decision addressing expediency in implementation of EGs for protection of public health and welfare.

To develop a CAA section 111(d) state plan, a state must complete a series of steps to ensure that the plan will meet all applicable requirements. Subpart Ba specifies the elements that must be included in a state plan submission (see 40 CFR 60.24a, 60.25a, 60.26a) as well as certain processes that a state must undertake in adopting and submitting a plan (see 40 CFR 60.23a). In addition to the requirements of these implementing regulations, there are also state-specific processes applicable to the development and adoption of a state plan, including the administrative processes (*e.g.,* permitting processes, regulatory development, legislative approval) necessary to develop and adopt enforceable standards of performance. State plan development generally involves several phases, including providing notice that the state agency is considering adopting a rule; taking public comment; and approving or adopting a final rule. The process required to formally adopt a rule at the state level differs from state to states.[18]

As previously mentioned, subpart B provides 9 months for states to submit plans after publication of a final EG. The EPA's review of state's timeliness for submitting CAA section 111(d) plans under the 9-month timeline indicated that most states either did not submit plans or submitted plans that were substantially late.[19] The EPA also noted that the plans submitted under subpart

B were not subject to additional requirements for meaningful engagement and consideration of RULOF, which may add time to the state development process relative to plans developed and submitted under subpart B. For these reasons, the EPA found that 9 months is not a reasonable amount of time for most states to adequately develop a plan for an EG.

To help inform the proposal for the state plan submission deadline, the EPA also reviewed CAA section 129's statutory deadline and requirements for state plans, and the timeliness and responsiveness of states under CAA section 129 EGs. CAA section 129 references CAA section 111(d) in many instances, creating considerable overlap in the functionality of the programs. The processes for CAA sections 111(d) and 129 are similar in that states are required to submit plans to implement and enforce the EPA's EGs. However, there are some key distinctions between the two programs, most notably that CAA section 129(b)(2) specifies that state plans be submitted no later than 1 year from the promulgation of a corresponding EG, whereas the statute does not specify a particular timeline for state plan submissions under CAA section 111(d). Moreover, CAA section 129 plans are required by statute to be at least as protective as the EPA's EGs, without exception. CAA section 129(b)(2). While CAA section 111(d) permits states to take into account remaining useful life and other factors to set less stringent standards for particular sources. This suggests that the development of a CAA section 111(d) plan could involve more complicated analyses than a CAA section 129 plan and that a longer timeframe is likely reasonable for state plans under CAA section 111(d) than the 1-year timeframe the statute provides under CAA section 129.

Additionally, the EPA found that a considerable number of states have not made timely state plan submissions in response to previous CAA section 129 EGs. In instances where states submitted CAA section 129 plans, a significant number of states submitted plans between 14 to 17 months after the promulgated EG.[20] This again suggests that states will typically need more than

[18] In many states, the agency must submit its rule to a particular independent commission or the legislature for review and approval before the rule is finally adopted. Generally, adopted rules are filed with a state entity, such as the secretary of state, and eventually published in a register and placed into the state's administrative code. State law establishes when an adopted rule is effective.

[19] The EPA reviewed the information available in 40 CFR part 62. The supporting information reviewed is available at Docket ID No. EPA–HQ–OAR–2021–0527. Part 62 codifies the Administrator's approval and disapproval of state plans for the control of pollutants and facilities under CAA section 111(d), and under CAA section 129 as applicable, and the Administrator's promulgation of such plans or portions of plans thereof.

[20] The EPA reviewed the information available in 40 CFR part 62. The supporting information reviewed is available at Docket ID No. EPA–HQ–OAR–2021–0527. Part 62 codifies the Administrator's approval and disapproval of state plans for the control of pollutants and facilities under CAA section 111(d), and under CAA section 129 as applicable.

one year to develop a state plan to implement an EG.

In the 2019 promulgation of subpart Ba, the EPA mirrored CAA section 110 by giving states 3 years to submit plans. As previously described, the D.C. Circuit faulted the EPA for adopting the CAA section 110 timelines without accounting for the differences in scale and scope between CAA section 110 and 111(d) plans. Therefore, in proposing the revised timelines the EPA closely evaluated other statutory deadlines and requirements for state implementation plans to determine what is feasible for a CAA section 111(d) state plan submission timeline. The EPA specifically focused on statutory SIP submission deadlines and requirements in the context of attainment plans for the 2012 PM$_{2.5}$ NAAQS under CAA section 189 because it provided a comparable process. CAA section 189(a)(2)(B) requires states to submit attainment planning SIPs within 18 months after an area is designated nonattainment and there is a record of successful state submittals pursuant to this timeline. The 2012 PM$_{2.5}$ NAAQS attainment plans were, in most cases, more complicated for states to develop when compared to a typical plan that may be required under CAA sections 111(d). For example, attainment plans require states to determine how to control a variety of sources, based on extensive modeling and analyses, in order to bring a nonattainment area into attainment of the PM$_{2.5}$ NAAQS by a specified date. Identification of contributing emission sources and the development of effective control strategies can be challenging because particulate matter pollution is comprised of both primary emissions and secondary particle formation. By contrast, under CAA section 111(d), it is clear which designated facilities are subject to a state plan, in general what control methods are available for the designated pollutant from that facility, and that the standards of performance for these sources must reflect the level of stringency for the facility as determined by the EG unless a state chooses to account for RULOF.

Informed by these analyses, the EPA proposed to require that each state adopt and submit to the Administrator a plan for the control of the designated pollutant(s) to which the EG applies within 15 months of publication of a final EG. Some commenters supported the proposed timeline based on the need for urgency in achieving the emission reductions targeted by an EG. Additionally, some commenters noted that, in comparison with NAAQS SIP requirements, states are generally well-positioned to address the source sectors historically regulated under CAA section 111(d) and have access to information about control strategies and regulatory approaches for controlling emissions. Most commenters on this issue were state agencies or other state-related entities that generally expressed the need for a longer state plan submittal timeline in order to accommodate state regulatory processes associated with plan submittals (*i.e.,* legislative and/or administrative state processes), as well as to accommodate technical development of the plans and to implement the proposed meaningful engagement requirements. Approximately 10 states responded to the EPA's request with information about their state processes. The information received indicates that states argued that they need anywhere from 15 months to 36 months to adopt and submit state plans. As discussed further below, the EPA is finalizing a state plan submittal timeline of 18 months. It is doing so after consideration of comments received on the proposal and recognizing the need to protect public health and welfare. The EPA has determined that 18 months is the appropriate timeline for these general implementing regulations; for a generic EG, this represents a reasonable balance between providing states sufficient time to develop and submit a plan that satisfies the applicable requirements and ensuring that the emission reductions contemplated in an EG are achieved as expeditiously as practicable. Consistent with the existing regulations of subpart Ba, 40 CFR 60.20a(a)(1), the EPA may supersede this 18-month state plan submittal timeline in an individual EG.

The proposed 15-month submittal timeline was based on the EPA's proposed determination that this was a reasonably expeditious deadline that would provide states and stakeholders sufficient time to develop and submit an approvable state plan. However, based on public comments received, we no longer believe that 15 months will provide sufficient time to complete the substantive and procedural requirements under subpart Ba. For example, the EPA is revising subpart Ba to require that states demonstrate meaningful engagement as part of their state plan development. While the time needed to conduct meaningful engagement will depend highly on the source category, the designated pollutant, and the types of impacts associated with designated facilities and potential controls, as well as on the pertinent stakeholders under a given EG within each state, it is very likely to require additional time relative to the existing public notice and hearing requirements under CAA section 110 and subpart Ba. We received comments that 15 months would be insufficient time to identify pertinent stakeholders, develop public participation strategies, and conduct outreach and engagement. Some commenters also pointed out that adding requirements, such as meaningful engagement and RULOF, without a corresponding extension of time to develop plans may undermine states' abilities to submit timely, approvable plans. While some commenters requested 36 months to submit state plans, several indicated that a minimum timeframe of 18 months would be appropriate for a state plan under a generic EG. Given the preponderance of comments suggesting that 15 months was not a reasonable amount of time to develop an approvable state plan and in recognition of the need to promulgate a timeline that achieves emission reductions as expeditiously as practicable, the EPA believes 18 months is the most reasonable timeline to include in these generally applicable implementing regulations.

The EPA acknowledges that, as commenters asserted, state regulatory and legislative processes and resources can vary significantly and influence the time needed to develop and submit state plans (*e.g.,* legislative procedures and timelines vary by state). Some commenters opposed to a shorter state plan submission timeline asserted that they need 36 months to complete their administrative and legislative processes. However, because the CAA contains numerous, long-standing requirements under other programs for states to develop and submit plans within 18 months (or fewer),[21] the EPA believes that states should be well positioned to accommodate an 18-month submittal timeline for plans under section 111(d). In designing a submittal deadline for state plans, it is reasonable to look to what Congress has determined are appropriate timelines for SIPs and to assume that states should be able to accommodate comparable timelines under CAA section 111(d). Indeed, some commenters recommend that the EPA not defer to lengthy state administrative processes, and expressed concern that some states have adopted, or may adopt, procedures that are longer than necessary and that will unnecessarily postpone Federal emission-reduction obligations. To this point, extending

---

[21] See, e.g., CAA sections 110(k)(5); 129; 179(d)(1); 189.

state plan submittal timelines to account for any and all unique state procedures would inappropriately delay reductions in emissions that have been found under CAA section 111 to endanger health or the environment.

Some commenters asserted that the *ALA* decision does not preclude the EPA from adopting a 36-month time frame for state plan submittals and that the Agency need only justify a longer timelines more fully. However, the EPA recognizes that the D.C. Circuit, in *ALA,* faulted the Agency for failing to consider the potential impacts to public health and welfare associated with extending planning deadlines. In response, the EPA is promulgating a state plan submittal timeline that reflects the generally expeditious period of time for states to develop and submit a plan per the corresponding emission guidelines that is both comprehensive and legally sound. The EPA does not interpret the court's direction to require a quantitative measure of impact, but rather consideration of the importance of meeting the public health and welfare goals when determining appropriate deadlines for implementation of regulations under CAA section 111(d). Based on EPA's assessment of the time it will take for states to develop and submit plans under these general implementing regulations, both in the notice of proposed rulemaking and this preamble and after consideration of comments received, the EPA has determined that 18 months represents the generally expeditious period of time.

Some commenters stated that reduction of the designated pollutants addressed by currently proposed emission guidelines (*i.e.,* GHG) is not urgent based on the fraction of global GHG reduced by currently proposed emission guidelines, so a longer state plan timeline would be justified. The EPA disagrees with the commenters' characterizations of the threat posed by elevated concentrations of greenhouse gases in the atmosphere. The EPA has determined that greenhouse gas air pollution may reasonably be anticipated to endanger public health or welfare[22] and has explained that "scientific assessments, EPA analyses, and documented observed changes in the climate of the planet and of the U.S. present clear support regarding the current and future dangers of climate change and the importance of GHG emissions mitigation." [23] Moreover, subpart Ba applies to any EG promulgated after July 8, 2019, not only to the recently proposed EGs addressing

GHG emissions from two source categories. The EPA regulates source categories, through EGs, that emit pollutants the Agency has determined under CAA section 111(d) to cause or significantly contribute to an endangerment of public health or welfare. Accordingly, consistent with *ALA,* it is appropriate for the EPA to set an expeditious but reasonable schedule in these general provisions for state plan development and submission to ensure that emission reductions occur in a timely manner.

Finally, some commenters asserted that if the EPA were to finalize the state plan submittal timeline as proposed, the EPA should include a mechanism in subpart Ba for states to ask for extensions of the state plan submittal deadline. However, as we are providing additional time for state plan submittals relative to proposal, we are not providing a mechanism for states to request deadline extensions in subpart Ba. Additionally, the EPA has the ability to supersede the timelines in subpart Ba in individual EGs and will take into account any unique considerations that may result in the need for longer or shorter timelines on an EG-by-EG basis.

In summary, while the EPA proposed a 15-month state plan submittal timeline, after consideration of comments, the EPA is finalizing 40 CFR 60.23a(a)(1) to provide an 18-month timeline for the submission of state plans following publication in the **Federal Register** of a final EG. The EPA has determined that this is the generally expeditious period in which states can create and submit a plan per the EPA's corresponding EGs that is both comprehensive and legally sound. In considering the appropriate timeline, the EPA has evaluated data from previously implemented EGs and the statutory deadlines and data from analogous programs (*e.g.,* CAA sections 129 and 189). We have also considered comments that some of the requirements the EPA had proposed for subpart Ba would require additional time to implement, as well as comments asserting that certain states need up to 36 months to complete their administrative and legislative processes. While a reasonable state plan submittal timeline must provide states sufficient time to develop and submit plans that comport with the applicable requirements, the EPA also believes that state processes should be able to accommodate an 18-month timeline because the CAA already contains numerous deadlines that require SIP submissions to be developed and submitted to the Agency within 18 or fewer months. Thus, this finalized

timeline should provide states reasonable time to adopt and submit approvable plans, and is also sufficiently expeditious to protect against significant adverse impacts to health and welfare resulting from foregone emission reductions during the state planning process. Providing states sufficient time to develop feasible implementation plans for their designated facilities that adequately address public health and environmental objectives also ultimately helps ensure more timely implementation of an EG, and therefore achievement in actual emission reductions, than would an unattainable deadline. Because 18 months is an expeditious time period, it follows that the EPA has appropriately considered the potential impacts to public health and welfare associated with this extension of time by providing no more time than the states reasonably need to ensure a plan is comprehensive and timely.

The EPA is also finalizing the proposed amendment to 40 CFR 60.27a(a) replacing the word "shorten" with "amend". The applicability provision at 40 CFR 60.20a(a)(1) states that "each emission guideline may include specific provisions in addition to or that supersede requirements of this subpart." However, the existing provision in 40 CFR 60.27a(a) only provides for the Administrator to "shorten the period for submission of any plan or plan revision or portion thereof." To make these two provisions consistent in light of the timelines for plan submission finalized in this action, the EPA is replacing the word "shorten" with "amend." One commenter opposed the amendment stating there is no regulatory certainty for the state in state plan submittal if the Administrator can simply change the timeline as he deems necessary. However, the appropriate timeline would undergo notice and comment rulemaking as the EG is proposed and finalized so that states would have sufficient notice of the timeline. To the extent the EPA considers deviating from this 18-month timeframe in promulgating an EG in the future, the EPA will consider the public health and welfare impacts associated with extending the state plan submission timeline, consistent with the D.C. Circuit's direction in *ALA.*

The EPA is also finalizing two amendments to 40 CFR 60.28a(a), which addresses plan revisions by the state. First, the EPA is finalizing the proposed clarification that meaningful engagement requirements apply to any significant plan revision by the state. Second, the EPA is finalizing revisions

---

[22] See, *e.g.,* 80 FR 64510, 64530 (Oct. 23, 2015).
[23] 88 FR 33240, 33252 (May 23, 2023).

to the timeline for state plan revisions required in response to a revised emission guideline. At proposal, the EPA indicated in the revised regulatory text that it was proposing to shorten the timeline for state plan revisions in this specific circumstance from three years to 12 months.[24] The EPA received comments on this proposed revision asserting that the same process-related challenges that apply to initial state plan submissions, including conducting meaningful engagement and RULOF procedures and working through states' administrative and legislative processes, also apply to state plan revisions. Commenters requested that the EPA extend the timeline for state plan revisions in response to revised emission guidelines; one commenter specifically requested that the EPA leave it at 36 months. However, the EPA anticipates that, in most instances, plan revisions required in response to a revised emission guideline would be narrower in scope than the initial state plan and would not require states to reevaluate standards of performance or conduct significant new analysis. For example, the EPA may revise an emission guideline to provide for additional or updated monitoring or compliance protocols or to clarify applicability provisions. In such instances, the full period of time provided for initial state plan development and submission would not be necessary.[25] Thus, the EPA believes it is reasonable to set a default timeline for the submission of state plan revisions in these general implementing guidelines that is shorter than the timeline for initial state plan submission. Because the EPA is providing an additional three months for state plan submission in this final rule relative to the proposed timeline (18 months versus 15 months), it is finalizing a timeline for the submission of state plan revisions in response to a revised emission guideline of fifteen months, which is also three months longer than the twelve months proposed. Additionally, in recognition that some state plan revisions in response to a revised emission guideline may in fact be more complex or necessitate additional analysis or rulemaking, the EPA is finalizing the

provision at 40 CFR 60.28a(a) to allow the Agency to determine a different timeline for the submission of revised state plans, which it will provide in the revised emission guideline.

2. Timeline for the EPA To Determine Completeness of State Plans

Once a state plan has been submitted to the EPA, the EPA reviews the plan for "completeness" to determine whether it includes certain elements necessary to ensure that the EPA can substantively evaluate the plan. The EPA determines completeness by comparing the state's submission against the administrative and technical criteria specified in subpart Ba to determine whether the submission contains the specified elements (see 40 CFR 60.27a(g)(2) for completeness criteria). The timeline to make completeness determinations in the version of subpart Ba the EPA promulgated in 2019 mirrored the language for SIPs in CAA section 110(k)(1)(B): "Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria [for completeness] have been met." Like CAA section 110(k)(1)(B), subpart Ba also provided that a state plan would be deemed complete by operation of law if the EPA had not made an affirmative determination by the date 6 months after receipt of the plan submission. 40 CFR 60.27a(g)(1).

After a state plan is deemed complete through either an affirmative determination or by operation of law, the EPA will act on the state plan submission through notice-and-comment rulemaking. The timeline for the EPA to act on a state plan submission runs from the date a submission is deemed complete; more on this timeline can be found in section III.A.3. of this preamble.

If a state plan submission does not contain the elements required by the completeness criteria, the EPA would find that the state has failed to submit a complete plan and notify the state through a letter. The determination of incompleteness treats the state as if the state has made no submission at all. The determination that a submission is incomplete and that the state has failed to submit a plan is ministerial in nature.

As part of the EPA's overall effort to set implementation timelines under CAA section 111(d) that are as expeditious as possible, the EPA proposed to revise the timing element of the completeness review at 40 CFR 60.27a(g)(1). In light of the ministerial

nature of the completeness determination, the EPA proposed a maximum of 60 days from receipt of the state plan submission for the EPA to make a determination of completeness. The EPA additionally proposed that any state plan or plan revision submitted to the EPA that has not received a completeness determination within 60 days of receipt, shall on that date be deemed, by operation of law, to meet the completeness criteria, which will trigger the EPA's obligation to take substantive action on the state plan. Sixty days provides an expeditious timeframe for the EPA to evaluate state plans for completeness and to notify the states of the determination. Because the EPA may be required to evaluate up to 50 state plans during this period, in addition to plans submitted by territories and tribes, the EPA explained at proposal that it did not find that this timeframe could reasonably be shortened any further.

While most commenters supported the 60-day completeness period, some commenters expressed concern that a state plan that is automatically deemed complete by operation of law as of the allotted 60 days could cause unnecessary turbulence in state plan implementation if the plan is later disapproved by the EPA due to missing information. Other commenters noted that if a plan is determined to be incomplete, a 60-day period will not allow states sufficient time to correct the deficiency and submit a complete plan. First, the EPA notes that the completeness determination is ministerial in nature and does not affect the Agency's subsequent responsibility and authority to substantively review a state plan submission against the requirements of the Act and applicable regulations, including this subpart Ba and the relevant EG. That is, a determination that a state plan is complete does not signify that it necessarily satisfies the substantive requirements. The commenters fail to explain how deeming a state plan submission complete by operation of law, in this case after 60 days, and later finding it does not satisfy an applicable requirement is a new phenomenon or would cause unnecessary turbulence in state plan implementation. Rather, a shorter period for deeming plans complete by operation of law would be less disruptive than a longer period in this instance because the EPA will complete its substantive evaluation of the plan sooner and the state will have notice earlier on of any deficiencies. Additionally, because states may submit plan revisions at any time, states may

---

[24] "Docket_memo_outlining_proposed_changes_ to_regulatory_text.pdf," *available at https:// www.epa.gov/stationary-sources-air-pollution/ adoption-and-submittal-state-plans-designated- facilities-40-cfr*, as well as Docket ID No. EPA–HQ– OAR–2021–0527–0002.

[25] The EPA's response to comments that the state plan submission timelines should accommodate every state's unique administrative and legislative processes is also relevant here and is provided elsewhere in this section of the preamble.

work collaboratively with the EPA on any portions of a plan identified as being deficient during both the completeness determination period and the period for the EPA's substantive review of the plan. Thus, again, a shorter completeness determination period that includes a cutoff for deeming submissions complete by operation of law merely keeps the state plan review process moving expeditiously and does not foreclose any state opportunities to correct or supplement submissions at any point in the EPA's review process.

Moreover, the EPA intends to review for completeness as soon as possible after submittal. Although the EPA believes that it will be able to provide a timely completeness determination for most if not all state plan submissions, providing for completeness through operation of the law will help ensure that the EPA's action on state plans does not significantly delay plan processing or implementation.

The EPA is therefore finalizing the completeness provision at 40 CFR 60.27a(g)(1) as proposed. The EPA notes that if the EPA determines a plan is incomplete, the EPA is required to promulgate, through notice-and-comment rulemaking, a Federal plan. See sections III.A.4. and III.B. for the discussion and final amendments associated with the timeline and triggers of the Federal Plan respectively. If a state submits a plan prior to the state plan submission deadline and the EPA also makes a determination that the plan is incomplete prior to that deadline, the EPA will treat the state as if the state has made no submission at all, but this determination does not yet trigger further action by the EPA. Instead, because the state still has an opportunity to submit a complete plan before the state plan submission deadline, the EPA's authority to promulgate a Federal plan is only triggered if the state fails to timely submit a new plan to replace the incomplete plan by the state plan deadline.

### 3. Timeline for the EPA's Action on State Plans

After a state plan has been determined to be complete or is deemed complete by operation of law, CAA section 111(d) provides that the EPA must evaluate whether the plan is "satisfactory"; that is, whether the components of the plan meet all the requirements of the statute, these implementing regulations, and the corresponding EG. The EPA does so by evaluating a plan (or plan revision) to determine whether the plan or plan revision is approvable, in part or in

whole (see section III.D.1. of this preamble for discussion on partial plan approvals), through a notice-and-comment rulemaking process. After the EPA proposes an action on a state plan submission (e.g., approval, partial approval/partial disapproval, disapproval) and reviews comments on the proposed action, the EPA will finalize its action on the plan. If the EPA approves a state plan, the standards of performance and other components of that state plan become federally enforceable. If the state plan is disapproved, in part or in whole, the EPA is obligated to promulgate a Federal plan for designated facilities within the state that were covered by the disapproved portions of the plan (see section III.A.4. of this preamble below for the EPA's timeline to publish a Federal plan).

Subpart B requires the EPA to take action on applicable state plans (e.g., approve or disapprove) within 4 months after the date required for submission. 40 CFR 60.27(b). In the development of subpart Ba, the EPA contended that 4 months was an inadequate time to review and take action on state plans and therefore instead provided a deadline of 12 months for final action on a state plan (mirroring the maximum time permitted under CAA section 110(k)(1)(2) for the EPA's action on complete SIPs). 84 FR 32520, July 8, 2019. In the *ALA* decision, the D.C. Circuit vacated this revised timeline in subpart Ba on the basis that the EPA did not adequately justify the extended timeframes and did not consider the public health and welfare impacts of extending the implementation times. As is discussed below, the EPA has in this rulemaking closely evaluated the process, steps, and timeframes for the EPA to substantively review and act upon each state plan submission through a public notice-and-comment rulemaking process. After considering the time anticipated to be necessary for generally expeditious EPA action on state plans, the EPA again proposed that it must take final action on a state plan or plan revision submission within 12 months after a plan is determined to be complete or becomes complete by operation of law.[26]

In the notice of proposed rulemaking, the EPA explained that the first step it takes once a state plan submittal has been deemed "complete" under 40 CFR 60.27a(g) is for an intra-agency workgroup to review the plan components to determine whether they

conform to the applicable regulatory requirements. The workgroup may require a broad range of expertise in legal, technical, and policy areas, potentially including attorneys, engineers, scientists, economists, air monitoring experts, health and welfare analysts, and/or policy analysts from across a variety of the EPA programs. After review and coordination, the workgroup then develops recommendations for approval or disapproval of each plan component and presents them to Agency decision-makers for review. Once the Agency completes its internal decision-making process, the workgroup proceeds to prepare a written notice of proposed rulemaking. The notice of proposed rulemaking contains the EPA's legal, policy, and technical bases for its proposed action on a state plan submission, which must be thoroughly developed and explained in writing to provide clear and concise information and reasoning to support the public in understanding the Agency's decision and the justification for that decision, and so that the public may provide informed comments on the proposal. The EPA may further develop technical support documents as record support for the proposal. The draft proposed rulemaking and any record support then undergo a multi-layered review process across the EPA offices and levels of management before being processed for signature. The process to evaluate the state plan, draft a proposed action on a CAA section 111(d) state plan, and get the proposed action edited, reviewed, and signed typically requires a minimum of between 6 to 8 months to complete. The signed notice of proposed rulemaking is then submitted for publication in the **Federal Register**, which may require several weeks of review and processing prior to publication.

The publication of the proposed rulemaking triggers the start of a public comment period of at least 30 days with possible extension, if requested by commenters. Because of the types of sources and pollutants regulated under CAA section 111(d), the EPA reasonably anticipates that many of its proposed actions on state plans will garner significant public interest from individuals, industry, states, and environmental and public health advocates. After completion of the comment period, the EPA then reviews all comments and determines whether, based on any information provided by the comments, it should alter its proposed action or further augment the legal, policy, and technical rationales

---

[26] The deadlines for the EPA action under subpart Ba would apply to any state plan submission regardless of when it is submitted.

**80492** **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

supporting that action. Comments received on a proposed action may include technical information that was not available to the EPA at the time of proposal. In the event technical data are received as part of comments on the proposed action, the EPA would then be required to review the new data and evaluate whether and how it should affect the EPA's proposed conclusions regarding the state plan. If a substantive comment is raised that merits reconsideration of the EPA's proposed action, the EPA may determine that it is necessary to revise and repropose its action on the state plan or it may go to the state for more information to help the Agency determine how to proceed.

Once this review of comments is complete, the workgroup drafts and presents updated recommendations for action for internal review and consideration by Agency decision-makers. Once the Agency completes its internal decision-making process, the workgroup then drafts a notice of final rulemaking on the plan submission, which includes responses to comments, any necessary record support, and may also include final regulatory text. The draft final action is then reviewed by senior management and other interested EPA offices within the Agency prior to signature of the final rulemaking approving or disapproving, in whole or in part, a state plan. It is reasonable to permit at least 4 to 7 months for evaluation of the comments received, any necessary technical analysis, decision-making, and drafting and review of the final action.

The duration of each step in this deliberative process varies. The amount of time the EPA needs to review a state plan submission and the time it needs to finalize a notice of proposed rulemaking depends in part on the plan's complexity and the nature of the technical, policy, and legal issues that it implicates. For example, a state plan submission that includes standards of performance for dozens of facilities on different compliance schedules would be more complex and time consuming to review than a plan that simply establishes standards of performance reflecting the presumptive level of stringency for all sources. Similarly, the amount of time needed to respond to comments and issue a final rulemaking depends in part on the number and type of comments received on the EPA's proposed rulemaking. Additionally, the EPA reasonably anticipates that it will be required to review multiple plan submissions at a given time, and these phases of review for a given plan are impacted by the EPA's review of other state plan submissions, as the EPA will

need to assure its review across multiple plans and regional offices is consistent from a legal, technical, and policy perspective.

While some commenters supported 12 months as an expeditious timeframe for the EPA review and action on state plan submittals, several noted that 12 months may be insufficient. These commenters asserted that the EPA must meaningfully evaluate and take action on a state plan and a 12-month timeframe may be too short for this process. However, as detailed in the discussion above, the EPA has a mapped out the time necessary to take action on a generic plan submission and believes that 12 months is the most expeditious and therefore the most appropriate period to provide for these generally applicable implementing regulations. Additionally, the EPA has completed hundreds of actions on CAA section 110 SIPs within 12 months over the past 4 years. Given that the EPA may choose to supersede the requirements of subpart Ba as necessary in an individual EG, we believe that providing the shortest period here is consistent with considering health and welfare impacts by designing timelines to achieve state plan implementation as expeditiously as reasonably possible.

The EPA is therefore finalizing as proposed 40 CFR 60.23a(b) to provide that it will take action on a state plan or plan revision within 12 months of a determination of a complete plan pursuant to 40 CFR 60.27a(g). This is a reasonably expeditious timeframe to accommodate the EPA action on a state plan or plan revision submission and the considerations described above, while ensuring that an EG is expeditiously implemented. The process and steps described in this action highlight the fact that it would be unreasonable, if not impossible, to accomplish all of the steps in a legally and technically sound manner within a 4-month timeframe as required under subpart B. Particularly, any proposed action by the EPA has to be open for public comment for at least 30 days, and therefore the 4-month timeline provided in subpart B only gave the EPA 3 months to do the substantive work of both the proposed and final actions, including evaluating the state plan submission, drafting preamble notices, responding to comments, and developing record support at both the proposed and final action stages. A 12-month timeframe after a plan is determined to be complete more

reasonably accommodates the process and steps described in this action.[27]

As explained at proposal, the EPA recognizes that the court in *ALA* faulted the Agency for failing to consider the potential impacts to public health and welfare associated with extending planning deadlines. The EPA does not interpret the court's direction to require a quantitative measure of impact, but rather consideration of the importance of the public health and welfare goals of CAA section 111(d) when determining appropriate deadlines. Because 12 months is an adequate period of time in which the EPA can both expeditiously act on a plan submission *and* ensure that its action is technically and legally sound, it follows that the EPA has appropriately considered the potential impacts to public health and welfare associated with this extension of time by providing no more time than the EPA reasonably needs to ensure a plan submission contains appropriate and protective emission reduction measures. If the EPA does not have adequate time to evaluate a state plan submission, its ability to ensure the plan contains appropriate measures to satisfactorily implement and enforce the standards necessary to comply with the EG may be compromised, which would in turn compromise the EPA's ability to ensure that the public health and welfare objectives of the EG are satisfied. Although several commenters noted that the review of some plans may require a more in depth analysis, the EPA believes 12 months is a both reasonable and expeditious timeframe to evaluate and act on most state plans. Accordingly, in order to ensure that the public health and welfare objectives of CAA section 111 are timely realized, and consistent with the direction in *ALA*, the EPA does not believe it would be appropriate to finalize a timeframe longer than 12 months for the EPA action on state plans.

### 4. Timeline for the EPA To Promulgate a Federal Plan

CAA section 111(d)(2) provides that the EPA has the same authority to prescribe a Federal plan for a state that fails to submit a satisfactory plan as it does for promulgating a FIP under CAA section 110(c). Accordingly, the EPA's obligation to promulgate a Federal plan is triggered in three situations: where a state does not submit a plan by the plan

---

[27] While the EPA would have the discretion to act on a state's submission more quickly than 12 months where specific circumstances allow (*e.g.,* where there are no public comments on the proposed action), the EPA does not believe that it would be reasonably possible to act significantly more quickly than 12 months in most cases.

submission deadline; where the EPA determines a portion or all of a state plan submission did not meet the completeness criteria and the time period for state plan submission has elapsed and, therefore, the state is treated as having not submitted a required plan; and where the EPA disapproves a state's plan. 40 CFR 60.27a(c). The EPA is finalizing as proposed the revisions to 40 CFR 60.27a(c) providing that the Agency will promulgate a Federal plan at any time within 12 months of any of the triggers in § 60.27a(c)(1) and (2) (see section III.B. of this preamble for discussion).[28]

The EPA is obligated to promulgate a Federal plan for states that have not submitted a plan by the submission deadline. Once the obligation to promulgate a Federal plan is triggered, it can only be tolled by the EPA's approval of a state plan. If a Federal plan is promulgated, a state may still submit a plan to replace the Federal plan. A Federal plan under CAA section 111(d) is a means to ensure timely implementation of EGs, and a state may choose to accept a Federal plan for their sources rather than submit a state plan. While the EPA encourages states to timely submit plans for EGs, there are no sanctions associated with failing to timely submit an approvable plan or with the implementation of a Federal plan.[29]

The original implementing regulations in subpart B provided the EPA with 6 months to promulgate a Federal plan once its obligation to do so was triggered. 40 CFR 60.27(d). When the EPA promulgated subpart Ba in 2019, it concluded that this amount of time was insufficient and consequently extended the time for the EPA to promulgate a Federal plan to 24 months, mirroring the timeframe permitted for promulgation of a FIP under CAA

section 110. 84 FR 32520, July 8, 2019. In the *ALA* decision, the D.C. Circuit vacated this revised timeline in subpart Ba on the basis that the EPA did not adequately justify the extended timeframe and did not consider the health and welfare impacts of extending the implementation timeframe.

At proposal, the EPA reevaluated the process, steps, and timeframes for the EPA to promulgate a Federal plan through a public notice-and-comment rulemaking process and proposed a 12-month timeframe to promulgate a Federal plan once this obligation to do so is triggered.[30] As explained in the notice of proposed rulemaking, a Federal plan must meet the requirements of CAA section 111(d) and therefore contain the same components as a state plan, namely standards of performance for designated facilities and measures that provide for the implementation and enforcement of such standards. CAA section 111(d)(2)(B) also explicitly requires the EPA to consider RULOF in promulgating a standard of performance under a Federal plan. Additionally, Federal plans containing standards of performance are subject to the procedural requirements of CAA section 307(d), such as the requirements for proposed rulemaking and opportunity for public hearing. CAA section 307(d)(1)(C). The EPA's regulations at 40 CFR 60.27a implement these various statutory requirements and contain general regulatory requirements for the EPA's promulgation of a Federal plan. The process, and steps for the EPA to promulgate a Federal plan consistent

with these applicable requirements is described in the following paragraphs.

Once the EPA's obligation to promulgate a Federal plan is triggered, the EPA establishes an intra-agency workgroup to develop the rulemaking action to address that obligation. The workgroup first develops recommendations for the components of the Federal plan to be proposed, and on legal, policy, and technical rationales that support the recommendations. These components are identified in subpart Ba as well as in the corresponding EG and are generally the same as those required for a state plan. One of these fundamental components is the determination of standards of performance for designated facilities. Based on the requirements of CAA sections 111(d) and 111(a)(1), these standards must generally reflect the degree of emission limitation achievable through application of the BSER as determined by the EPA as part of the EG. Depending on the form of the BSER and the degree of emission limitation in a particular EG, the EPA may need to do additional work to calculate standards of performance that reflect this level of stringency. For example, an EG may translate the degree of emission limitation into a presumptive standard in the form of numerical emission rates, which a Federal plan could simply adopt as the requisite standards of performance. However, if an EG provides the degree of emission limitation in a form other than presumptive numerical standards, and the EPA may need to calculate appropriate standards of performance in the context of a Federal plan. Further, CAA section 111(d)(2) requires the EPA to consider RULOF for sources in the source category in setting standards of performance as part of a Federal plan which requires the EPA to identify whether the remaining useful lives of relevant designated facilities, among other appropriate factors, merit the EPA establishing different standards of performance for those facilities. The development of a Federal plan may also necessitate that the EPA determine appropriate testing, monitoring, reporting, and recordkeeping requirements to implement the standard if the EG does not provide presumptive requirements to address those aspects of implementation. Further, the EPA will need to consider associated compliance times for designated facilities in circumstances where they are not provided by an EG, or in cases where a standard of performance is adjusted to account for RULOF. There may also be situations where IoPs are warranted,

---

[28] The EPA has discretion to address its obligation to promulgate a Federal plan in a variety of ways for states that do not have an approved state plan. For example the EPA may initially promulgate a single Federal plan that applies to all appropriate states and then update that Federal plan as necessary to accommodate the inclusion of other states that trigger the need for a Federal plan in the future (*e.g.*, a Federal plan that applies to states that fail to submit a plan can be updated to include applicability for states that later have a plan disapproved); or the EPA may promulgate separate Federal plans each time its authority to do so has been triggered (*e.g.*, the EPA will promulgate a Federal plan for all states that fail to submit a plan and another Federal plan for all states that have their plan disapproved).

[29] CAA section 179 provides that sanctions should be applied in states that fail to submit approvable SIPs for certain specified requirements for NAAQS implementation. The EPA has not promulgated any similar sanctions provisions governing the submission of state plans pursuant to section 111(d).

[30] The EPA reviewed the information available in 40 CFR part 62 associated with the promulgation of Federal Plans under CAA section 111(d). The supporting information reviewed is available at Docket ID No. EPA–HQ–OAR–2021–0527. Under the provisions of CAA section 111 and subpart B, the EPA promulgated Federal plans for municipal solid waste landfills EG 40 CFR part 60, subpart Cc (Federal plan codified at 40 CFR part 62, subpart GGG) and municipal solid waste landfills EG 40 CFR part 60, subpart Cf (Federal plan codified at 40 CFR part 62, subpart OOO).

The EPA also reviewed information available in 40 CFR part 62 associated with the promulgation of Federal Plans under CAA 129. The supporting information reviewed is available at Docket ID No. EPA–HQ–OAR–2021–0527. Under the provisions of CAA sections 111 and 129 and subpart B, the EPA has promulgated Federal plans for large municipal waste combustors EG 40 CFR part 60, subpart Cb (Federal plan codified at 40 CFR part 62, subpart FFF); small municipal waste combustors EG 40 CFR part 60, subpart BBBB (Federal plan codified at 40 CFR part 62, subpart JJJ); hospital, medical, and infectious waste incinerators EG 40 CFR part 60, subpart Ce (Federal plan codified at 40 CFR part 62, subpart HHH); commercial and industrial solid waste incinerators EG 40 CFR part 60, subpart DDDD (Federal plan codified at 40 CFR part 62, subpart III) and sewage sludge incinerators EG 40 CFR part 60, subpart MMMM (Federal plan codified at 40 CFR part 62, subpart LLL).

**80494** **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

and the EPA will correspondingly need to identify and determine the appropriate IoPs. The development of a Federal plan with these components, or of significant revision to a Federal plan, will also include elements of meaningful engagement, as finalized in this action including revision to section 40 CFR 60.29a and as further described in section III.C. of this preamble.

Once the recommendations for each component are developed, the workgroup presents them to Agency decision-makers for review. After the Agency completes its internal decision-making process, the workgroup proceeds to prepare a written notice of proposed rulemaking. The proposal must include the following elements, as required by CAA section 307(d)(3): the factual data on which the proposed rulemaking is based; the methodology used in obtaining the data and in analyzing the data; and the major legal interpretations and policy considerations underlying the proposed rulemaking. These elements must be thoroughly developed and explained in the proposal to meaningfully provide the public adequate information to comment on the proposal. The EPA may further develop a technical support document as record support for the proposal.

The draft proposed rulemaking and any record support are then reviewed by the relevant EPA offices and processed for signature. The signed notice of proposed rulemaking is then submitted for publication in the **Federal Register**. To develop the proposed Federal plan rulemaking, establish unique standards for RULOF, allow review of materials by senior management, go through an interagency review process and have the package signed typically requires a minimum of between six to nine months to complete.

As previously noted, the EPA's promulgation of a Federal plan is subject to the requirements of CAA section 307(d), which includes providing the public with an opportunity to provide an oral presentation at a public hearing. CAA section 307(d)(5). The Federal Register Act requires the EPA to provide sufficient notice of a public hearing, which (in the absence of a different time specifically prescribed by the relevant Act of Congress) is satisfied if the EPA provides at least 15 days' notice. 44 U.S.C. 1508. Section 307(d)(5) of the CAA further provides that the EPA must keep the record for the proposed action open for public comment for 30 days after any public hearing for the submission of rebuttal and supplemental information. Because the

EPA reasonably expects to provide notice of the required public hearing at the time its proposed action is published in the **Federal Register**, in order to allow for both a 15-day notice of the public hearing and a subsequent 30-day comment period on the open record, the EPA should allow for at least 45 days for public comment on the notice of proposed action.

As with state plans, because of the types of sources and pollutants regulated under CAA section 111(d), the EPA reasonably anticipates that many of its proposed actions on a Federal plan will garner significant public interest from individuals, industry, states, and environmental and public health advocates. After completion of the comment period, the EPA then reviews all comments and determines whether, based on any comment, it should alter any components of the proposed Federal plan, or further augment the legal, policy, and technical rationales supporting that proposed action. Additionally, in the EPA's experience, comments may include technical information that was not in front of the Agency at the time of proposal. In the event technical data are received as part of comments on the proposed action, the EPA would then be required to review the new data and evaluate whether and how it should affect the EPA's proposed Federal plan. If a substantive comment is raised that merits reconsideration of any component in the proposed Federal plan, the EPA would need to repropose the plan.

Once this review of comments is complete, the workgroup drafts and presents updated recommendations for internal review and decision making. Once the Agency completes its internal decision-making process, the workgroup then drafts a notice of final rulemaking, which includes responses to comments and any necessary record support, and final regulatory text as the Federal plan directly regulates certain designated facilities. The draft final action is then reviewed by relevant offices within the Agency prior to signature of the final rule promulgating the Federal plan. The EPA typically anticipates that the process of reviewing comments received, making corresponding changes to the rulemaking, and promulgating the final Federal plan to be between 4 and 8 months.

The duration of each step in this deliberative process varies. The amount of time the EPA needs to develop, propose, and finalize a Federal plan depends in part of the plan's complexity and the nature of the technical, policy, and legal issues that it implicates. For

example, some states needing a Federal plan may have thousands, if not hundreds of thousands, of designated facilities for which the EPA will need to establish standards of performance and implementation measures, while other Federal plans may be significantly smaller in scale. Similarly, the amount of time needed to respond to comments and issue a final rule depends in part on the number and type of comments received on the EPA's proposed rulemaking. Additionally, the EPA reasonably anticipates that it may need to promulgate a Federal plan for multiple states at a given time, which can amplify the amount of time and work needed.

In response to this proposed timeline, several commenters asserted that the EPA should provide itself more than the proposed 12 months to promulgate a Federal plan, with some commenters noting additional time needed for the EPA to provide for meaningful engagement and consideration of RULOF. However, based on the assessment as presented in the preceding paragraphs, recognizing that much of the evaluation needed for promulgating a Federal plan will be performed by the EPA during development of the EG, considering the need for expeditious implementation of EGs, and noting that RULOF is expected to only be needed for certain limited circumstances, the EPA is finalizing the requirement that it promulgate a Federal plan within 12 months once its obligation to do so is triggered, *i.e.,* either the date required for submission of a state plan (for states that fail to submit a complete plan) or the date the EPA disapproves a state's plan. As with the other timelines in subpart Ba, the EPA may supersede the 12 month timeline for a Federal plan as appropriate depending on the circumstances of the applicable EG.

The EPA also recognizes that some commenters stated that the EPA need not and should not wait for its Federal plan obligation to be ''triggered'' to begin developing such a plan. The EPA agrees that early development of the Federal plan, where possible before the EPA's obligation is formally triggered, could provide the EPA with additional time to meet this deadline. The EPA notes that to further streamline the timeline associated to the issuance of a Federal plan, the EPA is also finalizing the proposed change to the trigger for the EPA's obligation and timeline to provide a Federal plan for states that do not submit a timely plan. That discussion is found in section III.B. of this preamble.

Thus, the EPA is finalizing as proposed the revisions to 40 CFR 60.27a(c) providing that the Agency will promulgate a Federal plan at any time within 12 months of any of the triggers in § 60.27a(c)(1) and (2). While retaining the authority to supersede this timeline in an EG if appropriate, the EPA has determined that 12 months reasonably accommodates the amount of time that the EPA needs to undertake the process, steps, and the considerations described above, while ensuring that an EG is expeditiously implemented. The process and steps described earlier that the EPA must be taken in promulgating a Federal plan highlight the fact that it would be unreasonable, if not an impossibility, to accomplish all of the steps in a legally and technically sound manner within a 6-month timeframe as required under subpart B.[31]

As with the EPA's finalized timeline to act on state plan submissions, 12 months is generally the period of time in which the EPA can both expeditiously complete a Federal plan *and* ensure it is technically and legally sound. Therefore, this time period considers potential impacts to public health and welfare by giving the EPA a reasonably expeditious timeframe to promulgate a Federal plan that contains appropriate and protective emission reduction measures. This is especially true in the context of a Federal plan, where there is otherwise no state plan in place that is adequately protective of public health and welfare. If the EPA does not have adequate time to promulgate a Federal plan, its ability to ensure the plan contains appropriate measures to satisfactorily implement and enforce the standards necessary to comply with the EG may be compromised, which would in turn compromise the EPA's ability to ensure that the public health and welfare objectives of the EG are satisfied.

The EPA notes that a state may submit a plan to replace a Federal plan, even after the state plan submission deadline. However, once the EPA's authority and obligation to promulgate a Federal plan has been triggered, the act of a state submitting a plan alone does not abrogate the EPA's authority or obligatory timeline to promulgate a Federal plan. Only an approved state plan can supplant an already promulgated Federal plan or abrogate the EPA's responsibility to timely

promulgate a Federal plan. Where a state submits a late plan, that may have the practical effect of concurrent timelines for promulgation of the Federal plan and the EPA's action on that late state plan; the EPA is not obligated to act on a late state plan prior to promulgating a Federal plan (40 CFR 60.27a(d)).

5. Timeline for Increments of Progress (IoPs)

As part of the EPA's statutory responsibility to determine the degree of emission limitation achievable through application of the BSER and to include it in an EG, the EPA also determines in an EG "the time within which compliance with standards of performance can be achieved." 40 CFR 60.22a(b)(5). Accordingly, state plans must include both standards of performance for designated facilities and compliance schedules for achieving those standards of performance.[32]

In 1975, the EPA defined in subpart B "compliance schedule" as "a legally enforceable schedule specifying a date or dates by which a source or category of sources must comply with specific standards of performance contained in a plan or with any increments of progress to achieve such compliance." In subpart B the EPA also defined "increments of progress" as steps to achieve compliance which must be taken by an owner or operator of a designated facility including: (1) submittal of a final control plan for the designated facility to the appropriate air pollution control agency; (2) awarding of contracts for emission control systems or for process modifications, or issuance of orders for the purchase of component parts to accomplish emission control or process modification; (3) initiation of on-site construction or installation of emission control equipment or process change; (4) completion of on-site construction or installation of emission control equipment or process change; and (5) final compliance. The EPA adopted these definitions without change when it promulgated subpart Ba in 2019.

Subpart B requires that each state plan include emission standards and compliance schedules. 40 CFR 60.24a. In addition, subpart B specifies in 40 CFR 60.24(e)(1) that any compliance schedule extending more than 12 months from the date required for submittal of the plan must include legally enforceable increments of progress to achieve compliance for each designated facility or category of

facilities. Unless otherwise specified in the applicable subpart, increments of progress must include, where practicable, each increment of progress specified in § 60.21(h) and must include such additional increments of progress as may be necessary to permit close and effective supervision of progress toward final compliance. The provision in 40 CFR 60.24(e)(1) was amended in 2000.[33] The 2000 amendments to 40 CFR 60.24(e)(1) added the words "Unless otherwise specified in the applicable subpart" to the requirements associated with IoPs. The EPA described in the 1999 proposal that the purpose of this amendment was to allow the EPA, in a specific subpart, discretion in the number of IoPs that a designated facility must meet. Without this amendment subpart B required designated facilities to meet all five IoPs specified in the IoP definition. In the 1999 proposal the EPA recognized that while for some categories of designated facilities the five increments are appropriate, all five IoPs may not be necessary to ensure compliance for other categories of designated facilities. Therefore, EPA proposed and finalized amendments to 40 CFR 60.24(e) to allow discretion and flexibility in establishing IoPs for a particular subpart.

In promulgating subpart Ba in 2019, the EPA largely carried over the requirement of subpart B at 40 CFR 60.24(e)(1) in a new provision 40 CFR 60.24a(d).[34] However, to align the trigger of IoPs in 40 CFR 60.24a(d) to the updated timelines it was finalizing in subpart Ba, in 2019 the EPA adopted a timeframe trigger for IoPs of 24-months instead of the 12-months as in subpart B. Per the finalized 2019 subpart Ba provision at 40 CFR 60.24a(d), unless otherwise specified in the applicable subpart, any compliance schedule extending more than 24 months from the date required for submittal of the plan must include legally enforceable IoPs to achieve compliance for each designated facility or category of facilities. As discussed previously, the D.C. Circuit vacated the extended implementation timelines in subpart Ba, including the 24-months timeline trigger for IoPs in 40 CFR 60.24a(d).[35]

---

[31] While the EPA would have the discretion to promulgate a Federal plan more quickly than 12 months where specific circumstances allow (*e.g.*, where there are no public comments on the proposed action), the EPA does not believe that would be reasonably possible to act significantly more quickly than 12 months in most cases.

[32] "Each plan shall include standards of performance and compliance schedules." 40 CFR 60.24a(a).

[33] 65 FR 76380 (Dec 6, 2000).

[34] In promulgating Ba in 2019, the EPA specified that for "For those provisions that are being carried over from the existing implementing regulations into the new implementing regulations, the EPA is not intending to substantively change those provisions from their original promulgation and continues to rely on the record under which they were promulgated." 84 FR 32520 (July 8, 2019).

[35] Petitioners did not challenge, and the court did not vacate in *ALA*, the substantive requirement for or definition of increments of progress.

To address the vacated timeline trigger of IoPs in 40 CFR 60.24a(d), the EPA proposed in 2022 that, unless otherwise specified in the applicable subpart, any compliance schedule extending more than 16 months from the date required for submittal of the plan must include legally enforceable IoPs to achieve compliance for each designated facility or category of facilities. The proposed 16-month trigger for IoPs overlapped with the EPA's proposed 60-day completeness review following a state plan submittal and the proposed 12-month period for the EPA to review and take action on the state's plan and would have further provided a 2-month buffer after the timeline for the EPA's action on a state plan (occurring no later than 14 months after the plan submission deadline under these general implementing regulations). In the 2022 proposal the EPA recognized the proposed 16-month timeframe trigger for IoPs provided a 2-month time buffer between the EPA's action on a state plan and the trigger of IoPs. As proposed, this 2-months buffer was less than both the 8 months previously provided by subpart B and the 6-month buffer provided by the vacated subpart Ba timeline.

In response to the proposed 16-month IoPs timeframe trigger, several commenters asserted the proposed 2-month buffer from the time of the EPA's action on a state plan to the trigger of IoPs is not practically workable. Some commenters argued that, assuming that there could be a required increment of progress right after the 16-months trigger and the EPA has 14 months to take final action on a state plan, the designated facilities would have only two months to comply with the requirement after it becomes federally enforceable. Other commenters similarly noted that if final compliance was required just after the 16-month trigger, designated facilities would similarly have only two months to complete any IoPs. The commenters explained that it is unduly burdensome for sources to expend resources on developing hypothetical final control plans and committing resources to construction projects that may ultimately be inconsistent with the EPA's action on a state plan. Several commenters that opposed the 16-months proposed timeframe trigger for IoPs suggested that the EPA extend the trigger to more than 24-months, consistent with the previously vacated subpart Ba. Some commenters argued that 24 months is the minimum time necessary to develop control strategies, design plans, procure construction

materials and/or equipment, and complete the installations often necessary for compliance. Other commenters suggested that a 10-month buffer from the EPA action on a state plan to the trigger for IoPs would also be acceptable and even preferred, should the EPA miss its approval deadlines.

After consideration of comments and accounting for the discretion that EPA has in establishing IoPs in a particular EG, the EPA is extending the buffer associated with the trigger of IoPs from 2 months to 6 months, so that, unless otherwise specified in the applicable subpart, any compliance schedule extending more than 20 months from the date required for submittal of the plan must include legally enforceable IoPs to achieve compliance for each designated facility or category of facilities.

The EPA emphasizes that the timeline for the trigger for IoPs merely signals when the gap between state plan submission and final compliance is long enough that the EPA must consider whether IoPs are necessary. It is not the case that any EG with a final compliance date after the trigger for consideration of IoPs will necessarily require all of the increments listed in 40 CFR 60.21a(h). The EPA is required, per 40 CFR 60.22a(b)(4), to include within an EG ''[i]ncremental periods of time normally expected to be necessary for the design, installation, and startup of identified control systems.'' These incremental periods are determined within an EG through notice and comment rulemaking, providing an opportunity for appropriate consideration of the reasonable time needed for the designated facilities to meet the requirements associated with the pertinent standards of performance. As provided by subpart Ba, the EPA will determine in an individual EG whether IoPs are needed to achieve final compliance with the standards of performance and, if increments are needed, how many and the timeframes associated with compliance of such IoPs. However, the EPA also believes that the trigger requirement for IoPs should attach to plans that contain compliance periods that are longer than the period provided for the EPA's review of such plans and in addition provide a reasonable buffer after the EPA has acted on such plans so that designated facilities could reasonably comply with required increments. After further consideration, the EPA believes that a default 2-month buffer between an EPA action on a state plan and a hypothetical compliance deadline for a

full set of IoPs is not generally sufficient.

In 2019, the EPA promulgated a trigger for IoPs of 24-months given that it was finalizing a period of up to 18 months for its action on state plans (*i.e.,* 12 months from the determination that a state plan submission is complete, which could occur up to six months after receipt of the state plan). The 24-month period would have provided a 6-month buffer for designated sources to comply with any IoPs after the EPA acted on state plans. In this action, the EPA is finalizing a trigger for consideration of IoPs that provides the same buffer provided by the EPA in the 2019 vacated increment of progress timeline trigger. The EPA believes a 6-month buffer is generally needed to appropriately balance ensuring designated facilities control emissions of harmful pollutants as expeditiously as reasonably possible with the need for designated facilities to have reasonable certainty regarding their federally enforceable regulatory compliance obligations with sufficient time before those obligations are due. In addition, the EPA determines that the 6-months buffer provides a reasonable time to come into compliance with any potential increment of progress when compliance date that extends more than 20 months from the date required for submittal of the plan. Per the EPA's assessment of the comments and in light of the *ALA* court decision, the EPA determines that a 6-month timeframe buffer before the trigger for requirements associated with IoPs provides is the most reasonable expeditious period of time associated with the requirements for IoPs in 40 CFR 60.24a(d). While some commenters argued more time is necessary to develop control strategies, design plans, procure construction materials and/or equipment, and complete the installations often necessary for compliance, the final requirements in subpart Ba does not express the EPA's intent to require that states require designated facilities to complete all potential IoPs in a 6-month period.

Several commenters also urged the EPA to link the timelines for IoPs to the date on which the EPA takes final action on a state plan, instead of with the state plan submittal deadline. However, given that there will typically be a single final compliance date specified in an EG but the dates on which the EPA takes final action on individual states plans are likely to be many and varied based on, *inter alia,* when each state plan was submitted to the Agency, such an approach would create unnecessary confusion about whether IoPs must be

implemented and potentially uneven application of the requirement for state plans to include IoPs. It could also create a perverse incentive for states to delay submission of their state plans. Additionally, the timeline for IoPs initiates from the state plan submittal deadline because it is the earliest instance when all standards of performance in all timely state plans will be enforceable. It is a requirement of state plans, when submitted, to be enforceable at the state level and thus all designated facilities subject to a standard of performance in a state plan will have assurance of their requirements at the state level and can start planning for compliance while the EPA reviews and acts on the state plan.

The timeline for IoPs finalized in this action will ensure standards of performance are implemented as expeditiously as possible so that the intended emission reductions are achieved, and the public health and welfare are protected.

*B. Federal Plan Authority and Timeline Upon Failure To Submit a Plan*

CAA section 111(d)(2)(A) provides that the EPA has the same authority "to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan." The original implementing regulations in subpart B provide that the EPA is to "promptly prepare and publish proposed regulations setting for a plan, or portion thereof, for a State if:" a state fails to submit a plan within the time prescribed, the state fails to submit a plan revision within the time prescribed or the Administrator disapproves a state plan or plan revision or any portion thereof. 40 CFR 60.27(c). Subpart B further requires the EPA to promulgate the plan proposed under paragraph (c) "within six months after the date required for submission of a plan or plan revision . . . unless, prior to such promulgation, the State has adopted and submitted a plan or plan revision which the Administrator determines to be approvable." 40 CFR 60.27(d).

In promulgating subpart Ba in 2019, the EPA incorporated language in the provisions associated with the Actions by the Administrator in 40 CFR 60.27a(c) from CAA sections 110(c)(1)(A) and 110(k)(1)(B) addressing the circumstances which trigger the EPA's authority under CAA section 111(d)(2) for promulgating a Federal plan. Specifically, in 2019 the EPA adopted language at 40 CFR 60.27a(c)(1) that requires the EPA to promulgate a

Federal plan after it "*[f]inds* that a state fails to submit a required plan or plan revision or *finds* that the plan or plan revision does not satisfy the minimum criteria under" 40 CFR 60.27a(g), *i.e.,* the completeness criteria (emphasis added). Pursuant to the amendments being finalized in this action, the EPA will be required, under 40 CFR 60.27a(g), to determine whether completeness criteria have been met no later than 60 days after the date by which a state is required to submit a plan (see section III.A.2. of this preamble). These provisions under subpart Ba taken together would mean that, no later than 60 days after the state plan submission deadline has passed, the EPA must make a finding (often referred to as a "finding of failure to submit") as to whether any states have failed to submit a plan that meets the completeness criteria, and such finding is what triggers the EPA's obligation and timeline to promulgate a Federal plan.[36]

At proposal, the EPA acknowledged that in the CAA section 110 context, it has not always timely met its obligation to issue a finding of failure to submit, which in turn delays the timing for when the EPA promulgates a FIP to achieve the necessary emission reductions. Accordingly, the EPA proposed to streamline the process in the subpart Ba context to ensure that the emission reductions anticipated by the EG are realized in a timely way through the promulgation of any necessary Federal plan. In particular, the EPA proposed revisions to 40 CFR 60.27a(c)(1) consistent with the framework and requirements that have been effective in subpart B since 1975. As proposed the Administrator would issue a Federal plan if a state fails to submit a plan within the time prescribed without requiring the EPA to affirmatively issue a finding of failure to submit before the EPA's obligation to issue a Federal plan is triggered.

As explained in the notice of proposed rulemaking, as part of evaluating ways to streamline the steps leading to promulgation of a final Federal plan, the EPA considered the value and role of issuing findings of failure to submit in this process. A finding of failure to submit was intended to serve three purposes under subpart Ba, consistent with its purpose

under CAA section 110: to notify the public of the status of state plan submissions (*i.e.,* providing transparency to the process); to notify states that the EPA has not received a plan; and to formally start the clock for the EPA to promulgate a Federal plan. While these concepts may have some utility as part of the overall Federal plan development and implementation process, the EPA finds that in the CAA section 111(d) context there is minimal value in coupling the notification aspects of a finding of failure with the initiation of the clock for the EPA to promulgate a Federal plan. These aspects are not inextricably linked to one another in that nothing about a formal finding of failure to submit substantively informs the development of a Federal plan; the EPA has the information it needs to know which states have and have not submitted complete plans. By decoupling the timeline from the finding of failure to submit, the EPA's obligation to promulgate a Federal plan can be triggered without the interim step and potential lag associated with issuing a formal finding of failure to submit notification. By removing this interim process, the EPA will be required to promulgate the Federal plan more expeditiously, and, in turn, overall implementation of the corresponding EG will be timelier. Finalizing this amendment is also consistent with the spirit of the *ALA* decision, where the D.C. Circuit emphasized the need for implementation timelines that consider potential impacts on public health and welfare. By expeditiously and efficiently promulgating a Federal plan and by removing an interim step of a finding of failure, the EPA is further addressing the potential impacts of implementation times on health and welfare.

Some commenters requested that the EPA retain a separate "finding of failure to submit" action as the trigger for starting the timeline on a Federal plan. They note that the "finding of failure" provides notification to the states, regulated community, and public of the failure, as state submissions can be difficult to track. Commenters also note that the need to first provide the finding also provides additional time for the states to submit plans or revisions. One commenter noted that the EPA should retain the "finding of failure to submit" procedure and avoid establishing automatic deadlines for itself on a schedule that, based on past experience, it is almost certain to miss.

First, the EPA notes that where a state has failed to timely submit a state plan, the absence of a state plan submission should be easy to track for the state,

---

[36] Note that this procedure does not address circumstances when the EPA promulgates a Federal plan for states whose plan is disapproved. In these circumstances, the state has submitted a plan so no finding of failure to submit is issued. The EPA's obligation and timeline to promulgate a Federal plan in this instance arises from the EPA's disapproval based on its conclusion that the state plan submission was unsatisfactory.

regulated community, and public; many, if not all, states maintain public websites on which they document their submissions to the EPA. The EPA expects that notification and tracking capabilities will also generally be much improved through the use of electronic submittal (see section III.F. of this preamble) and increasing public access to online information.

Second, the EPA stresses that the purpose of using a finding of failure to submit as the trigger for Federal plan development was not to give states time to develop and submit their state plans in excess of the regulatorily allotted timeframes. In this action, the Agency is finalizing timeframes for state plan submissions that are reasonably achievable and that may be superseded where necessary. Decoupling the finding of failure to submit and the trigger of state plan development should therefore not impact states' abilities to develop and submit satisfactory state plans. States always have the ability to submit state plans and state plan revisions at any time. Additionally, while the EPA recognizes that it has not always provided timely Federal plans, the Agency does not believe that changing the starting point for its Federal plan clock from a finding of failure to submit to the day after state plan submission are due will have an appreciable impact on its ability to do so. Notably, the trigger for its timeline will not change the length of time the EPA has to promulgate a plan. While the commenter implies that the EPA would use the time before it has made a finding of failure to submit to start working on a Federal plan, it is not reasonable to assume that the Agency is in a position to start developing such a plan before it has had a chance to determine if a state plan is incomplete. Therefore, the EPA is finalizing its proposed approach of removing from subpart Ba a finding of failure to submit as the trigger for starting the timeline for a Federal plan. The approach being finalized in subpart Ba is consistent with the framework and requirements that have been effective in subpart B since 1975. The regulatory text at 40 CFR 60.27a(c)(1) is being revised slightly relative to proposal to clarify that the 12-month clock starts running the day after the state plan submission deadline for instances in which a state fails to submit a plan or plan revision by that deadline, and the day after state plan submissions would be deemed complete by operation of law (*i.e.,* 60 days after the state plan submission deadline) for instances in which a state plan has been submitted

but deemed incomplete.[37] These revisions merely clarify the EPA's intent at proposal to ensure that all states and stakeholders have a clear understanding of the timeline for promulgation of a Federal plan. As discussed in section III.A.4. of this preamble, the EPA is finalizing the requirement that it will have 12 months from the state plan deadline to promulgate a Federal plan for states that do not submit a plan. Note, the EPA is also finalizing a deadline of 12 months to promulgate a Federal plan for states whose plans are disapproved, but in those instances the EPA's obligation and timeline to provide a Federal plan are triggered off of its disapproval of a state plan.

The EPA notes that this amendment to subpart Ba does not affect the EPA's obligation under CAA section 110(c) to promulgate a FIP within 2 years of making a finding that a state has failed to submit a complete SIP. In the case of the CAA section 110, the obligation for the EPA to first make a finding of failure to submit is derived from the statute, whereas nothing in CAA section 111(d) obligates the EPA to make such a finding before promulgating a Federal plan. CAA section 111(d)(1) directs the EPA to promulgate a process "similar" to that of CAA section 110, rather than a process that is identical. Therefore, the fact that a finding of failure to submit serves as the legal predicate for the EPA's obligation to issue a FIP under CAA section 110 does not mean that the EPA is also required to treat such a finding as a legal predicate for a Federal plan under CAA section 111(d).

In summary, while recognizing that a finding of failure to submit can have value in notifying states and the public of the status of plans, the EPA does not find that it is integral to the process of promulgating a Federal plan for states that do not submit plans. Further, the requirement for the EPA to issue a finding of failure can result in significant unwarranted delays in EG implementation. The EPA is therefore finalizing the proposal amendment that this finding will no longer be the event that triggers the timeline for the EPA's issuance of a Federal plan. 40 CFR 60.27a(c)(1). While the EPA will not publish a formal finding of failure to submit in the **Federal Register**, the Agency will notify the states and the

public of a failure to submit expeditiously following the state plan submission deadline or deadline for EPA determinations of completeness, as applicable. Additionally, the EPA notes that the completeness criteria in 40 CFR 60.27a(g) were promulgated in 2019, 84 FR 32520, 32578 (July 8, 2019), and, while the EPA is removing finding of failure to submit as the trigger for promulgation of a Federal rule, it emphasizes that states may have discussions with the EPA and submit revised state plans at any point. That is, there remains within this framework ample opportunity for iterative state plan development.

The regulatory provision at 40 CFR 60.27a(c)(1), as finalized, is consistent with the requirement that applies regarding the EPA's issuance of a Federal plan under subpart B. In subpart B (*i.e.,* applicable to implementing regulations for CAA section 111(d) EGs promulgated on or prior to July 8, 2019, and currently applicable implementing regulations for CAA section 129 EGs), the EPA's obligation to promulgate a Federal plan is triggered by the state plan submission deadline.

## C. Outreach and Meaningful Engagement

The fundamental purpose of CAA section 111 is to reduce emissions from certain stationary sources that cause or significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. Therefore, a key consideration in the state's development of a state plan, in any significant plan revision,[38] and in the EPA's development of a Federal plan or significant plan revision, pursuant to an EG promulgated under CAA section 111(d) is the potential impact of the proposed plan requirements on public health and welfare. A robust and meaningful public participation process is critical to ensuring that the full range of these impacts are understood and considered.

States often rely primarily on public hearings as the foundation of their public engagement in their state plan development process because a public hearing has always been explicitly required pursuant to the applicable regulations. The existing provisions in subpart Ba (40 CFR 60.23a(c) through (f)) detail the public participation requirements associated with the development of a state plan. Per these implementing regulations, states must

---

[37] As discussed in section III.A.2., if a state submits a plan but that submission does not contain the elements required by the completeness criteria, the EPA would find that the state has failed to submit a complete plan and notify the state through a letter. That letter is for notification only and, although the EPA intends to issue such letters expeditiously, it does not start the clock for a Federal plan.

[38] A significant state plan revision includes, but is not limited to, any revision to standards of performance or to measures that provide for the implementation or enforcement of such standards.

provide certain notice of, and conduct one or more public hearings on, their state plan before such plan is adopted and submitted to the EPA for review and action.[39] The EPA is not reopening these basic and long-standing public hearing requirements in this rulemaking. However, as explained in the notice of proposed rulemaking,[40] robust and meaningful public involvement in the development of a plan should sometimes go beyond the minimum requirement to hold a public hearing depending on who may be most affected by and vulnerable to the impacts being addressed by the plan. Because the CAA section 111(d) program addresses existing facilities, some of which may be decades old, it is possible that impacted communities may not have had a voice in the process when the source was originally constructed, or previous outreach may have focused largely on engaging the industry. The EPA proposed amendments to 40 CFR part 60, subpart Ba, were intended to strengthen the public participation provisions and ensure that all affected members of the public, not just a particular subset, have an opportunity to participate in the pollution control planning process by requiring meaningful engagement with pertinent stakeholders in the state's development of a state plan, in any significant plan revision, and in the EPA's development of a Federal plan pursuant to an EG promulgated under CAA section 111(d).

The EPA proposed to add meaningful engagement with pertinent stakeholders in 40 CFR 60.23a(i) and 60.27a(f) and add the definition of meaningful engagement and of pertinent stakeholders in 40 CFR 60.21a. The EPA proposed to define meaningful engagement as it applies to this subpart as timely engagement with pertinent stakeholder representation in the plan development or plan revision process. Such engagement must not be disproportionate nor favor certain stakeholders. It must include the development of public participation strategies to overcome linguistic, cultural, institutional, geographic, and other barriers to participation to assure pertinent stakeholder representation, recognizing that diverse constituencies may be present within any particular stakeholder community. It must include early outreach, sharing information, and soliciting input on the state plan. The EPA also proposed to evaluate the

approvability of state plans based on the components of the meaningful engagement definition.

The EPA proposed that pertinent stakeholders ". . . include, but are not limited to, industry, small businesses, and communities most affected by and vulnerable to the impacts of the plan or plan revision." Additionally, to ensure that a robust and meaningful public engagement process occurs as the states develop their CAA section 111(d) plans, the EPA proposed to amend the requirements in 40 CFR 60.27a(g) to include, as part of the completeness criteria, the requirement for states to demonstrate in their plan submittal how they provided meaningful engagement with the pertinent stakeholders. The state would be required to provide, in their plan submittal: (1) a list of the pertinent stakeholders identified by the state; (2) a summary of engagement conducted; and (3) a summary of the stakeholder input received.

Most of the comments received on the proposed meaningful engagement requirements and proposed definitions were supportive of including meaningful engagement in the development of the state plans. Several commenters stated that they supported the inclusion of environmental justice considerations in Federal programs, including requirements for meaningful engagement. In particular, one commenter stated that outreach and meaningful engagement with stakeholders, specifically including communities most affected by and vulnerable to the pollution that would be reduced by a state plan, is an important and overdue step to ensuring that impacted communities have a voice in a process that directly impacts their health and welfare. While several commentors affirmed the EPA's authority to require meaningful engagement, some commenters said that the EPA lacks such authority. One of the commenters argued that the EPA lacks authority to require consideration of public health and welfare under CAA section 111(d) because CAA section 111 was devised as a technology-based approach to controlling emissions from stationary sources, not one predicated on the setting of standards directly and exclusively based on public health and welfare needs. One of the commenters stated the EPA lacks the authority to pass judgment on state plans submitted pursuant to CAA section 111(d) based on public engagement and argued that the only statutory requirement in CAA section 110 (which 111(d) cross-references) is the requirement that states provide "reasonable notice and public

hearings" prior to adoption of a state plan.

Several commenters supported the EPA's definition of meaningful engagement and the proposed meaningful engagement requirement. Additionally, some comments supported the state plan approvability requirements for meaningful engagement and recommended that the EPA also require an accounting of what states have done with stakeholder input and how that input was used or not used in their state plan.

Several commenters expressed the need for additional resources in order to conduct meaningful engagement, both for states and communities. Some of the comments stated that the EPA needs to consider how these increased requirements may strain already limited state resources. One commenter said that resources needed to fulfill the requirements for meaningful engagement, including costs associated with identifying and contacting stakeholders, renting of rooms or spaces for multiple public meetings, travel, and associated staff time, will be significant and burdensome to states.

There were several comments requesting clarification on the definition of meaningful engagement, and on the proposed approvability requirements for meaningful engagement. Some commenters requested that the rule provide more clarity on what states need to do for meaningful engagement and provide a clear path for states to develop an approvable meaningful engagement demonstration. Similarly, other commenters recommended the EPA establish a more detailed definition and provide examples of best practices for states to follow in implementing meaningful engagement, particularly with vulnerable communities, and further clarify what is meant by meaningful engagement with pertinent stakeholders. Some commenters cited lack of clarity in expressing their concern with meaningful engagement being a requirement for state plan approvability.

Based on comments received, the EPA has revised the proposed definition of meaningful engagement and is finalizing revisions that are flexible enough to serve the unique needs of states and their stakeholders, rather than relying on the more prescriptive approach of the proposal. The EPA recognizes that states will generally be in the best position to understand how to meaningfully engage pertinent stakeholders within their borders as they develop state plans. The EPA also believes that states and the Federal Government may learn from each

---

[39] States may cancel a public hearing if no request for one is received during the required notification period. 40 CFR 60.23a(e).

[40] 87 FR 79176, 79190–92 (Dec. 23, 2022).

other's efforts to meaningfully engage pertinent stakeholders. The EPA further recognizes that appropriate approaches to meaningful engagement, as well as the time and resources needed, will be highly dependent on characteristics of the source category—such as the number and location of designated facilities—as well as on the type of health or environmental impacts of the emissions addressed by an EG. Additionally, as noted by a number of commenters, states are highly diverse in, among other things, their local conditions, resources, and established practices of engagement. Also as noted by commenters, vulnerable communities are highly diverse in, among other things, their technical capacities, access to resources for meaningful participation (*e.g.,* geographic distribution, transportation, childcare), languages, and available representation.

For these reasons, rather than finalizing prescriptive substantive requirements for how states should conduct meaningful engagement, the EPA is requiring in subpart Ba that states, in their state plan submissions or significant plan revisions, describe the efforts they undertook to meaningfully engage pertinent stakeholders, what input they received from stakeholders, and how that input was used or not used in their state plan. The EPA will also include this information when promulgating Federal plans or significant plan revisions. In addition, the EPA is describing some current best practices for meaningful engagement in this preamble that states may consider, that and which the Agency expects will continue to develop as states experiment with different types of meaningful engagement and share their experiences through state plans.

Consistent with these changes, the EPA is finalizing the definition of meaningful engagement, as it applies to subpart Ba, as follows: ". . . timely engagement with pertinent stakeholders and/or their representatives in the plan development or plan revision process. Such engagement should not be disproportionate in favor of certain stakeholders and should be informed by available best practices." States should therefore make a good faith effort to ensure that they are engaging in a proportionate manner with all pertinent stakeholders. The EPA is also finalizing, as proposed, a definition of "pertinent stakeholders." Pertinent stakeholders "include, but are not limited to, industry, small business, and communities most affected by and/or vulnerable to the impacts of the plan or plan revision." Finally, the EPA is

including in subpart Ba the three proposed completeness criteria requirements for meaningful engagement at 40 CFR 60.27a(g)(2)(ix) and adding a fourth completeness criterion, which will require state to include in their plans a description of how stakeholder input was considered in the development of the state plan or plan revisions.

The EPA expects that the finalized approach to meaningful engagement in state plans will provide the flexibility needed to allow states to address specific and unique issues in their states and to appropriately communicate with and respond to their stakeholders during the notice and comment process. As revised, the meaningful engagement component finalized here strengthens the framework for public participation in state plan development, a long-standing cornerstone of the cooperative federalism structures of CAA sections 110 and 111(d). The meaningful engagement component finalized here is intended to promote equitable opportunities to participate in the planning process for all stakeholders, as opposed to dictating a specific approach or set of practices that constitute meaningful engagement.

To support the goals outlined above, and in response to comments received, the EPA is finalizing the proposed completeness criteria that require documentation of meaningful engagement, including adding a fourth completeness criterion, but the EPA is not finalizing specific requirements for what types of outreach meaningful engagement must include in subpart Ba. The fourth completeness criterion will require states to include a description of how stakeholder input from the meaningful engagement process was considered in the development of the plan, which the EPA expects will both bolster accountability to stakeholders and assist states in ensuring that their meaningful engagement processes are additive to the public hearing and notification processes which have always been required under subpart Ba. See 40 CFR 60.27a(g)(1)(ix). While the EPA finds that the requirements finalized in this action are sufficient and appropriate for the general CAA section 111(d) implementing regulations, the EPA may provide additional guidance pertaining to meaningful engagement in specific EGs.

While the EPA is revising the definition of meaningful engagement relative to proposal, the definition of pertinent stakeholders is being finalized as proposed. Pertinent stakeholders include, among other stakeholders, industry, small business, and

communities—in particular, communities who are most affected by and vulnerable to the health or environmental impacts of pollution from the designated facilities addressed by the plan or plan revision. Increased vulnerability of communities may be attributable to, among other reasons, an accumulation of negative environmental, health, economic, or social conditions within these populations or communities, and a lack of positive conditions. Examples of such communities have historically included, but are not limited to, communities of color (often referred to as "minority" communities), low-income communities, Tribal and indigenous populations, and communities in the United States that potentially experience disproportionate health or environmental harms and risks as a result of greater vulnerability and/or exposure to environmental hazards. For example, populations lacking the resources and representation to combat the effects of climate change—which could include populations exposed to greater drought or flooding, or damaged crops, food, and water supplies—experience greater vulnerability to environmental hazards. Sensitive populations (*e.g.,* infants and children, pregnant women, the elderly, and individuals with disabilities exacerbated by environmental hazards) may also be most affected by and vulnerable to the impacts of the plan or plan revision depending on the pollutants or other factors addressed by an EG.

Communities in neighboring states or neighboring Tribal nations may also be impacted by a state plan and, if so, are pertinent stakeholders. In addition, to the extent a designated facility would qualify for a less stringent standard through consideration of RULOF as described in section III.E. of this preamble, the pertinent stakeholders would include the communities most affected by and vulnerable to the health and environmental impacts from the designated facility considered in a state plan for RULOF provisions.

The EPA has determined that the definitions of meaningful engagement and pertinent stakeholders in subpart Ba provide the states sufficient specificity while allowing for flexibility in the implementation of meaningful engagement. Meaningful engagement is an enhancement of the existing public notice and comment requirements and is intended to promote the sharing of relevant information with, and the soliciting of input from, pertinent stakeholders at critical junctures during plan development. In particular, the

processes for meaningful engagement should allow for fair and balanced participation, including opportunities for communities most affected by and vulnerable to the impacts of a plan an opportunity to be informed of and weigh in on that plan. These procedural requirements, in turn, help ensure that a plan will adequately address the potential impacts to public health and welfare that are the core concern of CAA section 111. Meaningful engagement can provide valuable information regarding health and welfare impacts experienced by the public (*e.g.,* recurring respiratory illness, missed work or school days due to illness associated with pollution, and other impacts) and allow regulatory authorities to explore additional options to improve public health and welfare. Because the CAA section 111(d) program is designed to address widely varying types of air pollutants that may have very different types of impacts, from highly localized to regional or global, what constitutes fair and balanced participation among a broad set of pertinent stakeholders will be highly dependent on which stakeholders are directly impacted by a particular state plan.

The EPA's authority for finalizing procedural requirements to strengthen the public participation provisions is provided by the authority of both CAA sections 111(d) and 301(a)(1). Under CAA section 111(d), one of the EPA's obligations is to "establish a procedure similar to that provided by" CAA section 110, under which states submit plans that implement emission reductions consistent with the BSER. CAA section 110(a)(1) requires states to adopt and submit SIPs after "reasonable notice and public hearings." [41] The Act does not define what constitutes "reasonable notice and public hearings" under CAA section 110, and the EPA has reasonably interpreted this requirement in promulgating a process under which states submit state plans.[42]

Subpart Ba currently includes certain requirements for notice and public hearing in 40 CFR 60.23a(c) through (f). The notice requirements include prominent advertisement to the public of the date, time, and place of the public hearing, 30 days prior to the date of such hearing, and the advertisement requirement may be satisfied through publication to the internet. *Id.* at paragraph (d). A state may choose to cancel a public hearing if no request for

one is received during the required notification period. *Id.* at paragraph (e).

A fundamental purpose of the Act's notice and public hearing requirements is to ensure that all affected members of the public are able to participate in pollution control planning processes that impact their health and welfare.[43] In order to effectuate this purpose of the Act's notice and public hearing requirements, the notice of the proposed plans and of the public hearings should be reasonably adequate in its ability to reach affected members of the public. While many states provide for notification of public engagement through the internet consistent with the current requirements under the CAA section 111(d) implementing regulations, such notification may not be adequate to reach all those who are impacted by a CAA section 111(d) state plan and would benefit the most from participating in the state planning process. For example, data shows that as many as 30 million Americans do not have access to broadband infrastructure that delivers even minimally sufficient speeds, and that 25 percent of adults ages 65 and older report never going online.[44] Accordingly, the EPA has determined that it is appropriate to improve the procedural public engagement requirements under CAA section 111(d) to ensure the statutory objectives are met.

Given the public health and welfare objectives of CAA section 111(d) in regulating specific existing sources, it is reasonable to include a meaningful engagement component as part of the state plan development public participation process in order to further these objectives. Additionally, CAA section 301(a)(1) provides that the EPA is authorized to prescribe such regulations "as are necessary to carry out [its] functions under [the CAA]." As

finalized, the meaningful engagement components of this rule would effectuate the EPA's function under CAA section 111(d) in prescribing a process under which states submit plans to implement the statutory directives of this section and promote the statutory objective that all pertinent stakeholders have reasonable notice of relevant information and the opportunity to participate in the state plan development throughout the process. Ongoing engagement between states and pertinent stakeholders will help ensure that plans achieve the appropriate level of emission reductions, that communities most affected by and vulnerable to the health and environmental impacts from the designated facilities share in the benefits of the state plan, and that these communities are protected from being adversely impacted by the plan.

To promote meaningful engagement, the EPA is finalizing as part of the completeness criteria in 40 CFR 60.27a(g) procedural requirements for states to describe in their plan submittals how they engaged with pertinent stakeholders. As proposed, the state will be required to describe, in its plan submittal, (1) a list of the pertinent stakeholders identified by the state; (2) a summary of engagement conducted; and (3) a summary of the stakeholder input received. The EPA is also finalizing a fourth component as part of the procedural completeness demonstration—that the state also includes (4) a description of how stakeholder input was considered in the development of the plan or plan revisions. The EPA will review the state plan to ensure it includes these required descriptions regarding meaningful public engagement as part of its completeness evaluation of a state plan submittal. If a state plan submission does not include the required elements for notice and opportunity for public participation, including the procedural requirements at 40 CFR 60.23a(i) and 60.27a(g)(2)(ix) for meaningful engagement, this may be grounds for the EPA to find the submission incomplete or (where a plan has become complete by operation of law) to disapprove the plan.

While the EPA is finalizing procedural requirements for meaningful engagement as completeness criteria and is not prescribing how states proceed with such engagement, we understand states would find it useful to consider guidance as to how such engagement could be meaningfully conducted. In light of this interest, the following paragraphs provide examples and guidance which the EPA

---

[41] 42 U.S.C. 7410(a)(1).

[42] See 40 CFR 51.102; 40 CFR part 51, appendix V, section 2.1.

[43] Consistent with this principle of providing reasonable notice under the CAA, under programs other than CAA section 111(d), current regulations governing other CAA programs similarly require states to provide specific notice to an area affected by a particular proposed action. See *e.g.,* 40 CFR 51.161(b)(1) (requiring specific notice for an area affected by a state or local agency's analysis of the effect on air quality in the context of the New Source Review program (40 CFR 51.102(d)(2), (4), and (5) (requiring specific notice for an area affected by a CAA section 110 SIP submission).

[44] FACT SHEET: Biden-Harris Administration Mobilizes Resources to Connect Tribal Nations to Reliable, High-Speed Internet (December 22, 2021). *https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/22/fact-sheet-biden-harris-administration-mobilizes-resources-to-connect-tribal-nations-to-reliable-high-speed-internet/;* 7 percent of Americans don't use the internet. Who are they? Pew Research Center (April 2, 2021), *https://www.pewresearch.org/fact-tank/2021/04/02/7-of-americans-dont-use-the-internet-who-are-they/.*

encourages states to consider in designing their own meaningful engagement programs.

In considering approaches for meaningful engagement, states should consider the identification of pertinent stakeholders; developing a strategy for engagement with the identified pertinent stakeholders; making information available in a transparent manner; and providing adequate and accessible notice. First, it would be reasonable for states to identify pertinent stakeholders considering information specific to the applicable EG, including the nature of the designated pollutants at issue and the communities likely to be impacted by facilities in the source category. The EPA intends to specifically provide information on impacts of designated pollutant emissions to assist states in the identification of their pertinent stakeholders, in addition to any other guidance that EPA may find it reasonable to provide in the applicable EG. Moreover, in developing a strategy for engagement, it would be reasonable for states to share information and solicit input on plan development and on any accompanying assessments. Finally, in providing transparent and adequate notice of plan development, states should consider that internet notice alone may not be adequate for all stakeholders, given lack of access to broadband infrastructure in many communities. Thus, in addition to internet notice, examples of prominent advertisement for engagement and public hearing may include notice through newspapers, libraries, schools, hospitals, travel centers, community centers, places of worship, gas stations, convenience stores, casinos, smoke shops, Tribal Assistance for Needy Families offices, Indian Health Services, clinics, and/or other community health and social services as appropriate for the emission guideline addressed.

The EPA believes the following example, while not tailored to specific designated facilities but to a source category for recent EG development, provides states with ideas for how they can structure their own meaningful engagement activities.[45] Prior to the November 2021 proposal for the "Standards of Performance for New, Reconstructed, and Modified Sources

and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review" (86 FR 63110), the EPA conducted meaningful engagement with pertinent stakeholders. For the pre-proposal stakeholder outreach, the EPA engaged with stakeholders through information posted on the internet, meetings, training webinars, and public listening sessions to disseminate information regarding this action, communicate how to submit comments on the proposed rule, and receive stakeholder input about the industry and its impact. In addition to the pre-proposal stakeholder engagement, the EPA conducted additional post-proposal training during the comment period on the proposed rule and held a public hearing. The EPA conducted three half-day post-proposal trainings to provide background information, an overview of the proposed rule, stakeholder panel discussions, and information on how to effectively engage in the regulatory process. The trainings were open to the public, focusing on individuals from and representatives of communities with EJ concerns, Tribes, and small businesses. Further considerations, analyses, and outreach relevant to meaningful engagement are presented in sections VI.[46] and VII.[47] of the preamble for that action and could help states in designing, planning, and developing their own outreach and engagement plans associated with the development and implementation of their state plans. An additional resource is the memorandum on stakeholder outreach[48] for the "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule" proposed rule (88 FR 33240, May 23, 2023). This memorandum provides states with another example of the types of activities and processes that the EPA has found appropriate for meaningfully engaging with stakeholders in the particular context of EG development.

The EPA recognizes that the state planning process is different than a national rulemaking and may benefit from different types of engagement. Nonetheless, the information and examples the EPA has provided on meaningful engagement can serve as an example of what types of engagement

states should consider for their meaningful engagement processes. In addition, to further assist states in the meaningful engagement efforts, the EPA expects to develop resources to aid states in establishing meaningful engagement best practices, while recognizing that states have differing situations and that best practices will not be "one size fits all." One resource that states may find helpful in developing their own best practices is the "Public Involvement Policy of the US Environmental Protection Agency,"[49] which is currently under revision. Another helpful resource the EPA has developed is the "Capacity Building Through Effective Meaningful Engagement" booklet.[50] The booklet is also available in the docket for this rule. Additionally, most states have opted into the EPA Climate Pollution Reduction Grant Program (CPRG),[51] developed under the Inflation Reduction Act.[52] To assist states that are participating in the CPRG, the EPA is conducting training for states on meaningful engagement, sharing case studies, best practices, and lessons learned through ongoing EPA-led CPRG forums. The EPA expects that, with experience and shared access to information on best practices, approaches to address challenges and barriers, and other resources and collaborative opportunities, meaningful engagement practices at the state and Federal level will continue to improve.

*D. Regulatory Mechanisms for State Plan Implementation*

CAA section 111(d)(1) requires the EPA to promulgate regulations that establish a procedure "similar" to that provided by CAA section 110 for each state to "submit to [the EPA] a state plan which . . . establishes standards of performance . . . and . . . provides for the implementation and enforcement of such standards." The EPA reasonably interprets this provision, particularly

---

[45] The EPA emphasizes that the appropriateness of any meaningful engagement strategy will depend on the specific context, including the sources and pollutants addressed by the EG, the scope and scale of the proposed regulation or plan, and the pertinent stakeholders. The activities and processes included in the examples of meaningful engagement in this preamble were tailored to the specific circumstances of EPA's EG development.

[46] See 86 FR 63110, 63140.

[47] See 86 FR 63110, 63145.

[48] See Docket ID No. EPA–HQ–OAR–2023–0072–0002.

[49] https://archive.epa.gov/publicinvolvement/web/pdf/policy2003.pdf.

[50] https://www.epa.gov/system/files/documents/2023-09/epa-capacity-building-through-effective-meaningful-engagement-booklet_0.pdf.

[51] See U.S. EPA Office of Air and Radiation "Climate Pollution Reduction Grants Program: Formula Grants for Planning Program Guidance for States, Municipalities, and Air Pollution Control Agencies" (March 1, 2023), https://www.epa.gov/system/files/documents/2023-02/EPA%20CPRG%20Planning%20Grants%20Program%20Guidance%20for%20States-Municipalities-Air%20Agencies%2003-01-2023.pdf (overview of the CPRG). See also U.S. EPA, "Status of Notice of Intent to Participate (NOIP) Submittals by States (March 31, 2023), https://www.epa.gov/system/files/documents/2023-04/NOIP%20Status%20Lists.pdf (list of states who have opted in to the CPRG as of March 31, 2023).

[52] Inflation Reduction Act section 60114.

the "similar" clause, as referring to all the procedural provisions provided in CAA section 110 which serve the same purposes of providing useful flexibilities for states and EPA actions that help ensure emission reductions are appropriately and timely implemented.

The EPA proposed to incorporate 5 regulatory mechanisms as amendments to the implementing regulations under 40 CFR part 60, subpart Ba, governing the processes under which states submit plans and the EPA acts on those plans. 87 FR 79176, 79193–96 (Dec. 23, 2022). The proposed additional regulatory mechanisms include: (1) partial approval and disapproval of state plans by the EPA; (2) conditional approval of state plans by the EPA; (3) parallel processing of plans by the EPA and states; (4) a mechanism that allows the EPA to call for revision of a previously approved state plan; and (5) an error correction mechanism for the EPA to revise its prior action on a state plan.[53] These mechanisms were proposed to update the implementing regulations to better align with the flexible procedural tools that Congress added into section 110 of the CAA in the 1990 Amendments. The EPA is finalizing the adoption and incorporation of these mechanisms into subpart Ba as the EPA has interpreted and applied them in the context of CAA section 110.

As explained in the notice of proposed rulemaking, the interpretation that CAA section 111(d)(1) authorizes the EPA to adopt procedures "similar" to those under CAA section 110 for the entire state plan process, and not just the initial plan submission process, is strengthened by the provisions in CAA section 111(d)(2), which provide that the EPA has the "same" authority to promulgate a Federal plan for a state that has failed to submit a satisfactory plan as under CAA section 110(c), and to enforce state plan requirements as it does for SIPs under CAA sections 113 and 114. This is because, read together, CAA section 111(d)(1) and (2) call for the set of essential procedural requirements for state and Federal plan development and implementation and enforcement that generally reflect the essential procedural requirements for SIPs and FIPs in section 110.[54] In that

context, it is reasonable to read CAA section 111(d)(1) as authorizing the EPA to promulgate procedures for section 111(d) that are comparable to CAA section 110 procedures for the overall state plan process. Moreover, the EPA believes that it is reasonable, in promulgating the regulations required under CAA section 111(d)(1), to look to the mechanisms and flexibilities that Congress has deemed appropriate for states and the EPA to use in the highly analogous context of state and Federal implementation plans.

The availability of these 5 regulatory mechanisms will streamline the state plan review and approval process, accommodate variable state processes, facilitate cooperative federalism, further protect public health and welfare, and generally enhance the implementation of the CAA section 111(d) program. Together, these mechanisms provide greater flexibility, may reduce processing time, and have proven to be very useful tools for the review and processing of CAA section 110 SIPs.

Overall, the comments received for incorporating the 5 regulatory mechanisms were favorable, in particular noting that the mechanisms would offer not only procedural improvements long sought by state agencies but also reflect the flexibility offered in section 111 of the CAA, consistent with the Act's cooperative approach, and would expand state planning options while conserving state resources. However, one commenter noted generally that for 111(d) plans, the CAA directs the EPA to establish a procedure similar to CAA section 110 for SIP submittals but does not require those procedures to be identical. This commenter contended that while the CAA specifically authorized various flexible mechanisms in sections 110(k)(2)–(6), the plain language of CAA section 111 does not provide for these options for 111(d) plans.

The EPA agrees that procedures adopted under CAA section 111(d)(1) need not be identical to CAA section 110 procedures, but interprets section 111(d)(1) to authorize the EPA to adopt procedures under 111(d)(1) which are substantially the same as those outlined under section 110, including section

110 procedural mechanisms.[55] Additionally, as explained above, while CAA section 111(d)(1) directs EPA to establish "a procedure . . . under which each State shall submit to the Administrator a plan," section 111(d)(2) further provides that EPA also has authority to prescribe a Federal plan where states fail to submit a satisfactory plan and to enforce the provisions of state plans in cases where states fail to do so. Congress saw fit to provide mechanisms such as conditional approval and SIP calls under CAA section 110 for the purpose of EPA evaluation and action on, and enforcement of, SIPs, and the Agency believes it is reasonable to look to section 110 as evidence of the types of mechanisms that are reasonable for EPA to provide for the same purposes under section 111(d).

These regulatory mechanisms will provide flexibility and support efficiency to the states and the EPA in the submission and processing of state plans. For the reasons discussed in the following sections, the EPA is finalizing these provisions.

### 1. Partial Approval and Disapproval

The EPA proposed a provision similar to that under CAA section 110(k)(3) for the EPA to partially approve and partially disapprove severable portions of a state plan submitted under CAA section 111(d). Under CAA section 110(k)(3), "[i]f a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter." Subpart Ba currently authorizes the EPA to "approve or disapprove [the state] plan or revision or each portion thereof" (40 CFR 60.27a(b)) but does not explicitly specify whether such actions may be partial.

One commenter stated that the partial approval and disapproval mechanisms the EPA proposed appear to be aimed at providing a way for the EPA to approve model rule provisions and disapprove RULOF provisions. The EPA disagrees with this comment. The EPA reviews each provision of a state plan, regardless of the type of provision, to determine whether it meets the applicable

---

[53] These regulatory mechanisms were also previously proposed to be added to subpart B in 2015 and largely received support from states, the public, and stakeholders, but were never finalized. 80 FR 64965 (October 23, 2015).

[54] Compare CAA section 111(d)(1) (requiring states to submit state plans that include specified types of measures that, in turn, meet minimum EPA requirements) and section 111(d)(2) (indicating that the EPA must review and approve or disapprove state plans, requiring the EPA to promulgate a Federal plan if the state does not submit a

satisfactory plan, authorizing the EPA to enforce state plan measures) with section 110(a)(1)–(2) (requiring states to submit SIPs that include specified types of measures that in turn meet minimum EPA requirements), section 110(k) (requiring the EPA to review and approve or disapprove SIPs), section 110(c) (requiring the EPA to promulgate a FIP if the state does not submit a plan or the EPA disapproves the state plan) and 113(a)(1) (authorizing the EPA to enforce SIP measures).

[55] See Merriam Webster's Dictionary, defining "Similar" as "having characteristics in common" or "alike in substance and essentials." *https://www.merriam-webster.com/dictionary/similar.*

statutory and regulatory requirements. If it meets the applicable requirements, the EPA must approve it. It is entirely possible, and in fact common, for some state plan provisions to comport with the applicable requirements and others not to. Pursuant to this mechanism, the EPA may partially approve or partially disapprove a state plan when portions of the plan are approvable, but other discrete and severable portions are not. In such cases, the purposes of a CAA section 111(d) EG, as well as section 111(d)'s framework of cooperative federalism, would be better served by allowing the state to move forward with implementing those portions of the plan that are approvable, rather than to disapproving the full plan and potentially delaying implementation of beneficial emission reductions. This mechanism is consistent with the *ALA* decision's emphasis on ensuring timely mitigation of harms to public health and welfare, as problematic parts of a state plan submission would not stall the implementation of emission reductions at designated facilities for which a portion of a plan could be approved, thus efficiently reducing the time from EG promulgation to implementation of emission reductions at those facilities.

The EPA is finalizing this provision so that it is similar to CAA section 110(k)(3), providing clarity on the EPA's authority to partially approve plans and the circumstances under which it may be used. As explained at proposal, the portion of a state plan that the EPA may partially approve must be "severable." A portion is severable when: (1) the approvable portion of the plan does not depend on or affect the portion of the plan that cannot be approved, and (2) approving a portion of the plan without approving the remainder does not alter the approved portion of a state plan in any way that renders it more stringent than the state's intent. See *Bethlehem Steel* v. *Gorsuch,* 742 F.2d 1028, 1034 (7th Cir. 1984). The EPA's decision to partially approve and partially disapprove a plan must go through notice and comment rulemaking. As a result, the public will have an opportunity to submit comment on the appropriateness and legal application of this mechanism on a particular state plan submission. A partial disapproval of a plan submission would have the same legal effect as a full disapproval for purposes of the EPA's authority under CAA section 111(d)(2)(A) to promulgate, for the partially disapproved portion of the plan, a Federal plan for the state to fill the gap. See section III.A.4 of this preamble for finalized timelines for promulgation of

a Federal plan. If the EPA does promulgate a Federal plan for a partially disapproved portion, the state may, at any time, submit a revised plan to replace that portion. If the state does so, and the EPA approves the revised plan, then the EPA would withdraw the Federal plan for that state.

This partial approval/disapproval mechanism also enables states to submit, and authorizes the EPA to approve or disapprove, state plans that are partial in nature and to address only certain elements of a broader program. For example, with this mechanism, states will be able to submit partial plans intended to replace discrete portions of a Federal plan, where appropriate. Partial submittals must meet all completeness criteria.

2. Conditional Approval

The EPA proposed a mechanism analogous to the authority under CAA section 110(k)(4) to grant the EPA the ability to conditionally approve a state plan under CAA section 111(d). Under CAA section 110(k)(4), "[t]he Administrator may approve a plan revision based on a commitment of the state to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the state fails to comply with such commitment." The proposed provision would authorize the EPA to conditionally approve a plan submission that substantially meets the requirements of an EG but that requires some additional, specified revisions to be fully approvable. For the EPA to conditionally approve a submission, the state Governor or their designee must commit to adopt and submit specific enforceable provisions to remedy the stipulated plan deficiency. The provisions required to be submitted by the state pursuant to a conditional approval would be treated as an obligation to submit a plan revision and be subject to the same processes and timeframes for the EPA action as other plan revisions (*e.g.,* completeness determination, approval and/or disapproval).

Comments were generally supportive of including the mechanism in subpart Ba for use by the EPA in acting on CAA 111(d) state plans. One commenter submitted that the EPA should limit conditional approvals to plans either with only procedural deficiencies or with substantive deficiencies that (1) apply to few designated facilities (*e.g.,* no more than 5); (2) do not lead to impacts on vulnerable communities; and (3) are likely to be remedied by the

state within one year. Comments were received both supporting and opposing the proposed 12-month time period for adopting and submitting the necessary revisions associated with a conditional approval. In particular, one commenter recommended allowing more than 12 months for submission of subsequent revisions that are required as part of conditional approvals that relate to RULOF provisions. After considering the comments received, the EPA is declining to explicitly limit the circumstances in which conditional approval may be used and is finalizing the 12-month period for submission of a plan revision pursuant to a conditional approval as proposed. First, the EPA views the conditional approval mechanism as a beneficial flexibility for states in instances in which partial disapproval may be appropriate because a discrete portion of a state plan does not meet the applicable requirements, but that deficiency is not so significant that it affects the substantial adequacy of the plan. CAA section 110(k)(4) supports this view, as Congress provided only 12 months for states correct the deficiency; 12 months is likely not sufficient for states to remedy significant substantive deficiencies in a plan. Thus, the EPA believes both that structure of the conditional approval mechanism already appropriately circumscribes its use and that extending the timeline for states to submit plan revisions pursuant to conditional approval would abrogate its utility as a way to address minor issues in a plan and encroach on circumstances in which partial disapproval is more appropriate. Second, under the provisions being finalized in this rulemaking, in the event that EPA did partially disapprove a state plan in lieu of conditionally approving it, the Agency would have 12 months to promulgate a Federal plan to fill the gap. See 40 CFR 60.27a(c)(2). It would be inappropriate to provide states a longer period of time in the same circumstances to remedy a deficiency.

As finalized, if the state fails to meet its commitment to submit the measures within 12 months, the conditional approval automatically converts to a disapproval. If a conditionally approved state plan converts to a disapproval due to either the failure of the state to timely submit the required measures or if the EPA finds the submitted measures to be unsatisfactory, such disapproval would be grounds for implementation of a Federal plan under CAA section 111(d)(2)(A). The EPA will publish a notice in the **Federal Register** and, if appropriate, on the public website

established for the EG notifying the public that the conditional approval is converted to a disapproval. As described in section III.A.4. of this preamble, the EPA would be required to promulgate a Federal plan within 12 months of state's failure to submit the required measures or the EPA's disapproval of measures submitted to address the conditional approval.

Commenters asserted that the EPA should take action to develop a Federal plan immediately upon issuing a conditional approval, and further asserted that the EPA should not allow the conditional approval mechanism to toll the Federal plan clock and thereby delay needed public health and welfare protections. A conditional approval is not a disapproval and therefore there has been no failure on the part of the state and thus will not trigger a corresponding Federal plan for the given state nor initiate a timeline for the EPA to provide a Federal plan. Conditional approvals will be evaluated and designed on a case-by-case basis, with consideration of public health and welfare, and are expected to result in approved state plans and therefore not require the development of a Federal plan. The commenters also noted the EPA proposed to allow 12 months in which to impose a Federal plan following disapproval of a previously conditionally approved plan and stated instead the EPA should start the clock for developing a Federal plan as soon as a state plan submission is conditionally approved if the EPA has determined that there is a significant possibility that the deficiencies will not be corrected. The EPA disagrees with this comment because the Agency would not conditionally approve a plan if the deficiencies were not expected to be corrected; in this instance, a partial disapproval of the plan would be appropriate.

Another commenter requested that the EPA clarify the applicable compliance deadline for a state plan that is conditionally approved by the Agency. The commenter contended that the proposed rule did not specify the ''trigger'' date for compliance deadlines when the EPA conditionally approves a state plan, and recommended that, in this scenario, compliance deadlines should begin to run when the state satisfies the condition(s) established by the EPA. However, the EPA notes that compliance timeframes for designated facilities are specified in the applicable EGs. To the extent that the Administrator conditionally approves a plan, the compliance timeframes must still meet the requirements in the EG. A conditional approval may not be an appropriate action if the result would be a significant delay in compliance, as that is inconsistent with the intention of adding this flexibility for state plan processing.

Incorporating this mechanism under the subpart Ba will have the benefit of allowing a state with a substantially complete and approvable program to begin implementing it, while also promptly making specific changes that ensure it fully meets the requirements of CAA section 111(d) and of the applicable EGs. The EPA is therefore finalizing this provision as proposed at 40 CFR 60.27a(b)(2).

3. Parallel Processing

The EPA proposed to include a mechanism similar to that for SIPs under 40 CFR part 51 appendix V, section 2.3.1., for parallel processing a plan that does not yet meet all of the administrative completeness criteria under 40 CFR 60.27a(g)(2). This streamlined process allows the EPA to propose approval of such a plan in parallel with the state completing its process to fully adopt the plan in accordance with the required administrative completeness criteria, and then allows the EPA to finalize approval once those criteria have been fully satisfied and a final plan has been submitted.

At proposal, the EPA explained that parallel processing under subpart Ba would be subject to certain conditions. In lieu of the letter required under 40 CFR 60.27a(g)(2)(i), the state must submit the proposed plan with a letter requesting the EPA propose approval through parallel processing. Under the parallel processing procedures, a state will be temporarily exempt from the administrative completeness criteria as defined by 40 CFR 60.27a(g)(2) regarding legal adoption of the plan (40 CFR 60.27a(g)(2)(ii) and (v)) and from some of the public participation criteria (40 CFR 60.27a(g)(2)(vi), (vii), and (viii)). However, as with parallel processing for SIPs under 40 CFR part 51, appendix V, in lieu of these administrative criteria, the state must include a schedule for final adoption or issuance of the plan and a copy of the proposed/draft regulation or the document indicating the proposed changes to be made, where applicable. Note that a proposed plan submitted for parallel processing must still meet all the criteria for technical completeness as defined by 40 CFR 60.27a(g)(3) and meet all other administrative completeness criteria as defined by 40 CFR 60.27a(g)(2). If these conditions are met, the submitted plan may be considered for purposes of the EPA's initial plan evaluation and proposed rulemaking action.

The exceptions to the administrative criteria described above only apply to the EPA proposing action on the state plan. If the EPA has proposed approval through parallel processing, the state must still submit a fully adopted and final plan that meets all of the completeness criteria under 40 CFR 60.27a(g), including the requirements for legal adoption and public engagement, before the EPA can finalize its approval. If the state finalizes and submits to the EPA a plan that includes changes relative the plan that the EPA proposed to approve, the EPA will evaluate those changes for significance. If any such changes are found by the EPA to be significant (*e.g.*, changes to the stringency or applicability of a particular standard of performance), then the state submittal would be treated as an initial submission and the EPA would be required to re-propose its action on the final plan and to provide an opportunity for public comment.

Note further that once the state plan submission deadline passes, the EPA retains the authority to initiate development of a Federal plan at any time for a state that has not submitted a complete plan, even if a state has requested parallel processing and the EPA has proposed an action. The EPA intends to continue working collaboratively with states who are in the process of adopting and submitting state plans but notes that states must remain mindful of regulatory deadlines for CAA section 111(d) plan submissions even when seeking to use the parallel processing mechanism.

While comments were generally supportive of the EPA adopting parallel processing for CAA section 111(d) plans, some commenters expressed concern that the purpose and benefits of meaningful engagement would not be realized in the state plan development process if this mechanism were finalized as proposed. One commenter noted that the proposed parallel processing provision appeared to indicate that the state can submit its plan to the EPA prior to conducting meaningful engagement, and that the EPA is expecting an informational meeting rather than actual engagement from the public during the meaningful engagement process. Another commenter remarked that if a state does not include meaningful engagement before submitting its initial plan to the EPA, the proposed parallel processing mechanism creates an inherent disincentive for the state to modify a plan under this mechanism in response to any public engagement which occurs

subsequent to submittal, and further stated this would increase the disparity between the feedback received from the individuals the EPA designed the meaningful engagement provisions to protect and feedback from individuals or organizations with plentiful resources for proactive engagement. The commenters also asserted that members of the public, knowing that a version of the plan is already under Federal review, would be more likely to doubt that their feedback would have an impact on the final product.

The EPA agrees with these commenters that, as proposed, exempting meaningful engagement from completeness criteria requirements under parallel processing would be a disincentive to meeting to the goals of meaningful engagement. In fact, as defined in this action, meaningful engagement is the "*timely* engagement with pertinent stakeholders and/or their representatives in the plan development or plan revision . . ." (emphasis added). Thus, meaningful engagement should occur well in advance of a state being ready to submit a plan to the EPA for parallel processing. The EPA is therefore excluding the meaningful engagement completeness criteria defined at 40 CFR 60.27a(g)(2)(ix) from the completeness criteria exceptions provided under the finalized parallel processing provision at § 60.27a(h)(4). That is, states must include the information required under § 60.27a(g)(2)(ix) in any proposed state plans submitted to the EPA for parallel processing. Meaningful engagement is integral in early state plan development and should be included as part of the completeness criteria for parallel processing.

The EPA is finalizing as part of the completeness criteria in 40 CFR 60.27a(g) procedural requirements for states to describe in their plan submittals how they engaged with pertinent stakeholders. The state will be required to describe, in its plan submittal, (1) a list of pertinent stakeholders identified by the state; (2) a summary of engagement conducted; (3) a summary of the stakeholder input received; and (4) a description of how stakeholder input was considered in the development of the plan or plan revisions.

## 4. State Plan Call

Under CAA section 110(k)(5), the EPA may call for a revision of a state implementation plan "[w]henever the Administrator finds that the applicable implementation plan . . . is substantially inadequate to . . . comply with any requirement of [the Act]." The

EPA proposed to add a mechanism analogous to this "SIP call" provision to subpart Ba at 40 CFR 60.27a(i) under CAA section 111(d), which would authorize the EPA to find that a previously approved state plan does not meet the applicable requirements of the CAA or of the relevant EG and to call for a plan revision. This mechanism is a useful tool for ensuring that approved state plans continue to meet the requirements of the EGs and of the CAA over time. This may be particularly important because EGs that achieve emission reductions from specific source categories may be implemented over many years.

As proposed, the state plan call provision stated that, whenever the Administrator finds that the applicable plan is substantially inadequate to meet the requirements of the applicable EG, to provide for the implementation of such plan or to otherwise comply with any applicable requirement of subpart Ba or the CAA, the Administrator shall require the state to revise the plan as necessary to correct such inadequacies. The EPA explained that a plan call would be generally appropriate under two circumstances: when legal or technical conditions arise after the EPA approves a state plan that undermine the basis for the approval and when a state fails to adequately implement an approved state plan. In the first circumstance, a change in conditions or circumstances could render an approved plan inconsistent with the EG, subpart Ba, and/or the CAA, necessitating a plan revision to realign it with the applicable requirements. For example, a court decision subsequent to the approval of a plan may render that plan substantially inadequate to meet applicable CAA requirements resulting from the change in law.[56] Or, the EPA may determine that technical conditions, such as design assumptions, about control measures that were the basis for a state plan approval later prove to be inaccurate, meaning that the plan would be substantially inadequate to achieve the emission reductions required by the EG and therefore the plan should be revised.[57]

The second circumstance in which a state plan call may be appropriate is when a state fails to adequately implement an approved state plan. In this case, the approved state plan may facially meet all applicable requirements, but a failure in implementation (*e.g.,* due to changes in available funding, resources, or legal authority at the state level) renders the plan substantially inadequate to meet the requirements of the EG and CAA section 111(d). In this circumstance, a state, in response to a plan call, would either be required to submit a plan revision that provides for implementation of the plan's requirements given the state's actual circumstances or to provide demonstration that the plan is being adequately implemented as approved.

Consistent with the SIP call process under CAA section 110(k)(5), the EPA proposed that, after it finds that a state's approved plan is substantially inadequate to comply with applicable requirements, it would require the state to revise the plan as necessary to correct inadequacies. The EPA proposed that such finding and notice must be public. The plan call notice would identify the plan inadequacies leading to the plan call and establish a reasonable deadline (not to exceed 12 months after the date for such notice) for submission of a plan revision and/or demonstration of appropriate implementation of the approved plan.

A number of commenters asserted that the EPA is not authorized to issue a call for state plans under CAA section 111(d) because Congress did not provide this explicit authority in CAA section 111. Some commenters also expressed concern that this mechanism undermines the regulatory certainty approved plans provide to facilities. Additionally, some commenters contended that CAA sections 113 and 114 address the condition of states not properly implementing approved state plans such that a state plan call mechanism is unnecessary.

As explained at the start of this section of the preamble (section III.D.), the EPA interprets CAA section 111(d)(1)'s direction to prescribe regulations establishing a procedure similar to that provided by CAA section 110 for the submission of state plans to authorize the EPA to adopt the section 110 procedural mechanisms. Additionally, CAA section 111(d)(2) provides that EPA shall have the same authority as under CAA section 110(c) to prescribe a Federal plan where a state fails to submit a satisfactory plan, as well as the same authority as under CAA sections 113 and 114 to enforce the

---

[56] An example of this circumstance in the context of CAA section 110 is the 2015 "SSM SIP Call", which required states to correct previously approved SIP provisions based on subsequent court decisions regarding startup, shutdown, and malfunctions (SSM) operations. 80 FR 33840, June 12, 2015.

[57] For example, the 1998 "NO$_X$ SIP call" required states to submit SIP revisions addressing NO$_X$ emissions found, after SIP approvals, to significantly impact the attainment of air quality standards in other states due to atmospheric transport. 63 FR 57356, October 27, 1998.

provisions of a state plan where the state fails to enforce them. Congress did not specify how the EPA is to exercise its authority to approve or disapprove state plans, promulgate Federal plans, and oversee and enforce state plan implementation on an ongoing basis, and the EPA finds it reasonable to look to other mechanisms under the CAA that Congress has provided for substantially the same purpose. That is, the EPA believes CAA sections 111(d)(1) and 111(d)(2), taken together, provide the legal basis for incorporating mechanisms into subpart Ba that ensure the ongoing compliance of state plans with the applicable requirements, including the state plan call mechanism of CAA section 111(k)(5).

While CAA sections 113 and 114 provide the EPA authority to enforce the provisions of state plans through, *inter alia,* issuance of administrative orders and penalties, civil actions in the case of violations, and use of monitoring, reporting, recordkeeping, and compliance certifications, the EPA believes it is also reasonable and helpful to provide a mechanism for states to bring their state plans into compliance with the applicable requirements. A state's failure to implement its approved plan may result if that plan's implementation or enforcement measures, *e.g.,* monitoring, reporting, and verification requirements, prove inadequate to enable a state to ensure that a designated facility is meeting its standards of performance. A failure to implement may also arise, as described above, where an approved state plan contains the appropriate implementation and enforcement measures but changes in, *e.g.,* available funding, resources, or legal authority at the state level render the plan, as it is being implemented, substantially inadequate to meet the requirements of subpart Ba, the EG, or CAA section 111(d). In either instance, a reasonable alternative to EPA enforcement may be for the Agency to issue a state plan call in order to give the state an opportunity to remedy the deficiency or to provide demonstration that the plan is being or will be adequately implemented as approved. As with all of the regulatory mechanisms being incorporated into subpart Ba in this rulemaking, the EPA interprets CAA sections 111(d)(1) and (2) as collectively providing the authority to provide for procedures for ensuring that state plans remain "satisfactory" over the long time periods over which they are implemented, given that subsequent findings or conditions may affect the basis for a previous plan approval.

The EPA acknowledges that a call for revision of a state plan may result in a change in the requirements to which regulated entities are subject under that plan. However, as explained above, state plan calls are appropriate in two general circumstances: when legal or technical conditions arise that abrogate the basis of the initial state plan approval and when a state fails to adequately implement an approved state plan. In either of these two instances, the plan as it is currently being implemented fails to meet the applicable requirements. The EPA believes it would be neither consistent with the statute nor reasonable to fail to correct a state plan under these circumstances and that the state plan call mechanism, which provides for notice to the state and the public and a process for revising the state plan that is intended to cause as little disruption to the original plan as possible, is appropriate. The state plan call provisions state that "[a]ny finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this part to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate." [58]

Several commenters noted that the proposed "not to exceed 12 months" timeline associated with the state call revision provision may be inadequate for states to respond to a state plan call and noted that this time is shorter than that provided for plan development. However, because a state plan call would represent that a plan is substantially inadequate to meet an EG after implementation of the plan was supposed to be underway, and compliance deadlines may have already passed, a more expeditious timeline to fix the problem than the deadline for initial plan development is imperative to the public health concerns. Additionally, the EPA anticipates that in many instances a state plan call would impact a discrete portion or element of a plan that will not require the same amount of time the EPA is allotting for initial state plan development and submission, *i.e.,* 18

months, to correct. The EPA believes 12 months is a reasonable timeframe and allows for public outreach and state processes while ensuring the deficiency is expeditiously corrected to address any outstanding public health and welfare concerns associated with a deficient plan, consistent with the *ALA* decision. However, the Agency also acknowledges that this may not be true in every instance. The EPA is therefore finalizing the state plan call mechanism with a change relative to proposal to provide that plan revisions associated to a state plan call shall be submitted to the Administrator within 12 months or within a period as determined by the Administrator, instead of "not to exceed 12 months." Because the CAA contains numerous deadlines requiring states to submit various state implementation plans within 12 months of a triggering event,[59] the EPA believes it is reasonable to expect states to be able to submit state plan revisions pursuant to a state plan call within this timeframe as well. The final language provides more flexibility and allows that the EPA may supersede this 12-month timeframe in appropriate circumstances.

While this period is less than the time allotted for the submission of a full state plan (finalized in section III.A.1. of this preamble above as 18 months), it can provide a reasonable timeframe for public outreach and state processes while ensuring the deficiency is expeditiously corrected to address any outstanding public health and welfare concerns associated with a deficient plan, consistent with the *ALA* decision.

With the exception of this revision to the timeline for states to submit revised state plans, the EPA is finalizing the state plan call mechanism at 40 CFR 60.27a(i) as proposed. As explained at proposal, any failure of a state to submit necessary revisions by the date set in the call for state plan revisions constitutes a failure to submit a required plan submission. Therefore, pursuant to CAA section 111(d)(2)(A), the EPA would have the authority to promulgate a Federal plan for the state within 12 months after the necessary revisions are due. If the state fails to submit a plan revision, to make an adequate demonstration within the prescribed time pursuant to 40 CFR 60.27a(i)(1), or if the EPA disapproves a submission, then the EPA would be required to promulgate a Federal plan addressing the deficiency for sources within that state.

---

[58] The regulations being finalized at § 60.27a(i)(1) further provided that if the Administrator makes the finding in § 60.27a(i) on the basis that a State is failing to implement an approved plan, or part of an approved plan, the State may submit a demonstration to the Administrator it is adequately implementing the requirements of the approved state plan in lieu of a plan revision. Such demonstration must be submitted by the deadline established under § 60.27a(i).

[59] See, *e.g.,* CAA sections 110(k)(4), 129(b)(2), and 179(d).

5. Error Correction

Under CAA section 110(k)(6), the EPA may, on its own accord, revise its prior action on a state implementation plan under certain circumstances: "[w]henever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof) . . . was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State." The EPA proposed to add a mechanism analogous to this "error correction" provision to subpart Ba at 40 CFR 60.27a(j) under CAA section 111(d) and is finalizing that mechanism as proposed.

As explained in the notice of proposed rulemaking, this error correction provision would authorize the EPA to revise its prior action when the EPA determines its own action on the state plan was in error. Specifically, this provision allows the EPA to revise its prior action in the same manner as used for the original action (*e.g.*, through rulemaking) without requiring any further submissions from the state. In this manner, the error correction mechanism does away with unnecessary burdens on states based solely on an error made by the EPA, such as submitting a plan revision and the public participation related requirements under 40 CFR 60.23a (*e.g.*, providing notice and holding a public hearing).

CAA section 110(k)(6) is phrased broadly, and its legislative history makes clear that it "explicitly authorizes EPA on its own motion to make a determination to correct any errors it may make in taking any action, such as . . . approving or disapproving any plan." See House Report No. 101–490 at 220. The circumstances that may give rise to an error that the EPA may correct with this mechanism depend on the specific facts and plan at issue, and the use of the mechanism is justified on a case-by-case basis. The EPA has previously used CAA section 110(k)(6) for correction of technical or clerical errors,[60] for removal of substantive provisions from an EPA-approved state plan that did not relate to implementation, enforcement, or maintenance of the NAAQS or is otherwise permissible under the CAA

for inclusion in the plan,[61] and when the EPA in error approved a SIP that did not meet applicable requirements.[62] These examples are not the only circumstances when the EPA has used CAA section 110(k)(6) in the past and do not limit the EPA for circumstances of error correction under section 111(d) in the future.

One commenter, while not objecting to the inclusion of this mechanism, suggested the EPA should make clear in the regulations that this provision cannot be used to effect a change in policy because of a change in perspective on implementation that may arise from an administration transition, citing the need for designated facilities to have regulatory certainty and to avoid unexpected changes in regulatory requirements. Other commenters also noted that the proposed regulatory text does not place any limitations on the EPA's ability to use the error correction provision and that the EPA should impose meaningful limits on its ability to use this mechanism to effectuate significant changes to a prior action or to implement new policy perspectives. The EPA acknowledges the concern expressed by the commenters. The Agency intends the same intrinsic limits on its error correction authority that exist under CAA section 110(k)(6) to apply to its use under subpart Ba: the EPA must determine that its action on a state plan submission was "in error." The EPA reviews state plan submissions against the applicable requirements of the statute, general implementing regulations, and specific EG. If the submission meets those requirements, it is "satisfactory" and the EPA must approve it. A subsequent change in Agency policy alone does not constitute an error that the EPA committed in acting on the state plan. The EPA's history of using error correction mechanisms under CAA section 110(k)(6), including to correct clerical or typographic errors and remove provisions from SIPs that it was without authority to approve in the first instance (as described earlier), gives good indication of how the EPA intends to use this mechanism under subpart Ba. The EPA also notes that use of error correction is fact- and context-specific, and a determination that a previous action was in error is subject to scrutiny and review by the state and public. Additionally, due to the complex facts and circumstances that frequently

characterize state plans and state plan implementation, the EPA believes that any attempt to further define the circumstances in which use of error correction may or may not be permissible is likely to inadvertently limit its use where otherwise appropriate. Thus, the Agency does not find it necessary to prescribe further limits on its use of error correction under these CAA section 111 implementing regulations. The EPA is therefore finalizing its use of error correction for state plan actions at 40 CFR 60.27a(j) as proposed. While the EPA maintains that this error correction mechanism would be available for acting on state plans when appropriate, it also expects that it will work with states, as it has done previously in the SIP context, to correct any deficiencies in their plans.

*E. Remaining Useful Life and Other Factors (RULOF) Provisions*

The EPA is finalizing revisions to certain provisions of 40 CFR 60.24a to clarify the framework for applying standards of performance based on RULOF in state plans[63] under CAA section 111(d). Consistent with Congress's mandate in CAA section 111(d), the EPA's implementing regulations have guided the implementation of RULOF for decades. See 40 CFR 60.24(d), (f). The existing subpart Ba regulations[64] contain provisions at 40 CFR 60.24a(e) governing the circumstances under which states may take RULOF into consideration when applying standards of performance to particular sources in state plans. The EPA proposed revisions to these existing provisions as well as additional RULOF-related requirements to ensure consistency with the statute and to enhance clarity and equitable treatment for states. The EPA is finalizing some of these provisions as proposed, is finalizing other provisions with changes relative to proposal in response to public comments, and is choosing not to finalize yet other provisions.

Section III.E.1. of this preamble describes the statutory and regulatory background of RULOF under CAA section 111 and section III.E.2. of this preamble explains the authority and rationale for the collective regulatory revisions. Section III.E.3. of this

---

[60] For example, see 74 FR 57051, November 3, 2009, for correction of clerical and typographical errors in a portion of an Arizona SIP.

[61] For example, see 86 FR 24505 (May 7, 2021) (removal of asbestos requirements from a Kentucky SIP).

[62] For example, see 86 FR 23054, April 30, 2021, for error correction with respect to Kentucky's "good neighbor obligations" and SIP disapproval.

[63] As explained in section III.E.1. of this preamble, any discussion and requirements that apply to states' consideration of RULOF in state plans also apply to the EPA's consideration of RULOF in the context of a Federal plan.

[64] The D.C. Circuit's vacatur of certain provisions of subpart Ba in *ALA* did not impact the existing RULOF provision at 40 CFR 60.24a(e).

preamble describes in detail the proposed RULOF provisions and the EPA's approach to each provision in this final rule.

1. Statutory and Regulatory Background

Under CAA section 111(d), the EPA is required to "establish a procedure . . . under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for" designated facilities and "(B) provides for the implementation and enforcement of such standards of performance." As the Supreme Court explained in *West Virginia* v. *EPA* (in the context of an EG addressing existing power plants): "Although the States set the actual rules governing existing power plans, EPA itself still retains the primary regulatory role in Section 111(d)." [65] The Court elaborated that the "[t]he Agency, not the States, decides the amount of pollution reduction that must ultimately be achieved. It does so by again determining, as when setting the new source rules, 'the best system of emission reduction . . . that has been adequately demonstrated for [existing covered] facilities.' 40 CFR part 60.22(b)(5) (2021); see also 80 FR 64664, and n. 1. The States then submit plans containing the emissions restrictions that they intend to adopt and enforce in order not to exceed the permissible level of pollution established by EPA. See parts 60.23, 60.24; 42 U.S.C. part 7411(d)(1)." [66]

Accordingly, while states establish the standards of performance for individual sources, EPA must ensure that such standards reflect the degree of emission limitation achievable through the application of the BSER. This obligation derives from the definition of "standard of performance" under CAA section 111(a)(1), which is "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which . . . the Administrator determines has been adequately demonstrated." Consistent with this definition, the EPA identifies the degree of emission limitation achievable through application of the BSER for a category (or sub-category) of existing sources as part of its EG. 40 CFR 60.22a(b)(5). States must then

establish standards of performance for existing sources in their state plans that reflect the EPA's degree of emission limitation.

CAA section 111(d)(1) also requires that the "regulations which establish a procedure" for submission of state plans must "permit" states, "in applying a standard of performance to any particular source under a plan," to consider, "among other factors, the remaining useful life of the existing source." Thus, while standards of performance must generally reflect the degree of emission limitation achievable through application of the BSER determined by the EPA pursuant to CAA section 111(a)(1), see 40 CFR 60.24a(c), CAA section 111(d)(1) also contemplates circumstances in which states would be permitted to deviate from the degree of emission limitation in the applicable EG based on consideration of RULOF for particular sources.

The 1970 version of CAA section 111(d) made no reference to the consideration of RULOF in the context of standards for existing sources.[67] In the 1975 regulations promulgating subpart B to implement the 1970 CAA section 111(d), however, the EPA included a provision that would allow states to provide "variances" from the EPA's emission guideline on a case-by-case basis.[68] For health-based pollutants, the regulations provided that states could apply a standard of performance less stringent than the EPA's EGs based on cost, physical impossibility, and other factors specific to a designated facility that would make the application of a less stringent standard significantly more reasonable. 40 CFR 60.24(f). For welfare-based pollutants, the regulations provided that states could apply a less stringent standard by balancing the requirements of an EG "against other factors of public concern." 40 CFR 60.24(d).

In proposing this variance provision, the EPA explained that the application of less stringent emission standards on a case-by-case basis is allowed, provided that sufficient economic justification is demonstrated in each case. Such justification must be presented for each case in the plan and may include, for example, unreasonable cost of control resulting from plant age, location, or basic process design or physical impossibility of installing specified control systems.[69] In response to a comment received on its proposal

arguing that the EPA did not have authority to promulgate a variance provision, the Agency explained that, although section 111(d) does not explicitly provide for variances, it does require consideration of the cost of applying standards to existing facilities. Such a consideration is inherently different than for new sources, because controls cannot be included in the design of an existing facility and because physical limitations may make installation of particular control systems impossible or unreasonably expensive in some cases. For these reasons, EPA believes the provision (§ 60.24(f)) allowing States to grant relief in cases of economic hardship (where health-related pollutants are involved) is permissible under section 111(d).[70]

The Agency further explained in the 1975 rulemaking that the "EPA's emission guidelines will reflect its judgment of the degree of control that can be attained by various classes of existing sources without unreasonable costs." [71] States were required to establish emission standards for existing sources that are equivalent to the EPA's emission guidelines; states would also be free to apply more stringent standards for particular sources within a class of sources that can achieve greater control without unreasonable costs, or where they otherwise believe that additional control is necessary or desirable.[72]

As part of the 1977 CAA amendments, Congress amended CAA section 111(d)(1) in a way that codified the provision of a variance as contained in the EPA's 1975 regulations. Specifically, Congress amended CAA section 111(d)(1) to require that the EPA's regulations under this section "shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." The EPA considered the variance provision under subpart B to meet this requirement and did not revise the provision subsequent to the 1977 CAA amendments until the Agency promulgated new implementing regulations in 2019 under subpart Ba. As part of the 2019 revisions, the EPA removed the health- and welfare-based pollutants distinction and collapsed the associated requirements of the previous variance provision into a single, then-

---

[65] 142 S. Ct. 2587, 2601–02 (2022).

[66] Id. The part of the rule preamble cited by the Court states, in part: "Under CAA section 111(a)(1) and (d), the EPA is authorized to determine the BSER and to calculate the amount of emission reduction achievable through applying the BSER. The state is authorized to identify the emission standard or standards that reflect that amount of emission reduction." 80 FR 64662, 64664 n. 1 (Oct. 23, 2015).

[67] See Public Law 91–604, section 111(d)(1) (Dec. 31, 1970), 84 Stat. 1684.

[68] 40 FR 53340, 53344 (Nov. 17, 1975).

[69] 39 FR 36102, 36102 (Oct. 7, 1974).

[70] 40 FR 53343.

[71] Id.

[72] See id.

**80510** Federal Register / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

new RULOF provision.[73] As did subpart B before it, this subsection provides that, in applying a standard of performance to a particular source, the state may take into consideration factors including the remaining useful life of such source, provided that the state demonstrates one or more of three circumstances: unreasonable cost of control resulting from plant age, location, or basic process design; physical impossibility of installing necessary control equipment; or other factors specific to the facility that make application of a less stringent standard or compliance time significantly more reasonable. The 2019 RULOF provision also allows, as did the 1975 version, for the variance to be provided for a particular facility or class of such facilities.

CAA section 111(d)(2) provides that "[t]he Administrator shall have the same authority . . . to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title [*i.e.,* CAA section 110(c)] in the case of failure to submit an implementation plan." When CAA section 111(d)(2) was enacted in 1970, CAA section 110(c) stated that the Administrator shall promptly propose a Federal implementation plan for a state if "(1) the State fails to submit an implementation plan . . . within the time prescribed, (2) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section, or (3) the State fails, within 60 days after notification by the Administrator or such longer period as he may prescribe, to revise an implementation plan as required pursuant to a provision of its plan . . . ." [74]

Thus, CAA section 111(d)(2), through its reference to CAA section 110(c), provides the EPA the authority and the obligation to review state plans for compliance with CAA requirements.[75][76]

If a state has not submitted a state plan or if the EPA determines that a state plan is not "satisfactory," *i.e.,* not in accordance with the requirements of CAA section 111, the EPA must promulgate a Federal plan.

Congress further provided in CAA section 111(d)(2) that the EPA shall, in promulgating a standard of performance under a Federal plan, "take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies." Thus, the RULOF regulations the EPA has previously promulgated in subparts B and Ba, and the revisions to the RULOF regulations in subpart Ba being finalized in this action, apply not only to states when promulgating state plans, but also to the EPA when promulgating a Federal plan. Throughout this section III.E. of the preamble, discussion of provisions and requirements that apply to states' consideration of RULOF in state plans also apply to the EPA's consideration of RULOF in the context of a Federal plan.

2. Authority and Rationale for the Revisions

The primary authority for these revisions is in CAA section 111(d)(1). The rationale for the revisions finalized here is to more fully align the implementing regulations with the statute and to enhance clarity for states as well as the equitable treatment of states and sources.

CAA section 111(d)(1) directs the EPA to "prescribe regulations which establish a procedure" under which states submit state plans. These regulations must "permit" states, in applying a standard of performance to any particular source, to consider RULOF. That is, Congress gave the EPA the authority and the obligation to establish procedures that permit states to consider RULOF.

The EPA has been guiding consideration of RULOF for over fifty years, consistent with Congress's direction. "Permit" means "to consent

to formally; to allow (something) to happen, esp[ecially] by an official ruling, decision, or law." [77] It is well understood that there may be parameters or rules as a condition of someone consenting to or allowing something to be done. For example, a building permit generally does not allow a person to build in any way they like, but contains conditions and requirements such as compliance with safety codes and limitations on height. In general, "permit," whether a verb or noun, carries with it an expectation of rules and parameters designed to ensure consistency with the applicable framework, as opposed to open-ended discretion.[78] CAA section 111(d)(1) provides that "*regulations* of the Administrator . . . *shall permit* the State" to consider RULOF (emphasis added). The natural reading of this provision is that Congress intended the EPA to set out parameters and conditions that govern states' consideration of RULOF.[79]

The EPA's role in implementing RULOF finds further support in the Supreme Court's understanding of this provision as laid out in *American Electric Power* v. *Connecticut*.[80] In describing the statutory framework of CAA section 111, the Court explained that the EPA sets standards of performance based on CAA section 111(a)(1). It further recognized that, pursuant to the EPA's subpart B general implementing regulations for state plans, 40 CFR 60.24(f), "EPA may permit state plans to deviate from generally applicable emissions standards upon demonstration that costs are '[u]n-reasonable.' " [81]

At the same time that Congress clearly directed the EPA to prescribe rules governing states' consideration of RULOF, it also provided that those rules establish a *procedure* under which

---

[73] 84 FR 32520, 32577 (July 8, 2019).

[74] Public Law 91–604, section 110(c) (Dec. 31, 1970), 84 Stat. 1681–82.

[75] See also 40 CFR 60.27(c) ("The Administrator will, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth a plan, or portion thereof, for a State if: (1) The State fails to submit a plan within the time prescribed; . . . (3) The Administrator disapproves the State plan or plan revision or any portion thereof, as unsatisfactory because the requirements of this subpart have not been met."); 60.27(d) (providing for promulgation of a proposed Federal plan).

[76] Congress subsequently updated CAA section 110(c) in 1977 and again in 1990. The current version of CAA section 110 splits the EPA's Federal implementation plan authority and the criteria for disapproval of State implantation plans across

subsections 110(c) and 110(k)(3). CAA section 110(c)(1) provides that "[t]he Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator— (A) finds that a State has failed to make a complete plan submission, or "(B) disapproves a State implementation plan submission in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal plan." CAA section 110(k)(3), which addresses "[f]ull and partial approval and disapproval," states that the Administrator shall approve all or certain portions of the plan that "meet[] the applicable requirements of this chapter." Thus, a plan, or any portion thereof, that fails to meet the applicable CAA requirements must be disapproved.

[77] Black's Law Dictionary (11th ed. 2019); *see also* The American College Dictionary (1970) ("to let (something) be done or occur"); Oxford English Dictionary Online ("to allow or give consent to (a person or thing) to do or undergo something"), *https://www.oed.com/search/dictionary/ ?scope=Entries&q=permit,* page accessed Sept. 1, 2023.

[78] See, *e.g., U.S.* v. *Chau,* 293 F.3d 96, 101 (3d Cir., 2002) (a provision requiring an entity to provide notice to the EPA prior to acting is not a "permit" because "[a] requirement that someone provide written notice of an intention to perform an act is not the same at the EPA's granting of a license, or other permission, to the person to perform the act in question . . . .").

[79] This contrasts with other provisions of the Clean Air Act where Congress granted states unbounded discretion. *See, e.g.,* CAA section 116 ("nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce" more stringent requirements).

[80] 564 U.S. 410 (2011).

[81] Id. at 427.

states submit state plans, including any standards of performance pursuant to consideration of RULOF. CAA section 111(d)(1) states, ''The Administrator shall prescribe regulations which shall establish a procedure . . . . Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source . . . to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.'' Consistent with this statutory direction, the EPA's RULOF provisions, both the existing provisions and those being finalized in this action, are fundamentally procedural in nature. They prescribe the series of steps and considerations states must undertake to apply a less stringent standard of performance that is consistent with CAA section 111(d).

As discussed in section III.E.1. of this preamble, Congress also granted the EPA a role in ensuring that states applying standards of performance based on RULOF do so in an appropriate manner. CAA section 111(d)(2) requires the EPA to evaluate standards of performance in state plans and approve them only if they are ''satisfactory,'' *i.e.,* if they meet the applicable requirements.[82] Thus, while states have responsibility for establishing, implementing, and enforcing standards of performance for designated facilities, the EPA has an obligation to ensure that those standards of performance—including any standards of performance based on consideration of RULOF—are consistent with the statute. The regulations the EPA is promulgating in this final rule provide greater clarity and thus enable states to apply less stringent standards of performance that are consistent with CAA section 111(d). Having clear, detailed regulations also aids the EPA in evaluating less stringent standards of performance included in state plans, which maximizes the Agency's ability to provide for fair and equitable treatment across the states and sources that use the RULOF provision.

In addition, the parameters for considering RULOF set out in this final rule are consistent with the role of RULOF as an important tool for states in the unusual circumstance in which the EPA's BSER determination is

unreasonable for a particular source. As explained in detail in section III.E.3.b. of this preamble, the EPA's longstanding interpretation is that RULOF provision in CAA section 111(d)(1) allows the Agency to permit states to provide variances for existing facilities in certain circumstances. These circumstances are limited to when a state can demonstrate that it is unreasonable for a particular facility to achieve the degree of emission limitation determined by the EPA in the applicable EG.

Under CAA section 111, EPA must provide BSER and degree of emission limitation determinations that are, to the extent reasonably practicable, applicable to all designated facilities in the source category. In many cases, this requires the EPA to create subcategories of designated facilities, each of which has a BSER and degree of emission limitation[83] tailored to its circumstances.[84] Thus, the EPA endeavors, to the extent practicable, to promulgate BSER and degree of emission limitation determinations that are achievable for all designated facilities covered by an EG. However, as Congress recognized, this may not be possible in every instance because, *e.g.,* it is not be feasible for the Agency to know and consider the idiosyncrasies of every designated facility in a source category or because the circumstances of individual facilities change after the EPA determined the BSER. The EPA believes Congress intended RULOF to allow the EPA to permit the use of variances for states to adjust a standard of performance in unusual circumstances in which the EPA's determination regarding the degree of emission limitation achievable through the BSER is not reasonable for a particular designated facility.

This view of the RULOF provision as a limited variance from the EPA's determinations in an EG has a long history. The EPA's description of how it develops EGs in the preamble to the 1975 subpart B implementing regulations stated that ''emission guidelines will reflect subcategorization within source categories where

appropriate, taking into account differences in sizes and types of facilities and similar con- . . . siderations [*sic*], including differences in control costs that may be involved for sources located in different parts of the country.''[85] As a result, emission guidelines ''will in effect be tailored to what is reasonably achievable by particular classes of existing sources, and States will be free to vary from the levels of control represented by the emission guidelines in the ways mentioned above.''[86] The ''ways mentioned above'' included establishing more stringent standards under CAA section 116 where states believe additional control is necessary or desirable, as well as setting more lenient standards, subject to EPA review, in cases of economic hardship.[87] The EPA subsequently explained that such cases could arise because controls were not included in the design of existing sources or because physical limitations may make installation of particular control systems impossible or unreasonably expensive in some cases.[88]

Thus, the EPA's long-standing interpretation is that the standards of performance established by states must generally reflect the degree of emission limitation determined by the Agency, except where, based on RULOF, states provide ''sufficient justification'' that the EPA's determination is ''unreasonable'' for a particular source.[89] Although the EPA endeavors to address the circumstances of all designated facilities in its EG, there may remain instances in which the circumstances of a particular facility justify application of a less stringent standard of performance.

---

[82] CAA section 111(d)(2)(A) authorizes the EPA to promulgate a Federal plan for any state that ''fails to submit a satisfactory plan'' under section 111(d)(1). Accordingly, the EPA interprets ''satisfactory'' as the standard by which the EPA reviews state plan submissions. The EPA discusses the ''satisfactory'' standard of review in greater detail in section III.E.3.b of this preamble.

[83] The EPA, in different contexts, uses the phrase ''degree of emission limitation'' to refer to both the degree of emission limitation achievable through application of the BSER at the level of an individual source, *e.g.,* the best system can achieve an 85% reduction in end-of-stack emissions when applied to a designated facility, and to the overall level of stringency that results from applying the BSER to the source category as a whole. In this section of the preamble, this phrase refers to the emission reductions that are achievable at an individual source.

[84] See 40 CFR 60.22a(b)(5) (EPA may specify different degrees of emission limitation and compliance times for different subcategories of designated facilities).

[85] 40 FR 53343.

[86] Id.

[87] See id.

[88] Id. at 53344. Similarly, in the 1974 notice of proposed rulemaking for the subpart B regulations, the EPA explained that ''it is the Administrator's judgment that section 111(d) permits him to approve State emission standards only if they reflect application of the best systems of emission reduction (considering the cost of such reduction) that are available.'' The EPA further stated: ''It is recognized, however, that application of such standards may be unreasonable in some situations. For example, to require that existing controls be upgraded by a small margin at a relatively high cost may be unreasonable in some cases. The proposed regulations, therefore, provide that States may establish less stringent emission standards on a case-by-case basis provided that sufficient justification is demonstrated in each case.'' 39 FR 36102, 36102 (Oct. 7, 1974).

[89] 39 FR 36102; see also 40 CFR 60.24(c), (f) (EPA's longstanding regulations in subpart B require standards of performance in state plans to be no less stringent than the corresponding EG except where a state has satisfied the regulatory requirements for invoking RULOF).

Finally, and relatedly, to be consistent with the statutory purpose of reducing dangerous air pollution under CAA section 111; the statutory framework under which to achieve that purpose the EPA is directed to set the degree of emission limitation achievable through application of the best system of emission reduction; and the history of the statutory RULOF provision as a limited variance from that degree of emission limitation to address unusual circumstances at particular facilities, the EPA's regulations must ensure that application of less stringent standards of performance pursuant to consideration of RULOF does not undermine the degree of emission limitation achievable through application of the BSER.

Thus, for the reasons explained above, the EPA has the authority to promulgate the regulatory updates included in this final rule, which flow from the statute's direction for the Agency to ''establish procedures'' that, among other things, ''permit'' states to consider RULOF. The EPA believes these updates are warranted to provide additional clarity to the states (when developing state plans) and the EPA (when issuing Federal plans and reviewing state plans) regarding the appropriate procedures for considering RULOF and to ensure the predictable and equitable treatment of states and sources in implementing EGs under CAA section 111(d). Furthermore, the updates to the framework are needed to ensure that consideration of RULOF adheres to statutory purpose, structure, and historical context discussed above.

Critically, the regulatory revisions also provide a framework for how states and the EPA calculate and apply less-stringent standards of performance. Neither the RULOF provision in subpart B nor the 2019 update to that provision in subpart Ba clearly delineate the process for states or the EPA after they have determined that a source cannot reasonably achieve the degree of emission limitation in the applicable emission guideline. As such, the existing regulations are not adequate to ensure that standards of performance pursuant to RULOF are no less stringent than required to address the basis for providing a variance from the EPA's degree of emission limitation in the first instance.

Consistent with the long-held interpretation of the RULOF provision as a limited variance, the EPA is aware of only a small handful of instances in which a state has used this provision to apply a less-stringent standard of performance to a designated facility in a state plan. In three of these instances, the Agency approved less stringent

standards of performance for welfare-related designated pollutants for which, under subpart B (40 CFR 60.24(d)), there was a lower bar for doing so.[90] In the fourth instance, the state invoked RULOF to apply a less-stringent standard for a health-related designated pollutant and the EPA disapproved the less-stringent standard for failing to satisfy the requirements of 40 CFR 60.24(f).[91] At the time of this rulemaking, however, there are two new EGs for which rulemaking is ongoing; each of these EGs would address large, complex, and highly diverse source categories.[92] Commenters on these proposed EGs have suggested that there may be more of a role for RULOF than in past EGs.[93] The revisions to the

RULOF provisions are thus timely to give states greater clarity and predictability for applying less stringent standards of performance consistent with CAA section 111.

Note that the RULOF provisions are distinct from the flexible compliance mechanisms such as trading and averaging, discussed in section III.G.1. of this preamble. The RULOF provisions apply where a state intends to *depart* from the degree of emission limitation in the EG and propose a less stringent standard for a designated facility (or class of facilities). That is, the RULOF provisions are relevant to a state's process of applying a standard of performance to a designated facility in the first instance. In contrast, trading and averaging are mechanisms that, when permitted in an EG, states may use to demonstrate compliance with the standards of performance that are contained within their state plans.

### 3. Proposed and Finalized RULOF Provisions

The EPA proposed revisions to the existing RULOF provision at 40 CFR 60.24a(e), which details the circumstances under which states or the EPA may apply a less stringent standard of performance. The EPA also proposed to add new provisions: a procedure for determining less stringent standards when a state has properly invoked RULOF (proposed and finalized at 40 CFR 60.24a(f)); a clarification that state plans may not apply less stringent standards if a designated facility can reasonably achieve the presumptive standard of performance using a technology other than the BSER (proposed at 40 CFR 60.24a(g)); a clarification that any less stringent standards must meet all other applicable requirements (proposed at 40 CFR 60.24a(l), finalized at 60.24a(h)); requirements related to when operating conditions that are relied on for a less stringent standard must be included as enforceable requirements in state plans (proposed at 40 CFR 60.24a(h), finalized at 40 CFR 60.24a(g)); requirements related to the consideration of remaining useful life (proposed 40 CFR 60.24a(i)); a clarification regarding the burden of proof and information on which RULOF demonstrations are based (proposed 40 CFR 60.24a(j));

---

[90] 49 FR 35771 (Sept. 12, 1984), 47 FR 50868 (Nov. 10, 1982), 47 FR 28099 (June 29, 1982). See, *e.g.,* Emission Guideline Document for Kraft Pulping: Control of TRS Emissions from Existing Mills, EPA–450/2–78–003b (March 1979) at 1–3 (''For Welfare-related pollutants, states may balance the emission guidelines, times for compliance, and other information in a guideline document against other factors of public concern in establishing emission standards, compliance schedules, and variances provided that appropriate consideration is given to the information presented in the guideline document and at public hearing(s) required by Subpart B and that all other requirements of Subpart B are met. . . . Thus, states will have substantial flexibility to consider factors other than technology and costs in establishing plans for the control of welfare-related pollutants if they wish.'').

[91] See 40 CFR 62.8860(a) (''The requirements of § 60.24(f) of this chapter are not met because the State failed to justify the application of emission standards less stringent than the Federal emission standards.''); see also 55 FR 19883, 19884 (May 14, 1990) (explaining the proposed less-stringent limits were not approvable because the state had not demonstrated sufficient justification). The RULOF provision that governed that action in subpart B was substantively identical to the version promulgated in 2019 in subpart Ba.

[92] Proposed Rule: ''Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review,'' 86 FR 63110 (Nov. 15, 2021); Supplemental Proposal: Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review,'' 87 FR 74702 (Dec. 6, 2022); Proposed Rule: New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule,'' 88 FR 33240 (May 23, 2023).

[93] See, *e.g.,* Comment Letter of Pioneer Natural Resources USA, Inc. on Supplemental Notice of Proposed Rulemaking for Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector (''Oil and Gas Proposed Rule''), EPA–HQ–OAR–2021–0317–2298 at 20–21; Comment Letter of American Petroleum Institute on Oil and Gas Proposed Rule, EPA–HQ–OAR–2021–0317–2428 at 93–95, 102–104; Comment Letter of Power Generators Air Coalition on New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed

Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule (''EGU Proposed Rule''), EPA–HQ–OAR–2023–0072–0710 at 75–78; Comment Letter of Wisconsin Department of Natural Resources and Public Service Commission of Wisconsin on EGU Proposed Rule, EPA–HQ–OAR–2023–0072–0538 at 1–2, 10–11.

requirements to consider potential impacts and benefits of control to communities most affected by and vulnerable to emissions from a designated facility for which a state is proposed a less stringent standard (proposed 40 CFR 60.24a(k)); and a clarification that states may account for other factors in applying a more stringent standard of performance (proposed 40 CFR 60.24a(m)). In addition, the EPA proposed changes to the existing 40 CFR 60.24a(f) (proposed at 40 CFR 60.24a(n), finalized at § 60.24(i)) reflecting the Agency's revised interpretation that CAA sections 111(d) and 116 authorize states to include standards of performance more stringent than the EPA's presumptive standards in their state plans as enforceable requirements.

The EPA received a wide range of comments on its proposed RULOF provisions. Some commenters expressed support for the proposed revisions, noting that the EPA has the authority to specify how RULOF is implemented and the obligation to ensure that its use does not undermine the emission reductions that are achievable through application of the BSER. Supportive commenters also noted that providing a regulatory structure is important to ensure that RULOF is applied in a reliable, consistent, and appropriate manner. Commenters opposed to the proposed RULOF revisions stated that there is no basis in the statute for the EPA to restrict states' authority to consider RULOF and apply less-stringent standards of performance. Some commenters also argued that the EPA's proposed regulations were too prescriptive and burdensome. Other commenters generally supported the EPA's proposed revisions but had questions or concerns regarding specific provisions, including the requirements around source-specific standards of performance and consideration of impacted communities. One commenter requested that the EPA clarify that the revised RULOF provisions would apply to design, equipment, work practice, or operational standards issued under CAA sections 111(d) and 111(h)(1).

After consideration of these comments, the EPA is finalizing a subset of the requirements that it proposed. As a general matter, the EPA is finalizing as requirements the provisions that must apply under any EG to provide necessary clarity to both the states and the EPA in applying or approving less stringent standards of performance. This clarity and predictability with regard to what constitutes a satisfactory, and therefore approvable, less stringent standard is crucial to ensuring the

equitable treatment of states and sources that are considering RULOF in state plans. The requirements the EPA is finalizing are additionally necessary to ensure that use of RULOF is consistent with the statutory purpose of reducing emissions of dangerous air pollutants, the framework under which the EPA is directed to achieve that purpose through determining the degree of emission limitation, and history of RULOF as a limited variance to address unusual circumstances when it is not possible for a particular facility to achieve the EPA's degree of emission limitation. The proposed RULOF provisions that are not being included as regulatory requirements remain important considerations when applying RULOF; however, the EPA is not finalizing them in these general implementing regulations.

The EPA recognizes that in finalizing these updates it is imposing certain requirements on states' use of RULOF. Consistent with the framework of cooperative federalism under which CAA section 111(d) operates, states apply standards of performance pursuant to consideration of RULOF, as well as provide the compliance measures for implementing such standards, subject to the applicable statutory requirements. The Agency again notes that it has placed requirements on states' ability to apply less stringent standards of performance since it first created a variance provision in subpart B in 1975. See 40 CFR 60.24(c) through (e). When Congress later adopted the RULOF provision into the statute, it directed the EPA in CAA section 111(d)(1) to establish a procedure *permitting* states to consider RULOF. Moreover, as discussed further in section III.E.3.b, these updates are consistent with the historical interpretation of RULOF as a variance from the EPA's degree of emission limitation. The EPA also notes that the requirements being finalized in this action establish a process for states in applying less stringent standards of performance. These final regulations ensure, consistent with the statutory purpose, that any less stringent standards are no less stringent than necessary to address the reason that the variance is needed in the first place.

Finally, the EPA confirms that the RULOF provisions, including those being finalized in this action, apply to standards of performance promulgated pursuant to CAA sections 111(d) and 111(h)(1). The existing definition of "standard of performance" in 40 CFR 60.21a(f) includes "a legally enforceable regulation . . . prescribing a design, equipment, work practice, or

operational standard, or combination thereof.'' Therefore, the RULOF provisions in 40 CFR 60.24a, which may be invoked to apply a "standard of performance" to a particular designated facility, also apply to standards of performance applied under CAA section 111(h)(1).[94]

a. Threshold Requirements for Considering Remaining Useful Life and Other Factors

The existing RULOF provision at 40 CFR 60.24a(e) addresses the circumstances in which states may invoke RULOF to deviate from the BSER and degree of emission limitation determinations the EPA has made pursuant to CAA section 111(a)(1). It allows states to consider RULOF to apply a less stringent standard of performance for a designated facility or class of facilities if they demonstrate one of the three following circumstances: (1) unreasonable cost of control resulting from plant age, location, or basic process design; (2) physical impossibility of installing necessary control equipment; or (3) other factors specific to the facility (or class of facilities) that make application of a less stringent standard or final compliance time significantly more reasonable.

As discussed in the notice of proposed rulemaking, the proposed amendments largely retained this provision, including the three circumstances under which a less stringent standard of performance may be applied, and provided further clarification of what a state must demonstrate in order to invoke RULOF in a state plan. Specifically, the proposed amendments required the state to demonstrate that a particular facility cannot reasonably apply the BSER to achieve the degree of emission limitation determined by the EPA, based on one or more of the three circumstances. The EPA's proposal retained the first circumstance in whole and revised the second circumstance to add the "technical infeasibility" of installing a control as another situation in which application of RULOF may be appropriate. The proposal further clarified the third circumstance for invoking RULOF, the existing version of which provides that states may invoke RULOF when other factors specific to the facility make a less stringent standard of performance "significantly more reasonable." The EPA proposed to revise this circumstance, under which the first two circumstances also fall, to specify that states may consider RULOF

---

[94] See also 40 CFR 60.24a(b).

to apply a less stringent standard if circumstances specific to a facility are fundamentally different from the information the EPA considered in determining the BSER. This proposed clarification was intended to provide clear parameters for developing and assessing state plans, as the existing third circumstance is vague and potentially open-ended.

The EPA explained at proposal that the revisions clarified the RULOF provision by tethering a state's RULOF demonstration to the statutory factors the EPA considered in the BSER determination. As discussed in section III.E.1. of this preamble, CAA section 111(a)(1) gives the EPA the responsibility of determining the BSER and degree of emission limitation that is required of designated facilities in the source category; the EPA endeavors, to the extent reasonably practicable based on the information before it, to promulgate determinations that are achievable for every designated facility covered by an EG. Per the statutory requirements, the EPA determines the BSER by first identifying control methods that it considers to be adequately demonstrated and then determining which is the best system of emission reduction by evaluating the statutory factors: (1) the cost of achieving such reduction, (2) nonair quality health and environmental impacts, (3) energy requirements, and (4) the amount of emission reductions.[95] The EPA's BSER determination thus represents a system that is "adequately demonstrated" and reasonable for sources broadly within the source category; CAA section 111(a)(1) requires that standards of performance must reflect the degree of emission limitation that is achievable through application of the BSER.

In considering the BSER, the D.C. Circuit has stated that to be "adequately demonstrated," the system must be "reasonably reliable, reasonably efficient, and . . . reasonably expected to serve the interests of pollution control without becoming exorbitantly costly in an economic or environmental way." *Essex Chem. Corp.* v. *Ruckelshaus,* 486 F.2d 427, 433 (D.C.

Cir. 1973). Thus, in making the BSER determination, the EPA must evaluate whether a system of emission reduction is "adequately demonstrated" for the source category or sub-category based on the physical possibility and technical feasibility of control. Similarly, the court has interpreted CAA section 111(a)(1) as using reasonableness in light of the statutory factors as the standard in evaluating cost, so that a control technology may be considered the "best system of emission reduction . . . adequately demonstrated" if its costs are reasonable (*i.e.,* not exorbitant, excessive, or greater than the industry can bear), but cannot be considered the BSER if its costs are unreasonable.[96] In light of the statutory factors the EPA is required to consider, it follows that most designated facilities within the source category or subcategory should be able to implement the BSER at a reasonable cost to achieve the degree of emission limitation determined by the EPA. Consideration of RULOF is appropriate only for particular sources for which implementing the BSER to achieve that degree of emission limitation would impose unreasonable costs or would otherwise not be feasible due to facility-specific circumstances that are not applicable to the broader source category (or subcategories) and that the EPA did not consider in determining the BSER.

For example, if the EPA applied a specific cost threshold in determining the BSER, application of RULOF based on cost would only be appropriate where the cost of achieving the associated degree of emission limitation at a particular designated facility is unreasonably high relative to the costs the EPA considered for the BSER. Or, by way of further example, if the EPA were to determine that a specific back-end control technology is adequately demonstrated and the BSER for a source category, a state may need to evaluate whether it would be physically possible to install that control technology at a designated facility given the particular size and physical constraints of that facility. Application of RULOF to deviate from the EPA's determinations pursuant to CAA section 111(a)(1) may be appropriate, *e.g.,* where the state could show that the cost of achieving the degree of emission limitation would be significantly higher at a specific designated facility than the cost-per-ton EPA considered in setting the BSER, or that a specific designated facility does

not have adequate space to reasonably accommodate the installation of the BSER and the facility cannot reasonably achieve the degree of emission limitation using a different control technology. The EPA proposed to require states to hew to the same types of factors and analyses the EPA's considered in its BSER determination when demonstrating that the EPA's determinations are not reasonable for a particular designated facility; the Agency explained that this would be consistent with the statutory framework under which RULOF is a limited exception to the level of stringency otherwise required by the BSER.[97]

Related to the proposed revisions at 40 CFR 60.24a(e), the EPA also proposed to add new § 60.24a(g) to the regulations, which would explicitly provide that a state plan may not apply a less stringent standard of performance in cases where a designated facility cannot reasonably apply the BSER to achieve the degree of emission limitation determined by the EPA, but *can* reasonably implement a different technology or other system to achieve that same degree of emission limitation. This is consistent with the statutory framework, which does not require sources to implement the EPA's BSER but rather permits states to allow their sources to comply with their standards of performance using systems of their choosing.

The EPA received a range of comments on the proposed revisions to the threshold circumstances for invoking RULOF to apply a less-stringent standard of performance. Some commenters agreed with the EPA that the existing criteria are not specific or clear enough to ensure that RULOF is invoked only when a designated facility cannot achieve the degree of emission limitation that the EPA has determined pursuant to section 111(a)(1). Several commenters supported the EPA's proposal that application of RULOF is only appropriate where a facility cannot reasonably apply the BSER to achieve the degree of emission limitation determined by the EPA based on fundamental differences between that facility and the factors the EPA considered in the BSER determination. Some commenters also urged the EPA to explicitly apply the "fundamentally different" standard to all three circumstances under 40 CFR 60.24a(e).

However, other commenters argued that the EPA cannot preclude states from considering factors specific to particular facilities on the basis that the EPA did not consider those factors in

---

[95] Although CAA section 111(a)(1) may be read to state that the factors enumerated in the parenthetical are part of the "adequately demonstrated" determination, the D.C. Circuit's case law may be read to treat them as part of the "best" determination. *See Sierra Club* v. *Costle,* 657 F.2d 298, 330 (D.C. Cir. 1981). Under either approach, the EPA's analysis and ultimate determination as to the BSER would be the same. In determining the "best" system of emission reduction, the EPA also considers the advancement of technology, consistent with D.C. Circuit caselaw. See id. at 347.

[96] See *Lignite Energy Council* v. *EPA,* 198 F.3d 930, 933 (D.C. Cir. 1999), *Sierra Club* v. *Costle,* 657 F.2d 298, 343 (D.C. Cir. 1981), *Portland Cement Ass'n* v. *EPA,* 513 F.2d 506, 508 (D.C. Cir. 1975).

[97] 87 FR 79199.

determining the BSER, and that the "fundamentally different" standard unlawfully narrows states' consideration of site-specific factors under the third RULOF criterion. Some commenters further contended that states should have wide latitude and flexibility to consider RULOF and that the EPA lacks authority to restrict states' abilities to apply RULOF in circumstances they deem appropriate. The EPA also received a request from one commenter asking the Agency to clarify how the proposed provisions at 40 CFR 60.24a(e) and (g) interact with each other.

The EPA is finalizing the provisions for invoking RULOF at 40 CFR 60.24a(e) with clarifying revisions relative to proposal. Based on these changes, the proposed addition of 40 CFR 60.24a(g) is redundant; the EPA is therefore not finalizing this provision.

These revisions to 40 CFR 60.24a(e) are necessary to ensure that state plans comply with CAA section 111(d). As explained above, the EPA's determination of the degree of emission limitation achievable through application of the BSER is the level of stringency required by CAA section 111(d), unless it can be demonstrated that something about the EPA's determination does not hold true for a particular designated facility. The enumerated circumstances for invoking RULOF in 40 CFR 60.24a(e) mirror the information the EPA considers in making its BSER and degree of emission limitation determination pursuant to CAA section 111(a)(1): information related to determining that a system is adequately demonstrated (including physical possibility and technical feasibility), the cost of achieving emission reductions, and other factors, which include nonair quality health and environmental impacts and energy requirements. Thus, the long-standing RULOF provision[98] is formulated for states to examine, at a minimum, the same factors the EPA considered in determining the BSER in order to determine the reasonableness of the EPA's BSER and degree of emission limitation as it applies to a particular designated facility. In this action, the EPA is clarifying the circumstances in 40 CFR 60.24a(e) for invoking RULOF in order to provide more objective and consistent criteria that will aid both states and the EPA in developing and reviewing standards of performance consistent with CAA section 111(d), as

well as ensure the equitable treatment of states and sources that avail themselves of the RULOF provision.

The EPA disagrees with commenters who argued that the proposed revisions to the third circumstance unlawfully constrain states' authority to invoke RULOF. On the contrary, the EPA believes these revisions provide necessary clarity to ensure that states invoke RULOF in appropriate circumstances. First, as discussed more fully in section III.E.2. of this preamble, Congress directed the EPA to promulgate regulations for the submission of state plans that "permit" states to consider RULOF. Rather than granting states unfettered discretion to consider RULOF in applying standards of performance, the statute directs the EPA to establish regulations describing the "permissible" use of such consideration. Thus, the EPA has the authority and obligation to guide states' consideration of RULOF.

Second, the revisions to 40 CFR 60.24a(e) provide a clear and easily replicable standard for when it is appropriate to apply a less stringent standard of performance: when there are fundamental differences between the information the EPA considered in determining the degree of emission limitation and the information specific to a facility that make the EPA's degree of emission limitation unreasonable for the facility. In addition to clarifying the circumstances under which consideration of RULOF is appropriate, this standard also provides greater specificity that will aid both states and the EPA in implementing the provision. This standard is further consistent with statutory purpose, structure, and history of CAA section 111(d), under which the generally applicable requirement is the degree of emission limitation determined by the EPA and RULOF serves as a variance to that requirement.[99] Moreover, the revisions to 40 CFR 60.24a(e) will provide a framework for the EPA to use when considering any requests for less stringent standards of performance when the Agency is promulgating a Federal plan, which is again critical to ensuring both the equitable treatment of states and sources and the integrity of an EG's emission reduction purpose.

This revision will additionally provide the EPA with clear criteria to use when evaluating any invocation of RULOF in state plans to determine whether providing a less-stringent standard of performance is consistent with the statutory framework and

therefore approvable as "satisfactory." As noted above, it provides an objective, replicable benchmark against which to assess states' plans, which can be further elaborated on in individual EGs.

The "fundamentally different" standard ensures that RULOF is invoked for circumstances where application of the statutory factors would lead to a result that is outside the realm of what the EPA considered reasonable in determining the BSER. The EPA makes BSER determinations on a source category, or sub-category, basis. Necessarily, therefore, the Agency considers information relevant to potential BSERs for representative, average units or as average values for the set of designated facilities. Implicit in an EPA determination that a system is the BSER based on average, representative information is a determination that values around those average representative values are also reasonable, including some portion of unit-specific values that will deviate from but are not significantly different than the average representative values. Therefore, in order to justify deviating from the EPA-determined degree of emission limitation, the circumstances of a particular source must be not just different but fundamentally different from those the Agency considered in determining the BSER.

Furthermore, as explained at proposal, the "fundamentally different" standard is also consistent with other variance provisions that courts have upheld for environmental statutes. For example, in *Weyerhaeuser Co.* v. *Costle*,[100] the court considered a regulatory provision promulgated under the Clean Water Act (CWA) that permitted owners to seek a variance from the EPA's national effluent limitation guidelines under CWA sections 301(b)(1)(A) and 304(b)(1). The EPA's regulation permitted a variance where an individual operator demonstrates a "fundamental difference" between a CWA section 304(b)(1)(B) factor at its facility and the EPA's regulatory findings about the factor "on a national basis."[101] The court upheld this standard as ensuring a meaningful opportunity for an operator to seek dispensation from a limitation that would demand more of the individual facility than of the industry generally, but also noted that such a provision is not a license for avoidance of the Act's strict pollution control requirements.[102]

---

[98] The circumstances for invoking RULOF in the existing subpart Ba provision at 40 CFR 60.24a(e) are identical to those in the original variance provision of subpart B at 40 CFR 60.24(f).

[99] See the discussion in section III.E.3.b. of this preamble.

[100] 590 F.2d 1011 (D.C. Cir. 1978).

[101] Id. at 1039.

[102] Id. at 1035.

The EPA is revising the regulatory text of 40 CFR 60.24a(e) relative to proposal to explicitly provide that the "fundamentally different" standard applies to all three categories of circumstances for invoking RULOF. This change is consistent with the stated intent at proposal; for example, the EPA proposed "to require that, in order to demonstrate that a designated facility cannot reasonably meet the presumptive level of stringency based on one of these three criteria, the state must show that implementing the BSER is not reasonable for the designated facility due to fundamental differences between the factors the EPA considered in determining the BSER, such as cost and technical feasibility of control and circumstances at the designated facility." [103] As explained above, in order to be consistent with the statutory framework, the fundamentally different standard necessarily applies to any consideration that may be cause to invoke RULOF to provide a less-stringent standard of performance.

There may be instances in which the EPA has not considered, in making its BSER determination, a circumstance that makes the BSER unreasonable for a particular facility because that circumstance is not applicable to the average or typical designated facility in the source category. Where the EPA did not consider a circumstance that is relevant to a particular designated facility and that circumstance causes the BSER to be unreasonable for that facility due to one or more of the reasons enumerated in 40 CFR 60.24a(e), a state may find there is a fundamental difference from the information the EPA considered in determining the degree of emission limitation achievable through application of the BSER. That is, if the EPA did not consider any information pertaining to a certain circumstance in making its determination, facility-specific information relevant to that circumstance that demonstrates that achieving the degree of emission limitation is unreasonable pursuant to 40 CFR 60.24a(e) may be "fundamentally different" from the information the EPA considered. The EPA notes that, in many cases, facility-specific circumstances can be considered in terms of differences in cost. For example, an issue of the technical feasibility of implementing a control to achieve a certain degree of emission limitation may, at its root, be an issue of being able to achieve that degree of emission limitation *at a reasonable cost.* Because cost is generally a more quantifiable and

replicable metric, where possible the EPA expects states to include the impacts of any facility-specific circumstances in the cost calculation, rather than evaluating those circumstances under a different factor or consideration.

The EPA is also finalizing its proposed clarifying revisions to 40 CFR 60.24a(e) with further updates. The existing provision in subpart Ba was not clear, unless it was read directly in conjunction with 40 CFR 60.24a(c), that its specific purpose is application of less stringent standards of performance pursuant to consideration of RULOF; it did not mention less stringent standards until 40 CFR 60.24a(e)(3). [104] The EPA therefore proposed and is finalizing revisions so that the provision's purpose is now clearly stated at the outset. The EPA is also making two further revisions relative to the proposed 40 CFR 60.24a(e). First, it is adding back in language allowing the RULOF provision to be used to provide a compliance schedule longer than otherwise required by an applicable emission guideline. In proposing to revise 40 CFR 60.24a(e), the EPA inadvertently deleted the phrase "that make application of a less stringent . . . final compliance time significantly more reasonable" in the document containing redline/strikeout of the subpart Ba regulations. [105] It was not the EPA's intent to preclude the use of RULOF to provide a longer compliance schedule; this has been part of the provision since the original variance in 1975. [106] However, as the language pertinent to providing a longer compliance time no longer fits in its original sub-paragraph, the EPA is adding this allowance back elsewhere in 40 CFR 60.24a(e).

Second, the EPA is revising this provision relative to proposal to change the circumstances under which invoking RULOF is appropriate from the state demonstrating that "the facility cannot reasonably apply the best system of emission reduction to achieve the degree of emission limitation determined by the EPA . . ." to the state demonstrating that "the facility cannot reasonably achieve the degree of emission limitation determined by the EPA. . . ." At proposal, the EPA explained that "the state must show that implementing the BSER is not reasonable for the designated facility due to fundamental differences between

the factors the EPA considered in determining the BSER, such as cost and technical feasibility of control and circumstances at the designated facility." [107] However, it is not sufficient that a facility not be able to implement the BSER; the state must demonstrate that the facility cannot otherwise reasonably achieve the EPA's degree of emission limitation (for example, through a different system of emission reduction) in order for a facility to be eligible for a less stringent standard of performance. This is consistent with the definition of "standard of performance" in CAA section 111(a)(1), which is a "standard for emissions of air pollutants" that "reflects the degree of emission limitation achievable through application of the [BSER]," as opposed to a standard requiring the application of the BSER. That is, the statute requires a certain degree of emission limitation, not the use of a particular technology. Therefore, the fact that a facility cannot apply the BSER on its own is not sufficient to invoke RULOF.

The EPA believes that simplifying the language in 40 CFR 60.24a(e) will reduce confusion about the ultimate circumstances under which invoking RULOF is appropriate: where a particular facility cannot meet the degree of emission limitation determined by the EPA. Because the degree of emission limitation is based on the EPA's BSER determination, the information the EPA considered in determining the BSER remains the touchstone for determining when a particular facility cannot reasonably achieve the degree of emission limitation in the applicable emission guideline. Furthermore, given that the BSER presumptively reflects a system that is adequately demonstrated and reasonable for all designated facilities within a source category or subcategory, the EPA anticipates that in many if not most instances a state considering RULOF will in fact be evaluating the reasonableness of applying the BSER to achieve the degree of emission limitation. However, even if the state is evaluating the use of a different system to achieve the degree of emission limitation determined by the EPA, the factors and information the EPA considered in the EG, *e.g.,* cost effectiveness, will remain relevant to this inquiry.

As a corollary to this change, the EPA is not finalizing the provision proposed at 40 CFR 60.24a(g), which would have provided that a state could not apply a less stringent standard of performance where a facility could reasonably

---

[103] 87 FR 79199.

[104] 84 FR 32520, 32577 (July 8, 2019).

[105] Memorandum, "Redline/Strikeout for proposed amendments to 40 CFR 60 Subpart Ba: Adoption and Submittal of State Plans for Designated Facilities," Docket ID No, EPA–HQ–OAR–2021–0527–0035.

[106] See 40 CFR 60.24(f).

[107] 87 FR 79199.

implement a system of emission reduction other than the BSER to achieve the degree of emission reduction determined by the EPA. This provision is redundant now that the EPA is clarifying in 40 CFR 60.24a(e) that states may apply less stringent standards of performance only when they demonstrate that a facility cannot reasonably achieve the degree of emission limitation determined by the EPA.

Both subpart B at 40 CFR 60.24(f) and the existing regulations of subpart Ba at 40 CFR 60.24a(e) provide that use of RULOF is appropriate if a state demonstrates that one of the three circumstances is met "with respect to each facility (or class of such facilities)." In the notice of proposed rulemaking for this action, the EPA stated that, "[t]o the extent that a state seeks to apply RULOF to a class of facilities that the state can demonstrate are similarly situated in all meaningful ways, the EPA proposes to permit the state to conduct an aggregate analysis of [the five BSER factors] for the entire class." [108] The EPA is reiterating in this final rule that invoking RULOF and providing a less-stringent standard or performance or longer compliance schedule for a class of facilities is only appropriate where all the facilities in that class are similarly situated in all meaningful ways. That is, they must not only share the circumstance that is the basis for invoking RULOF, they must also share all other characteristics that are relevant to determining whether they can reasonably achieve the degree of emission limitation determined by the EPA in the applicable EG. For example, it would not be reasonable to create a class of facilities for the purpose of RULOF on the basis that the facilities do not have space to install the EPA's BSER control technology if some of them are able to install a different control technology to achieve the degree of emission limitation in the EG. Similarly, it would not be appropriate for a state to conduct a single evaluation pursuant to 40 CFR 60.24a(f) to apply the same less stringent standard of performance to a class of facilities if individual facilities within that class have different characteristics that could result in different standards of performance. The evaluation of when it is appropriate to create a class of facilities is extremely source-sector and EG-specific; the EPA will advise circumstances in which it may or may not be permissible to group facilities for purposes of RULOF in individual EGs.

In summary, the EPA is finalizing its proposed revisions to 40 CFR 60.24a(e) with additional clarifications. The first is to reflect that the "fundamentally different" standard applies to all three circumstances for invoking RULOF. This clarification reinforces that invocation of RULOF is appropriate when the circumstances of a particular designated facility are fundamentally different from those the EPA considered such that the facility cannot reasonably achieve the degree of emission limitation the EPA determined pursuant to CAA section 111(a)(1). Second, the EPA is revising the circumstances under which invoking RULOF is appropriate from a demonstration that a facility cannot reasonably apply the BSER to achieve the degree of emission limitation determined by the EPA to a demonstration that the facility cannot reasonably achieve the degree of emission limitation determined by the EPA. This change is intended to simplify and clarify the provision as it is the degree of emission limitation determined by the EPA, not the system used to achieve it, that has always been the relevant consideration under CAA sections 111(d) and 111(a)(1). Third, the EPA is clarifying the provision that states may use RULOF to provide for a longer compliance timeline as well as less-stringent standards of performance, which was inadvertently omitted from the proposed regulatory text. In general, the EPA is revising 40 CFR 60.24a(e) to provide more objective and consistent criteria for when it is appropriate to invoke RULOF in order to guide states in applying standards of performance to particular designated facilities and the EPA in evaluating state plans. The EPA is not finalizing proposed 40 CFR 60.24a(g), as this provision is now superfluous given the updates to 40 CFR 60.24a(e).

The EPA acknowledges that what is considered reasonable in light of the statutory factors is a fact-specific inquiry based on the source category and pollutant that is being regulated pursuant to a particular EG, and that the EPA cannot anticipate and address all circumstances that may arise in these general implementing regulations. Thus, the EPA may consider additional factors and establish additional parameters governing the consideration of RULOF, including what deviations from the EPA's determinations may be within the range of reasonable versus deviations that constitute fundamental differences between facility-specific circumstances and the EPA's degree of emission limitation determination, in a particular EG.

b. Calculation of a Standard Which Accounts for Remaining Useful Life and Other Factors

If a state has demonstrated, pursuant to 40 CFR 60.24a(e), that there is a fundamental difference between the information the EPA considered in the applicable EG and the information specific to a particular source that makes it unreasonable for that source to achieve the degree of emission limitation, the state may then apply a less stringent standard of performance.[109] The current RULOF provision, 40 CFR 60.24a(e), does not specify how a less stringent standard is to be calculated and applied. While this provision stands on its own and permits states to consider RULOF to apply a less stringent standard of performance, the lack of a process for determining any such standards makes it difficult for states to know whether the result will be approvable and additionally makes it difficult for the EPA to review less stringent standards in a consistent and equitable manner. In order to provide clarity and ensure the integrity of the emission reduction purpose of CAA section 111(d), as well as to ensure the equitable treatment of designated facilities across states, the EPA is promulgating a framework in 40 CFR 60.24a(f) for the calculation of a standard of performance that accounts for RULOF. As explained in this section of the preamble, the process the EPA is finalizing differs from the proposed framework, but the material components of calculating and applying a less stringent standard of performance, and the underlying purpose and direction of the EPA's framework, remain the same.

The EPA proposed to require that states determine a source-specific BSER for each designated facility for which RULOF has been invoked pursuant to 40 CFR 60.24a(e) and include a standard of performance that reflects the degree of emission limitation achievable through application of that BSER in their state plans. The notice of proposed rulemaking explained that the statute requires the EPA to determine the BSER by considering emission control methods that it finds to be adequately demonstrated, and then determining which is the best system of emission

---

[108] 87 FR 79200 n.46.

[109] States intending to apply a less-stringent standard of performance pursuant to RULOF would include all information, demonstrations, etc. necessary to satisfy 40 CFR 60.24a(e) through (h) in their state plan submissions. The EPA will first review a state's demonstration that invocation of RULOF pursuant to 40 CFR 60.24a(e) is appropriate for a particular designated facility against the applicable requirements. If the EPA finds that demonstration satisfactory, it will proceed to evaluate the standard of performance for that facility applied pursuant to 40 CFR 60.24a(f).

reduction by evaluating (1) the cost of achieving such reduction, (2) nonair quality health and environmental impacts, (3) energy requirements, and (4) the amount of reductions.[110] To be consistent with this statutory construct, the EPA proposed to require that in determining a source specific BSER for a designated facility (or class of such facilities [111]), a state must also consider all these factors in applying RULOF for that source.

Specifically, the EPA proposed that a state in its plan submission would identify all control technologies available for the source and evaluate the BSER factors for each technology, using the same factors and evaluation metrics as the EPA did in developing the EG. For example, if the EPA evaluated the cost factor using the evaluation metric of capital costs in determining the BSER, the EPA proposed that the state must do the same in evaluating a control technology for an individual designated facility, rather than selecting a different evaluation metric for cost. The state would then calculate the emission reductions that applying the source-specific BSER would achieve and select the standard of performance which reflects this degree of emission limitation. This standard would be in the form or forms (*e.g.,* numerical rate-based emission standard) as required by the specific EG.

While the EPA proposed to require that states identify all control technologies or other systems of emission reduction available for the source and evaluate each system using the same factors and evaluation metrics as the EPA did in determining the BSER, it also solicited comment on whether there are additional factors, not already accounted for in the BSER analysis, that the EPA should permit states to consider in determining a less stringent standard of performance. The EPA further solicited comment on whether it should provide that the manner in which the EPA conducted the BSER analysis would be a presumptively approvable framework for applying a less-stringent standard rather than requirements and, if so, what different approaches states might use to evaluate and identify less stringent standards of performance.

The EPA also noted at proposal that CAA section 111(d) requires that state plans include measures that provide for the implementation and enforcement of a standard of performance. This requirement applies to any standard of performance established by a state, including one that accounts for RULOF. Such measures include monitoring, reporting, and recordkeeping requirements, as required by 40 CFR 60.25a, as well as any additional measures specified under an applicable EG. In particular, any standard of performance that accounts for RULOF is also subject to the requirement under subpart Ba that the state plan submission include a demonstration that each standard is quantifiable, non-duplicative, permanent, verifiable, and enforceable. 40 CFR 60.27a(g)(3)(vi). The EPA did not reopen these existing requirements of subpart Ba in this rulemaking.

The EPA received both comments in support of and comments opposed to the proposed requirements for calculating facility-specific standards of performance under RULOF. Some commenters supported the addition of a regulatory framework for facility-specific BSER analysis and stated that the BSER factors encompass all relevant information to a state's determination of an appropriate standard for a facility. Other commenters opposed the proposed framework. Comments in opposition largely fell into two categories: Some commenters asserted there is no basis in the statute for requiring states to conduct facility-specific BSER analyses pursuant to RULOF and, relatedly, that the EPA should not put restrictions on what states may consider in applying a less stringent standard of performance for a particular source but should rather maintain the wide latitude afforded to states under CAA section 111. Others stated that the EPA's proposed requirements would constitute a heavy lift for state agencies and would require substantial work for states to implement. In this vein, one commenter requested that the EPA not require states to evaluate, as part of their facility-specific BSER analyses, control technologies that the Agency has previously excluded from the BSER on the basis of technological or economic feasibility. Rather, the only control technologies that states should be required to evaluate are technologies that result in less emission reduction than the technology the EPA determined to be the BSER.

As explained below, the EPA disagrees with comments that there is no basis for putting a framework in

place for states and the Agency to use in applying and evaluating less stringent standards of performance. The EPA believes that such a framework is well supported by the statutory purpose, text, and context of the RULOF provision. In particular, after considering the comments, the EPA believes that the purpose, text, and context support a requirement that states (or the EPA in the case of a Federal plan) calculate and apply a standard of performance that varies from the EPA's degree of emission limitation in the applicable emission guideline only to the extent necessary to address the fundamental difference that is the basis for invoking RULOF.

First, providing a framework for calculating less stringent standards of performance is consistent with the text of CAA section 111(d) and is responsive to Congress's directive in that provision that the Agency prescribe regulations establishing a procedure for state plans, including regulations that ''permit'' states ''in applying'' a standard of performance to a particular source to ''take into consideration'' RULOF. The provisions the EPA is promulgating in this action set out a procedure—the series of steps and considerations states must undertake to apply a less stringent standard of performance. As described in section III.E.2. of this preamble, to ''permit'' something means to allow or give consent for that thing to occur. In this case, the EPA is prescribing the procedures that allow for states to apply less stringent standards of performance. To ''apply'' means ''to put to a special use or purpose'' or ''put into practical operation,'' [112] and ''consideration'' means ''the action of taking into account.'' [113] Thus, the state's authorization to ''apply[]'' a standard of performance to any particular source, ''tak[ing] into consideration'' RULOF, means the state may particularize a standard of performance for a given source by accounting for remaining useful life and other factors where there are fundamental differences between the information specific to a facility and the information the EPA considered in determining the degree of emission limitation achievable through application of the BSER. In doing so, the state must remain as consistent as possible with that degree of emission limitation in light of what the Supreme

---

[110] The D.C. Circuit has stated that in determining the ''best'' system, the EPA must take into account ''the amount of air pollution'' reduced, *see Sierra Club* v. *Costle,* 657 F.2d 298, 326 (D.C. Cir. 1981), and the role of ''technological innovation.'' *Id.* at 347.

[111] See section III.E.3.a. of this preamble. The EPA expects to address the appropriateness of invoking RULOF and applying less-stringent standards to a class of facilities in individual EGs.

[112] Oxford English Dictionary, *https:// www.oed.com/search/advanced/ Meanings?textTermText0=apply&text TermOpt0=WordPhrase,* last accessed Nov. 1, 2023.

[113] *Id., https://www.oed.com/search/advanced/ Meanings?textTermText0=consideration& textTermOpt0=WordPhrase,* last accessed Nov. 1, 2023.

Court has recognized as the EPA's "primary regulatory role in section 111(d)" [114] and the emission reduction purpose of CAA section 111.

Second, the history and context of CAA section 111(d) supports the EPA's authority to provide a framework for states' consideration of RULOF. As explained in section III.E.2. of this preamble, the standards of performance that states establish in state plans must generally be no less stringent than the degree of emission limitation that Congress required, which is the degree of emission limitation that EPA determines in the applicable EG. [115] However, in the original 1975 subpart B implementing regulations, the EPA allowed states to grant variances from this degree of emission limitation in cases of economic hardship based on the age of the plant and other factors, as long as the states could justify the variances. [116] Congress then, in the 1977 CAA Amendments, included the RULOF provision in CAA section 111(d)(1), which similarly allows states to deviate from the EPA's degree of emission limitation based on consideration of an existing source's age (i.e., remaining useful life) and other factors.

Congress's inclusion of the RULOF provision in CAA section 111(d)(1) should be interpreted as expressing its intent to confirm that the EPA has authority to promulgate a regulatory variance provision, including the provision the EPA had, at that time, recently promulgated. The EPA, following its 1974 proposal of the subpart B implementing regulations, had received a comment arguing that it did not have authority to promulgate such a variance provision, to which it responded by asserting that it did have the authority and explaining that such a provision is consistent with CAA section 111(d). [117] The Courts have held that Congress is presumed to be aware of an administrative interpretation under certain circumstances. [118] Accordingly, Congress's adoption of the RULOF provision in the 1977 CAA Amendments should be interpreted as expressing its intent to make explicit under CAA section 111(d) the EPA's

authority to promulgate regulations that include a variance provision. [119]

It is also clear that the EPA understood the RULOF provision in CAA section 111(d)(1) to be a variance in the same way it had provided a variance in subpart B. This is evidenced by the fact that following the 1977 CAA Amendments the EPA did not revise its 1975 regulations, which were premised on this understanding, for over forty more years. [120] This indicates that the EPA viewed its 1975 regulations granting a variance as authorized under the RULOF provision enacted in 1977.

The regulations the EPA is promulgating at 40 CFR 60.24a(f) are consistent with the long-held view that the Agency's implementing regulations provide a variance. While 40 CFR 60.24a(e) provides the process for invoking this variance, to date the regulations have not included the second part: how to address a source that has qualified for the variance. [121] Although variances may operate in different ways in the context of different statutory and regulatory schemes, it is

clear from both the language and the context of the RULOF provision that Congress intended it to provide for alternative compliance with CAA section 111(d), i.e., a less stringent standard of performance, to the extent necessary to address the fundamental differences between the EPA's EG and the circumstances of a particular facility. Such variances are common throughout environmental statutes and, for the environmental protection aim to be achieved, must be crafted so that the alternative is as close as possible to the statutory standard, even as it departs from the generally applicable requirement.

For example, Clean Water Act (CWA) section 301(b)(2) requires, in part, certain sources to achieve effluent limitations consistent with application of the best available technology economically achievable, which will result in reasonable further progress toward eliminating the discharge of all pollutants. These limitations must be determined in accordance with factors specified in the statute and are provided by either effluent limitation guidelines issued by the EPA or the permitting authority on a best professional judgment basis where no such national effluent limitation guidelines exist. CWA section 301(n) authorizes the EPA to grant variances for existing sources from the best available technology requirements of its effluent limitation guidelines where a facility can demonstrate that it is fundamentally different with respect to the factors (other than cost) specified in the statute and considered by the EPA in establishing those requirements. CWA section 301(n) further requires that, where a variance is warranted, the EPA must provide an alternative requirement that (1) is no less stringent than justified by the fundamental difference, and (2) will not result in a non-water quality environmental impact which is markedly more adverse than the impact considered in establishing the rule. [122]

Similarly, section 3004(m)(1) of the Resource Conservation and Recovery Act (RCRA) requires the EPA to promulgate regulations specifying the levels or methods of treatment of hazardous waste, if any, that "substantially diminish the toxicity of the waste or substantially reduce the

---

[114] *West Virginia* v. *EPA*, 142 S. Ct. at 2601.

[115] 40 CFR 60.24(c); 40 CFR 60.24a(c); see 39 FR 36102.

[116] 40 CFR 60.24(f); 40 FR 53344.

[117] 40 FR 53344.

[118] See *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when in re-enacts a statute without change.").

[119] In the notice of proposed rulemaking for this rule, the EPA stated that "[t]here are noticeable differences between the subpart B variance provision and the CAA section 111(d) RULOF provision that indicate Congress did not intend to incorporate and ratify all aspects of the EPA's regulatory approach when amending CAA section 111(d) in 1977." The EPA thus proposed to conclude that it could not "clearly ascertain whether the statutory RULOF provision ratified the variance provision under subpart B . . . ." 87 FR 79176, 79205 (Dec. 23, 2022). Upon further consideration, however, the EPA believes the most reasonable interpretation of the statutory RULOF provision, given its history and context, is that Congress intended it to authorize the EPA to provide variances from the required degree of emission limitation on a case-by-case basis. However, the EPA agrees with its assessment at proposal that Congress did not necessarily incorporate or ratify specific aspects of the Agency's 1975 variance provision; it is reasonable that Congress would not have codified the precise regulations that the EPA promulgated in 1975 and instead leave the Agency space to revise those regulations as needed, as it is did in 2019 and is doing in the present rule.

[120] The ACE rule, in which the EPA promulgated subpart Ba in 2019, declined to refer to the RULOF provision as a "variance," apparently because the term conflicted with that rule's view that RULOF would be used to establish standards of performance as a general matter. 84 FR 32520,32570 n. 291 (July 8, 2019). The ACE rule misunderstood the RULOF provision. As explained throughout section III.E. of this preamble, this provision authorizes a state to depart from the degree of emission limitation the EPA determines under CAA section 111(a)(1) when applying a standard of performance to a particular source pursuant to consideration of RULOF. As the 1975 regulations indicated, 40 FR 53332, 53344 (Nov. 17, 1975), it is appropriate to call this type of departure or exception a "variance."

[121] The EPA explains the reasons it believes it is now necessary to provide the second part of the process for this variance—how to calculate a less stringent standard of performance—in section III.E.2. of this preamble.

[122] As another example, CWA section 301(c) provides that the EPA may modify the best available technology requirements for particular sources if a facility can demonstrate that a modified standard will (1) represent the maximum use of technology within the economic capability of the owner or operator and (2) will result in reasonable further progress toward the elimination of the discharge pollutants.

**80520** **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized.'' The EPA has set generally applicable regulatory standards for the treatment of hazardous waste under RCRA section 3004(m)(1). The Agency has also has provided regulatorily for waste-specific variances in instances in which it is not physically possible, or it is inappropriate, to treat waste to the level specified in the Agency's treatment standard or to treat waste using the method the Agency specified as the treatment standard.[123] In order for the EPA to grant a variance, the party requesting it must provide an alternative waste treatment requirement that is sufficient to minimize threats to human health and the environment posed by disposal of the waste, *i.e.,* that is sufficient to satisfy the underlying statutory requirement, even though it differs from the generally applicable treatment standard prescribed by the EPA.

The discussion above highlights examples of environmental statutes that require adherence to a generally applicable standard, but under which either Congress or the EPA has authorized variances when it is impossible or unreasonable for a particular regulated entity to achieve that standard. For a general statutory standard requiring the ''best'' technology or ''substantial'' progress, the variances are an alternative way of achieving the statutory standard, as opposed to an exemption from that standard. In the case of the CWA variances, in particular, this means that the alternative requirement pursuant to the variance constitutes a degree of pollutant limitation that deviates as little as possible from the EPA's regulation pursuant to that statutory standard. That is, the alternative requirement constitutes a particular regulated entity's best effort to achieve the generally applicable standard.

The EPA has crafted 40 CFR 60.24a(e) and (f) to be a variance in the same vein as the CWA and RCRA statutory and regulatory provisions discussed above. It is clear from both the history and plain language of CAA section 111(d)(1) that Congress did not provide an exemption from regulation, but rather a method for providing alternative compliance with the general statutory requirement of that section.[124] CAA

section 111(d) provides that states must submit plans that include ''standards of performance,'' and CAA section 111(a)(1) defines ''standard of performance'' as ''a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which . . . the Administrator determines has been adequately demonstrated.'' Thus, the underlying statutory standard is the degree of emission limitation determined by the EPA in the applicable EG. A variance from this statutory standard is not available if a source can reasonably achieve the EPA's degree of emission limitation. If a variance is warranted, the alternative requirement, *i.e.,* a standard of performance pursuant to consideration of RULOF, must be a standard for emissions of air pollutants that is no less stringent than necessary to address the fundamental differences identified under 40 CFR 60.24a(e). That is, the degree of emission limitation of a standard of performance pursuant to RULOF must deviate as little as possible from the degree of emission limitation in the applicable EG.[125] Consistent with the structure of CAA section 111(d) generally, the RULOF provision does not prescribe the use of any particular system of emission reduction in conjunction with a less stringent standard of performance but instead focuses on ensuring that the degree of emission limitation deviates no more than necessary; anything less would be inconsistent with the general statutory framework.

Thus, 40 CFR 60.24a(f)(1) requires that a less stringent standard of performance be no less stringent (or have a compliance schedule no longer) than necessary to address the fundamental differences identified under 40 CFR 60.24a(e). It also contains a framework that states must use, to the extent necessary to satisfy that criterion, to determine the less stringent standard of performance. In some instances, determining the standard of performance that is no less stringent

than necessary to address the fundamental differences will be straightforward and the state will not need to undertake the analysis of additional systems of emission reduction that is laid out in the second and third sentences of 40 CFR 60.24a(f)(1). For example, where the BSER the EPA has identified in the applicable EG may be implemented at the source at either a lower stringency or with a longer compliance schedule and it is clear that no other system of emission reduction will result in greater stringency or a shorter schedule, it is unnecessary for a state to evaluate other systems in order to satisfy the first sentence of paragraph (f)(1). In this case, the state would simply justify the degree of emission limitation or compliance schedule as the most stringent or shortest reasonably possible.

However, where a particular source cannot implement the types of controls that comprise the BSER or where it is not apparent that implementation of the BSER at lower stringency or with a longer compliance schedule will result in a standard of performance that is no less stringent than necessary, evaluation of additional systems of emission reduction will be necessary under 40 CFR 60.24a(f)(1). In this situation, the EPA does not believe it is reasonably possible to determine a standard of performance that satisfies the criterion of § 60.24a(f)(1) without considering the systems of emission reduction that the EPA determined, in the applicable EG, have been adequately demonstrated.[126] As discussed below, however, it may not be necessary for a state to evaluate every system of emission reduction that the EPA considered. Thus, the EPA is requiring that, to the extent necessary to determine a standard of performance that is no less stringent than necessary, states must evaluate the systems of emission reduction in the applicable EG. As further discussed below, the EPA expects states will leverage the information and analysis the Agency has provided in that EG for their evaluations, particularizing that information to the circumstances of the particular facility as needed.

Similarly, it is not reasonably possible to craft a standard of performance that is no less stringent than necessary to address a fundamental difference between a particular facility's circumstances and the information the EPA considered in determining the degree of emission limitation without engaging with that information.[127] In

---

[123] 40 CFR 268.44.

[124] See CAA section 111(d)(1) (requiring that states considering RULOF for a particular source nonetheless apply a standard of performance to that source); 39 FR 36102, 36102 (Oct. 7, 1974)

(proposed regulations ''provide that States may establish less stringent emission standards on a case-by-case basis provided that sufficient justification is demonstrated in each case'').

[125] *Cf. Weyerhaeuser Co.* v. *Costle,* F.2d 1011, 1035 (D.C. Cir. 1978) (Clean Water Act variance provision ''authorizes the Agency to relieve a particular point source operator from any demands that the Act does not allow the Agency to make of the industry generally.'' However, the point source operator must still, consistent with the general statutory requirement for the industry, use the best available technology economically available and ''the variance may not halt progress toward eliminating pollution.'').

[126] See 40 CFR 60.22a(b)(2).

[127] *Cf. Weyerhaeuser Co.* v. *Costle,* F.2d 1011, 1035 (D.C. Cir. 1978) (CWA section 304(b)(2)(B) lays out

determining the degree of emission limitation in an EG, the EPA considers whether available systems of emission reduction have been adequately demonstrated, the amount of emissions they reduce, the cost of achieving such reduction, any nonair quality health and environmental impacts, and energy requirements.[128] To evaluate whether a state's less stringent standard of performance is no less stringent than necessary, both states and the EPA need to be able to compare the information relevant to the source category (or subcategory) with the facility-specific information. Additionally, to ensure equitable consideration and treatment of sources in different states that have invoked RULOF to apply less stringent standards of performance, it is necessary that each state is using a common set of factors and metrics as the bases for their decisions. Using the factors [129] and evaluation metrics [130] that the EPA considered in determining the degree of emission limitation ensures "apples-to-apples" comparisons, both between the EPA's degree of emission limitation and a state's less stringent standard of performance and between different sources in different states. Thus, to the extent that states are evaluating systems of emission reduction to determine a less stringent standard of performance under 40 CFR 60.24a(f)(1), they must

use the same factors the EPA considered, and the evaluation metrics the EPA used to consider the factors, in doing so.

For example, assume the EPA considered cost using the evaluation metric dollars per ton of pollutant reduced and concluded that costs of up to $500/ton of pollutant reduced are reasonable. A state has invoked RULOF for a particular source under 40 CFR 60.24a(e) because, based on that source's shortened remaining useful life, the cost, in dollars per ton of pollutant reduced, of achieving the degree of emission limitation in the applicable EG is fundamentally different from $500/ ton. The state, in determining a less stringent standard of performance pursuant to 40 CFR 60.24a(f), must evaluate the systems of emission reduction in the EG using the cost evaluation metric dollars per ton of pollutant reduced. In doing so, the state would consider the reasonableness of the costs of those systems against the benchmark of $500/ton.

The regulations at 40 CFR 60.24a(e) also allow states to invoke RULOF based on a fundamental difference unrelated to cost, *e.g.,* physical impossibility of implementing control equipment necessary to achieve the EPA's degree of emission limitation. In this instance, a state may find that a particular facility's footprint is such that there are no systems of emission reduction that could be installed at the facility to achieve the degree of emission limitation in the applicable EG. Under 40 CFR 60.24a(f)(1), the state would evaluate the systems of emission reduction in the EG using the factors— technical feasibility, amount of emission reductions, cost of achieving such reductions, nonair quality health and environmental impacts, and energy requirements—and evaluation metrics the EPA considered in order to determine the standard of performance that is both physically possible for the source to achieve and that is no less stringent than necessary.

As explained in section III.E.3.a., there may be facility-specific circumstances and factors that the EPA did not anticipate and consider in the applicable EG that make achieving the EPA's degree of emission limitation unreasonable for that facility. Such facility-specific information may constitute an "other factor specific to the facility" under 40 CFR 60.24a(e) and could potentially represent a fundamental difference between the information the EPA considered in determining the degree of emission limitation and the information specific to a facility. Such facility-specific "other

factors" may also be relevant in determining and applying a less stringent standard of performance. Thus, pursuant to the process the EPA is finalizing in 40 CFR 60.24a(f)(1), states may consider "other factors specific to the facility" that were the basis of the demonstration under paragraph (e) in determining and applying a less stringent standard of performance.

In some instances, the fundamental difference between the information the EPA considered in the applicable EG and the information specific to a facility will manifest as a difference in whether or how an enumerated factor applies to a particular facility. For example, parasitic load may be an appropriate evaluation metric for considering energy requirements for some systems of emission reduction but not for others, or water availability may not have been important to the EPA's consideration of nonair quality environmental impacts but may be relevant for a source located in a particularly water-scarce region. If such information represents a fundamental difference that make the EPA's degree of emission limitation determination unreasonable for a particular facility pursuant to 40 CFR 60.24a(e), it would be reasonable and permissible for a state to consider such information in applying a less stringent standard of performance under 40 CFR 60.24a(f)(1).

In addition to "other factors" that the EPA did not necessarily consider, there may be circumstances in which a system of emission reduction that the EPA did not consider in the applicable EG or that the EPA concluded was not adequately demonstrated because, *e.g.,* it is not available on a source-category wide basis, is available, technically feasible, and potentially reasonable for a particular facility.

The EPA is therefore providing in 40 CFR 60.24a(f)(1) that states may consider, in determining a less stringent standard of performance, "other factors specific to a facility" that were the basis for the fundamental difference and invoking RULOF under 40 CFR 60.24a(e), as well as systems of emission reduction in addition to those the EPA considered in the applicable EG. At the same time, however, the EPA in a particular EG makes certain judgments about which systems are available and adequately demonstrated, as well as how the factors are reasonably considered when evaluating those systems for designated facilities within the source category. To ensure that any additional considerations do not result in a standard of performance that deviates more than necessary from the

---

[128] The D.C. Circuit has stated that in determining the "best" system of emission reduction, the EPA must also take into account the role of "technological innovation." See *Sierra Club* v. *Costle*, 657 F.2d 298, 347 (D.C. Cir. 1981). However, because technological innovation is less likely to be relevant at the scale of a single facility than it is on a source-category basis, the EPA is not explicitly requiring states to consider it under 40 CFR 60.24a(f)(1).

[129] Under 40 CFR 60.24a(f)(1), as finalized in this action, states must evaluate the systems of emission reduction identified in the applicable EG. The EPA's EGs include systems of emission reduction that have been "adequately demonstrated." There is therefore no need for states to revisit the "adequately demonstrated" consideration. However, "adequately demonstrated" includes "technical feasibility," and the EPA acknowledges that systems of emission reduction that are adequately demonstrated for the source category may not be technically feasible for a particular source. The EPA is thus adding "technical feasibility" to the list of factors states must consider in determining a less stringent standard of performance.

[130] An "evaluation metric" includes both the form of the EPA's consideration of a factor and any threshold or level of reasonableness the EPA considered in the applicable EG.

EPA's degree of emission limitation, the state must justify how any additional consideration results in a standard of performance that is no less stringent than necessary to address the fundamental differences identified under paragraph (e).

In addition to being consistent with statutory and regulatory precedent on variances, the procedure the EPA is promulgating in 40 CFR 60.24a(f)(1) for determining standards of performance that are no less stringent than necessary is also consistent with CAA section 111. As explained throughout this section of the preamble, CAA section 111(a)(1) defines a standard of performance as a standard for emissions of air pollutants that reflects a certain degree of emission limitation and gives the EPA the "primary regulatory role"[131] of determining that degree of emission limitation. Congress required that, in doing so, the EPA evaluate systems of emission reduction that have been adequately demonstrated and determine which is best based on the amount of emission reductions, cost of achieving such reduction, nonair quality health and environmental impacts, and energy requirements. As also explained in this section of the preamble, CAA section 111(d) directs the EPA to prescribe regulations that "permit" states "in applying" a standard of performance to a particular source to "take into consideration" RULOF. The requirements the EPA is promulgating in 40 CFR 60.24a(f)(1) "permit" a state to particularize a standard of performance for any given source by accounting for RULOF where there are fundamental differences between the information specific to a facility and the information the EPA considered in determining the degree of emission limitation in the applicable EG. In doing so, the state must remain as consistent as possible with that degree of emission limitation in light of what the Supreme Court has recognized as the EPA's primary regulatory role in CAA section 111(d) and the emission reduction purpose of CAA section 111. Because Congress has identified the factors noted above as relevant considerations for the EPA in determining a standard of performance, the Agency believes it is also reasonable to require states to consider these systems, factors, and evaluation metrics in the manner that the EPA did in applying standards of performance pursuant to 40 CFR 60.24a(f).

Furthermore, the EPA's authority to promulgate 40 CFR 60.24a(f) is buttressed by CAA section 111(d)(2). As discussed in sections III.E.1. and 2. of this preamble, CAA section 111(d)(2) provides that the EPA shall have the same authority as under CAA section 110(c) to prescribe a Federal plan where a state fails to submit a satisfactory plan. The EPA's long-standing interpretation of this subsection is that it provides the Agency authority to substantively review states' standards of performance.[132] The existing regulations of subpart Ba and the EPA's emission guidelines provide the substantive criteria for the Agency's evaluation of standards of performance generally;[133] the regulations the EPA is promulgating at 40 CFR 60.24a(f) constitute the substantive criteria for evaluating standards of performance states have applied pursuant to RULOF.

Some commenters on proposed 40 CFR 60.24a(f) dislike the EPA's approach to determining what constitutes a "satisfactory" less stringent standard of performance but offer no alternatives, other than states should have complete discretion to apply standards pursuant to RULOF. This cannot be correct. If this was the case, the EPA would have no choice but to approve plans in which states have applied business-as-usual standards, or standards that allows designated facilities' emissions to *increase,* even if more stringent standards of performance are reasonable for that facility. Such an outcome would be inconsistent with the text, context, and purpose of CAA section 111. The EPA believes the criteria it is providing for the Agency's substantive review of less stringent standards of performance are a reasonable approach to fulfilling its statutory obligation under CAA section 111(d)(2) to substantively review standards of performance in state plans.

Moreover, it is not uncommon for the EPA to promulgate regulatory frameworks to guide states in areas in which Congress has granted them discretion. For example, under the visibility protection provisions of CAA section 169A, Congress directed the EPA to promulgate regulations to assure that reasonable progress towards meeting the national goal for visibility improvement in mandatory class I Federal areas, as well as to assure compliance with the requirements of CAA section 169A. Section 169A further provides that states implement the visibility protection requirements through state implementation plans, in which they must include emission limitations for sources of visibility impairing pollutants. The statute provides two types of control analyses for states to use in determining the applicable emission limitations: reasonable progress and best available retrofit technology.[134] Although Congress directed states to determine the best available retrofit technology for their existing sources, the EPA, in promulgating its implementing regulations, provided a detailed methodology and requirements for doing so in 40 CFR 51.308(e) and 40 CFR part 51, appendix Y. The EPA has similarly prescribed requirements for states to determine the emission reduction measures that are necessary to make reasonable progress in 40 CFR 51.308(f).[135] These requirements create procedural and substantive frameworks within which states exercise their discretion in order to ensure the outcomes of their control analyses are consistent with the statutory requirements and purpose. The regulatory framework and associated guidance also provide states useful clarity as to how the EPA will fulfill its statutory obligation to review and approve or disapprove state plans, and how the EPA will promulgate Federal plans.

The EPA is not providing that states can forgo analyzing control technologies or other systems of emission reduction that the EPA has excluded from being the BSER on the basis of technological or economic feasibility, as suggested by commenters. The EPA conducts BSER analyses on a source-category basis. It may be that a system of emission

---

[131] *West Virginia* v. *EPA,* 142 S. Ct. at 2601.

[132] See 40 FR 53342 (CAA section 111(d)'s references to CAA section 110 suggest that Congress intended the Administrator to apply some substantive criterion to his review of State plans).

[133] See 40 CFR 60.24a(c).

[134] CAA section 169A(g)(1) and (2). The statutory factors that states must use to determine reasonable progress are "costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements." The statutory factors for best available retrofit technology analysis are: "costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology."

[135] The EPA has also issued extensive and detailed guidance for states in conducting reasonable progress analyses for sources of visibility impairing pollutants. See Guidance on Regional Haze State Implementation Plans for the Second Implementation Period (2019), available at *https:// www.epa.gov/visibility/guidance-regional-haze-state-implementation-plans-second-implementation-period;* Clarifications Regarding Regional Haze State Implementation Plans for the Second Implementation Period (2021), available at *https://www.epa.gov/visibility/clarifications-regarding-regional-haze-state-implementation-plans-second-implementation.*

reduction is generally adequately demonstrated but is not the BSER because it cannot be applied to designated facilities across the category at a reasonable cost or because it is technically infeasible for a certain portion of the category. However, designated facilities are eligible to receive a less-stringent standard of performance are in demonstrably different circumstances than facilities in the source category generally. Therefore, control technologies or other systems that may not be the BSER for the source category may be reasonable for a source that has invoked RULOF. Similarly, to avoid inadvertently precluding consideration of a system that could allow a state to apply a standard of performance that is no less stringent than necessary, the EPA is not providing that states must consider only control technologies or systems that result in less emission reductions than the EPA's BSER. While it is true that states should only be in the position of applying less stringent standards of performance if they have demonstrated that a designated facility cannot achieve the degree of emission limitation, there may be situations in which it is not practical or feasible to ascertain *a priori* what degree of emission limitation a technology or system could achieve when applied to a particular source. Thus, the EPA does not believe it is reasonable to narrow the scope of control technologies or other systems of emission reduction that states must consider under these general implementing regulations. The Agency may find it appropriate to do so in the context of an individual EG.

Some commenters noted the resources and potential burden associated with conducting the proposed source-specific BSER analyses. While the EPA is not finalizing a requirement for states to conduct source-specific BSER analyses, it acknowledges that stakeholders could have similar concerns in the context of the provision being promulgated at 40 CFR 60.24a(f). However, the EPA does not believe the RULOF provisions will significantly add to states' planning processes. First, as explained in section III.E.2. of this preamble, consistent with the statutory framework the EPA believes that use of RULOF should be an exception to the general rule that the EPA's degree of emission limitation is reasonable for designated facilities within the applicable source category. Given the EPA's ability to subcategorize source categories and to tailor its EG to the circumstances of each subcategory, using RULOF to apply a less stringent standard of performance should be

appropriate in only very limited circumstances.

Second, as explained above, the EPA is providing in 40 CFR 60.24a(f)(1) that states must evaluate the systems of emission reduction in the applicable EG using the factors and evaluation metrics the EPA considered "[t]o the extent necessary to determine a standard of performance" that is no less stringent than necessary to address the fundamental differences identified under paragraph (e). As noted above, the EPA anticipates that in some if not many cases, states will be able to demonstrate that the less stringent standard of performance they are applying is no less stringent than necessary without evaluating all of the systems of emission reduction in the applicable EG. For example, if the EPA's degree of emission limitation is 95% reduction in emissions and a state applies a less stringent standard of performance that results in 90% reduction, the state may reasonably forgo evaluating additional systems of emission reduction if, based on the information in the EG, it is clear that none is able to achieve comparable reductions. Similarly, a state may not need to consider every system of emission reduction in an applicable EG if it starts by evaluating the system or systems that achieve the greatest emission reductions and applies a standard of performance corresponding to one of those systems.

Third, the EPA anticipates states applying less stringent standards of performance would leverage the information and analyses the Agency has provided in the applicable EG. In promulgating an EG, the EPA is required to provide the elements listed in 40 CFR 60.22a(b), which include "[a] description of systems of emission reduction which, in the judgment of the Administrator, have been adequately demonstrated," and "[i]nformation on the degree of emission limitation which is achievable with each system, together with information on the costs, nonair quality health environmental [sic] effects, and energy requirements of applying each system to designated facilities," as well as "[s]uch other available information as the Administrator determines may contribute to the formulation of State plans." In many cases, the EPA provides extensive technical support documents including feasibility and cost analyses. The Agency also typically discusses the types of nonair quality health and environmental effects and energy requirements that might be expected in conjunction with various systems of emission reduction applicable to the

source category. Although designated facilities for which RULOF has been invoked are in fundamentally different circumstances that the average or typical facilities that EPA considers in the context of its own analysis, the information provided in an EG will provide a starting point and, in at least some cases, much of the analytical basis for states' evaluations.

Fourth, in the event the state needs to analyze different systems of emission reduction to determine a less stringent standard of performance, the EPA believes it would be in this position regardless of any requirements the Agency does or does not provide. That is, because CAA section 111(d)(1) requires a standard of performance for each existing source, the EPA does not believe the framework being provided in 40 CFR 60.24a(f) will significantly alter states' workload if and when invoking RULOF. Rather, it is intended to provide clarity for states in developing standards of performance consistent with the statutory requirements. The EPA intends for these requirements to in fact reduce planning burdens overall, as they provide a framework for states to submit approvable standards of performance for sources invoking RULOF, thereby obviating the need for subsequent plan revisions to address any disapproved standards.

As noted above, the EPA requested comment on whether to provide consideration of the five BSER factors as part of a source-specific BSER analysis as a presumptively approvable framework for applying a less stringent standard of performance, as opposed to requirements. The framework the EPA is finalizing in this action differs from the proposed approach under which states would conduct source-specific BSER analyses; the process the EPA is finalizing at 40 CFR 60.24a(f) is premised on determining the appropriate variance from the EPA's degree of emission limitation. The EPA is providing this framework as requirements for states applying a less stringent standard of performance. As explained elsewhere in this section of the preamble, the EPA does not believe it is possible, as a practical matter, to determine a standard of performance that is no less stringent than necessary without evaluating the systems of emission reduction that the EPA determined are adequately demonstrated and engaging with the factors and evaluation metrics that the EPA used to evaluate those systems in the applicable EG. Therefore, the EPA believes that states must use the framework laid out in 40 CFR 60.24a(f) in order for the resulting variance to be

consistent with CAA section 111(d). As laid out in the § 60.24a(f)(1), states may also consider additional systems and other factors specific to the facility that were the basis of the fundamental difference identified under 40 CFR 60.24a(e), so long as they justify that any such consideration is consistent with applying a standard of performance that is no less stringent than necessary.

In sum, the EPA is not finalizing its proposed requirement under 40 CFR 60.24a(f)(1) that states that have invoked RULOF for a particular facility determine a source-specific BSER. As a result, it is also not finalizing the provision proposed at 40 CFR 60.24a(f)(2) that would have required states to calculate the emission reductions a source-specific BSER would achieve and apply the standard of performance that reflects this degree of emission reduction. However, consistent with its proposal, the EPA continues to believe it is necessary for the Agency to provide a process for states that have invoked RULOF for a particular facility to follow in applying a less stringent standard of performance. The EPA is therefore promulgating requirements at 40 CFR 60.24a(f) to ensure that states that have invoked RULOF for a particular designated facility apply a standard of performance that is no less stringent than necessary to address the fundamental differences identified under 40 CFR 60.24a(e). These provisions are necessary to ensure consistency with the purpose, text, and context of CAA section 111(d), including an understanding of RULOF as a limited variance from the degree of emission limitation in the applicable EG. The provisions at 40 CFR 60.24a(f)(1) as finalized will require states to determine a less stringent standard of performance that is no less stringent than necessary. In doing so, states must, to the extent necessary, evaluate the systems of emission reduction in that EPA using the factors and evaluation metrics that the EPA considered. States may also consider, as justified, other factors specific to the facility that were the basis for invoking RULOF under 40 CFR 60.24a(e), as well as additional systems of emission reduction. The EPA is finalizing the provision proposed at 40 CFR 60.24a(f)(3), requiring that a less stringent standard of performance pursuant to RULOF be in the form [136]

---

[136] "Form" of the less stringent standard of performance refers to a numerical emissions standard versus a work practice standard, the units in which a standard is expressed, or both.

required by the applicable EG, at paragraph (f)(2).

### c. Contingency Requirements

The EPA recognizes that a source's operations may change over time in ways that cannot always be anticipated or foreseen by the EPA, state, or designated facility. This is particularly true where the basis of the application of RULOF is a designated facility's operational conditions, such as the source's remaining useful life or restricted capacity. If the designated facility subsequently changes its operating conditions after the state or EPA applies a less stringent standard of performance, the basis for the variance may be abrogated and the standard of performance may no longer be no less stringent than necessary. For example, a state may seek to invoke RULOF for an EGU on the basis that it is running at lower utilization than the EPA considered in determining the degree of emission limitation and intends to do so for the duration of the compliance period required by an EG. Under this scenario, the state may be able to demonstrate that it is not reasonably cost-effective for the designated facility to achieve the degree of emission limitation and the state could set a less stringent standard of performance for this EGU. However, because reduced utilization is not a physical constraint on the designated facility's operations, it is possible that the source's utilization could increase in the future without any other legal constraint.

The EPA proposed to address this potential scenario by adding a contingency requirement to the RULOF provision at 40 CFR 60.24a(h) that would require a state to include in its state plan an instrument making a source's operating condition, such as remaining useful life or restricted capacity, enforceable whenever the state seeks to rely on that operating condition as the basis for a less stringent standard. This requirement would not extend to instances where a state applies a less stringent standard on the basis of an unalterable condition that is not within the designated source's control, such as technical infeasibility, space limitations, water access, or geologic sequestration access. Rather, this requirement addresses operating conditions such as operation times, operational frequency, process temperature and/or pressure, fuel parameters, and other conditions that are subject to the discretion and control of the designated facility.

Many commenters on this subject supported the EPA's proposed approach to operating conditions that are within a designated facility's control. They

noted that, in the absence of an enforceable requirement, a designated facility could change its operations with the result being foregone emission reductions and undermining of the level of stringency in the EG. One commenter stated that the EPA should not permit a source that has legally committed to a retirement date as a condition of invoking RULOF to receive a less-stringent standard to postpone that date because, even if it committed to meet the emission limitation in the EG from that point forward, it could not make up for its excess emissions before that time. Other commenters opposed the EPA's proposed requirement and asserted that the EPA had cited no legal authority or record basis for a need to require states to make operational conditions that are the basis of less stringent standards into enforceable requirements in state plans. One commenter noted that states should have latitude in their regulatory and permit processes to determine what additional restrictions or contingencies are necessary to ensure that the less stringent standard remains appropriate over time.

The EPA continues to believe the requirement proposed at 40 CFR 60.24a(h) is a necessary and reasonable safeguard to ensure that designated facilities' standards of performance are consistent with the level of stringency Congress required. Where are particular facility's operating conditions are the basis for a variance from the EPA's degree of emission limitation, that variance is warranted only so long as the operating condition remains a fundamental difference between that facility's circumstances and the information the EPA considered in the applicable EG. Therefore, in order for a state plan to include satisfactory standards of performance as well as measures for the implementation and enforcement of those standards pursuant to CAA section 111(d)(1), the contingency must be an enforceable requirement in that plan; upon EPA approval of the plan the contingency becomes a federally enforceable requirement (in addition to being enforceable through the state-law instrument that was included in the plan). Inclusion in a state permit, rule, or other instrument alone is not sufficient to satisfy CAA section 111(d)(1). A state-only instrument can additionally be changed outside the state plan revision process, which could result in the lifting of the operational condition without a corresponding adjustment to the designated facility's less stringent standard of performance.

The EPA notes that it has a practice of requiring operational conditions that

are the basis of less stringent emission limitations to be included in state plans or state implementation plans under CAA section 111 or 110, respectively, including in the Affordable Clean Energy Rule [137] and under the CAA's regional haze program.[138]

States may revise their state plans to allow a designated facility that has committed to retiring as the basis for invoking RULOF to postpone its retirement date. There could be many reasons a designated facility that previously agreed to a federally enforceable commitment to cease operations by a certain date might need to extend that date. The EPA is unable to assess, in the context of these general implementing regulations, an appropriate approach for all possible circumstances to ensure that the level of stringency of the EG is not undermined. The EPA anticipates addressing this consideration in individual EGs.

As previously discussed, the state plan submission must also include measures for the implementation and enforcement of a standard that accounts for RULOF. For standards that are based on operating conditions that a facility has discretion over and can control, the operating condition and any other measure that provides for the implementation and enforcement of the less stringent standard must be included in the plan submission and as a component of the standard of performance. For example, if a state applies a less stringent standard for a designated facility on the basis of a lower capacity factor, the plan submission must include an enforceable requirement for the source to operate at or below that capacity factor, and include monitoring, reporting, and recordkeeping requirements that will allow the state, the EPA, and the public to ensure that the source is in fact operating at that lower capacity. A specific EG may detail supplemental or different requirements on implementing the proposed general requirement that a state plan submission include both the operating condition that is the basis for a less stringent standard, and measures

to provide for the implementation and enforcement of such standard.

The EPA notes there may be circumstances under which a designated facility's operating conditions change permanently so that there may be a potential violation of the contingency requirements approved as federally enforceable components of the state plan. For example, a designated facility that was previously running at lower capacity now plans to run at a higher capacity full time, which conflicts with the federally enforceable state plan requirement that the facility operate at the lower capacity. To address this concern, a state may submit a plan revision to reflect the change in operating conditions. Such a plan revision must include a new standard of performance that accounts for the change in operating conditions. The plan revision would need to include a standard of performance that reflects the degree of emission limitation required by the EG and meet all applicable requirements, or if a less stringent standard is still warranted for other reasons, the plan revision would need to meet all of the applicable requirements for considering RULOF. The new standard of performance would only become effective upon the EPA's determination that the plan revision is satisfactory.

The EPA is finalizing as proposed the requirement that, where a plan applies a less stringent standard of performance on the basis of an operating condition within the designated facility's control, such as remaining useful life or restricted capacity, the plan must also include such operation condition or conditions as an enforceable requirement (this requirement was proposed at 40 CFR 60.24a(h) and is being finalized at 40 CFR 60.24a(g)). The plan must also include requirements to provide for the implementation and enforcement of the operating condition, such as monitoring, reporting, and recordkeeping requirements.

d. Requirements Specific to Remaining Useful Life

CAA section 111(d) explicitly requires that the EPA permit states to consider remaining useful life in applying a standard of performance. While the EPA may consider the age of designated facilities within a source category as a general matter in determining the BSER, it is a factor that can have considerable variability from facility to facility. The annualized costs can change considerably based on the applied technology at any particular designated facility given the amortization period. When the EPA determines a BSER, it

considers cost and, in many instances, specifically considers annualized costs associated with payment of the technology associated with the BSER. The shorter that payback period is (*i.e.*, shorter remaining useful life), the less cost-effective that BSER may become. The current RULOF provision in subpart Ba generally allows for a state to account for remaining useful life to set a less stringent standard. However, the provision does not provide guidance or parameters on when and how a state may do so.

Consistent with the principles described previously in section III.E., the EPA proposed requirements for when a state seeks to apply a less stringent standard on grounds that a designated facility will retire in the near future. Specifically, the EPA proposed that the Agency would be required to identify in an EG the outermost retirement date for designated facilities that could qualify for consideration of remaining useful life, or a methodology and considerations for states to use in determining such an outermost date. The proposed regulations would have also allowed states to apply a routine maintenance standard of performance to designated facilities with "imminent" retirement dates and additionally provided that the EPA may define the timeframe for imminent retirements in an EG. Finally, consistent with the proposed provisions regarding contingency requirements, the EPA proposed that any state plan that applies a standard of performance that is based on a particular designated facility's remaining useful life must include the retirement date as an enforceable commitment and provide measures for its implementation and enforcement.

Several commenters supported the EPA's proposal to identify in an EG an outermost and imminent retirement date to guide states' consideration of remaining useful life in setting less stringent standards. Some supportive commenters also urged the EPA to prescribe further requirements for designated facilities that rely on a shorter remaining useful life, including prohibiting them from extending their retirement dates and defining an imminent retirement as one that occurs within two years of state plan submission. Other commenters opposed the EPA's proposed requirements around the consideration of remaining useful life. Some argued that the requirements would foreclose states from considering remaining useful life when a designated facility's retirement date falls outside the prescribed range and that, although states must reasonably exercise their discretion, the

[137] 84 FR 32520, 32558 (July 8, 2019). The EPA has proposed to repeal the ACE Rule on other grounds. See 88 FR 33240 (May 23, 2023).

[138] See, *e.g.*, 76 FR 12651, 12660–63 (March 8, 2011) (best available retrofit technology requirements for Oregon source based on enforceable retirement that were to be made federally enforceable in state implementation plan); Guidance on Regional Haze State Implementation Plans for the Second Implementation Period at 34, EPA–457/B–19–003, August 2019 (to the extent a state relies on an enforceable shutdown date for a reasonable progress determination, that measure would need to be included in the SIP and/or be federally enforceable).

**80526** **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

CAA puts no limits on their consideration of this factor. Adverse commenters also noted that the remaining useful life consideration is very source-specific and that there may be relevant factors that the EPA would not necessarily take into account when determining the outermost and imminent dates in an EG.

After consideration of the comments received, the EPA has decided not to finalize the provisions proposed at 40 CFR 60.24a(i) regarding remaining useful life. As a general matter, the proposed requirement for the EPA to identify an outermost and imminent retirement date for the consideration of remaining useful life was intended to assist states in developing their state plans and to provide transparency and consistency in states' application of, and the EPA's review of, standards of performance based on this factor. As explained in the preamble to the proposed rule, a designated facility's remaining useful life generally impacts a cost analysis by changing the amortization period, or the period of time over which a facility pays the capital costs for a system of emission reduction. The shorter the period, the higher the annualized costs. The EPA generally assumes a certain amortization period in its BSER determination based on, *e.g.*, the lifespan of the system under consideration and the characteristics of facilities within the source category. A designated facility that has a shorter remaining useful life than the amortization period the EPA assumed in its BSER determination will likely find that achieving the degree of emission based on application of the BSER has higher annualized costs; the larger the difference between a particular facility's remaining useful life and the EPA's assumed amortization period, the larger the difference in annualized costs. However, as a factual matter, there is a point at which a designated facility's remaining useful life is long enough so that the difference in annualized costs for that facility and the costs the EPA considered reasonable in the applicable EG are not fundamentally different. At this point, it would be unreasonable for a state to use remaining useful life as the basis for a less-stringent standard for that facility because it could achieve the EPA's degree of emission limitation at a reasonable cost.

Similarly, an imminent retirement date could serve to streamline states' planning for sources with remaining useful lives that are so short that, as a factual matter, no available system of emission reduction could have reasonable costs. What constitutes a reasonable cost in the context of a specific EG could depend on, *inter alia,* the source category, the emission reductions available, and the designated pollutant.

However, the EPA agrees with commenters that states' consideration of remaining useful life and what constitutes reasonable consideration of this factor will necessarily depend on the source category, the variability of the individual designated facilities within the source category, and the structure of the applicable EG. In some instances, the nature of the designated facilities and structure of the EG may render a designated facility's remaining useful life of little relevance. For example, where a BSER is based on operational changes or activities that entail little to no capital cost, the remaining useful life of a designated facility should not change the reasonableness of the system and there would be no need for the EPA to prescribe imminent and outermost retirement dates in an EG. Alternatively, designated facilities within the source category may, by virtue of how an industry developed, fall into discrete age classes based on their remaining useful lives such that the EPA considers this characteristic in creating subcategories and determining appropriate BSERs for each subcategory. In this case, too, there might be little utility in the EPA defining imminent and outermost dates for consideration of remaining useful life in an EG.

The EPA is therefore choosing not to finalize the provisions proposed at 40 CFR 60.24a(i), although it may be appropriate to include outermost and imminent retirement dates for the consideration of remaining useful life in individual EGs. The proposed provisions included a requirement that any plan that applies a less-stringent standard based on remaining useful life must include the retirement date for the designated facility as an enforceable commitment, including any measures that provide for the implementation and enforcement of such a commitment. The EPA notes that although it is not finalizing the proposed 40 CFR 60.24a(i)(3), as discussed in section III.E.3.c. of this preamble plans that include less-stringent standards based on remaining useful life will still be required to include the relevant designated facilities' retirement dates as enforceable commitments and include any measures necessary to provide for the implementation and enforcement of those commitments pursuant to the requirement being finalized at 40 CFR 60.24a(g).

The EPA also reiterates that the obligation to include a standard of performance in a state plan applies to any designated facility that meets the applicability requirements of an EG as of that EG's compliance date. That is, a state plan must include a standard of performance for a designated facility that is retiring after the compliance date, even if the facility has an enforceable commitment to retire imminently following that date. In the case of an imminently retiring designated facility, it may be reasonable for a state to apply a standard reflecting that facility's business as usual; the EPA will address this and other potential considerations, including how such a standard would be calculated, in individual EGs.

e. Reasoned Decision Making and the EPA's Review of State Plans Invoking RULOF

As discussed previously in section III.E. of this preamble, under CAA section 111(d)(2), the EPA has the obligation to determine whether a state plan submission is ''satisfactory.'' This obligation extends to all aspects of a state plan, including the application of a less stringent standard of performance that accounts for RULOF. States carry the primary responsibility to develop plans that meet the requirements of CAA section 111(d) and therefore have the obligation to justify any consideration of RULOF in applying standards less stringent than the degree of emission limitation provided by the EG. That states must provide a reasoned basis including, where applicable, technical analyses and other documentation to support the decisions they make in their plans is fundamental to the structure of CAA section 111(d).[139] As explained in section III.E.3.a. of this preamble, consistent with the statutory framework of CAA section 111(d), state plans must ensure that designated facilities achieve the degree of emission limitation achievable through application of the BSER as determined by the EPA unless doing so would be unreasonable for a particular facility. The fundamental tenet has been reflected in the EPA's regulations since 1975.[140] Thus, a ''satisfactory'' plan is one that, *inter alia,* applies less-stringent standards only where the state has demonstrated that achieving the EPA's degree of emission limitation would be unreasonable pursuant to 40 CFR 60.24a(e). A demonstration that a particular designated facility cannot

[139] See, *e.g.*, 84 FR 32558 (ACE Rule explained that state plans must adequately document and demonstrate the process and underlying data used to establish standards of performance so that EPA can adequately and appropriately review the plan to determine whether it is satisfactory).

[140] See 40 CFR 60.24(c), 60.24a(c).

reasonably achieve the degree of emission limitation determined by the EPA will, in most cases, necessarily be supported by technical analysis that assesses a particular designated facility and compares its circumstances to those the EPA considered in its EG.

While it is within states' discretion to apply a less stringent standard of performance where the state has identified fundamental differences for a particular facility (or class of facilities), the state must support its decision making and demonstrate that it results in a standard of performance that is no less stringent than necessary to address the fundamental differences and that meet the applicable requirements. When a state invokes RULOF and applies a less-stringent standard, it must demonstrate that the standard is no less stringent than necessary to address the fundamental difference identified by the state. Absent such a demonstration, the EPA cannot ascertain that a less-stringent standard meets the requirements of CAA section 111; that is, it cannot determine that a less-stringent standard is "satisfactory."

The requirements proposed at 40 CFR 60.24a(j) were intended to explicitly clarify states' responsibilities when invoking RULOF and to assist them in developing standards in a manner that enables the Agency to determine whether such standards are "satisfactory." The proposed requirements provided that states would carry the burden of making any demonstrations in support of less-stringent standards pursuant to the RULOF provisions. States would carry the primary responsibility to develop plans that meet the requirements of CAA section 111(d) and therefore have the obligation to justify any accounting for RULOF in support of standards less stringent than those provided by the EG. While the EPA has discretion to supplement a state's demonstration, the Agency may also find that a state plan's failure to include a sufficient RULOF demonstration is a basis for concluding the plan is not "satisfactory" and therefore disapprove the plan. The EPA further proposed that for the required demonstrations, states must use information that is applicable to and appropriate for the specific designated facility, and must show how information is applicable and appropriate. As RULOF is a source-specific determination, it is appropriate to require that the information used to justify a less stringent standard for a particular designated facility be applicable to and appropriate for that source. Finally, the EPA proposed to require that the information used for

states' demonstrations under the new RULOF provisions must come from reliable and adequately documented sources, such as EPA sources and publications, permits, environmental consultants, control technology vendors, and inspection reports.

Comments received on the proposed requirements regarding states' burden of demonstration and the use of site-specific information were generally supportive while also requesting further clarification of and flexibility in the types of information that the EPA would consider acceptable. One commenter suggested that the EPA allow states to use historical data even if not published or documented by third parties, as this constitutes site-specific information, while another suggested allowing verified industry information, even if it is not site-specific.

Despite the generally supportive commenters received, the EPA is not finalizing the requirements proposed at 40 CFR 60.24a(j). While the EPA continues to find that states carry the burden of making any demonstrations in support of less-stringent standards pursuant to RULOF in developing their plans, we have determined that it is not necessary to promulgate this expectation as a standalone regulatory requirement. States always bear the responsibility of reasonably documenting and justifying the standards of performance in their plans.[141] If the EPA cannot ascertain, based on the information and analysis included in a state plan submission, whether a standard of performance meets the statutory requirements, it cannot find that standard satisfactory. Additionally, it is *de facto* necessary to use information that is applicable to and appropriate for the designated facility when analyzing systems of emission reduction for that particular facility. For example, for a designated facility invoking RULOF based on its unique design features, the state plan must provide information corroborating the uniqueness of those features and analysis demonstrating how they result in the facility being unable to reasonably achieve the degree of emission limitation determined by the EPA. It would not be reasonable in this instance for a state to use generic industry data, whether verified or not, as the basis of demonstrations pursuant to 40 CFR 60.24a(e) and (f).

While the proposed requirements would have simply codified generally applicable tenets of reasoned decision making, the EPA recognizes that the specific types and provenances of information needed to justify a less-stringent standard can vary significantly between not only source categories, but between individual designated facilities within a source category. As a result, the proposed provisions had the potential to be both over- and underinclusive. While we are not finalizing these provisions as generally applicable requirements for state plans, they and the accompanying discussion in the notice of proposed rulemaking[142] remain important guidance for plan development. The EPA may also choose to promulgate requirements for RULOF demonstrations in individual EGs.

f. Consideration of Impacted Communities

While the consideration of RULOF can be warranted to apply a less stringent standard of performance to a particular facility, such standards have the potential to result in disparate health and environmental impacts to communities most affected by and vulnerable to those impacts from the designated facilities being addressed by the state plan. These communities could be put in the position of bearing the brunt of the greater health or environmental impacts resulting from that source implementing less stringent emission controls than would otherwise have been required pursuant to the EG. The EPA considers that a lack of attention to such potential outcomes would be antithetical to the public health and welfare goals of CAA section 111(d) and the CAA generally. Because of CAA section 111(d)(2)'s requirement that the EPA determine whether a state plan is "satisfactory" applies to such plan's consideration of RULOF in applying a standard of performance to a particular facility, the EPA must determine whether a plan's consideration of RULOF is consistent with CAA section 111(d)'s overall health and welfare objectives.

In order to address the potential exacerbation of health and environmental impacts to these communities as a result of applying a less stringent standard, the EPA proposed to require states to consider such impacts when applying the RULOF provision to establish those standards. Under the proposed provisions at 40 CFR 60.24a(k), to the extent a designated facility would qualify for a less stringent standard through

---

[141] Where a state has relied on information or analyses the EPA provided in an applicable EG as part of its source specific BSER determination, a state would explain why such reliance is reasonable and cite or otherwise incorporate that information or analyses in its state plan submission.

[142] See 87 FR 79176, 79202–03 (Dec. 23, 2022).

consideration of RULOF, the state, in calculating such standard, would have been required to demonstrate consideration of the potential health and environmental impacts and potential benefits of control to communities most affected by and vulnerable to the impacts from the designated facility considered in a state plan for RULOF provisions. These communities will be identified by the state as pertinent stakeholders under the finalized meaningful engagement completeness requirements described in section III.C. of this preamble.

The notice of proposed rulemaking further explained that state plan submissions seeking to invoke RULOF for a source would be required to identify where and how a less stringent standard impacts these communities. In evaluating a RULOF option for a facility, states should describe the health and environmental impacts anticipated from the application of RULOF for such communities, along with any feedback the state received during meaningful engagement regarding its draft state plan submission, including on any standards of performance that consider RULOF. Additionally, to the extent there is a range of options for reasonably controlling a source based on RULOF, the EPA proposed that in determining the appropriate standard of performance, states should consider the health and environmental impacts to the communities most affected by and vulnerable to the impacts from the designated facility considered in a state plan for RULOF provisions and provide in the state plan submission a summary of the results that depicts potential impacts for those communities for that range of reasonable control options.

The EPA received a wide range of comments on the proposed requirements for state plans to consider the potential pollution impacts and benefits of control to communities most affected by and vulnerable to emissions from a designated facility that is invoking RULOF. Several commenters supported the proposal and agreed that, given that the purpose of regulating stationary source pollution under CAA section 111 is to address emissions that endanger public health and welfare, requiring states that are applying less-stringent standards to take into account how air pollution above the level reflected by application of the BSER may impact the health and welfare of local communities furthers the statutory design. Other commenters agreed that the EPA has authority to require states to consider the impacts of less-stringent standards of performance on vulnerable communities but expressed concern that

the lack of specificity of and guidance for implementing the proposed requirements would cause uncertainty among state regulators and impacted communities and lead to unequal application across states. Similarly, one commenter noted the differences between community impacts when considering localized pollutants versus regional or global pollutants and that impacts of the latter are more diffuse and difficult to assess. Some commenters, however, disagreed that the EPA has authority to require states to consider potential health and environmental impacts of less-stringent standards on vulnerable communities. These commenters generally asserted that the state-focused language of the RULOF provision in CAA section 111(d)(1) does not mandate an analysis of vulnerable communities and does not give the EPA power to force states to consider "other factors" that it deems relevant.

The EPA is not finalizing the proposed provisions at 40 CFR 60.24a(k) as requirements under the general implementing regulations. We agree with commenters that additional specificity and guidance with regard to how states should consider the potential pollution impacts and benefits of control to communities most affected by and vulnerable to emissions from a designated facility invoking RULOF would be key to ensuring meaningful implementation of this provision. However, given the diversity of source categories, designated facilities, and designated pollutants that are regulated and could be regulated in CAA section 111(d), as well as the wide range of potential impacts on vulnerable communities that may result from less-stringent standards of performance under any given EG,[143] the EPA does not believe it is either feasible or appropriate to prescribe a universally applicable approach or standard for approvability for this consideration. Instead, to protect all communities, including the most vulnerable ones, the EPA is finalizing a provision that will ensure that any less stringent standards of performance applied by states are no less stringent than necessary. Moreover, because consideration of health and environmental impacts is inherent in consideration of both the nonair quality health and environmental impacts and amount of emission reduction factors

the EPA considers under CAA section 111(a)(1), when a state considers the systems of emission reduction identified in the applicable emission guideline using the factors and evaluation metrics the EPA considers in assessing those systems pursuant to RULOF, the state will necessarily consider the potential impacts and benefits of control to communities affected by a designated facility that is receiving a less-stringent standard of performance.

Thus, while the EPA is not promulgating a regulatory requirement in subpart Ba for states to consider the impacts of applying a less-stringent standard of performance on the communities most affected by and vulnerable to emissions from a designated facility invoking RULOF, the EPA anticipates that states will consider these impacts. To this end, states may look to the EPA's emission guideline and its consideration of nonair quality health and environmental impacts and the amount of emission reductions available in determining the degree of emission limitation for guidance on considering the health and environmental impacts on communities affected by a designated facility for which RULOF has been invoked. Additionally, the procedural requirements under subpart Ba for meaningful engagement with pertinent stakeholders on state plan development that the EPA is finalizing will play an important role in RULOF. Meaningful engagement, which the EPA is defining as "timely engagement with pertinent stakeholder representation in the plan development or plan revision process," [144] and providing that "[s]uch engagement should not be disproportionate in favor of certain stakeholders and should be informed by available best practices," should address, *inter alia*, the application of any less-stringent standards of performance pursuant to RULOF. Thus, the EPA intends for communities most affected by and vulnerable to the health and environmental impacts of pollution from a designated facility invoking RULOF to have an opportunity to participate in the process of determining how that facility is addressed in the relevant state plan. The EPA may also consider whether to promulgate requirements pertaining to consideration of impacts on vulnerable communities as part of an individual EG in the future, at which point it would

---

[143] In the notice of proposed rulemaking, the EPA "recognize[d] that the consideration of communities in the standard setting process, such as what constitutes a benefit to a vulnerable community and what is a reasonable level of control, is highly dependent on the designated pollutant and source category subject to an EG." 87 FR 79203.

[144] The EPA is also finalizing the proposed definition of "pertinent stakeholders" to include those who are most affected by and vulnerable to the health or environmental impacts of pollution from the designated facilities addressed by the plan or plan revision.

provide guidance on how to do so specific to the designated facilities and designated pollutant at issue.

g. Authority To Apply More Stringent Standards as Part of the State Plan

The EPA, in the notice of proposed rulemaking, addressed two different sources of authority that would allow the Agency to approve state plans that include standards of performance that are more stringent than the degree of emission limitation determined by the EPA in the applicable EG. First, the EPA explained that allowing states to apply a more stringent standard of performance as part of their CAA section 111(d) plans is consistent with CAA section 116, which generally authorizes states to include more stringent standards of performance or requirements regarding control or abatement of air pollution in their plans. Second, the EPA proposed to interpretation the RULOF provision in CAA section 111(d)(1), and specifically the ''other factors'' consideration, as allowing states to adopt more stringent standards of performance.[145] As explained below, the EPA is not finalizing its proposed interpretation that states can use the RULOF provision in CAA section 111(d)(1) to adopt, and have the EPA approve, more stringent standards of performance in their state plans because, inter alia, states already have the authority and ability to do so under CAA section 116.

As explained in the notice of proposed rulemaking, the anti-preemption requirements of CAA section 116 provide that nothing in the statute shall preclude or deny the right of states to adopt or enforce ''any standard or limitation respecting emissions of air pollutants.'' While CAA section 116 clearly extends to a state adopting or enforcing a standard of performance more stringent than required under CAA section 111(d), the subpart Ba implementing regulations did not explicitly speak to whether the EPA can approve a state plan that includes such standard of performance. However, the EPA proposed to find that CAA section 116, as interpreted through the Supreme Court in *Union Electric Co.* v. *EPA*,[146] requires the EPA to approve a state plan that includes more stringent standards of performance under CAA section 111(d). The EPA therefore proposed to modify the existing 40 CFR 60.24a(f),[147] clarifying that to the extent

a state chooses to submit a plan that includes standards of performance that are more stringent or compliance schedules that are more rapid than the requirements of an EG, states have the authority to do so under this provision and CAA section 116. Further, the EPA proposed to clarify that it has the obligation, and therefore the authority, to review and approve such plans and render the more stringent requirements federally enforceable if all applicable requirements are met.

The EPA is finalizing the proposed changes to the provision currently at 40 CFR 60.24a(f) which, as renumbered pursuant to this final rule, is now 40 CFR 60.24a(i). The Agency acknowledges that it previously took the position in the ACE Rule that *Union Electric* does not control the question of whether CAA section 111(d) state plans may be more stringent than Federal requirements. The EPA took this position in the ACE Rule on the basis that *Union Electric* on its face applies only to CAA section 110, and that it is ''potentially salient'' that CAA section 111(d) is predicated on specific technologies whereas CAA section 110 gives states broad latitude in the measures used for attaining the NAAQS.[148] The EPA no longer takes this position. Upon further evaluation, the EPA finds that, because of the structural similarities between CAA sections 110 and 111(d), CAA section 116 as interpreted by *Union Electric* requires the EPA to approve CAA section 111(d) state plans that are more stringent than required by the EG.

The Court in *Union Electric* rejected a construction of CAA sections 110 and 116 that measures more stringent than those required to attain the NAAQS cannot be approved into a federally enforceable SIP but can be adopted and enforced only as a matter of state law. The Court found that such an interpretation of CAA section 116 ''would not only require the Administrator to expend considerable time and energy determining whether a state plan was precisely tailored to meet the Federal standards but would simultaneously require States desiring stricter standards to enact and enforce

two sets of emission standards, one federally approved plan and one stricter state plan.'' 427 U.S. at 263–64. The Court concluded there was no basis for ''visiting such wasteful burdens upon the States and the Administrator.'' *Id.* CAA sections 111(d) and 110 are structurally similar in that both require the EPA to establish targets to meet the objectives of the respective sections (*i.e.,* the degree of emission limitation set by an EG under CAA section 111(d), and attainment and maintenance of the NAAQS under CAA section 110), and states must adopt and submit to the EPA plans which include requirements to meet these targets. Specifically, the EPA establishes a presumptive standard of performance corresponding to the degree of emission limitation it has determined in an EG, and state plans under CAA section 111(d) must establish standards of performance that generally reflect this degree of emission limitation. Because CAA section 116 applies to ''any standard or limitation,'' this provision clearly applies to standards of performance adopted under CAA section 111(d). Therefore, the Court's rationale in *Union Electric* as it pertains to the application of CAA section 116 in the context of the cooperative federalism structure of CAA section 110 also applies to CAA section 111(d). That is, the assessment of CAA section 116 in the context of requirements that states develop and submit to the EPA for evaluation against nationally applicable standards or criteria applies equally to CAA sections 110 and 111(d). On that basis, the EPA is finding that the Court's holding applies and controls the outcome here, as well. Requiring states to enact and enforce two sets of standards of performance, one that is exactly equal to the EPA's presumptive standard of performance that is federally approved as part of the CAA section 111(d) plan and one that is stricter and is only adopted and enforced as a matter state requirements, runs directly afoul of *Union Electric's* holding that there is no basis for interpreting CAA section 116 in such manner.

Moreover, there is nothing in CAA section 111(d) that precludes states from adopting, and EPA from approving, more stringent standards of performance.[149] In fact, permitting

---

[145] 87 FR 79204–06.

[146] 427 U.S. 246, 263–64 (1976).

[147] The existing provision at 40 CFR 60.24a(f) provides that ''[n]othing in this subpart shall be construed to preclude any State or political

subdivision thereof from adopting or enforcing,'' (1) standards of performance more stringent than an EG, or (2) compliance schedules requiring final compliance at earlier times than specified in an EG. In the proposed rulemaking, the EPA added several proposed provisions to 40 CFR 60.24a, which resulted in § 60.24a(f), in addition to being amended, being renumbered as § 60.24a(n). However, the EPA is not finalizing all the new provisions it proposed; as a result, erstwhile § 60.24a(f) is now being finalized, with amendments, at § 60.24a(i).

[148] 84 FR 32559–61.

[149] In the 1975 CAA section 111(d) implementing regulations the Agency explained that EPA's emission guidelines will reflect its judgment of the degree of control that can be attained by various classes of existing source without unreasonable costs. Particular sources within a class may be able to achieve greater control without unreasonable costs. Moreover, States that believe additional

Continued

states to adopt more stringent standards of performance and include such standards in their state plans is entirely consistent with the purpose and structure of CAA section 111(d). States bear the obligation pursuant to CAA section 111(d)(1) to establish standards of performance. Nothing in CAA section 111(d) suggests that Congress intended to preclude states from determining that it is appropriate to regulate certain sources within their jurisdiction more strictly than otherwise required by Federal requirements. For the EPA to do so would be arbitrary and capricious in light of the overarching purpose of CAA section 111(d), which is to require emission reductions from existing sources for certain pollutants that endanger public health or welfare. It is inconsistent with the purpose of CAA section 111(d) and the role it confers upon states for the EPA to constrain them from further reducing emissions that harm their citizens, and the EPA does not see a reasonable basis for doing so.

The EPA also included a second rationale for permitting more stringent standards of performance in the notice of proposed rulemaking. The Agency explained that CAA section 111(d)(1) provides that states are permitted to consider remaining useful life and other factors "in applying a standard of performance to any particular source under a plan," but does not specify that the source-specific standard must be a *less stringent* standard of performance. Aside from the explicit reference to remaining useful life, the statute is silent as to what the "other factors" are that states may consider in applying a standard of performance and whether such factors can be used only to weaken the stringency of a standard of performance for a particular designated facility. Therefore, in addition to proposing that states may include, and the EPA must approve, more stringent standards of performance in state plans pursuant to CAA sections 111(d) and 116, the EPA also proposed to interpret CAA section 111(d)(1) as allowing states to consider "other factors" in exercising their discretion to apply a more stringent standard to a particular source. The Agency acknowledged that it had previously, in promulgating subpart Ba in 2019, taken the position that the

control is necessary or desirable will be free under section 116 of the Act to require more expensive controls, which might have the effect of closing otherwise marginal facilities, or to ban particular categories of sources outright. 40 FR 53343. Congress did nothing to disturb the understanding that states can use CAA section 116 to adopt more stringent standards of performance when it enacted the 1977 CAA Amendments shortly thereafter.

statutory RULOF provision authorizes only standards of performance that are less stringent than the presumptive level of stringency required by a particular EG,[150] and explained why it was proposing to change course. To codify its revised interpretation of the RULOF provision, the EPA proposed explicit regulatory text that would have allowed states to use RULOF, and, specifically, "other factors," to apply a more stringent standard of performance. The new provision at 40 CFR 60.24a(n) would have also required that state plans include an adequate demonstration that the standard of performance is more stringent than required by an application EG and meet all other applicable requirements.

The EPA received comments both in support of and opposed to its proposed interpretation that states may apply more stringent standards of performance and that EPA has an obligation to approve such standards in state plans. Several commenters stated the Agency has appropriately interpreted CAA section 116 and 111(d), as well as *Union Electric Co.* v. *EPA*, as allowing states to submit, and the EPA to approve, more stringent standards. One commenter also agreed that the statutory phrase "remaining useful life and other factors" does not foreclose a state plan from applying a more stringent standard of performance to a particular source; while "remaining useful life" implies a less stringent standard, "other factors" does not. Another commenter asserted that the EPA need not rely on "other factors" to permit states to apply more stringent standards because states already have the ability to do so in light of the Supreme Court's ruling in *Union Electric*. Commenters that disagreed with the EPA's proposed interpretation generally recognized that states can adopt more stringent rules than those required by the EPA but asserted that the CAA does not authorize the EPA to approve them into state plans and thus make them federally enforceable. One commenter argued that the EPA's BSER determination defines the extent of both EPA and state authority under CAA section 111 and that the RULOF provision does not authorize states to select a different, more stringent BSER under the guise of RULOF. Another commenter stated that the EPA's position that RULOF is a variance provision for sources that cannot meet the BSER due to limited remaining

[150] See EPA's Responses to Public Comments on the EPA's Proposed Revisions to Emission Guideline Implementing Regulations at 56 (Docket ID No. EPA–HQ–OAR–2017–0355–26740) (July 8, 2019).

useful life or other factors is in tension with its interpretation that the same provision provides a broad grant of authority for states to impose more stringent standards on sources. The same commenter pointed out the difference in proposed requirements for states invoking RULOF to apply a less stringent standard and those for applying a more stringent standard.

The EPA agrees with commenters that it need not rely on "other factors" for authority to permit states to submit, and the EPA to approve, more stringent standards of performance in state plans. As explained above, CAA sections 116 and 111(d), and the Court's interpretation in *Union Electric* of section 116 as it relates to CAA section 110's analogous statutory framework, provide a sufficient basis this position. Moreover, upon further consideration of the history of the RULOF provision and the EPA's interpretation of that provision as a variance for states to use when a source cannot reasonably achieve the degree of emission limitation determined by the EPA, the Agency is not finalizing its proposed interpretation that the RULOF provision allows states to adopt more stringent standards of performance in their plans. The EPA is therefore not finalizing the provision it proposed at 40 CFR 60.24a(m) that would have explicitly allowed a state to "account for other factors in applying a standard of performance that is more stringent than required by an applicable emission guideline, or the proposed provision that "[t]he plan must include an adequate demonstration that the standard of performance is more stringent than required by an applicable emission guideline, and must meet all other applicable requirements, such as those that provide for the implementation and enforceable of the more stringent standard of performance." As a general matter, states already bear the burden of demonstrating that their standards of performance are no less stringent than the corresponding EG. See 40 CFR 60.24a(c).

The EPA disagrees with comments suggesting that the EPA's BSER determination is the ceiling—that the EPA is constrained from approving more stringent standards of performance into state plans. As explained above, there is no support for this position in the statutory language or structure of CAA section 111(d). It is also inconsistent with CAA section 116 and would run counter to the purpose of section 111—reducing emissions of dangerous air pollutants from designated facilities.

The EPA anticipates that, in many cases, more stringent standards of performance would entail marginal differences in stringency between the degree of emission limitation in the applicable EG and the state plan requirement. For example, the EPA may determine that, for the source category in general, a control technology can reasonably achieve an 80% reduction in emissions, while a state finds that at a particular designated facility, that same control technology can reasonably achieve a 90% reduction. Or a state may decide that a particular designated facility can install a control technology that has already been demonstrated to reasonably achieve greater emission reductions than the BSER the EPA determined for the source category generally. The EPA also notes that approving more stringent standards of performance in state plans is not a new practice under subpart Ba; for example, in 2020 the EPA approved more stringent standards of performance that California submitted as part of its CAA section 111(d) state plan to implement the emission guidelines for landfill gas emissions from municipal solid waste landfills. These more stringent standards of performance were incorporated into the Code of Federal Regulations and thus became federally enforceable.[151]

In summary, the EPA is finalizing, at 40 CFR 60.24a(i), the proposed revisions to the existing provision (currently at 40 CFR 60.24a(f)) stating that nothing in subpart Ba shall be construed to preclude any state from adopting or enforcing, as part of a state plan, (1) standards of performance more stringent that the applicable EG, or (2) compliance schedules requiring final compliance at earlier times than specified in the applicable EG. The EPA is not finalizing the regulatory text provision proposed at 40 CFR 60.24a(m) stating that a state may account for other factors in applying a more stringent standard of performance.

*F. Provision for Electronic Submission of State Plans*

The EPA proposed to revise subpart Ba to require electronic submission of state plans instead of paper copies.[152] As explained in the notice of proposed rulemaking, the regulations

promulgated in 2019 require state plan submissions to be made in accordance with 40 CFR 60.4. Pursuant to 40 CFR 60.4(a), all requests, reports, applications, submittals, and other communications to the Administrator pursuant to 40 CFR part 60 shall be submitted in duplicate to the appropriate regional office of the EPA. The provision in 40 CFR 60.4(a) then proceeds to list the corresponding addresses for each regional office. The EPA proposed that, rather than requiring paper copies of state plan submissions to be sent to the appropriate regional office, states would submit their state plans electronically via the use of its State Planning Electronic Collaboration System (SPeCS).

As previously described, CAA section 111(d) requires the EPA to promulgate a "procedure" similar to that of CAA section 110 under which states submit plans. The statute does not prescribe a specific platform for plan submissions, and the EPA reasonably interprets the procedure it must promulgate under the statute as allowing it to require electronic submission. Requiring electronic submission is reasonable for the following reasons. Providing for electronic submittal of CAA section 111(d) state plans in subpart Ba in place of paper submittals aligns with current trends in electronic data management and as implemented in the individual EGs will result in less burden on the states. It is the EPA's experience that the electronic submittal of information increases the ease and efficiency of data submittal and data accessibility. The EPA's experience with the electronic submittal process for SIPs under CAA section 110 has been successful as all the states are now using the SPeCS, which is a user-friendly, web-based system that enables state air agencies to officially submit SIPs and associated information electronically for review and approval to meet their CAA obligations related to attaining and maintaining the NAAQS. SPeCS for SIPs is the EPA's preferred method for receiving such SIPs submissions. The EPA has worked extensively with state air agency representatives and partnered with E-Enterprise for the Environment and the Environmental Council of the States to develop this integrated electronic submission, review, and tracking system for SIPs. SPeCS can be accessed by the states through the EPA's Central Data Exchange (CDX) (*https:// cdx.epa.gov/*). The CDX is the Agency's electronic reporting site and performs functions for receiving acceptable data in various formats. The CDX registration

site supports the requirements and procedures set forth under the EPA's Cross-Media Electronic Reporting Regulation, 40 CFR part 3.

Most of the commenters were supportive of the proposed amendments for electronically submitting state plans. However, a few commenters expressed that EPA should provide an option to submit state plans in paper format. The EPA has determined that submitting state plans electronically is more efficient and less burdensome than paper submittals. States already submit state implementation plans electronically via SPeCS so there should be little to no additional burden associated with using it for state plans. Additionally, having some states submit state plans via SPeCS and other states mail hard-copy plans to regional offices would undermine many of the efficiencies provided to the EPA through the use of electronic submission and could result in confusion. One commenter recommended adding language to clarify that a Negative Declaration letter submitted in accordance with 40 CFR 60.23a(b) can also be submitted via SPeCS. The EPA agrees with the need to add the electronic submittal language to 40 CFR 60.23a(b) identified by the commenter and has added the language in the final rule so that the states submit the Negative Declaration letter using the SPeCS, or through an analogous electronic reporting tool provided by the EPA for the submission of any plan required by this subpart.

The EPA is therefore finalizing the requirements for electronic submission of state plans in 40 CFR 60.23a(a)(1) and (3). As finalized, 40 CFR 60.23a(a)(1) provides: "The submission of such plan shall be made in electronic format according with § 60.23a(a)(3) or as specified in an applicable emission guideline." The regulation at 40 CFR 60.23a(a)(3) in turn contains the general requirements associated with the electronic submittal of a state plan in subpart Ba via the use of SPeCS or through an analogous electronic reporting tool provided by the EPA for the submission of any plan required by subpart Ba. The EPA is also including at 40 CFR 60.23a(a)(3) language to specify that states are not to transmit confidential business information (CBI) through SPeCS. Even though state plans submitted to the EPA for review and approval pursuant to CAA section 111(d) through SPeCS are not to contain CBI, the language at 40 CFR 60.23a(a)(3) also addresses the submittal of CBI in the event there is a need for such information to be submitted to the EPA.

---

[151] 40 CFR 62.1100(b)(7); 85 FR 1121 (Jan. 9, 2020); see also "Appendix E: Comparison of the Major Provisions of the Emission Guidelines and California's Landfill Methane Regulation," EPA–R09–OAR–2019–0393–0008 (technical support document for EPA action on California's CAA section 111(d) state plan to implement the EG for landfill gas from municipal solid waste landfills).

[152] 87 FR 79206.

Any other specific requirements associated with the electronic submittal of a particular state plan will be provided within the corresponding EG. The requirements for electronic submission of CAA section 111(d) state plans in EGs will ensure that these Federal records are created, retained, and maintained in electronic format. Electronic submittal will also improve the Agency's efficiency and effectiveness in the receipt and review of state plans. The electronic submittal of state plans may also provide continuity in the event of a disaster like the one our nation experienced with COVID–19.

### G. Other Proposed Modifications and Clarifications

#### 1. Standard of Performance and Compliance Flexibility

##### a. Definition of Standard of Performance

The EPA proposed amendments to 40 CFR 60.21a(f) and 60.24a(b) to clarify that the definition of "standard of performance" allows for state plans to include standards in the form of an allowable mass limit of emissions. As explained in the notice of proposed rulemaking,[153] the amendments were intended to harmonize these regulatory definitions with the definitions of "emission limitation" and "emission standard" in CAA section 302(k), which is "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice, or operational standard promulgated under this chapter." While the EPA had intended the phrase "allowable rate or limit of emissions" in the existing regulatory definitions to encompass the full range of forms included in the statute, to eliminate any potential confusion the Agency proposed to make this explicit.

Most comments received on the proposed revision to the definition of "standard of performance" were in support of these amendments. Some commenters pointed out that the revision would be consistent with the statutory definition in CAA section 302(k) and many expressed approval that the revised definition would clearly allow for standards of performance to take the form of mass-based emission limits. Several commenters stressed that, while they supported the proposed

definition of standard of performance for subpart Ba, the appropriate form of the standard of performance in any particular EG must be determined in the context of that EG. Some commenters expressed concern that the proposed revision would allow the EPA to define the BSER as a trading program for any source sector, or for states and the EPA to impose emissions averaging and trading programs in CAA section 111(d) plans.

The EPA is finalizing amendments to 40 CFR 60.21a(f) and 60.24a(b) as proposed. The Agency's interpretation of CAA section 111 with regard to emissions trading or averaging is a separate matter that is discussed in section III.G.1.b. of this preamble; it is reiterated that the revisions to the definition of standard of performance are being made to align it with the statutory definition of emission limitation and emission standard in CAA section 302(k) for the purpose of these general implementing regulations. The EPA agrees with commenters that the appropriate form of the standard of performance in any particular EG must be determined in the context of that EG, and the EPA may choose to prescribe the acceptable form or forms of the standard of performance in an individual EG. In addition to finalizing the proposed amendments to 40 CFR 60.21a(f) to clarify that the term "an allowable rate or limit of emissions" means "an allowable rate, quantity, or concentration of emissions" of air pollutants, the EPA is also finalizing its proposed removal of the phrase "but not limited to" from 40 CFR 60.21a(f) as unnecessary and potentially confusing verbiage that is redundant of the word "including," particularly where the definition already identifies a wide breadth of potential standards that may be included in a state plan. Moreover, the EPA is finalizing amendments to the definition of standard of performance under 40 CFR 60.24a(b) to read ". . . in the form of an allowable rate, quantity, or concentration of emissions" rather than ". . . either be based on allowable rate or limit of emission."

##### b. Compliance Flexibilities, Including Trading or Averaging

The EPA is finalizing its proposal that CAA section 111(a) and (d) cannot be interpreted, by their terms, to limit the types of controls that states, in their state plans, may authorize their sources to adopt to at-the-source, and thereby preclude states from authorizing their sources flexibilities such as trading or averaging. Under the provisions of CAA section 111(a) and (d), and consistent with the federalism principles that

underlie the CAA, states have broad authority to determine the types of control measures for their sources, including trading or averaging, although the EPA may establish constraints to protect the integrity of particular EGs. The EPA is also finalizing its proposal that CAA section 111 cannot be interpreted, by its terms, to limit the "best system of emission reduction . . . adequately demonstrated" (BSER) to at-the-source measures. As the EPA explains, many control measures that the EPA has determined to be the BSER in prior rules have outside-the-source components. The EPA is finalizing its repeal of the ACE Rule's contrary interpretations of CAA section 111.

In the proposal, the EPA provided a brief summary of the applicable CAA provisions, the ACE Rule, the D.C. Circuit's decision reversing the ACE Rule, and the U.S. Supreme Court's decision vacating the D.C. Circuit's vacatur of the ACE Rule.[154] For convenience, parts of that summary are reproduced here.

i. *CAA section 111.* Under CAA section 111(d)(1), each state is required to submit to the EPA "a plan which . . . establishes standards of performance for any existing source" that emits certain types of air pollutants, and which "provides for the implementation and enforcement of such standards of performance." Under CAA section 111(a)(1), a "standard of performance" is defined as "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction . . . adequately demonstrated."

ii. *Rulemaking and caselaw.* In the Clean Power Plan (CPP), the EPA interpreted the term "system" in CAA section 111(a)(1) to be broad and therefore to authorize the EPA to consider a wide range of measures from which to select the BSER.[155] Similarly, the CPP took the position that states had broad flexibility in choosing compliance measures for their state plans.[156] The CPP went on to determine that generation shifting qualified as the BSER,[157] and that states could include trading or averaging programs in their state plans for compliance.[158]

The ACE Rule included the repeal of the CPP. It interpreted CAA section 111 so that the type of "system" that the EPA may select as the BSER is limited to a control measure that could be

[153] 87 FR 79176, 79206–07 (Dec. 23, 2022).

[154] 87 FR 79176, 79207–08 (Dec. 23, 2022).
[155] 80 FR 64662, 64720 (October 23, 2015).
[156] See, *e.g.,* id. at 64887.
[157] Id. at 64707.
[158] Id. at 64840.

applied at each source (that is, inside the fenceline of each source) to reduce emissions at each source.[159] The ACE Rule also concluded that the compliance measures the states include in their plans must "correspond with the approach used to set the standard in the first place," [160] and therefore must also be limited to inside-the-fenceline measures that reduce the emissions of each source. For these reasons, the ACE Rule invalidated the CPP's generation-shifting system as the BSER, on grounds that it was an outside the source measure, and precluded states from allowing their sources to trade or average to demonstrate compliance with their emission standards.[161]

In 2021, the D.C. Circuit vacated the ACE Rule.[162] The court held, among other things, that CAA section 111(d) does not limit the EPA, in determining the BSER, to at-the- source measures.[163] The court further held that the ACE Rule's premise for viewing compliance measures as limited to at the source measures, which is that BSER measures are so limited, was invalid for the same reason. The court indicated that while requiring symmetry between the nature of the BSER and compliance measures "would be reasonable" where necessary to preserve the environmental outcomes a particular BSER was designed to achieve, a universal restriction on compliance measures could not be sustained by policy concerns that were not similarly universal.[164]

In 2022, the U.S. Supreme Court reversed the D.C. Circuit's vacatur of the ACE Rule's embedded repeal of the Clean Power Plan.[165] The Supreme Court made clear that CAA section 111 authorizes the EPA to determine the BSER and the amount of emission limitation that state plans must achieve.[166] However, the Supreme Court invalidated the CPP's generation-shifting BSER under the major question doctrine, explaining that the term "system" does not provide the "clear congressional authorization" needed to support a BSER "of such magnitude and consequence." [167] The Court declined to address the D.C. Circuit's decision that the text of CAA section 111 did not limit the type of "system" the EPA could consider as the BSER to at-the-

source measures.[168] Nor did the Court rule on the scope of the states' compliance flexibilities.

iii. *Proposal.* In the proposal, the EPA stated that it has reconsidered the ACE Rule's interpretation of the compliance flexibilities available to states under CAA section 111 and that it was proposing to disagree with the rule's view that trading or averaging are universally precluded [169] and that state plan compliance measures must always correspond with the approach the EPA uses to set the BSER. The EPA added, however, that the flexibility that CAA section 111(d) grants to states in adopting measures for their state plans is not unfettered; rather, CAA section 111(d)(2) requires the EPA to review state plans to ensure that they are "satisfactory," and the EPA may conclude in particular emission guidelines that limiting the types of control measures states may authorize their sources to adopt, including precluding trading or averaging, are necessary to protect the environmental outcomes of the emission guidelines.[170]

In addition, the EPA also proposed to reject the ACE Rule's interpretation that various provisions in CAA section 111 limit the type of "system" that may qualify as the BSER to at-the-source measures.[171] The EPA explained that it proposed to agree with the part of the D.C. Circuit's decision in *American Lung Ass'n,*[172] that rejected the ACE Rule's at-the-source statutory interpretation. The EPA added that it recognized that the Supreme Court, in *West Virginia,* did impose limits, through the application of the major question doctrine, on the type of "system" that may qualify as the BSER.[173] The EPA made clear that it was not proposing to address the scope of the limits that may result from application of the major question doctrine, and thus was not proposing to

address whether it could include trading or averaging as part of the BSER, or to identify any particular control mechanism that could or could not be part of a specific BSER, in light of those limits. Instead, the EPA stated that it may address further those limits, and their implications for the legality of particular systems of emission reduction and state compliance measures, in future emission guidelines.[174]

iv. *The EPA's finalized interpretation of state authority to grant compliance flexibilities.* The EPA is finalizing its proposal that, contrary to the position of the ACE Rule, CAA section 111 does not preclude states from including compliance flexibilities such as trading or averaging for their sources in their state plans, although in particular emission guidelines the EPA may limit those flexibilities if necessary to protect the environmental outcomes of the guidelines. The EPA is also rescinding the related ACE Rule interpretation that CAA section 111 requires that state plan measures be symmetrical to the types of measures the EPA included in the BSER.

Most commenters agreed with the proposal that CAA section 111 does not preclude states from including compliance flexibilities in their state plans. However, several commenters disagreed and submitted adverse comments. Some commenters stated that *West Virginia* is clear that the EPA cannot include generation-shifting as the BSER, and then argued that the EPA cannot include trading as part of the BSER because trading entails generation shifting, and then further argued that for emission guidelines applicable to electric generating units, the EPA cannot authorize trading as a compliance mechanism because trading incentivizes generation shifting to occur and only works if generation shifting does occur. As explained further below, the EPA does not believe that these adverse comments cast doubt on the rationale that it gave in the proposal for why states have the authority to allow compliance flexibilities such as trading or averaging.[175] The EPA continues to agree with the reasoning in *American Lung Ass'n,*[176] in rejecting the ACE Rule's limitations on those measures.

To review the reasons that the ACE Rule gave for asserting that trading or averaging across designated facilities is inconsistent with CAA section 111: The ACE Rule stated that those options would not necessarily require any emission reductions from designated

---

[159] 84 FR 32520, 32523–24 (July 8, 2019).

[160] Id. at 32556.

[161] Id. at 32556–57.

[162] *American Lung Ass'n* v. *EPA,* 985 F.3d 914 (D.C. Cir. 2021).

[163] *Id.* at 944–51.

[164] *Id.* at 957–58.

[165] *West Virginia* v. *EPA,* 142 S. Ct. 2587 (2022).

[166] *Id.* at 2601–02.

[167] *Id.* at 2614–16 (internal quotation marks omitted).

[168] *See id.* at 2615 ("We have no occasion to decide whether the statutory phrase 'system of emission reduction' refers exclusively to measures that improve the pollution performance of individual sources, such that all other actions are ineligible to qualify as the BSER." (emphasis omitted)).

[169] With respect to averaging, the ACE Rule noted that the D.C. Circuit has recognized that the EPA may have statutory authority under CAA section 111 to allow plant-wide emissions averaging, *See U.S. Sugar* v. *EPA,* 830 F.3d 579, 627 n.18 (D.C. Cir. 2016) (pointing to the definition of "stationary source"), but stated that the Agency's determination that individual EGUs are subject to regulation under ACE precludes the Agency from attempting to change the basic unit from an EGU to a combination of EGUs for purposes of ACE implementation.

[170] 87 FR 79208.

[171] 84 FR 33556.

[172] 985 F.3d at 944–51.

[173] 142 S. Ct. at 2615–16.

[174] 87 FR 79208.

[175] Id.

[176] 985 F.3d at 957–58.

facilities and may not actually reflect application of the BSER. The ACE Rule explained that "state plans must establish standards of performance—which by definition 'reflects . . . the application of the best system of emission reduction,'"[177] and then asserted that implementation and enforcement of such standards should be based on improving the emissions performance of sources to which a standard of performance applies. The ACE Rule added that trading or averaging would effectively allow a state to establish standards of performance that do not reflect application of the BSER, and gave, as an example, the possibility that under a trading program, a single source could potentially shut down or reduce utilization to such an extent that its reduced or eliminated operation generates sufficient allowances for a state's remaining sources to meet their standards of performance without themselves making any emission reductions from any other source. The ACE Rule asserted that this compliance strategy would undermine the EPA's determination of the BSER.[178]

This interpretation of CAA section 111 is unduly strained and the EPA rejects it. The provisions of CAA section 111(d) by their terms do not affirmatively bar states from considering trading or averaging as a compliance measure where appropriate for a particular emission guideline. Under CAA section 111(d)(1), each state must "establish[ ]," "implement[ ]," and "enforce[ ]" "standards of performance for any existing source." A state plan may "establish[ ]" a standard of performance for each source that constitutes an emissions standard that reflects the amount of emission reduction that the source could achieve by applying the BSER, but the state may also allow measures like trading or averaging as potential means of compliance. Nothing in the text of CAA section 111 precludes states from considering a source's acquisition of allowances as part of a trading program in "implement[ing]" and "enforce[ing]" a standard of performance for that particular source, so long as the state plan achieves the required overall level of emission reductions.[179] CAA section

111(d)(1) requires only that each source comply with its standard, not that each source do so through applying the BSER. By the same token, contrary to the ACE Rule,[180] CAA section 111(d)(1) does not limit the states to compliance measures that are symmetrical to what the EPA determined to be the BSER unless necessary to preserve the environmental outcomes a particular system was designed to achieve.

For further support for the interpretation that CAA section 111 does not preclude states from authorizing compliance flexibilities such as trading or averaging, the EPA notes that CAA section 111(d)(1) requires a "procedure similar to that provided by [CAA section 110]."[181] Consideration of the CAA section 110 framework reinforces the absence of any mandate that states consider only compliance measures that apply at and to an individual source. "States have 'wide discretion' in formulating their plans" under section 110.[182] The EPA has authorized trading programs in CAA section 110 SIPs for decades. See Economic Incentive guidance.[183]

Such flexibility is consistent with the framework of cooperative federalism that CAA section 111(d) establishes, which vests states with substantial discretion in establishing control requirements for their sources. As the U.S. Supreme Court has explained, CAA section 111(d) "envisions extensive cooperation between Federal and state

authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain."[184]

This interpretation is also consistent with the EPA's consistent views prior to the ACE Rule. The EPA authorized trading or averaging as compliance methods in the 2005 Clean Air Mercury Rule for coal-fired EGUs,[185] and the 2015 Clean Power Plan (CPP).[186]

It must be emphasized that the EPA retains an important role in reviewing state plans for adequacy. Under CAA section 111(d)(2)(A), the EPA must determine that the state plan is "satisfactory" and, if the state plan is not satisfactory or if the state does not submit a state plan, the EPA must promulgate a plan that establishes Federal standards of performance for the State's existing sources. Thus, the flexibility that CAA section 111(d)(1) grants to states in adopting measures for their state plans is not unfettered. As the Supreme Court stated in *West Virginia,* "The Agency, not the States, decides the amount of pollution reduction that must ultimately be achieved."[187] The Court further stated that state plans must contain "emissions restrictions that they intend to adopt and enforce in order not to exceed the permissible level of pollution established by EPA."[188] Thus, the EPA retains the authority to ensure that the permissible level of pollution is not exceeded by any state plan. If the EPA considers that compliance flexibility measures would compromise the ability of the state plan to achieve the environmental outcomes the best system could achieve, the EPA may, in the emission guidelines, preclude such measures or otherwise conclude that the state plan is not satisfactory.

In *West Virginia* v. *EPA,* the Supreme Court did not directly address the state's authority to determine their sources' control measures. Although the Court did hold that constraints apply to the EPA's authority in determining the BSER, the Court's discussion of CAA section 111 is consistent with the EPA's interpretation that the provision does not preclude states from granting sources compliance flexibility.

At the outset of the decision, the Court made clear CAA section 111

---

[177] This paraphrasing by the ACE Rule of the CAA section 111(a)(1) definition of "standard of performance" is incomplete—a "standard of performance" "reflects the degree of emission limitation achievable through the application of the best system of emission reduction."

[178] 84 FR 32557.

[179] This overall level of emissions reduction is the level that would be achieved if each source were to apply the BSER.

[180] 84 FR 32556 (ACE Rule states that one reason why CAA section 111 precludes states from authorizing trading or averaging is that "[a]pplying an implementation approach that differs from standard-setting would result in asymmetrical regulation").

[181] *See* CAA section 111(d)(2)(A) (referring to CAA section 110(c)), 111(d)(2)(B) (referring to enforcement of state implementation plans (SIPs)).

[182] *Alaska Dep't of Envtl. Conservation* v. *EPA,* 540 U.S. 461, 470 (2004) (citation omitted); *see Union Elec. Co.* v. *EPA,* 427 U.S. 246, 269 (1976) ("Congress plainly left with the States, so long as the national standards were met, the power to determine which sources would be burdened by regulation and to what extent."); *Train* v. *Natural Res. Def. Council, Inc.,* 421 U.S. 60, 79 (1975) ("'[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.").

[183] The ACE Rule stated that the reference in CAA section 111(d)(1) to CAA section 110 was limited to the procedure under which states shall submit plans to the EPA, and asserted that it does not imply anything about implementation mechanisms available under CAA section 111(d). 84 FR 32557. The EPA believes that the several references to CAA section 110 in CAA section 111(d)(1) and (2), as noted in the accompanying text, support the view that Congress intended that state plans under CAA section 111(d) would be similar to state plans under CAA section 110, including retaining the authority to grant sources compliance flexibility in appropriate circumstances.

[184] *American Elec. Power Co.* v. *Connecticut,* 564 U.S. 410, 428 (2011) (citations omitted).

[185] 70 FR 28606, 28617 (May 18, 2005), vacated on other grounds, *New Jersey* v. *EPA,* 517 F.3d 574 (D.C. Cir. 2008), *see* 40 CFR 60.24(b)(1) (2005) (providing that a state's "[e]mission standards [may] be based on an allowance system), repealed in the ACE Rule.

[186] 80 FR 64662, 64840 (October 23, 2015), repealed by the ACE Rule. 87 FR 79208.

[187] 142 S. Ct. at 2602.

[188] Id.

provides different roles for the EPA and the States:

Although the States set the actual rules governing existing power plants, EPA itself still retains the primary regulatory role in Section 111(d). The Agency, not the States, decides the amount of pollution reduction that must ultimately be achieved. It does so by again determining, as when setting the new source rules, "the [BSER]. . . . The States then submit plans containing the emissions restrictions that they intend to adopt and enforce in order not to exceed the permissible level of pollution established by EPA.[189]

The Court was clear that the focus of the case was exclusively on the EPA's role, that is, whether the EPA acted within the scope of its authority in establishing the BSER.[190] The Court applied the major question doctrine to hold that the generation-shifting BSER that the EPA promulgated in the CPP exceeded the constraints of the CAA section 111 BSER provisions, in light of "separation of powers principles and a practical understanding of legislative intent." [191] The Court did not identify any constraints on the states in establishing standards of performance to their sources, and its holding and reasoning cannot be extended to apply such constraints. In fact, the Supreme Court at least implicitly recognized that CAA section 111(d) does not preclude states from authorizing sources compliance flexibility when the Court observed that a new or modified source "may achieve [the EPA-determined] emissions [standard] any way it chooses." [192] There is no reason why existing sources should have less flexibility.

It should also be noted that the adverse commenters described above are incorrect in their view that trading necessarily results in generation shifting and that the logic of the *West Virginia* decision precludes any such generation shifting. As just noted, the reasons why the Court held that the CPP's generation-shifting BSER violated the major question doctrine and thus was invalid have no application to states in developing state plans. In addition, the Court was clear that a BSER that has the incidental effect of resulting in generation shifting would not, on those grounds, violate the major question doctrine. The Court emphasized that "there is an obvious difference between

(1) issuing a rule that may end up causing an incidental loss of coal's market share, and (2) simply announcing what the market share of coal, natural gas, wind, and solar must be, and then requiring plants to reduce operations or subsidize their competitors to get there." [193] The second option is what the Court viewed the CPP's generation-shifting BSER as attempting to do, which thereby triggers the major question doctrine. But, as a coalition of companies that operate electricity generation as well as transmission and distribution systems commented, the Court "evinced no general concern about option 1, which is an inevitable consequence of regulation within the power sector, in which all sources of emissions are interconnected and increase or decrease their generation based upon demand for electricity and other sources' availability." [194] If the Court in *West Virginia* had little concern with the EPA determining a BSER that has the incidental effect of shifting generation, there is no basis for reading the case to preclude a state from adopting trading measures in its state plan on grounds that those measures may have the incidental effect of shifting generation. In any event, in many instances, trading simply apportions the cost of controls between the sources engaged in the transaction, and does not result in generation shifting. To illustrate, assume that the EPA promulgates an emissions guideline that determines as the BSER the installation by a source of control equipment that captures 40 percent of its emissions of a pollutant. Assume further that a state allows two of its designated facilities of comparable size and emissions to engage in an emission trade, so that one source installs control equipment that captures 80 percent of its emissions, and the other one does not put on control equipment but purchases allowances from the first one that fund half the costs of the first one's control equipment. This type of emissions trade would not necessarily give rise to generation shifting.

For the reasons noted above, the EPA is rescinding the ACE Rule's interpretation that state plans may not include trading or averaging or other compliance flexibilities.

v. *The EPA's finalized interpretation of BSER.* The EPA is also finalizing its proposal to rescind the ACE Rule's

interpretation that CAA section 111, by its plain meaning, limits the BSER to at-the-source measures. The ACE Rule's interpretation is incorrect. In addition, as a practical matter, it could call into question many of the EPA's determinations in prior CAA section 111 rules that well-established control measures, including clean fuels and add-on control technology, qualified as the BSER. This is because many of these traditional measures are not entirely at-the-source controls, but also include outside-the-source components. *West Virginia* does not preclude the EPA from rescinding the ACE Rule interpretation because although the Supreme Court held that the CPP's generation-shifting BSER violated the major question doctrine, Court declined to address the ACE Rule's interpretation of CAA section 111.[195]

To repeat for convenience the key requirements for determining the BSER under CAA section 111: each state must establish "standards of performance for any existing source" of certain types of air pollutants, under CAA section 111(d)(1); a "standard of performance" is defined as "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction . . . adequately demonstrated, under CAA section 111(a)(1);" and "existing source" is defined as a "stationary source," which, in turn, is defined, in relevant part, as "any building, structure, facility, or installation," under CAA section 111(a)(6) and (a)(3).

The ACE Rule interpreted CAA section 111 to limit, by its plain language, the type of "system" that the EPA may select as the BSER to control measures that can be applied at each source to reduce that source's emissions.[196] Specifically, the ACE Rule argued that the requirements in CAA section 111(d)(1), (a)(3), and (a)(6) that each state establish a standard of performance "for" "any existing source" (in the singular), defined, in general, as any "building . . . [or] facility," and the requirements in CAA section 111(a)(1) that the standard of performance reflect a degree of emission limitation that is "achievable" through the "application" of the BSER, by their terms, impose this limitation.[197]

Upon reconsideration, the EPA concludes that, contrary to the ACE Rule, CAA section 111(d) does not limit the EPA to at-the-source measures in determining the BSER. The CAA section

---

[189] *West Virginia* v. *EPA,* 142 S.Ct. at 2601–02 (citations omitted).

[190] Id. at 2600 ("The question before us is whether this broad[ ] conception of EPA's authority [to determine the BSER] is within the power granted to it by the Clean Air Act.").

[191] Id. at 2609.

[192] Id. at 2601.

[193] Id. at 2613 n.4.

[194] Comment Letter from Energy Strategy Coalition on "Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d), EPA–HQ–OAR–2021–0527–0088 at 6.

[195] 142 S.Ct. at 2615–16.

[196] 84 FR 32523–24.

[197] Id. at 32556–57.

111 requirement that each state establish a standard of performance ''for'' any existing ''building . . . [or] facility,''' means simply that the state must establish standards applicable to each regulated stationary source; and the requirement that the standard reflect a degree of emission limitation ''achievable'' through the ''application'' of the BSER means that the source must be able to apply the system to meet the standard. None of these requirements by their plain language mandate that the BSER is limited to some measure that each source can apply to its own facility to reduce its own emissions in a specified amount. That the standards must be ''for'' a source does not mean that the control measures that form the basis for the standard are limited to measures that apply at the source or that all emission reductions from the control measures must occur at the source.

The ACE Rule also argued that as a matter of grammar, the term ''application,'' which is derived from the verb, ''to apply,'' requires an indirect object, and, further, that the phrase ''application of the best system of emission reduction'' has, as the unstated indirect object, an existing source. From this premise, the ACE Rule concluded that the phrase must be read to refer to the application of the best system of emission reduction at or to the existing source itself.[198] But this premise is incorrect. As the D.C. Circuit explained in *American Lung Ass'n,* ''application'' is a noun, and ''the phrase 'application of the best system of emission reduction' is what is called a nominalization, a 'result of forming a noun or noun phrase from a clause or a verb.' '' [199] The court further explained that ''[g]rammar assigns direct or indirect objects only to verbs—not nouns. No objects are needed to grammatically complete the actual statutory phrase.'' [200] In any event, the fact that any such indirect object is unstated itself contradicts the ACE Rule's conclusion that CAA section 111 by its plain language mandates that the BSER must be limited to at-the-source measures.[201]

It should also be noted that CAA section 111(a)(1) provides that when the EPA determines the BSER, it must ''tak[e] into account'' ''cost'' and ''any nonair quality health and environmental impact and energy requirements.'' As the ACE Rule itself recognized, the EPA may consider the application of these requirements on a ''sector-wide, region-wide or nationwide basis.'' [202] As discussed below, the reference to ''nonair quality health and environmental impact'' may encompass to offsite impacts of control measures. Thus, these provisions contradict the ACE Rule's argument that CAA section 111(d)(1) and (a), by its plain language, limits the BSER to at-the-source measures. By the same token, the term ''achievable'' refers to the ''degree of emission limitation'' that must be ''reflect[ed]'' in the standards of performance ''through the application of the [BSER].'' This term does not, by its plain language, limit the BSER to at-the-source measures.

Importantly, it should be emphasized that the ACE Rule's interpretation

exceed the emissions allowed by any applicable standard established pursuant to [CAA] section [111] or [112].'' The ACE Rule pointed to the EPA's reading of this sentence to mean that section 111 standards of performance ''operate as a floor to BACT.'' The ACE Rule asserted that, under the definition of BACT, control measures are limited to at-the-source measures. The ACE Rule reasoned that section 111 standards of performance must, by operation of the structure of the CAA, also be interpreted to be limited to at-the-source measures. 84 FR 32525. Upon further review, the EPA rejects this argument. The EPA considers whether CAA section 169(3) should be interpreted to limit BACT to at-the-source measures to be an open question, and is not addressing it at this time. Even if BACT were so limited, the ACE Rule did not demonstrate that any BACT requirement that a particular source would be subject to would be incompatible with any standard of performance that source would also be subject to. Section 169(3) by its plain language provides that the application of BACT may not result in exceedances of any applicable standard of performance.

The ACE Rule also focused on statements in the CPP that it asserted conflated the terms ''application'' and implementation, as well as ''source'' and owner/operator; and that defined ''system'' broadly. The rule asserted that the CPP strained the interpretation of CAA section 111 in those ways to justify determining generation-shifting as the BSER. 84 FR 32526–29. Regardless of whether those arguments have merit with respect to the generation-shifting, they are not relevant to the position that the EPA is taking in the present action that the ACE Rule erred in interpreting CAA section 111 by its terms to limit the BSER to at-the-source measures. It should also be noted that the CPP's recognition that as a practical matter, it is the owner/operator who takes actions to apply control measures and assure that the source's emissions meet the standard is a matter of common sense and applies as well to all control measures, whether at the source or outside the source. The ACE Rule itself referred to the ''owner or operator'' as the entity that ''must be able to achieve an applicable standard by applying the BSER . . . .'' 84 FR 32524.

[202] 84 FR 32534 n.152 (referring to application of ''energy requirements'').

the provisions of CAA section 111(d)(1) and (a) by their plain language require that the EPA identify as the BSER control measures that apply at-the-source would also impose the same limit on the state, that is, limit the state to authorizing its sources to comply with their standards only through at-the-source measures. As a result, this interpretation would preclude the state from allowing its sources compliance flexibilities such as trading or averaging. In fact, the ACE Rule argued that states were limited in that manner. For the reasons noted above, limiting the states in that manner is contrary to the provisions of CAA section 111(d) and the framework of cooperative federalism that CAA section 111(d) establishes.

The ACE Rule also argued that the legislative history of the 1970 CAA Amendments confirms the rule's at-the-source interpretation for BSER.[203] The rule read the legislative history to indicate that the House and Senate bills that led to the adoption of CAA section 111 ''contemplated only control measures that would lead to better design, construction, operation, and maintenance of an individual source. . . .'' [204] The EPA disagrees with this interpretation of the legislative history. The ACE Rule itself acknowledged that the 1970 CAA Amendments legislative history also included broader language in describing the types of measures that were to provide the basis for the standards of performance.[205] In addition, the ACE Rule went on to narrow its argument about legislative history to saying that the 1990 CAA Amendments made clear only that generation-shifting was precluded.[206] *Id.* at 32526 n.62. Thus, the EPA finds that the legislative history cannot be read to confirm the interpretation that section 111(d) and (a)(1), by their plain language, limit the BSER to at-the-source measures.

There is another reason why the ACE Rule's interpretation is incorrect: it appears to be inconsistent with many EPA determinations in previous CAA section 111 rulemakings that certain control measures qualified as the BSER. This is because although those measures apply at the source and reduce

---

[198] Id. at 32524.

[199] 985 F.3d at 948 (citations omitted).

[200] *Id.*

[201] The ACE Rule stated that the CAA provisions concerning the ''best available control technology'' (BACT) provide a CAA structural argument that supports its interpretation that CAA section 111 limits BSER to at-the-source measures. CAA section 165(a)(4) provides that construction and modification of major stationary sources of a pollutant are subject to BACT, as defined under CAA section 169(3), for each pollutant subject to regulation under the CAA. The definition of BACT provides, ''In no event shall application of [BACT] result in emissions of any pollutants which will

[203] 84 FR 32525–26.

[204] *Id.* at 32526.

[205] *Id.* at 32526 n.61. The ACE Rule argued that the canon of *ejusdem generis* required that those broader terms be interpreted to denote at-the-source measures but *ejusdem generis* is an aid in statutory construction and should not be used to narrow the meaning of a statute beyond its intention. Karl N. Llwellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons about how Statutes are to be Construed, 3 Vanderbilt L. Rev. 395, 405 & n.46 (1950).

[206] *Id.* at 32526 n.61.

emissions at the source, they also have components that are outside the source. In *West Virginia,* the Supreme Court recognized that the EPA had, in prior rules, identified as the BSER these "'more traditional air pollution control measures.'" [207] The Court made this point as part of its reasoning that the CPP's generation-shifting BSER—which the Court stated differed from these traditional measures—raised a major question. The Court quoted the CPP as describing these traditional measures as "'efficiency improvements, fuel-switching,' and 'add-on controls.'" [208] The Court noted that these types of controls have several characteristics: they "reduce pollution by causing the regulated source to operate more cleanly." [209] They "'allow[ ] regulated entities to produce as much of a particular good as they desire provided that they do so through an appropriately clean (or low-emitting) process.'" [210] They are "technology-based . . . [and] focuse[d] on improving the emissions performance of individual sources." [211]

However, many of these traditional controls also have components that are outside the source. One example includes what the Court, quoting the CPP, identified as "fuel-switching." [212] Fuel-switching entails the use of lower-emitting fuels. These include fuels that have been cleaned, or processed, to reduce their level of pollutants, [213] such as coal or oil that has been desulfurized. Desulfurization reduces the amount of sulfur in the fuel, which means that the fuel can be combusted with fewer $SO_2$ emissions. Importantly, the process of desulfurization typically occurs off-site and is undertaken by third parties. Congress itself recognized this in the 1977 CAA Amendments. Specifically, Congress revised CAA section 111(a)(1) to identify the basis for standards of performance for new fossil fuel-fired stationary sources as a "technological system of continuous emission reduction," including "precombustion

cleaning or treatment of fuels." [214] The 1977 House Committee report stated that fuel cleaning includes "oil desulfurization at the refinery." [215] The report added that fuel cleaning includes "various coal-cleaning technologies," which generally are also conducted off-site by third parties. [216] As noted above, in the 1990 CAA Amendments, Congress eliminated many of the restrictions and other provisions added in the 1977 CAA Amendments by largely reinstating the 1970 CAA Amendments' definition of "standard of performance." Nevertheless, there is no indication that in doing so, Congress intended to preclude the EPA from considering fuel cleaning off-site by third parties. In fact, the EPA's regulations promulgated after the 1990 CAA Amendments continue to impose standards of performance that are based on coal cleaning off-site by third parties. [217]

A second example includes what the Court, again quoting the CPP, identified as "add-on controls." [218] These controls include air pollution control devices that are installed at the unit. They routinely operate by removing air pollutants from a unit's emission stream and capturing them as a liquid or solid. For example, a baghouse is an add-on control device that captures particulate matter by trapping particles as a dust, which must then be disposed of. [219] Another add-on control device, flue-gas desulfurization, "scrubs" acid gases like sulfur dioxide from emissions using a chemical sorbent that reacts with the pollutant to generate a liquid slurry (wet scrubbing) or solid residue (dry scrubbing). These captured pollutants must then be disposed as solid wastes, discharged as wastewater, or otherwise

managed or reused. [220] The same is true for carbon capture and sequestration (CCS): the carbon capture control device scrubs $CO_2$ from the flue gas stream using a solvent; and the $CO_2$ must be stored underground. [221] Downstream management of captured pollutants is thus a commonplace feature of CAA section 111 standards. [222] Downstream management of captured pollutants is thus a commonplace feature of CAA section 111 standards. [223]

Indeed, CAA section 111(a)(1) by its terms recognizes that "system[s] of emission reduction" may entail off-site disposition of pollutants. The provision states that the EPA must consider "nonair quality health and environmental impact" when determining the BSER. Congress adopted this phrase in the 1977 CAA Amendments. [224] As the legislative history stated, Congress added this phrase so that "environmental impacts would be required to be considered in determining best technology which has been adequately demonstrated." [225] In making this addition, Congress codified the D.C. Circuit's holding in *Essex Chem. Corp.* v. *Ruckelshaus,* 486 F.2d 427, 438–39 (D.C. Cir. 1973), *cert. denied,* 416 U.S. 969 (1974). [226] In *Essex Chem. Corp.,* the D.C. Circuit required that EPA "take into account counter-productive environmental effects" when determining whether a control measure qualifies as the BSER, including "disposal problems" related to the control measure's captured pollutants. The Court remanded the NSPS at issue because there was no evidence that the EPA had considered "the significant land or water pollution potential

[207] 142 S.Ct.at 2611 (citing 80 FR 64662, 64784 (Oct. 23, 2015)).

[208] *Id.* (citing 80 FR 64784).

[209] 142 S.Ct. at 2610.

[210] *Id.* (quoting 80 FR 64738).

[211] *Id.* at 2611.

[212] *Id.*

[213] EPA considered fuel cleaning to be within the scope of the best system of emission reduction beginning immediately after the adoption of the 1970 CAA Amendments. *See* U.S. EPA, *Background Information for Proposed New-Source Performance Standards: Steam Generators, Incinerators, Portland Cement Plants, Nitric Acid Plants, Sulfuric Acid Plants,* Office of Air Programs Tech. Rep. No. APTD–0711, p. 7 (Aug. 1971) (indicating the "desirability of setting sulfur dioxide standards that would allow the use of low-sulfur fuels *as well as fuel cleaning,* stack-gas cleaning, and equipment modifications" (emphasis added)).

[214] 1977 CAA Amendments, section 109, 91 Stat. 700; see also CAA section 111(a)(7).

[215] H.R. Rep. No. 95–294 (May 12, 1977), 1977 CAA Legis. Hist. at 2655 (emphasis added).

[216] *Id.* EPA recognized in a regulatory analysis of new source performance standards for industrial-commercial-institutional steam generating units that the technology "requires too much space and is too expensive to be employed at individual industrial-commercial-institutional steam generating units." U.S. EPA, *Summary of Regulatory Analysis for New Source Performance Standards: Industrial-Commercial-Institutional Steam Generating Units of Greater than 100 Million Btu/hrHeat Input,* EPA–450/3–86–005, p. 4–4 (June 1986).

[217] 40 CFR 60.49b(n)(4); *see also* Amendments to New Source Performance Standards (NSPS) for Electric Utility Steam Generating Units and Industrial-Commercial-Institutional Steam Generating Units; Final Rule, 72 FR 32742 (June 13, 2007).

[218] 142 S.Ct. at 2611.

[219] *See Sierra Club* v. *Costle,* 657 F.2d 298, 375 (D.C. Cir. 1981).

[220] *See id.* at 323–24 n.69; see also 80 FR 21303, 21340 (April 17, 2015) (governing off-site disposal of solid wastes captured by air pollution controls at steam units).

[221] 80 FR 64549, 64555 (describing CCS and comparing CCS pollutant disposition to particulate or wet scrubber pollutant disposition).

[222] *See, e.g.,* 80 FR 64582–90 (requiring that an EGU that captures $CO_2$ assure that it is transferred to an entity that will dispose of it appropriately; generally describing oversight of $CO_2$ storage; detailing Department of Transportation pipeline regulations; detailing requirements for monitoring, reporting, and verification plans; detailing injection well requirements under the Safe Drinking Water Act; and detailing how existing regulations prevent, monitor, and address potential leakage); 75 FR 54970, 55022–23 (Sept. 9, 2010) (disposal of wastewater and solid waste from CAA section 111 standard for Portland cement plants); 54 FR 34008, 34015 (Aug. 17, 1989) (waste disposal impacts of standard of performance for sulfur oxide emissions for fluid catalytic cracking unit regenerators).

[223] *See* 80 FR 64549, 64555 (describing CCS and comparing CCS pollutant disposition to particulate or wet scrubber pollutant disposition).

[224] Pub. L. 95–95, section 109(c)(1)(A) (Aug. 7, 1977), 91 Stat. 699–700.

[225] H.R. Rep. No. 95–294 at 190 (May 12, 1977).

[226] *Id.*

resulting from disposal of the [scrubber system's] liquid purge byproduct.'' [227] That the ACE Rule's interpretation that CAA section 111 limits the BSER to at-the-source measures may be inconsistent with the EPA's prior determinations that traditional control measures like clean fuels and add-on controls qualified as the BSER provides another reason to reject that interpretation.

It should be noted that many of the reasons noted above are comparable to the reasoning by the D.C. Circuit to support its decision in *ALA* that the ACE Rule was incorrect in interpreting CAA section 111 to restrict the BSER to at-the-source measures.[228] The EPA agrees with the D.C. Circuit's reasoning.

In *West Virginia,* the Supreme Court held that the CPP's generation-shifting BSER violated the major question doctrine, and the Court vacated *ALA* on the basis of that holding.[229] However, the Court declined to address the ACE Rule's interpretation of CAA section 111.[230] Thus, its opinion does not cast doubt on the EPA's reasons for rejecting the ACE Rule's interpretation, as noted above and in *ALA.* Several commenters argued that *West Virginia* indicates that control measures that the commenters considered comparable to the generation-shifting BSER of the CPP, including trading programs and other measures that controlled designated facilities in the aggregate, were also precluded from inclusion as the BSER under the major question doctrine.[231] Other commenters disagreed, arguing that *West Virginia* identifies distinctions among those programs, so that the major question doctrine would not necessarily apply.[232] However, as noted in the proposal, in this action, the EPA is not addressing what types of controls, in addition to the generation-shifting BSER of the CPP, would be precluded under CAA section 111 by the major question

doctrine. Instead, the EPA will evaluate particular controls against the doctrine, as appropriate, when the EPA considers those controls in future rulemakings under CAA section 111.

### 2. Minor Amendments or Clarifications

The EPA proposed to amend the regulatory text in subpart Ba to address several editorial and other minor clarifications and is finalizing the amendments as described below. Except as noted specifically below, commenters supported these revisions to the regulatory text.

a. The EPA is finalizing amendments to the applicability provision for subpart Ba under 40 CFR 60.20a, with slight revision from as proposed. As discussed in section II.B. of this preamble, the revised applicability provision clarifies that the provisions of subpart Ba are applicable to an EG published after July 8, 2019. The EPA is finalizing the proposed removal of text that included ''if implementation of such final guideline is ongoing'' because there are no EGs the implementation of which is ongoing; [233] thus, leaving this language in the regulation would be needlessly confusing. Emission guidelines issued on and prior to July 8, 2019, and pursuant to CAA section 129 are subject to the provisions of subpart B. Also, in response to comment that the term ''final emission guideline'' is unclear, the EPA is adding the term ''in the **Federal Register**'' to 40 CFR 60.20a(a) to clarify the publication in the **Federal Register** determines the applicability date. Further clarification of the term ''final emission guideline'' is available in 40 CFR 60.22a(a). A commenter also noted that the proposed rule text deleted all references to ''subpart C of this part'' and removing this language means that it would apply to all EGs in 40 CFR part 60 (that are published after July 8, 2019), including those for incinerators addressed by CAA section 129. This was not the EPA's intent. Therefore, as noted in section III.G.2.b. of this preamble, the EPA is amending the definition of EG within subpart Ba to clarify that subpart Ba does not apply to EGs promulgated under CAA section 129.

b. The EPA is finalizing revisions to 40 CFR 60.21a(e), 60.22a(c), and 60.24a(c) and (f)(1) and (2), largely as proposed, at 40 CFR 60.21a(e), 60.22a(c), and 60.24a(c) and (i)(1) and (2) respectively (differences in numbering are due to provisions changing location in the final

regulations relative to proposal). These revisions delete ''subpart C'' from these provisions because EGs can be codified in other subparts of this part and not only in subpart C of this part. In response to a comment requesting clarification, 40 CFR 60.21a(e) is also amended clarify that the definition of emission guidelines for purposes of subpart Ba excludes guidelines promulgated pursuant to CAA section 129. As discussed above, EGs under CAA section 129 are subject to the provisions of subpart B.

c. The EPA is finalizing as proposed an editorial amendment to 40 CFR part 60, subpart A, at § 60.1(a) to add a reference to subpart Ba. The applicability provision in 40 CFR 60.1(a) states that ''[e]xcept as provided in subparts B and C, the provisions of this part apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility.'' We are amending this provision to include reference to subpart Ba in addition to subparts B and C.

d. A minor editorial correction at 40 CFR 60.22a(b)(3) amends the term ''nonair quality health environmental effects'' to ''nonair quality health and environmental effects.''

### 3. Submission of Emissions Data and Related Information

The EPA is finalizing as proposed amendments to 40 CFR 60.25a(a) that delete reference to 40 CFR part 60, appendix D, because the system specified for information submittal by the appendix is no longer in use and clarify that the applicable EG will specify the system for submission of the inventory of designated facilities, including emission data for the designated pollutants and any additional required information related to emissions. The EPA also proposed to delete the term ''related to emissions'' in 40 CFR 60.25a(a). A commenter noted as proposed this deletion caused the provision to be too vague. The EPA agrees that the term ''related to emissions'' should be retained to maintain the original and proper context of this provision. The term is retained by this final action.

### 4. State Permit and Enforcement Authority

Questions have previously arisen as to whether states may establish standards of performance and other plan requirements as part of state permits

---

[227] *Id. See Portland Cement Ass'n* v. *Ruckelshaus,* 486 F.2d 375, 385 n.42 (D.C. Cir. 1973) (''The standard of the ''best system'' is comprehensive, and we cannot imagine that Congress intended that 'best' could apply to a system which did more damage to water than it prevented to air.'').

[228] 985 F.3d 914, 955–41 (D.C. Cir. 2021).

[229] 142 S.Ct. at 2610, 2614, 2615–16.

[230] *Id.* at 2615–16.

[231] API Comment Letter on ''Adoption and Submittal of State Plans for Designated Facilities; Implementing Regulations Under Clean Air Act Section 111(d)'' (''Subpart Ba''), EPA–HQ–OAR–2021–0527–0074 at 8; Lignite Energy Council Comment Letter on Subpart Ba, EPA–HQ–OAR–2021–0527–0100 at 8–9.

[232] Energy Strategy Coalition Comment Letter on Subpart Ba, EPA–HQ–OAR–2021–0527–0088 at 6 (noting that *West Virginia* distinguished the trading program in the Clean Air Mercury Rule, which was based on technological controls, from the trading program in the CPP).

[233] The Municipal Solid Waste Landfills EG, which is currently being implemented, has its own applicability provisions and is subject to subpart B.

and administrative orders. The EPA is confirming in this final action that subpart Ba allows for standards of performance and other state plan requirements to be established as part of state permits and administrative orders, which then must be incorporated into the state plan. See 40 CFR 60.27a(g)(2)(ii).

However, the EPA notes that the permit or administrative order alone may not be sufficient to meet the requirements of an EG or the implementing regulations, including the completeness criteria under 40 CFR 60.27a(g). For instance, a plan submittal must include supporting material demonstrating the state's legal authority to implement and enforce each component of its plan, including the standards of performance, 40 CFR 60.27a(g)(2)(iii), as well as a demonstration that each emission standard is quantifiable, non-duplicative, permanent, verifiable, and enforceable. *Id.* at § 60.27a(a)(2)(vi). In addition, the specific EGs may also require demonstrations that may not be satisfied by terms of a permit or administrative order. To the extent that these and other requirements are not met by the terms of the incorporated permits and administrative orders, states will need to include materials in a state plan submission demonstrating how the plan meets those requirements. If a state does choose to use permits or administrative orders to establish standards of performance, it needs to demonstrate that it has the legal authority to do so. These implementing regulations do not themselves provide any independent or additional authority to issue permits and administrative orders under states' EPA approved title I and title V permitting programs.

## IV. Summary of Cost, Environmental, and Economic Impacts

In amending general implementing regulations, this final action does not independently impose any requirements and therefore does not directly incur any costs or benefits. However, the amendments finalized in this action can impact the costs and benefits of future EGs subject to subpart Ba. The potential impacts of these amendments as reflected in an EG will vary greatly depending on the source category, number and location of designated facilities, and the designated pollutant and potential controls addressed by the EG. Of note, the EPA may propose to supersede these general provisions in an EG as needed and with appropriate justification. Individual EGs are subject to notice and comment rulemaking, providing the opportunity for

stakeholders, including the public, to consider the impacts of implementing or superseding these general implementing regulations in the course of those rulemaking actions.

As described in detail in section III.A. of this preamble, the EPA is finalizing amendments to subpart Ba to replace timelines vacated by the D.C. Circuit in *ALA* [234] and to improve and update other provisions within subpart Ba. This section considers general impacts that could result from the amendments finalized in this action as adopted by an EG.

As discussed in section III.A. of this preamble, the EPA does not interpret the D.C. Circuit's direction to require the Agency to quantitatively evaluate the impacts of potential subpart Ba framework timelines, but rather to consider the balance between the public health and welfare benefits resulting from appropriate and reasonable deadlines for the implementation of EGs and the time needed for the technical, administrative, and legislative actions needed to develop and adopt approvable state or Federal plans. The EPA expects that the amendments to subpart Ba finalized in this action will improve the implementation of EGs under CAA section 111(d). In particular, the EPA expects that the timelines finalized both appropriately accommodate state and EPA processes to develop and evaluate plans to effectuate an EG and are consistent with the objective of CAA section 111(d) to ensure that designated facilities expeditiously control emissions of pollutants that the EPA has determined may be reasonably anticipated to endanger public health or welfare.

While the EPA initially proposed a 15-month deadline for state plan submissions following the promulgation of an EG (87 FR 79176, Dec. 23, 2022), most commenters, including states and state organizations, indicated that 15 months could not accommodate the technical, administrative, and legal steps necessary to develop and adopt an approvable state plan. Based on the comments and additional information received, the EPA is finalizing 18 months for state plan submissions after promulgation of a final EG, and finds that the additional time, compared with the 9 months provided in subpart B, will better accommodate states' processes to develop and adopt approvable plans and will most efficiently effectuate the applicable EG. Under an 18-month state plan submission timeframe, the costs of

developing a state plan under an applicable EG subject to subpart Ba, compared with the 9 months provided by subpart B, may be spread over 9 additional months. With this state plan submittal timeline, the EPA is providing states sufficient time to develop approvable implementation plans for their designated facilities that adequately address public health and environmental objectives. A timeline that is insufficient for states to conduct, *inter alia,* the appropriate technical analysis and public engagement may preclude them from timely adopting and submitting approvable state plans, which could ultimately delay the implementation of emission reductions. In addition, a successful submittal of approvable state plans will avoid an attendant expenditure of Federal resources associated with the development of a Federal plan.

After receiving a state plan, the EPA first must determine if the plan is complete. The EPA is finalizing amendments to its determination of completeness so the timeframe for such determination is streamlined from six months to 60 days from receipt of the state plan submission (see section III.A.2. of this preamble). If the EPA determines a state plan submission is complete, it then evaluates the plan to determine whether it satisfies the applicable requirements. The Agency proposes an action (*e.g.,* plan approval or plan disapproval) and then finalizes its action pursuant to a notice-and-comment rulemaking process. As described in detail in sections III.A.3. and III.A.4. of this preamble, the EPA is finalizing a 12-month period for the EPA to take final action on a state plan after a submission is found to be complete. The EPA is also finalizing a 12-month timeline for the EPA to promulgate a Federal plan, which runs from either the state plan deadline if a state has failed to submit a state plan, 60 days following the state plan deadline if a state has submitted a plan by the deadline and the EPA determines it is incomplete, or from the date the EPA finalizes disapproval of a state plan submission. As described in detail in section III. of this preamble, because these timeframes provide for the minimum time reasonably necessary for the EPA to accomplish propose and finalize a Federal plan, the EPA expects these timeframes will minimize the impacts on public health and welfare to the extent possible while ensuring that an EG is expeditiously implemented.

As described in detail in section III.A.5. of this preamble, the EPA is finalizing a requirement that state plans include IoPs if the plan requires final

---

[234] *Am. Lung Ass'n* v. *EPA,* 985 F.3d 914, 991 (D.C. Cir. 2021).

compliance with standards of performance later than 20 months after the plan submission deadline. The compliance schedule, as defined in subpart Ba (40 CFR 60.21a(g)) is a legally enforceable schedule specifying a date or dates by which a source or category of sources must comply with specific standards of performance contained in a plan. If final compliance for a source to meet their standards of performance is more than 20 months after the state plan submittal deadline, the plan must include IoPs, which are defined steps to achieve compliance (*e.g.,* submittal of a control plan, awarding of contracts for emission control systems or process modification, etc.). This 20 month timeline is the trigger for when IoPs must be included in a state plan. An EG will specify what the IoPs are and associated compliance schedules. The EPA considers this slightly longer timeline than is required under subpart B reasonable given that the EPA is also, in this action, extending the timelines for state plan submission under subpart Ba. The EPA notes that IoPs do not, on their own, govern how expeditiously emission reductions are achieved: this is dictated by the final compliance date, which is established in an individual EG. Additionally, any specific requirements associated with IoPs, including extended or truncated timelines, would be included in the EG, as these are dependent on the source type, pollutant, and control strategy addressed.

The EPA is also finalizing amending subpart Ba to enhance requirements for reasonable notice and opportunity for public participation. In particular, the EPA is requiring that states, as part of the state plan development or revision process, provide documentation that they have conducted meaningful engagement with a broad range of pertinent stakeholders and/or their representatives. Pertinent stakeholders include communities most affected by and vulnerable to the impacts of the plan or plan revision (see section III.C. of this preamble).

Overall, the EPA expects the amendments being finalized in this action will benefit the states in the development of approvable state plans. The EPA expects that the amendments associated with meaningful engagement with pertinent stakeholders will potentially increase the amount of information the states can use in designing state plans, which may increase both the level of resources states will need to employ in the development of an approvable plan, as well as the resulting health and welfare benefits of the plan. In addition to

health and welfare benefits, there are also administrative benefits of engaging with stakeholders and receiving pertinent information as a state plan is being developed. Such engagement may improve the record for the state's plan and reduce the amount of comments received when the state plan is proposed to the public, which would reduce the amount of effort employed after proposal to address issues raised by the public and stakeholders.

There is variation and uncertainty in determining the magnitude of impacts, both to states and the public, resulting from amendments associated with meaningful engagement. First, the EPA notes that the meaningful engagement provisions being finalized in this action are largely procedural in nature and do not prescribe any particular set of actions or activities that states must undertake. The potential costs and benefits will therefore be determined in significant part by choices that are within states' discretion. Second, the impacts of conducting meaningful engagement will be highly dependent on the number and location of designated facilities addressed by an EG, as well as on the type of health or environmental impacts of the associated emissions. If stakeholder and public involvement pursuant to the meaningful engagement provisions does not generate a large number of specific and unique comments, data, or other considerations, then the level of effort states will employ to review them will be lower in comparison to when meaningful engagement comments are voluminous. It might also be expected that less input and fewer comments might, in certain cases, have an adverse impact on the ability of a state plan to fulfill its health and welfare objectives.

To the extent that states already conduct significant engagement with pertinent stakeholders, the meaningful engagement amendments will most likely not result in additional costs. Conversely, states that do not have engagement procedures already in place may be required to increase their level of effort to engage with pertinent stakeholders. The burden and benefits of meaningful engagement for the pertinent stakeholders will also be highly dependent on the EG and associated variables such as, but not limited to, the geographical distribution of the facilities and communities impacted, available modes of participation for those areas, the pollutants addressed, and the range of options available to the state and facilities for meeting the EG standards. The burden and benefits to pertinent stakeholders may be difficult to

quantify, but overall their engagement will be voluntary and is anticipated to result in feedback that may improve the resulting health and welfare benefits of the state plan as perceived and experienced, particularly by those in communities most affected by and vulnerable to the impacts of the plan.

The EPA is also finalizing revisions to the RULOF provisions in subpart Ba. The amendments included in this final action are intended to provide clarity for states to ensure that less-stringent standards of performance for particular designated facilities are consistent with the statutory requirements, as well as a consistent framework for EPA to evaluate such standards across EGs and states (see section III.E. of this preamble).

The magnitude of impacts, both to states and the public, resulting from the final RULOF amendments will vary depending on the particular EG to which the final provisions would apply. As explained in section III.E.2. of this preamble, the EPA believes Congress intended RULOF as a mechanism for states to apply a less-stringent standard of performance in the unusual circumstances in which the degree of emission limitation determined by the EPA is not reasonable for a particular designated facility. Additionally, states are not required to invoke the RULOF provision in any particular instance and may choose not to do so, even if a particular designated facility's circumstances meet the threshold specified in the regulations. If a state does not invoke RULOF in their state plan, then the amendments will not result in any additional costs. If a state does invoke RULOF in their state plan, then the amendments could, in certain circumstances, result in an increased level of effort to develop standards of performance for certain sources. As such, the RULOF amendments could potentially increase the level of resources states will need to employ in the development of an approvable plan. However, because the amendments clarify is required in order for a less-stringent standard pursuant to RULOF to satisfy the statutory requirements, the amendments reduce the uncertainty of states and designated facilities in the development of such standards. This in turn could result in a decrease in the amount of time that a state that wished to invoke RULOF would need, relative to a situation where the requirements were less defined, by avoiding significant back and forth with the EPA and the sources in the state during state plan development. Overall, the EPA expects the RULOF amendments will benefit the states in the development of

approvable state plans and therefore result in benefits to public health and welfare.

Finally, the EPA expects that the requirements for electronic submittal and that the availability of the optional regulatory mechanisms being finalized in this action will improve flexibility and efficiency in the call for and submission, review, approval, and implementation of state plans, and thus will overall result in benefits to the states, the EPA, designated facilities, and public health and welfare. In addition, the EPA expects the requirements for electronic submittal will increase the ease and efficiency of data submittal and data accessibility and benefit the states and the EPA. Electronic submittal will also improve the Agency's efficiency and effectiveness in the receipt and review of state plans.

The EPA expects that the overall impacts of the implementation of the amendments to subpart Ba finalized in this action will improve the implementation of EGs under CAA section 111(d).

## V. Statutory and Executive Order Reviews

Additional information about these Statutory and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review; Executive Order 13563: Improving Regulation and Regulatory Review; and Executive Order 14094: Modernizing Regulatory Review

This action is a "significant regulatory action" as defined in Executive Order 12866, as amended by Executive Order 14094. Accordingly, the EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the Paperwork Reduction Act. The requirements in subpart Ba do not themselves require any reporting and recordkeeping activities, and no Information Collection Request (ICR) was submitted in connection with the original promulgation of subpart Ba or the amendments we are finalizing at this time. Any recordkeeping and reporting requirements are imposed only through the incorporation of specific elements of subpart Ba in the individual emission guidelines, which have their own ICRs.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities. This final rule will not impose any requirements on small entities. Specifically, this action addresses processes related to state plans for implementation of EGs established under CAA section 111(d).

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This final action does not contain a Federal mandate that may result in expenditures of $100 million or more for state, local, and Tribal governments, in the aggregate or the private sector in any 1 year.

This final action is also not subject to the requirements of section 203 of UMRA because, as described in 2 U.S.C. 1531–38, it contains no regulatory requirements that might significantly or uniquely affect small governments. This action imposes no enforceable duty on any local, or Tribal governments or the private sector. However, this action imposes enforceable duties on states. This action does not meaningfully require additional mandates on states beyond what is already required of them and will not impose a burden in excess of $100 million.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government. The EPA believes, however, that this action may be of significant interest to state governments.

Subpart Ba requirements apply to states in the development and submittal of state plans pursuant to emission guidelines promulgated under CAA section 111(d) after July 8, 2019, to the extent that an EG does not supersede the requirements of subpart Ba. This action finalizes amendments to certain requirements for development, submission, and approval processes of state plans under CAA section 111(d). In particular, the amendments associated with state plan submission deadlines, RULOF provisions, meaningful engagement, and regulatory mechanisms may be of significant interest to state governments. In section IV of this preamble, the EPA summarizes the potential cost, environmental, and economic impacts of the implementation (through individual emission guidelines) of the amendments to subpart Ba being finalized in this action. Overall, the EPA expects these amendments will benefit the states in the development of approvable state plans.

The EPA notes that notice and comment procedures required for the promulgation of individual EGs will provide opportunity for states to address issues related to federalism based on specific application of subpart Ba requirements to that particular EG.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have Tribal implications as specified in Executive Order 13175. It would not impose substantial direct compliance costs on Tribal governments that have designated facilities located in their area of Indian country. Tribes are not required to develop plans to implement the guidelines under CAA section 111(d) for designated facilities. A tribe with an approved TAS under TAR for CAA 111(d) is not required to resubmit TAS approval to implement an EG subject to subpart Ba. This action also will not have substantial direct costs or impacts on the relationship between the Federal Government and Indian tribes or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified in Executive Order 13175. Thus, Executive Order 13175 does not apply to the action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

### H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not a "significant energy action" because it will not have a significant adverse effect on the supply, distribution or use of energy. Specifically, this action addresses the

**80542**    **Federal Register** / Vol. 88, No. 221 / Friday, November 17, 2023 / Rules and Regulations

submission and adoption of state plans for implementation of EGs established under CAA section 111(d).

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or indigenous peoples) and low-income populations.

The EPA believes that it is not practicable to assess whether the human health or environmental conditions that exist prior to this action result in disproportionate and adverse effects on people of color, low-income populations and/or indigenous peoples. The 40 CFR part 60, subpart Ba, provisions are the implementing regulations for states to plan in response to individual EGs, and these individual EGs are applicable to specific pollutants from specified categories of existing sources. It is not possible to identify or assess human health and environmental conditions that will be impacted by this rule because this rule does not address a particular set of sources or a particular pollutant. This action is revising the implementing regulations and does not directly impact environmental justice communities or result in new disproportionate and adverse effects.

The EPA identified and addressed environmental justice concerns by specifying new requirements for meaningful engagement with pertinent stakeholders, which includes communities most affected by and/or vulnerable to the impacts of a state plan.

The information supporting this Executive order review is contained in section III.C. and section III.E.3.f. of this action.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**List of Subjects in 40 CFR Part 60**

Environmental protection, Administrative practice and procedures, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

**Michael S. Regan,**

*Administrator.*

For the reasons set out in the preamble, title 40, chapter I of the Code of Federal Regulations is amended as follows:

**PART 60—STANDARDS OF PERFORMANCE FOR NEW STATIONARY SOURCES**

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Amend § 60.1 by revising paragraph (a) to read as follows:

**§ 60.1   Applicability.**

(a) Except as provided in subparts B, Ba, and C of this part, the provisions of this part apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility.

\*    \*    \*    \*    \*

■ 3. Amend § 60.20a by revising paragraph (a) introductory text to read as follows:

**§ 60.20a   Applicability.**

(a) The provisions of this subpart apply upon publication of a final emission guideline under § 60.22a(a) if the guideline is published in the **Federal Register** after July 8, 2019.

\*    \*    \*    \*    \*

■ 4. Amend § 60.21a by:
■ a. Revising paragraphs (e) and (f); and
■ b. Adding paragraphs (k) and (l).
The revisions and additions read as follows:

**§ 60.21a   Definitions.**

\*    \*    \*    \*    \*

(e) *Emission guideline* means a guideline set forth in this part, with the exception of guidelines set forth pursuant to section 129 of the Clean Air Act, or in a final guideline document published under § 60.22a(a), which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any non-air quality health and environmental impact and energy

requirements) the Administrator has determined has been adequately demonstrated for designated facilities.

(f) *Standard of performance* means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated, including a legally enforceable regulation setting forth an allowable rate, quantity, or concentration of emissions into the atmosphere, or prescribing a design, equipment, work practice, or operational standard, or combination thereof.

\*    \*    \*    \*    \*

(k) *Meaningful engagement* means the timely engagement with pertinent stakeholders and/or their representatives in the plan development or plan revision process. Such engagement should not be disproportionate in favor of certain stakeholders and should be informed by available best practices.

(l) *Pertinent stakeholders* include, but are not limited to, industry, small businesses, and communities most affected by and/or vulnerable to the impacts of the plan or plan revision.

■ 5. Amend § 60.22a by revising paragraphs (b)(3) and (c) to read as follows:

**§ 60.22a   Publication of emission guidelines.**

\*    \*    \*    \*    \*

(b) \*    \*    \*
(3) Information on the degree of emission limitation which is achievable with each system, together with information on the costs, nonair quality health and environmental effects, and energy requirements of applying each system to designated facilities.

\*    \*    \*    \*    \*

(c) The emission guidelines and compliance times referred to in paragraph (b)(5) of this section will be proposed for comment upon publication of the draft guideline document, and after consideration of comments will be promulgated in this part with such modifications as may be appropriate.

■ 6. Amend § 60.23a by:
■ a. Revising paragraph (a)(1);
■ b. Adding paragraph (a)(3);
■ c. Revising paragraph (b); and
■ d. Adding paragraph (i).
The revisions and additions read as follows:

**§ 60.23a  Adoption and submittal of State plans; public hearings.**

(a)(1) Unless otherwise specified in the applicable subpart in this part, within eighteen months after publication in the **Federal Register** of a final emission guideline under § 60.22a(a), each State shall adopt and submit to the Administrator a plan for the control of the designated pollutant to which the emission guideline applies. The submission of such plan shall be made in electronic format according to paragraph (a)(3) of this section or as specified in an applicable emission guideline.

\*      \*      \*      \*      \*

(3) States must submit to the Administrator any plan or plan revision using the State Planning Electronic Collaboration System (SPeCS), which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*) or through an analogous electronic reporting tool provided by the EPA for the submission of any plan required by this subpart. Do not use SPeCS to submit confidential business information (CBI). Anything submitted using SPeCS cannot later be claimed to be CBI. The State must confer with the Regional Office for the procedures to submit CBI information. All CBI must be clearly marked as CBI.

(b) If no designated facility is located within a State, the State shall submit a letter of certification to that effect to the Administrator within the time specified in paragraph (a) of this section. Such certification shall exempt the State from the requirements of this subpart for that designated pollutant. The State must submit the letter using the SPeCS, or through an analogous electronic reporting tool provided by the EPA for the submission of any plan required by this subpart.

\*      \*      \*      \*      \*

(i) The State must submit, with the plan or revision, documentation of meaningful engagement including a list of identified pertinent stakeholders and/or their representatives, a summary of the engagement conducted, a summary of stakeholder input received, and a description of how stakeholder input was considered in the development of the plan or plan revisions.

■ 7. Amend § 60.24a by:

■ a. Revising paragraphs (b) introductory text, (c), (d), (e), and (f); and

■ b. Adding paragraphs (g), (h), and (i).

The revisions and additions read as follows:

**§ 60.24a  Standards of performance and compliance schedules.**

\*      \*      \*      \*      \*

(b) Standards of performance shall be in the form of an allowable rate, quantity, or concentration of emissions, except when it is not feasible to prescribe or enforce such a standard of performance. The EPA shall identify such cases in the emission guidelines issued under § 60.22a. Where standards of performance prescribing design, equipment, work practice, or operational standards, or combination thereof are established, the plan shall, to the degree possible, set forth the emission reductions achievable by implementation of such standards, and may permit compliance by the use of equipment determined by the State to be equivalent to that prescribed.

\*      \*      \*      \*      \*

(c) Except as provided in paragraph (e) of this section, standards of performance shall be no less stringent than the corresponding emission guideline(s) specified in this part, and final compliance shall be required as expeditiously as practicable, but no later than the compliance times specified in an applicable subpart of this part.

(d) Any compliance schedule extending more than twenty months from the date required for submittal of the plan must include legally enforceable increments of progress to achieve compliance for each designated facility or category of facilities. Unless otherwise specified in the applicable emission guideline, increments of progress must include, where practicable, each increment of progress specified in § 60.21a(h) and must include such additional increments of progress as may be necessary to permit close and effective supervision of progress toward final compliance.

(e)(1) The State may apply a standard of performance to a particular designated facility that is less stringent than or has a compliance schedule longer than otherwise required by an applicable emission guideline taking into consideration that facility's remaining useful life and other factors, provided that the State demonstrates with respect to each such facility (or class of such facilities) that the facility cannot reasonably achieve the degree of emission limitation determined by the EPA based on:

(i) Unreasonable cost of control resulting from plant age, location, or basic process design;

(ii) Physical impossibility or technical infeasibility of installing necessary control equipment; or

(iii) Other circumstances specific to the facility.

(2) For the purpose of this paragraph (e), the State must demonstrate that there are fundamental differences between the information specific to a facility (or class of such facilities) and the information EPA considered in determining the degree of emission limitation achievable through application of the best system of emission reduction or the compliance schedule that make achieving such degree of emission limitation or meeting such compliance schedule unreasonable for that facility.

(f) If the State makes the required demonstration in paragraph (e) of this section, the plan may apply a standard of performance that is less stringent than required by an applicable emission guideline.

(1) The standard of performance applied under this paragraph (f) must be no less stringent (or have a compliance schedule no longer) than is necessary to address the fundamental differences identified under paragraph (e) of this section. To the extent necessary to determine a standard of performance satisfying that criteria, the State must evaluate the systems of emission reduction identified in the applicable emission guideline using the factors and evaluation metrics EPA considered in assessing those systems, including technical feasibility, the amount of emission reductions, the cost of achieving such reductions, any nonair quality health and environmental impacts, and energy requirements. The States may also consider, as justified, other factors specific to the facility that were the basis of the demonstration under paragraph (e) as well as other systems of emission reduction in addition to those EPA considered in the applicable emission guideline.

(2) A standard of performance under this paragraph (f) must be in the form as required by the applicable emission guideline.

(g) Where a State applies a standard of performance pursuant to paragraph (f) of this section on the basis of an operating condition(s) within the designated facility's control, such as remaining useful life or restricted capacity, the plan must also include such operating condition(s) as an enforceable requirement. The plan must also include requirements to provide for the implementation and enforcement of the operating condition(s), such as requirements for monitoring, reporting, and recordkeeping.

(h) A less stringent standard of performance must meet all other applicable requirements, including in this subpart and in any applicable emission guideline.

(i) Nothing in this subpart shall be construed to preclude any State or political subdivision thereof from adopting or enforcing, as part of the plan:

(1) Standards of performance more stringent than emission guidelines specified in this part; or

(2) Compliance schedules requiring final compliance at earlier times than those specified in applicable emission guidelines.

(ii) [Reserved]

■ 8. Amend § 60.25a by revising paragraph (a) to read as follows:

### § 60.25a   Emission inventories, source surveillance, reports.

(a) Each plan shall include an inventory of all designated facilities, including emission data for the designated pollutants and any additional information related to emissions as specified in the applicable emission guideline. Such data shall be summarized in the plan, and emission rates of designated pollutants from designated facilities shall be correlated with applicable standards of performance. As used in this subpart, *correlated* means presented in such a manner as to show the relationship between measured or estimated amounts of emissions and the amounts of such emissions allowable under applicable standards of performance.

\*      \*      \*      \*      \*

■ 9. Amend § 60.27a by:
■ a. Revising paragraph (a);
■ b. Adding paragraphs (b)(1) and (2);
■ c. Revising paragraphs (c), (d), (f) introductory text, and (g)(1);
■ d. Removing the word "and" from the end of paragraph (g)(2)(viii);
■ e. Redesignating paragraph (g)(2)(ix) as paragraph (g)(2)(x); and
■ f. Adding new paragraph (g)(2)(ix) and paragraphs (h), (i) and (j).

The revisions and additions read as follows:

### § 60.27a   Actions by the Administrator.

(a) The Administrator may, whenever he determines necessary, amend the period for submission of any plan or plan revision or portion thereof.

(b) \*   \*   \*

(1) *Full and partial approval and disapproval.* In the case of any plan or plan revision on which the Administrator is required to act under this paragraph (b), the Administrator shall approve such plan or plan revision as a whole if it meets all of the applicable requirements of this subpart. If a portion of the plan or plan revision meets all the applicable requirements of this subpart, the Administrator may approve the plan or plan revision in part

and disapprove in part. The plan or plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan or revision as complying with the applicable requirements of this subpart.

(2) *Conditional approval.* The Administrator may approve a plan or plan revision based on a commitment of the State to adopt and submit to the Administrator specific enforceable measures by a date certain, but not later than twelve months after the date of conditional approval of the plan or plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

(c) The Administrator will promulgate, through notice-and-comment rulemaking, a Federal plan, or portion thereof, at any time within twelve months after:

(1) The State fails to submit a plan or plan revision within the time prescribed or the State has failed to satisfy the minimum criteria under paragraph (g) of this section as of the time prescribed in paragraph (g)(1) of this section; or

(2) The Administrator disapproves the required State plan or plan revision or any portion thereof, as unsatisfactory because the applicable requirements of this subpart or an applicable emission guideline under this part have not been met.

(d) The Administrator will promulgate a final Federal plan, or portion thereof, as described in paragraph (c) of this section unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal plan.

\*      \*      \*      \*      \*

(f) Prior to promulgation of a Federal plan under paragraph (d) of this section, the Administrator will conduct meaningful engagement with pertinent stakeholders and/or their representatives and provide the opportunity for at least one public hearing in either:

\*      \*      \*      \*      \*

(g) \*   \*   \*

(1) *General.* Within 60 days of the Administrator's receipt of a State submission, the Administrator shall determine whether the minimum criteria for completeness have been met for a plan submission or revision. Any plan or plan revision that a State submits to the EPA, and that has not been determined by the EPA within 60 days after the Administrator's receipt of a State submission to have failed to meet the minimum criteria, shall on that date be deemed by operation of law to

meet such minimum criteria. Where the Administrator determines that a plan submission does not meet the minimum criteria of this paragraph (g), the State will be treated as not having made the submission and the requirements of this section regarding promulgation of a Federal plan shall apply.

(2) \*   \*   \*

(ix) Documentation of meaningful engagement, including a list of pertinent stakeholders or their representatives, a summary of the engagement conducted, and a summary of stakeholder input received, and a description of how stakeholder input was considered in the development of the plan or plan revisions; and

\*      \*      \*      \*      \*

(h) The requirements of this paragraph (h) apply to parallel processing. A State may submit a plan requesting parallel processing prior to adoption and to completion of public outreach and engagement by the State in order to expedite review and to provide an opportunity for the State to consider EPA comments prior to submission of a final plan for final review and action. Under these circumstances and at the discretion of the EPA, the following exceptions to the completeness criteria under paragraph (g)(2) of this section apply to plans submitted explicitly for parallel processing:

(1) The letter required by paragraph (g)(2)(i) of this section must request that EPA propose approval of the proposed plan by parallel processing;

(2) In lieu of paragraph (g)(2)(ii) of this section, the State must submit a schedule for final adoption or issuance of the plan;

(3) In lieu of paragraph (g)(2)(iv) of this section, the plan must include a copy of the proposed/draft regulation or document, including indication of the proposed changes to be made to the existing approved plan, where applicable;

(4) In lieu of paragraph (g)(2)(ix) of this section, the plan must include documentation of the engagement conducted prior to the parallel processing submittal and of any planned additional meaningful engagement to be conducted prior to adoption of the final plan; and

(5) The requirements of paragraphs (g)(2)(v) through (viii) of this section do not apply to plans submitted for parallel processing. The exceptions granted in the preceding sentence apply only to EPA's determination of proposed action and all requirements of paragraph (g)(2) of this section must be met prior to publication of EPA's final determination of plan approvability.

(i) The requirements of this paragraph (i) apply to calls for plan revisions. Whenever the Administrator finds that the applicable plan is substantially inadequate to meet the requirements of the applicable emission guidelines in this part, to provide for the implementation of the applicable requirements, or to otherwise comply with any applicable requirement of this subpart or the Clean Air Act, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator must notify the State of the inadequacies and such plan revisions shall be submitted to the Administrator within twelve months or as determined by the Administrator. Such findings and notice must be public.

(1) Any finding under this paragraph (i) shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this part to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate.

(2) If the Administrator makes this finding on the basis that a State is failing to implement an approved plan, or part of an approved plan, the State may submit a demonstration to the Administrator it is adequately implementing the requirements of the approved State plan in lieu of submitting a plan revision. Such demonstration must be submitted by the deadline established under this paragraph (i).

(j) The requirements of this paragraph (j) apply to error corrections. Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or portion thereof) was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

■ 10. Amend § 60.28a by revising paragraph (a) to read as follows:

**§ 60.28a   Plan revisions by the State.**

(a) Any significant revision to a State plan shall be adopted by such State after reasonable notice, public hearing, and meaningful engagement. For plan revisions required in response to a revised emission guideline, such plan revisions shall be submitted to the Administrator within fifteen months, or as determined by the Administrator, after publication in the **Federal Register** of a final revised emission guideline under § 60.22a. All plan revisions must be submitted in accordance with the procedures and requirements applicable to development and submission of the original plan.

*       *       *       *       *

■ 11. Amend § 60.29a by revising the introductory text to read as follows:

**§ 60.29a   Plan revisions by the Administrator.**

After notice and opportunity for public hearing in each affected State, and meaningful engagement for any significant revision, the Administrator may revise any provision of an applicable Federal plan if:

*       *       *       *       *

[FR Doc. 2023–25269 Filed 11–16–23; 8:45 am]
**BILLING CODE 6560–50–P**