# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

STATE OF WEST VIRGINIA; STATE OF OKLAHOMA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF UTAH; COMMONWEALTH OF VIRGINIA; STATE OF WYOMING; ARIZONA LEGISLATURE; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Petitioners,*

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

———————

On Petition for Review of a Final Rule of the
U.S. Environmental Protection Agency

———————

## PETITIONERS' PRELIMINARY OPENING BRIEF
## (DEFERRED APPENDIX APPEAL)

———————

Dated: June 7, 2024

*Counsel listed on inside cover and additional counsel listed on signature page.*

PATRICK MORRISEY
  ATTORNEY GENERAL
Michael R. Williams
 *Principal Deputy Solicitor General*
Spencer J. Davenport
 *Assistant Solicitor General*
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

GENTNER DRUMMOND
  ATTORNEY GENERAL
Garry M. Gaskins, II
 *Solicitor General*
Jennifer L. Lewis
 *Deputy Attorney General*
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350

Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Mass. Ave. NW, Ste. 700
Washington, DC 20001

Drew F. Waldbeser
Adeline Kenerly Lambert
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*Counsel for State of Oklahoma*

**Parties and Amici.** Petitioners in this case are the State of West Virginia, State of Oklahoma, State of Alabama, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, State of Wyoming, Arizona Legislature, and the Texas Commission on Environmental Quality.

Respondents are the U.S. Environmental Protection Agency, and Michael S. Regan, Administrator, U.S. Environmental Protection Agency.

Intervenors supporting Respondents are the Clean Air Council, Clean Wisconsin, Commonwealth of Massachusetts, Dakota Resource Council, District of Columbia, Environmental Defense Fund, Ft. Berthold Protectors of Water and Earth Rights, GreenLatinos, Natural Resources Defense Council, Sierra Club, State of California, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Minnesota, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, and State of Wisconsin.

As of the date of this filing, no *amicus curiae* has appeared in this case.

**Rulings Under Review.** Petitioners seek review of the Environmental Protection Agency's final rule titled: Adoption and Submittal of State Plans

iii

for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d), 88 Fed. Reg. 80,480 (Nov. 17, 2023).

**Related Cases.** This case has not previously been before this Court or any other court. Counsel for Petitioners are not aware of any other related cases.

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases ........................................ iii

Table of Authorities .............................................................................. vii

Glossary ............................................................................................ xii

Jurisdictional Statement ...................................................................... 1

Statement of Issues .............................................................................. 1

Statutes and Regulations ...................................................................... 1

Introduction ........................................................................................ 2

Statement of the Case .......................................................................... 3

I.      Cooperative Federalism Under Section 111(d) of the Clean Air Act .... 3

II.     EPA's Past Section 111(d) Implementing Regulations ............................ 6

III.    The Final Rule .............................................................................. 7

Summary of Argument .......................................................................... 9

Standing .............................................................................................. 13

Standard of Review .............................................................................. 13

Argument ............................................................................................ 14

I.      EPA lacks authority to restrict state discretion to reasonably consider
        remaining useful life and other source-specific factors .................... 14

        A.      The Final Rule usurps the wide discretion Section 111(d) gives
                States to consider source-specific factors in developing state plans
                governing existing sources. ...................................................... 15

        B.      EPA's justifications for restricting state discretion fail. ............ 23

II.     EPA's decision to set an 18-month deadline for States to submit plans
        violates the statute and is arbitrary and capricious. ......................... 31

        A.      EPA ignored its own data and comments establishing that most
                States cannot submit Section 111(d) plans within 18 months. ........ 32

        B.      EPA unlawfully relied on materially different statutory
                deadlines in the Clean Air Act than the ones Congress directed. ....... 40

C.     The deadlines in the Final Rule violate Section 111(d)'s structure of cooperative federalism. ........................................................................46

III.    EPA lacks authority to import the state-plan-call and error-correction processes from Section 110 into Section 111(d). ...............................................49

Conclusion.............................................................................................................53

Certificate of Compliance......................................................................................60

Certificate of Service ..............................................................................................61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004)..........................................................15, 20, 21, 29

*Am. Corn Growers Ass'n v. EPA,*
291 F.3d 1 (D.C. Cir. 2002)...............................................................27

*Am. Fuel & Petrochem. Mfrs. v. EPA,*
3 F.4th 373 (D.C. Cir. 2021) ............................................................13

*Am. Lung Ass'n v. EPA,*
985 F.3d 914 (D.C. Cir. 2021)............................. 2, 7, 31, 38, 40, 42, 43

*Am. Petroleum Inst. v. EPA,*
52 F.3d 1113 (D.C. Cir. 1995)...........................................................53

*Bd. of Pardons v. Allen,*
482 U.S. 369 (1987).........................................................................15

*Bethlehem Steel Corp. v. Gorsuch,*
742 F.2d 1028 (7th Cir. 1984).........................................................20

*California v. EPA,*
978 F.3d 708 (9th Cir. 2020)...........................................................39

*Dist. Hosp. Partners, L.P. v. Burwell,*
786 F.3d 46 (D.C. Cir. 2015)...........................................................33

*FEC v. Cruz,*
596 U.S. 289 (2022).........................................................................49

*Authorities upon which we chiefly rely are marked with asterisks.*

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010)............................................................37

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
    140 S. Ct. 768 (2020).................................................................53

*Kucana v. Holder*,
    558 U.S. 233 (2010)..................................................................19

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000).....................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................... 13, 33, 40, 43, 44, 46

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015).....................................................3

*Nat'l Min. Ass'n v. EPA*,
    59 F.3d 1351 (D.C. Cir. 1995).....................................................23

*Nat'l-Southwire Aluminum Co. v. EPA*,
    838 F.2d 835 (6th Cir. 1988)...................................................5, 21

*Pulsifer v. United States*,
    144 S. Ct. 718 (2024).................................................................52

*Russello v. United States*,
    464 U.S. 16 (1983)...........................................................16, 25, 52

*State of Conn. v. EPA*,
    656 F.2d 902 (2d Cir. 1981).......................................................30

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016).......................................................20

*Train v. Nat. Res. Def. Council, Inc.,*
421 U.S. 60 (1975)................................................................5, 23, 28

*Union Elec. Co. v. EPA,*
427 U.S. 246 (1976)...................................................................5, 28

*United States v. Knauer,*
707 F. Supp. 2d 379 (E.D.N.Y. 2010) ............................................24

*Util. Air Regul. Grp. v. EPA,*
471 F.3d 1333 (D.C. Cir. 2006)......................................................27

*\*West Virginia v. EPA,*
597 U.S. 697 (2022)................................... 2, 4, 7, 13, 15, 22, 38, 46

*Wyoming v. EPA,*
78 F.4th 1171 (10th Cir. 2023)..................................................17, 27

## Statutes

5 U.S.C. § 706(2) ..........................................................................13

33 U.S.C. § 1311............................................................................26

42 U.S.C. § 6924(m)(1)...................................................................26

42 U.S.C. § 7401(a) .......................................................................3, 4

42 U.S.C. § 7407............................................................................4, 45

*42 U.S.C. § 7410 ................................. 5, 6, 8, 21, 28, 40, 41, 50

*42 U.S.C. § 7411 ...............1, 2, 4-5, 8, 10-12, 14-15, 21-22, 28-29, 40, 46, 51, 52

42 U.S.C. § 7429(b)(2) ....................................................................44

42 U.S.C. § 7475(e)(3) ....................................................................16

42 U.S.C. § 7491(b) ....................................................................16, 17

42 U.S.C. § 7513a(a)(2)(B) ...............................................................44, 45

42 U.S.C. § 7543(e)(2)(A) ........................................................................16

42 U.S.C. § 7607..................................................................................1, 13

42 U.S.C. § 13235(a)(1) ...........................................................................16

Clean Air Act, Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990)..............................................................................................6

Ill. Comp. Stat. Ann. 5/3-7-2 .................................................................25

Mont. Code Ann. § 2-4-402(1) ...............................................................35

Okla. Admin. Code § 252:4 ......................................................................35

Okla. Stat. tit. 27A, §§ 2-2-101(H), 2-5-107 .........................................35

Okla. Stat. tit. 75, §§ 303(A)(6), 308 .....................................................35

Public Law 91-604, § 111(d)(1) (Dec. 31, 1970), 84 Stat. 1676 .........18

Public Law 95-95, Title I, § 111(d) (Aug. 7, 1977), 91 Stat. 668 ........19

**Federal Regulations and Rulemaking**

39 Fed. Reg. 36,102 (Oct. 7, 1974) .........................................................18

40 Fed. Reg. 53,340 (Nov. 17, 1975)........................................................6

48 Fed. Reg. 31,401 (July 8, 1983) .........................................................37

55 Fed. Reg. 19,884 (May 14, 1990) .......................................................37

61 Fed. Reg. 55,574 (Oct. 28, 1996) .......................................................38

63 Fed. Reg. 47,436 (Sept. 8, 1998)........................................................38

64 Fed. Reg. 75,781 (Oct. 27, 1999) .......................................................38

78 Fed. Reg. 3,086 (Jan. 15, 2013) .......................................................................45

80 Fed. Reg. 2,206 (Jan. 15, 2015) .......................................................................45

84 Fed. Reg. 32,520 (July 8, 2019) ...................................................................6, 7

87 Fed. Reg. 9,545 (Feb. 22, 2022) .....................................................................42

87 Fed. Reg. 9,798 (Feb. 22, 2022) ...............................................................42, 48

87 Fed. Reg. 9,838 (Feb. 22, 2022) .....................................................................42

87 Fed. Reg. 20,036 (April 6, 2022) .....................................................................48

87 Fed. Reg. 79,176 (Dec. 23, 2022) ..............................................................20, 29

*88 Fed. Reg. 80,480 (Nov. 17, 2023) ..... 2-3, 5, 7-9, 14, 20-29, 31, 33-34, 36-44, 46-52

89 Fed. Reg. 12,666 (Feb. 16, 2024) .............................................................48, 50

**Other**

Black's Law Dictionary (11th ed. 2019) ...............................................................23

National Conference of State Legislatures, *Legislative Session Length* (July 1, 2021), https://perma.cc/F4HH-G6E8 ...................................35

Office of the Nevada Attorney General, *Administrative Rulemaking: A Procedural Guide* (Mar. 2014), https://perma.cc/4FLS-9HAZ; ........................................................................35

## GLOSSARY

| APA | Administrative Procedure Act |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| Final Rule | Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d), 88 Fed. Reg. 80,480 (Nov. 17, 2023) |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. §7607(b)(1).

EPA issued the Final Rule under 42 U.S.C. §7411, and it was published on November 17, 2023. Petitioners timely petitioned for review on January 16, 2024. 42 U.S.C. §7607(b)(1).

## STATEMENT OF ISSUES

1. Whether the Final Rule exceeds EPA's statutory authority, or is arbitrary and capricious, because it limits the States' statutory discretion under Section 111(d) of the Clean Air Act to reasonably consider source-specific factors when regulating existing sources through state plans.

2. Whether the Final Rule's deadline for state plan submittals under Section 111(d) of the Clean Air Act was arbitrary, capricious, or otherwise unlawful because EPA unreasonably ignored its own data, public comments, and Congress's directives in establishing the deadline.

3. Whether the Final Rule exceeds EPA's statutory authority, or is arbitrary and capricious, because it gives EPA extra-statutory authority to issue state plan calls and after-the-fact error corrections.

## STATUTES AND REGULATIONS

Pertinent statutes are contained in an addendum.

Section 111(d) of the Clean Air Act "prescribes a process of cooperative federalism for the regulation" of emissions from "existing sources." *Am. Lung Ass'n ("ALA") v. EPA*, 985 F.3d 914, 931 (D.C. Cir. 2021), *rev'd and remanded sub nom. on other grounds West Virginia v. EPA*, 597 U.S. 697 (2022). EPA establishes "standards of performance" for new sources and issues guidelines for States to set existing source standards. 42 U.S.C. § 7411(a)(1), (b). But "the States set the actual rules" governing what standards existing sources must meet and how. *West Virginia*, 597 U.S. at 710. Congress made sure States kept authority to tailor standards based on source-specific considerations established through state plans. § 7411(d)(1).

Spurning the Act's cooperative-federalism command, the Final Rule invades the States' statutory role. Section 111(d) mandates that EPA "*shall permit*" States to consider source-specific factors, like "the remaining useful life of the existing source," in establishing standards of performance for a "particular source." *Id.* (emphasis added). EPA has reinterpreted that mandatory statutory language to mean that EPA may forbid States from reasonably exercising their discretion unless they meet EPA's heightened justification requirements for considering these factors. 88 Fed. Reg. 80,480, 80,513-14 (Nov. 17, 2023).

Further spurning the States' role, the Final Rule arbitrarily imposes deadlines that in most cases will be impossible to meet. EPA's data confirms that States have historically needed 45 months to submit a plan under

Section 111(d). EPA admitted that the state plan submission deadline should "accommodate[e] the time needed for states … to develop an effective plan." *Id.* at 80,486. After all, for States to have a meaningful role under Section 111(d), EPA must give them sufficient time to *exercise* it. But EPA ignored its own data and imposed an 18-month deadline instead. That unreasonably short deadline nullifies the States' ability to participate in the cooperative regulatory process.

Finally, EPA has given itself new substantive powers that further minimize the States' role under Section 111(d). For the first time, EPA claims authority to order States to revise plans that EPA already approved—or even retract prior approvals—when it decides those state plans have become flawed. Congress did not grant EPA those powers. Instead, EPA argues that because Congress granted it such powers in Section 110, EPA may give itself the same powers under Section 111. That inverts basic rules of statutory interpretation. The Final Rule must be vacated.

STATEMENT OF THE CASE

## I. Cooperative Federalism Under Section 111(d) of the Clean Air Act

"The Clean Air Act 'is an exercise in cooperative federalism.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317 (D.C. Cir. 2015) (citation omitted). It divides responsibility and authority for "prevent[ing] and control[ling] air pollution" between EPA and the States. 42 U.S.C. §7401(a)(4). EPA sets overall air quality standards, and States submit

state implementation plans, which "specify the manner in which [those standards] will be achieved and maintained." *E.g.*, §7407(a). The Act gives States, rather than EPA, this power because "air pollution control at its source is the primary responsibility of States." §7401(a)(3).

Section 111 embodies this cooperative regulatory principle. Section 111(b) gives EPA authority to identify source categories for regulation. §7411(b)(1)(A), (3). EPA "establish[es] Federal standards of performance for *new* sources within" those categories, §7411(b)(1)(B) (emphasis added), which reflect "the degree of emission limitation achievable through application of the best system of emission reduction," §7411(a)(1).

When it comes to *existing* sources, however, "the States set the actual rules." *West Virginia*, 597 U.S. at 710. EPA determines the "best system of emission reduction," but States prepare implementation plans that "establish[] standards of performance for any existing sources" and "provide[] for the implementation and enforcement of such standards of performance." §7411(d)(1). Section 111(d) empowers States to set standards of performance through a source-specific analysis that "take[s] into consideration, among other factors, the remaining useful life of the existing source." *Id.* Thus, Congress sensibly provided that often decades-old existing sources should sometimes be subject to adjusted standards, given the various economic, technical, and practical considerations involved in deciding when and how to require sources to retrofit pollution controls. And Congress entrusted that regulatory balancing to the States.

Congress specified that the state plan submission process under Section 111(d) should track Section 110's process. §7411(d)(1) (state plan submission "procedure" in Section 111(d) must be "similar to" the procedures in Section 110). In both sections, EPA establishes initial guidelines. §7410(a)(1); §7411(a)(1), (b)(2). States then have responsibility for setting standards that "reflect[]" EPA's guidelines through their state implementation plans. *See* §§7410(a)(1), 7411(d)(1).

Under Section 110, "[e]ach State is given wide discretion in formulating its plan." *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976); *see also Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 87 (1975) (States enjoy "considerable latitude in determining specifically how the [national air quality standards will] be met"). Similarly, Section 111(d) "gives substantial latitude to the states in setting emission standards for welfare-related pollutants generated by local facilities." *Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835, 838 (6th Cir. 1988); *see also* 88 Fed. Reg. at 80,529-30, 80,534 & n.182 (citation omitted) (drawing from Section 110 precedent to inform interpretation of Section 111(d), including recognition of the States' "wide discretion in formulating their plans").

EPA "shall approve" state plans that "meet[] all of the applicable requirements" of the Act. §7410(k)(3); §7411(d)(2)(A) (EPA may disapprove a state plan only if it is not "satisfactory"); 88 Fed. Reg. at 80,510 (state plan is not "satisfactory" if it is "not in accordance with the requirements of" Section 111(d)). If and only if the state plan fails to satisfy the statutory requirements

5

may EPA promulgate a federal "implementation plan" in place of the State. §§ 7410(c)(1); 7411(d)(2)(A).

## II.    EPA's Past Section 111(d) Implementing Regulations

In 1975, EPA issued the first regulations to establish Section 111(d) state plan procedures. *See* 40 Fed. Reg. 53,340 (Nov. 17, 1975). The 1975 Rule gave States nine months to submit state plans covering existing sources after EPA issued a new emissions guideline. *Id.* at 53,340-41. EPA then had four months to review the plan and, if it disapproved, six months to promulgate a federal plan. *Id.* at 53,341. These procedures were "basically patterned after section 110 of the Act," *id.*, and the deadlines mirrored the then-applicable deadlines under Section 110. Congress later extended Section 110's deadline for state implementation plans to three years. Clean Air Act, Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990). But EPA left the nine-month state plan submission deadline under Section 111(d) unchanged. States have submitted 85 plans under Section 111(d), but only one plan has met that nine-month deadline. *See* Historical SIP Timeline Spreadsheet, J.A.__ [CI-3].[2]

EPA attempted to update these implementing regulations in 2019. 84 Fed. Reg. 32,520 (July 8, 2019). EPA determined that the 1975 deadlines no

_____

[2] In this brief, "CI" refers to the certified index of record Respondents filed on March 4, 2024, Document No. 2043291. R.17(b)(1)(B). Documents are identified by the final 3 digits of the EPA-assigned "Document ID" number. In the final briefs, CI cites will be replaced with "JA" cites to the Joint Appendix.

longer "appropriately align[ed]" with Section 111(d)'s instruction to promulgate "similar" procedures to Section 110. *Id.* at 32,564. EPA sought to align the deadlines for Section 111(d) with the deadlines in Section 110, giving States 36 months to submit a plan, then allowing EPA six months to evaluate the plan for completeness, 12 months to determine whether a state plan was satisfactory, and 24 months to promulgate a federal plan after disapproving a state plan. *Id.* at 32,565. EPA also justified aligning the Section 111(d) deadline with that of Section 110 by explaining, "[b]ased on years of experience working with states," that Section 111(d) plans require a "comparable amount of work, effort, coordination with sources, and … time … to develop [as Section 110] state plans." *Id.* at 32,564.

This Court vacated the 2019 revisions to the Section 111(d) implementing regulations. *See ALA*, 985 F.3d at 991-95.[3] The Court held EPA inadequately explained why the shorter deadlines under the 1975 Rule were unworkable or why the extended times were needed. *Id.* at 993. This Court also faulted EPA for failing to consider the "need for prompt reduction of … emissions" in establishing the deadlines. *Id.*

## III.   The Final Rule

The Final Rule is EPA's newest attempt to update the Section 111(d) implementing regulations. 88 Fed. Reg. at 80,480.

---

[3] The Supreme Court later reversed the primary holdings of this Court's *ALA* decision, but the Supreme Court did not consider this Court's holdings on the Section 111(d) timing regulations. *See generally West Virginia*, 597 U.S. 697.

**Deadlines.** EPA has extended the deadlines from the 1975 Rule. But, while giving itself additional time to act, it gave the States substantially shorter deadlines than those Congress set in Section 110. EPA gave States 18 months to submit plans, *id.* at 80,486—only half of the 36 months provided to States under Section 110, §7410(a)(1). EPA then gave itself 60 days to make a completeness determination, 12 months to evaluate a plan (the same as in Section 110(k)(2)), and another 12 months to promulgate a federal plan if it rejects the state plan.

EPA acknowledges that the 1975 Rule's nine-month deadline did not provide "a reasonable amount of time for most states to adequately develop a plan" because "most states either did not submit plans or submitted plans that were substantially late." 88 Fed. Reg. at 80,487. EPA's data reveal that only one State has ever met that nine-month deadline. *See* Historical SIP Timeline Spreadsheet, J.A.__ [CI-3]. The same data also demonstrate that, on average, States have required 45 months to submit Section 111 plans—far longer than the new 18-month deadline imposed by the Final Rule. *Id.*

**State Discretion.** In addition to deadline changes, the Final Rule also limits States' substantive role in the Section 111 process. EPA purports to "clarif[y]" the discretion granted to States by Section 111(d)(1). 88 Fed. Reg. at 80,514. While the statute specifies EPA "shall permit" States to consider "among other factors, the remaining useful life of the existing source," §7411(d)(1), the Final Rule forbids less stringent standards for an existing source unless States demonstrate the source's circumstances are

"fundamentally different from the information the EPA considered in determining the [best system of emission reduction]," 88 Fed. Reg. at 80,514. EPA has likewise restricted how States may "calculate[] and appl[y]" less stringent standards using remaining useful life and other factors. *See id.* at 80,517-24.

**New Powers.** EPA also gave itself two new powers. According to EPA, it may now "call for a plan revision" when EPA "find[s] that a previously approved state plan does not meet the applicable requirements of the [Act] or of the relevant [emissions guideline]," *id.* at 80,506, and "revise its prior" approval of a state plan whenever EPA determines the approval "was in error," *id.* at 80,508. While Section 110 of the Act gives EPA those powers *under that section*, that authority is notably absent from Section 111. Nevertheless, EPA claims that because Congress directed EPA "to prescribe regulations establishing a procedure similar to that provided by … section 110 for the *submission* of state plans," *id.* at 80,506 (emphasis added), it can give itself other substantive, supervisory powers found in Section 110 even after state plans have been submitted and approved.

## SUMMARY OF ARGUMENT

**I.A.** The Final Rule unlawfully imposes substantive limits on the exercise of discretion the statute guarantees to States. Section 111(d) mandates that EPA "shall permit" states to "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies" when "applying a standard of performance to any particular"

existing source. §7411(d)(1). But the Final Rule allows States to consider these source-specific factors only if they can identify aspects of the source that are *fundamentally different* from those EPA considered when establishing the best system of emission reduction. This new requirement for heightened justification conflicts with the broad discretion Congress preserved for the States. EPA may not second-guess reasonable decisions States make when developing Clean Air Act implementation plans. Indeed, when Congress amended Section 111(d) to grant States authority to develop plans for existing sources, it chose not to codify EPA regulations requiring States to satisfy a heightened standard of justification.

**B.** EPA's defense of these new restrictions on state discretion fails. EPA's reading misinterprets the statutory language, which *guarantees* States the discretion to consider source-specific factors, as granting EPA authority to *restrict* that discretion to exceedingly narrow circumstances. Next, EPA claims it may impose substantive limits on state plans because it has the same power to review state plans as it does under Section 110. But courts have repeatedly held that EPA must defer to state legislative and regulatory choices when reviewing state plans under Section 110. EPA cites examples under other statutory provisions where it has promulgated similar regulations. But those other provision do not require EPA to honor state discretion like Section 111(d) does. And although EPA contends that source-by-source variations are bad policy, Congress said exactly the opposite in enacting Section 111(d).

**II.A.** EPA also arbitrarily established an 18-month deadline for States to submit plans. EPA ignored its own data demonstrating that States have historically needed *45 months* on average to submit Section 111 plans. EPA also ignored numerous comments explaining that the process of preparing state plans includes time-consuming substantive and procedural requirements that are often impossible to complete within 18 months no matter how diligently States work. And because States will lack sufficient time to prepare fulsome plans, the new deadline means States must rush to develop plans that are more likely to contain legal or technical flaws, thus undermining the Act's environmental goals.

**B.** Despite Congress's instruction to EPA to develop a "procedure" for submitting state plans under Section 111(d) "similar to that provided by" Section 110, §7411(d)(1), EPA entirely ignored Section 110's *statutory* three-year deadline. Instead, it adopted a deadline that gives States just half the time to submit Section 111(d) plans. It defended that deadline by focusing on far shorter statutory deadlines in *other*, less analogous Clean Air Act sections that Congress did not tie expressly to Section 111(d). For example, EPA analogizes to Section 129 (with its 12-month deadline). But EPA's own data reveals that States have historically needed 29.5 months to submit Section 129 plans, and it admits that Section 111's more complicated requirements take on average 15 months longer than Section 129's to complete. Likewise, EPA cites Section 189 (with its 18-month deadline), but it ignores that States

have *years* of advance notice they will need to submit plans under that provision.

**C.** The 18-month deadline is directly contrary to Section 111(d)'s codification of cooperative federalism. State authority to promulgate plans is meaningless if they lack time to *exercise* it. And the Final Rule undermines state authority in other ways, too. For example, EPA no longer intends to notify States when it determines a state plan is "incomplete," meaning EPA will have the power to prepare and issue a federal plan before a State knows there was a problem with its submission. That is no way to treat a co-equal regulator, especially because when EPA misses its statutory deadlines—as it routinely does—it faces no consequences.

**III.** Finally, EPA's attempt to import additional powers from Section 110 into Section 111(d) is contrary to the statute. EPA claims newfound authority to order States to revise plans that EPA already approved—or even retract prior approvals—whenever it believes revisions are necessary. Section 110 grants EPA those powers, but Section 111 does not. EPA nevertheless asserts that Section 111(d)'s authorization for EPA to establish a "procedure similar" to that provided by Section 110 "under which each State shall *submit*" state plans, §7411(d)(1) (emphasis added), allows it to create these powers. But Section 111(d) does not authorize EPA to import Section 110's provisions granting revisionary powers *after* a submitted state plan is approved, and therefore unrelated to plan *submission*, into Section 111.

## STANDING

When petitioners are "directly regulated by the challenged rule," standing is "self-evident." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021). The Final Rule directly regulates Petitioners. *See West Virginia*, 597 U.S. at 719. States are "the object of" the Final Rule's requirements, which establish new deadlines for States to submit plans, impose new substantive requirements governing how States may exercise their discretion to develop those plans, and create new federal power over States under Section 111(d). *Id.* (citation omitted). The Final Rule therefore causes harm to Petitioners, and a decision by this Court vacating it would redress that harm.

## STANDARD OF REVIEW

This Court must set aside the Final Rule if EPA's action is "in excess of [EPA's] statutory … authority" or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. §7607(d)(9); 5 U.S.C. §706(2). EPA's action is "arbitrary and capricious if," for example "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**I.    EPA lacks authority to restrict state discretion to reasonably consider remaining useful life and other source-specific factors.**

Section 111(d) grants States authority to create plans that establish standards of performance for existing sources of air pollution. Unlike Section 111(b), under which EPA establishes federally mandated "standards of performance for new sources," §7411(b)(1)(B), Section 111(d) directs States to prepare plans establishing standards of performance for existing sources that account for source-specific considerations. It does so first by saying state standards need only "reflect[]" the emission limitations EPA's guidelines can achieve, §7411(a)(1), not carbon-copy them. And on top of that, it directs that EPA "shall permit" States to "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies" when "applying a standard of performance to any particular" existing source in a state implementation plan. §7411(d)(1). So Congress gave States discretion both in setting *and* applying existing-source standards.

The Final Rule casts aside these guarantees of state discretion. Now, States may only "take[] into consideration" these source-specific factors if "circumstances specific to a facility are *fundamentally different* from" those EPA considered when establishing the guideline best system of emissions reduction. 88 Fed. Reg. at 80,513-14, 80,543 (emphasis added). EPA has likewise prescribed how States may "calculate[] and appl[y]" less stringent standards using these factors. *See id.* at 80,517-24. The Final Rule's new

substantive limits on state discretion to consider source-specific factors in setting the standard of performance for a particular facility exceed EPA's statutory authority.

**A.    The Final Rule usurps the wide discretion Section 111(d) gives States to consider source-specific factors in developing state plans governing existing sources.**

The Final Rule's restrictions on the exercise of reasonable state discretion cannot be squared with the text of the Clean Air Act, its history, or its precedent.

**1.** Under the Act, "States set the actual rules" for existing sources. *West Virginia*, 597 U.S. at 710. Congress mandated that EPA "shall permit" States to tailor the standards of performance through a source-specific analysis for existing plants. §7411(d)(1).

Section 111(d)(1) thus "uses mandatory language (shall)" to clarify that EPA *must* allow states to consider remaining useful life and other factors. *Bd. of Pardons v. Allen*, 482 U.S. 369, 376-77 (1987) (holding that a statute stating that "parole shall be ordered" if certain findings were made imposed a mandatory duty that gave rise to a liberty interest in parole). Section 111(d)(1) places no limits on States' ability to account for these factors other than the reasonableness required in all regulatory decisionmaking. *Cf. Alaska Dep't of Env't Conservation ("ADEC") v. EPA*, 540 U.S. 461, 485, 487, 490 (2004). So Congress *required* EPA to recognize state discretion to adjust standards of

performance for existing sources as long as the States' choices are reasonable. The Final Rule illegally erases that command.

This mandatory language starkly contrasts with other provisions in the statute that allow EPA to restrict state discretion. For example, EPA "shall … authorize California" to adopt more stringent standards for nonroad vehicles, but it must withdraw that authorization if California's standards are unnecessary "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(e)(2)(A). Under the Prevention of Significant Deterioration of Air Quality program, EPA "shall … promulgate regulations" specifying the "air quality model" and kinds of "analysis" that States or major emitting facilities should conduct when applying for a permit. 42 U.S.C. § 7475(e)(3). And EPA "shall … issue regulations establishing guidelines for comprehensive State alternative fuels and alternative fueled vehicle incentives and program plans designed to accelerate the introduction and use of such fuels and vehicles." 42 U.S.C. § 13235(a)(1); *cf. Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Take, as a particularly strong example, the Act's regional haze provisions, which require States to mandate in their implementation plans a requirement that in-state sources install "the best available retrofit technology, as determined by the State." § 7491(b)(2)(A). In doing so, however, the Act

explicitly states EPA "shall … provide guidelines to the States … on appropriate techniques and methods" for making those determinations, and declares that for certain large powerplants, the States' requirements "shall be determined pursuant to" those EPA "guidelines." §§ 7491(b)(1), 7491(b)(2)(B). "In other words, Congress decided that the EPA's … guidelines are mandatory for larger powerplants … [b]ut the guidelines are *not mandatory* for smaller powerplants." *Wyoming v. EPA*, 78 F.4th 1171, 1175 (10th Cir. 2023). So when it comes to state determinations for smaller powerplants, "states have the most discretion—and the EPA owes the most deference." *Id.* at 1178. EPA may not treat its guidelines for smaller powerplants as mandatory or deem a state's analysis unreasonable if it deviates from those guidelines, because that would "disregard[] the state's broad discretion under the Clean Air Act." *Id.* at 1180, 1181.

That is precisely what the Final Rule does for Section 111(d). Like with smaller powerplants subject to the regional haze provisions, Section 111(d) solidifies State discretion to consider remaining useful life and other factors when setting standards of performance *without* granting EPA any power to substantively cabin that discretion outside of general "oversight authority" (that is, ensuring state plans stay within the bounds of the statute and reason). *See id.* Indeed, EPA's lack of authority to restrict reasonable state discretion is especially clear in Section 111(d): in the regional haze provision, EPA is at least given the explicit authority to promulgate *substantive* "guidelines" for States, § 7491(b)(1), but in Section 111(d) States need only "reflect"

EPA's substantive choices, as explained above, and EPA is given only the power to promulgate state plan submission "*procedures*."

Congress knows how to put the States' source-specific policy choices under EPA's substantive thumb. It didn't do that here. In fact, it did the opposite in saying EPA "shall" allow that reasonable state discretion. All of this firmly establishes that the text of the Act, as well as its context, does not permit the Final Rule's substantive restrictions on the States' discretion in considering remaining useful life and other factors.

**2.** Section 111(d)'s history confirms that Congress intended to grant States independent discretion when establishing standards of performance for existing sources. When first enacted, the Clean Air Act made no mention of state discretion to adjust standards for existing sources based on remaining life and other factors. *See* Public Law 91–604, § 111(d)(1) (Dec. 31, 1970), 84 Stat. 1676. EPA quickly "recognized, however, that application of [the default] standards may be unreasonable in some situations. For example, to require that existing controls be upgraded by a small margin at a high relative cost may be unreasonable." 39 Fed. Reg. 36,102, 36,102 (Oct. 7, 1974). EPA therefore promulgated regulations that permitted States to "appl[y] less stringent emission standards" when "plant age, location, or basic process design" made the "cost of control" unreasonable, it was physically impossible to install necessary control equipment, or other specific factors made "application of less stringent standards *significantly more reasonable*." *Id.* at 36,104 (emphasis added).

18

Congress then amended the Act to protect States' discretion but did *not* adopt EPA's requirement that States show their revised standards for existing sources were "significantly more reasonable." The 1977 amendments to the Clean Air Act formally granted States authority to "take into consideration[,] among other factors, the remaining useful life of the existing source." Public Law 95-95, Title I, §111(d) (Aug. 7, 1977), 91 Stat. 668, 699. That language, which remains in the statute unchanged today, omits any requirement for States to establish that less stringent standards are "significantly more reasonable."

In rejecting that language, Congress therefore agreed States should have discretion, but rejected the notion that EPA may cabin the reasonable exercise of that discretion by imposing heightened justification requirements on States. When Congress "codif[ies]" part of a regulation, but not all of it, courts enforce only the provisions Congress chose to enact. *See Kucana v. Holder*, 558 U.S. 233, 249-50 (2010). Section 111(d) therefore rejects the idea that EPA may require States to satisfy heightened justifications for their Section 111(d) plans.

Congress made another change confirming States have broad discretion to consider source-specific factors. In the 1977 amendments, Congress inserted a separate provision *requiring* EPA to "take into consideration … among other factors, remaining useful lives of the sources" when promulgating a *federal* plan under Section 111(d)(2). §111(d), 91 Stat. 668, 699. Congress thus gave States broad authority to decide whether and how to

19

consider remaining life and other factors, but it *required* EPA to do so when it promulgates a federal plan. In doing so, Congress necessarily rejected the idea that these source-specific standards are mere "variances." 88 Fed. Reg. at 80,511. Congress *required* EPA to consider source-specific circumstances to avoid unreasonable and unwise regulation of existing sources. Tellingly, EPA has *not* imposed heightened standards on itself when adjusting standards of performance to account for remaining useful life and other factors when it establishes a federal plan. *Id.* at 80,493-94 (nowhere proposing that EPA must meet the "fundamentally different" standard).

**3.** The Final Rule also runs afoul of precedent explicating the "wide discretion" States enjoy under the Clean Air Act's carefully designed system of cooperative federalism. *See supra* pp. 3-6. Because the Final Rule narrows States' broad discretion to consider remaining useful life and other factors in setting standards of performance, it "run[s] roughshod over the procedural prerogatives that the Act has reserved to the states." *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984).

States, after all, are "best positioned to adjust for local differences in … plant configurations." *ADEC*, 540 U.S. at 488. EPA admits it "cannot necessarily anticipate the appropriate and potentially unique implementation needs for every future [emission guideline]." 87 Fed. Reg. 79,176, 79,198 (Dec. 23, 2022). In developing plans under the Clean Air Act, States must make "intensely factual determinations" about the "particularities of the emissions sources" in the state and about other local conditions. *Texas v. EPA*,

829 F.3d 405, 421 (5th Cir. 2016). Throughout the Act, Congress decided that States are best suited to account for those "local conditions" and thus "strike the right balance between preserving environmental quality" and "advancing competing objectives." *ADEC*, 540 U.S. at 507 (Kennedy, J., dissenting). But the Final Rule rejects Congress's considered judgment.

Of course, States cannot exercise their discretion arbitrarily. Beyond the reasoned rulemaking requirement discussed above for all regulations, EPA has a role in verifying that state plans are "satisfactory." § 7411(d)(2)(A). Specifically, a state plan is not "satisfactory" if it is "not in accordance with the requirements of" Section 111(d). 88 Fed. Reg. at 80,510; *cf.* § 7410(k)(3) (EPA "shall approve" a state plan "if it meets all of the applicable requirements" of the Act). But if the state plan is "reasonably moored to the Act's provisions," and involves judgments supported by a "reasoned analysis," neither EPA nor federal courts are permitted to "second guess" it. *ADEC*, 540 U.S. at 485, 487, 490 (explaining standard for source-specific permitting decisions under Section 113 of the Clean Air Act). The Final Rule, by contrast, would condemn state judgments even if they involved a reasonable interpretation of the Act and a reasoned source-specific analysis.

If States truly have "substantial latitude" to set "emission standards for welfare-related pollutants generated by local facilities," *Nat'l-Southwire Aluminum Co.*, 838 F.2d at 838, EPA cannot require them to demonstrate that each deviation from EPA's preferences is based on "fundamentally different" facts. This Court has rejected similar attempts by EPA to "simply

throw[] the burden of persuasion onto the states" and disapprove state plans when they do not meet it. *Michigan v. EPA*, 213 F.3d 663, 683 (D.C. Cir. 2000); *contra* 88 Fed. Reg. at 80,526 (asserting that states may impose less stringent standards only if they show that EPA's baseline standards would be "unreasonable"). In this context, cooperative federalism means Congress told EPA it must allow the States room for tailored regulations based on their own source-specific, locally-informed analyses. It does not mean EPA can refuse the States' choices if they color outside EPA's lines.

For the same reasons, EPA may not require States to adopt EPA's preferred "factors and evaluation metrics" in exercising their discretion under Section 111(d). 88 Fed. Reg. at 80,518.[4] The statute plainly guarantees States the right to consider "other factors" in setting source-specific standards of performance. §7411(d)(1). Congress's decision not to enumerate exclusively the relevant factors necessarily means States have discretion to consider any relevant factors in any reasonable fashion. EPA may not override that statutory discretion by mandating States consider particular factors using only the same evaluation metrics as EPA, thereby mandating EPA's preferred

---

[4] EPA recognizes State discretion under Section 111(d) to "authorize[] their sources flexibilities such as trading or averaging [emissions allowances]." 88 Fed. Reg. at 80,532. Of course, *West Virginia* prohibits EPA from requiring States to participate in "trading systems" and from basing its standard of performance determinations on States' ability to implement such systems. 597 U.S. at 733. EPA therefore may not hold state plans to a higher standard when they do not adopt trading programs.

"regulatory techniques." *Nat'l Min. Ass'n v. EPA*, 59 F.3d 1351, 1363-64 (D.C. Cir. 1995). That would eliminate "equally effective" state regulatory approaches. *Id.* at 1364. EPA may voice a "preferred approach" for state plans, but it may not erase State discretion by insisting on it. *Train*, 421 U.S. at 69. By doing otherwise, the Final Rule exceeds EPA's authority under the Act.

**B.    EPA's justifications for restricting state discretion fail.**

EPA's attempts to justify these substantive limits on State discretion fail.

**1.** To begin with, the Final Rule ignores the text of Section 111(d), which directs that EPA "shall permit" States to exercise discretion to establish source-specific standards under Section 111(d). EPA paradoxically misreads this limit on EPA as a font of power to *restrict* state discretion. Specifically, EPA contends that the "shall permit" language gives EPA authority to create "parameters or rules" for how States may exercise their statutory discretion. 88 Fed. Reg. at 80,510; *see also id.* at 80,515, 80,518-19.

But Congress's direction that EPA "shall permit" States to establish source-specific standards of performance *limits* EPA's authority to interfere with state discretion. To "permit" something is "to allow [it] to happen" or "give opportunity for" it to occur. *Permit (verb)*, Black's Law Dictionary (11th ed. 2019). In context, Section 111(d)(1) requires EPA to allow States "to take into consideration, among other factors, the remaining use life of the existing source." That language forbids EPA from denying States that regulatory

discretion. It does not establish a process that makes state power to adjust standards of performance subject to EPA's substantive restrictions.

EPA claims that Section 111 gives it the power to "permit" States to consider these factors in the same way a city might issue building permits. *See* 88 Fed. Reg. at 80,510 ("It is well understood that there may be parameters or rules as a condition of someone consenting to or allowing something to be done. For example, a building permit generally does not allow a person to build in any way they like, but contains conditions and requirements such as compliance with safety codes and limitations on height."). EPA appears to confuse the verb "permit" (as used in Section 111(d)) with the noun "permit" (as used in the Final Rule). If Congress intended EPA to issue States "a permit," or to establish a permitting system, it would have said so. EPA's interpretation of language that restricts EPA's power as instead constraining *State* power flips the statutory language on its head.

EPA provides zero examples of other statutes working this way, and for good reason. Statutes that contain "shall permit" or similar language invariably impose mandatory *limits* on federal power, rather than grant authority to impose restrictions. For instance, when a statute provides that the Secretary of the Interior "*shall* permit hunting, fishing, shellfishing, trapping, and the taking of specimens" in a particular federal recreation area, the Secretary may not place additional conditions on hunting. *See United States v. Knauer*, 707 F. Supp. 2d 379, 385 (E.D.N.Y. 2010) (holding a regulation that

allowed hunting "only if authorized by the park superintendent" violated this mandatory "shall permit" language).

When, by contrast, legislatures intend to require the government to allow something but want to authorize the government to impose discretionary limits, they expressly say so. *See, e.g.*, 730 Ill. Comp. Stat. Ann. 5/3-7-2 ("All of the institutions and facilities of the Department shall permit every committed person to receive in-person visitors and video contact, if available, except in case of abuse of the visiting privilege or when the chief administrative officer determines that such visiting would be harmful or dangerous.").

In short, Section 111(d)(1)'s use of "shall permit" plainly imposes a mandatory duty on EPA. Nothing in that statutory language empowers "EPA to set out parameters and conditions that" restrict the States' exercise of discretion. *Contra* 88 Fed. Reg. at 80,510.

**2.** EPA similarly defends its attempt to substantively cabin state discretion by asserting Congress has elsewhere directed EPA to promulgate regulations guiding States. *See* 88 Fed. Reg. at 80,515, 80,519-20, 80,522. But those other statutory provisions only prove EPA *lacks* that authority in Section 111(d). *See Russello*, 464 U.S. at 23.

For example, EPA asserts that its "fundamentally different" standard is "consistent with other variance provisions that courts have upheld for environmental statutes," like Section 301 of the Clean Water Act. 88 Fed. Reg. at 80,515, 80,519. It isn't. For one thing, that Clean Water Act section sets up

the sort of permitting regime that EPA wishes Congress had created for Section 111(d), repeatedly using the *noun* "permit," 33 U.S.C. § 1311(b), (c), (h), (i), (k), (m), (p). For another, that provision includes *in the statute* the words EPA seeks to smuggle into its rule: It allows the administrator to "establish an alternative requirement" for effluent limitation guidelines for individual sources but specifically requires the owner of the facility to demonstrate that it "is fundamentally different" from the sources EPA considered when promulgating the rule. § 1311(n). Congress's inclusion of the "fundamentally different" standard in the Clean Water Act, but not the Clean Air Act, thus undermines EPA's interpretation of Section 111(d). In fact, Congress specifically omitted equivalent language when codifying EPA's prior regulations that *did* impose that kind of heightened standard. *See supra* 18-19. So in rejecting EPA's then-existing regulations and language in a nearby statute, Congress could hardly have made its decision to do something different in Section 111(d) more obvious.

EPA also relies on Section 3004(m)(1) of the Resource Conservation and Recovery Act. *See* 88 Fed. Reg. at 80,519-20. That provision authorizes EPA to promulgate regulations prohibiting "land disposal" of certain kinds of "hazardous waste." 42 U.S.C. § 6924(m)(1). EPA has authority under Section 3004(m)(1) to grant variances to treatment plants. *See* 88 Fed. Reg. at 80,520. But this provision does not establish a system of cooperative federalism where States and EPA work together—States do not submit state plans under § 3004(m)(1). Section 3004(m)(1) is thus irrelevant to the question

whether EPA has authority under Section 111(d) to forbid state discretion unless States can satisfy a heightened standard.

Finally, EPA relies on the regional haze provisions discussed above for the proposition that Congress sometimes gives EPA authority to "promulgate regulatory frameworks to guide states in areas in which Congress has granted them discretion." 88 Fed. Reg. at 80,522. But, unlike Section 111(d), those provisions expressly direct EPA to promulgate regulations establishing substantive requirements for state plans. *Supra* I.A.1. And courts have repeatedly emphasized that States have "broad authority" under even this section, regardless. *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 8 (D.C. Cir. 2002) (per curiam); *see also Wyoming*, 78 F.4th at 1180; *Util. Air Regul. Grp. v. EPA*, 471 F.3d 1333, 1340 (D.C. Cir. 2006).

**3.** EPA also defends its substantive limits on state discretion by claiming that Section 111(d)(2) gives EPA "the same authority as under … section 110(c) to prescribe a Federal plan where a state fails to submit a satisfactory plan." 88 Fed. Reg. at 80,522; *see also id.* at 80,491 (assuming that a state plan is "satisfactory" only if it "meet[s] all the requirements of the statute, these implementing regulations, and the corresponding [emissions guideline]"). But EPA's power to evaluate whether a state plan is "satisfactory" does not authorize the Final Rule, either.

Section 110 does not grant EPA the power to direct how States exercise their discretion to create state plans under Section 110 and 111(d). *Contra id.* at 80,522. Under Section 110 (as under Section 111(d)), EPA's substantive

review power is limited to ensuring that the state plan complies with the *statutory* criteria, not any additional requirements imposed by EPA. Specifically, if a state plan "meets all of the applicable requirements of" the Act, § 7410(k)(3), then EPA "'shall approve' the proposed state plan," *Union Electric*, 427 U.S. at 257 (quoting § 7410(a)(2)). EPA "is not to be concerned with factors other than those specified." *Id.*

Thus, in both Section 110 and 111(d), Congress delegated to States, not EPA, the power to make "legislative choices in regulating air pollution." *Id.* at 269. EPA has "no authority to question the wisdom of a State's choices" in developing a state plan as long as it complies with the statute's criteria. *Train*, 421 U.S. at 79; *see also* 88 Fed. Reg. at 80,529 ("[T]he Court's rationale in *Union Electric* as it pertains to … the cooperative federalism structure of [Clean Air Act] section 110 also applies to [Clean Air Act] section 111(d)."); *id.* at 80,534 & n.182 (relying on *Union Electric Co.* and *Train* in interpreting Section 111(d)). Section 111(d)'s reference to Section 110 thus simply confirms that EPA lacks authority to direct States in how they may substantively exercise their discretion. Under both Sections 110 and 111(d), EPA must defer to state legislative choices and reasonable regulatory decisions. Put differently, a State can't be faulted for unsatisfactory work if it "take[s] into consideration," § 7411(d)(1), factors Congress expressly said it could.

To be clear, none of this means that States have "unfettered discretion" under Section 111(d). 88 Fed. Reg. at 80,515. As explained, States promulgating a plan cannot act arbitrarily or adopt unreasonable positions. But

because the Act vests state "authorities with initial responsibility," EPA may "second guess state decisions … *[o]nly*" when the "determination is not based on a reasoned analysis." *ADEC*, 540 U.S. at 488, 490 (quotation marks and citation omitted) (emphasis added).

**4.** Finally, EPA's insistence that heightened restrictions on state discretion are necessary to ensure consistency in standards for existing sources simply reveals that the Final Rule is at war with the statute Congress enacted.

EPA has repeatedly suggested that state-by-state variations in the standards of performance for existing sources undermine the statute. *See, e.g.*, 88 Fed. Reg. 80,515 (arguing the new restrictions on state discretion are "critical to ensuring both the equitable treatment of states and sources and the integrity of an EG's emission reduction purpose"); *id.* at 80,521 ("[I]t is necessary that each state is using a common set of factors and metrics as the bases for their decisions."); 87 Fed. Reg. at 79,197 ("[U]nder the current broadly structured provision, two states could consider [source-specific factors] for two identically situated designated facilities and apply completely different standards of performance on the basis of the same factors.").

But state-by-state variation is the point of Congress's deliberate choice to grant States discretion. By giving each State the *permission* to consider "remaining useful life" and "other factors," §7411(d)(1), Congress necessarily rejected the idea that state plans must be uniform. EPA must "follow the statute's plain meaning, 'even though effectuating that meaning may have

… public policy ramifications'" that EPA considers "undesirable." *State of Conn. v. EPA*, 656 F.2d 902, 910 (2d Cir. 1981) (citation omitted).

Nor would uniform national standards for existing sources be wise. For instance, if a particular source will not operate long enough to recoup a major capital investment, it would be an outrageous waste of resources to install state-of-the-art pollution controls. Likewise (considering the common power generator context for Section 111 rules), depending on a facility's role in the integration of renewable resources, weather conditions, and other factors, a fossil-fuel-fired electric generator's operating mode could fluctuate between peak production to minimum baseload within a short period of time. States therefore need flexibility to account for these (sometimes rapidly) changing factors in their implementation plans. Other state-specific factors could be relevant too. Each State and source is differently situated when it comes to costs of service, electricity demand, availability of renewable resources, and the State's need for generation capacity and ancillary services. Congress could have tasked EPA with making these sorts of judgments or with setting standards for States to apply in doing so. Instead, it intentionally empowered States to adjust the standards of performance *themselves* to account for the needs and characteristics of each source. EPA might think this kind of state-by-state variation makes for bad policy, but Congress took a different view.

*　　*　　*

In short, Section 111(d) requires EPA to recognize State discretion to reasonably account for remaining useful life and other factors when regulating existing sources, and it imposes no requirement that States provide heightened justifications to EPA when they do so. By imposing substantive limits restricting State discretion under Section 111(d)(1), the Final Rule not only violates the statute's clear text, it sacrifices the Act's statutory objective of cooperative federalism. The Final Rule exceeds EPA's authority.

## II.　EPA's decision to set an 18-month deadline for States to submit plans violates the statute and is arbitrary and capricious.

Recently, this Court vacated EPA's implementing regulations for Section 111(d) because EPA failed to propose "amended provisions that correspond to the actual workload involved in section [111(d)] rulemakings." *ALA*, 985 F.3d at 993 (cleaned up). Despite this, EPA has once again provided "a radically incomplete explanation" for imposing an 18-month deadline on States to submit plans. *Id.* at 994. EPA admits the deadline for state plans should "accommodat[e] the time needed for states … to develop an effective plan." 88 Fed. Reg. at 80,486. But the Final Rule imposes a deadline on States that most States will be unable to meet. EPA has thus failed to carry its "burden of justification" for its chosen "compliance timeframes." *ALA*, 985 F.3d at 993.

EPA arrived at its 18-month deadline by dismissing comments explaining the amount of time States need and ignoring its own evidence that

States—even operating under a shorter deadline—have historically needed much more than 18 months to submit Section 111(d) plans. EPA also ignores the deadline in Section 110—which Congress made the required analogue for Section 111(d) state plans—and instead attempts to justify the deadline by reference to *other*, noncomparable statutory provisions. Thus, EPA ignored its own data and relied on factors Congress did not direct it to consider while setting aside the factors Congress mandated—classic arbitrary and capricious rulemaking. Moreover, the Final Rule's unreasonably short deadline for state plan submissions nullifies the States' role under Section 111(d). The Court should vacate the Final Rule for this reason, too.

### A. EPA ignored its own data and comments establishing that most States cannot submit Section 111(d) plans within 18 months.

EPA arbitrarily chose an 18-month deadline even though *its own data* (and many comments) confirmed that most States have not and cannot meet that deadline.

**1.** In *ALA*, this Court faulted EPA for failing to "document any problems during the decades that the existing timelines" for submitting state plans under Section 111(d) "have been in place." *Id.* When promulgating the Final Rule, EPA therefore prepared a spreadsheet tracking when each prior state plan under Section 111(d) and Section 129 was submitted. *See* Historical SIP Timeline Spreadsheet, J.A.__ [CI-3]. That spreadsheet reveals that, historically, States have on average required *45 months* to prepare state plans under Section 111(d). *Id.* ("State Plan Submittals_CAA 111" tab). Only 24 of

the 85 state plans submitted under Section 111(d) took 18 months or fewer to prepare. *Id.*

EPA referenced and relied on this historical data in the Final Rule. Indeed, EPA admitted that "the 9-month timeline," which is the original deadline established by the 1975 implementing regulations, "is not a reasonable amount of time for most states to adequately develop a plan" under Section 111(d). 88 Fed. Reg. at 80,487. That is because "under the 9-month timeline, … most states either did not submit plans or submitted plans that were substantially late." *Id.* EPA makes no attempt to explain why, if nine months is "not a reasonable amount of time" to prepare a state plan because "most states" have failed to meet that deadline, *id.*, 18 months is a reasonable timeline even though the same data confirms that most States cannot meet *that* deadline either. EPA ignored the fact that its own data and logic justified a deadline significantly longer than the 18 months the agency settled on.

So to satisfy *ALA*, it was not enough for EPA to marshal data this time around. It was required to meaningfully "examine *the relevant data*." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (citation omitted). EPA did the first part by collecting historical data, and properly admitted that data should "inform … the state plan submission deadline." 88 Fed. Reg. at 80,487. But then it inexplicably ignored that States have historically needed 45 months to prepare Section 111(d) plans. EPA thus lacked a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

**2.** In the teeth of its own data, EPA contends that its chosen deadlines reflect "the minimum administrative time reasonably necessary" for States to submit their plans. 88 Fed. Reg. at 80,486; *see also* Response to Comments, J.A.__-__ [CI-156 at 44-55] (arguing the same in response to the comments pointing out EPA's inconsistency with its own data). But EPA does not show its work on how 18 months is sufficient for any States, much less most or all of them. It says *it* thinks that should be enough time, but it ignores on-the-ground realities saying otherwise. That approach is wrong.

States make good-faith efforts—and expend significant resources—to timely prepare state plans. EPA never suggests otherwise. But for many States, it is impossible to substantively prepare a state plan *and* comply with the state law procedural and administrative requirements necessary to finalize that plan within 18 months. State regulators must conduct "an in-depth evaluation of each designated facility within the agency's jurisdiction." Class of '85 Comment, J.A.__ [CI-93 at 6]. This analysis often involves engaging outside technical specialists, economists, and regulated entities to "comprehensively evaluate all of the sources in an affected source category and come up with an appropriate standard of performance considering [remaining useful life and other factors]." *Id.* States also must develop compliance schedules for each source. *Id.*

"Significant lead time" is therefore necessary to properly employ these efforts before a State can even begin drafting a state plan. *Id.* at 7. In many States, this preparatory work and the related drafting of the state plan will

take most of the 18-month timeline. For example, Arkansas spends nearly 15 months just gathering source-specific information and conducting a technical evaluation. *See id.* at 8. Similarly, Mississippi needs at least 18 months to conduct required public engagement, draft the state plan, and otherwise complete the rulemaking process. *Id.* at 9.

Then, after preparing their substantive plans, States must satisfy specific procedural requirements—which often involve notice and comment procedures and legislative or administrative approval. For example, Montana and Nevada require legislative review of regulations, but their legislatures do not convene every year, meaning that if the emissions guideline is promulgated a few months before a legislative session, those States might not have a completed, approved plan until the *next* legislative session, after the 18-month deadline.[5] And in Oklahoma, the Air Quality Advisory Council must recommend proposed state plans to the Environmental Quality Board, which meets only three times a year. Okla. Stat. tit. 27A, §§ 2-2-101(H), 2-5-107; Okla. Admin. Code §§ 252:4-5-8(b), 252:4-3-1(a). If the Board rejects the plan, it must be sent back for revisions and the process starts over. Okla. Admin. Code § 252:4-5-8(d), (e). Finally, the legislature and the governor must both approve. Okla. Stat. tit. 75, §§ 303(A)(6), 308.

---

[5] *See* Class of '85 Comment, J.A.__ [CI-93 at 7]; Mont. Code Ann. § 2-4-402(1); Office of the Nevada Attorney General, *Administrative Rulemaking: A Procedural Guide* at 38 (Mar. 2014), https://perma.cc/4FLS-9HAZ; *see also* National Conference of State Legislatures, *Legislative Session Length* (July 1, 2021), https://perma.cc/F4HH-G6E8.

So too in West Virginia, where plans require legislative approval and its legislature only meets for several weeks per year. West Virginia Comment, J.A.__ [CI-80 at 5]. This means, depending on when the clock begins, West Virginia may have to rush the substantive phase of its plan development in a matter of a few months to get the plan in front of the legislature because EPA's 18-month clock would run out if it waited for the next year's session. In Ohio and Kentucky, "a minimum of 12-months is required … to conduct rulemaking procedures alone," leaving those States with at most six months to substantively develop their plans. Ohio Comment, J.A.__ [CI-60 at 2]; *see also* Kentucky Comment, J.A.__ [CI-91 at 1] ("The regulatory process in Kentucky is a minimum of 12 months.").

And rather than streamline the States' requirements or explain how steps could be taken more quickly (while still being accurate or diligent), EPA acknowledges the Final Rule *adds* requirements to States in promulgating plans. 88 Fed. Reg. at 80,487. For instance, EPA is now requiring "that states demonstrate meaningful [public] engagement" in the state plan preparation process. *Id.* at 80,488. EPA admits that new requirement "is very likely to require additional time relative to the existing public notice and hearing requirements." *Id.*

Despite these comments estimating the time necessary to prepare state plans—by the States and entities within them most familiar with those processes—EPA failed to construct a state plan submission deadline that was tailored to the actual process required to prepare a plan. EPA simply asserts

that "account[ing] for any and all unique state procedures would inappropriately delay reductions in emissions." *Id.* at 80,489. EPA's "failure to address these comments, [not even] in a conclusory manner, is fatal to its defense of the [Final Rule]." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

EPA's refusal to address these comments was particularly capricious because EPA took care to specifically estimate the time it would need to accomplish each step when it established deadlines for *itself*. *See* 88 Fed. Reg. at 80,491-92. The Final Rule expands EPA's deadline to determine whether a state plan is "satisfactory" from what had been 4 months to 12 months. EPA justifies that deadline by carefully listing the steps involved in review and estimating the time necessary to accomplish each step. *See id*. For instance, EPA estimates "6 to 8 months" to "evaluate the state plan, draft a proposed action … and get the proposed action edited, reviewed, and signed." *Id.* at 80,491. EPA then estimates "at least 30 days" for public comments, *id.*, and an additional "4 to 7 months for evaluation of the comments received, any necessary technical analysis, decision-making, and drafting and review of the final action." *Id.* at 80,492.

*Preparing* state plans requires more time than *reviewing* them. But EPA admits that its review process could take up to 16 months. *Id.* at 80,491-92. And experience suggests that EPA's review process will often take even longer. *See, e.g.,* 48 Fed. Reg. 31,401 (July 8, 1983) (approving 111(d) plan three years after submission); 55 Fed. Reg. 19,884 (May 14, 1990)

(disapproving five and half years after submission); 61 Fed. Reg. 55,574 (Oct. 28, 1996) (approving after seven years); 63 Fed. Reg. 47,436 (Sept. 8, 1998) (eight years); 64 Fed. Reg. 75,781 (Oct. 27, 1999) (11 years).

Similarly, EPA gives States 12 months to *revise* state plans when it issues a call for revisions, 88 Fed. Reg. at 80,506, yet simultaneously assumes States need only six months longer to prepare an entire plan from scratch. EPA's decision to give States only six months longer to create state plans than it gave itself to review them or States to revise them was wholly unreasonable.

The Final Rule's selection of a deadline that fails to "correspond to the actual workload involved" in preparing Section 111(d) plans was arbitrary and capricious. *ALA*, 985 F.3d at 993 (citation omitted).

**3.** EPA defends the 18-month deadline as necessary to ensure that "the emissions reductions contemplated" by the Clean Air Act "are achieved as expeditiously as practicable." 88 Fed. Reg. at 80,488.

Congress has already balanced the need for environmental protection with the importance of giving States enough time to prepare adequate plans. Section 110 gives States 36 months to develop plans, and that provision is one of the Clean Air Act's "main regulatory programs" for controlling "air pollution." *West Virginia*, 597 U.S. at 707. Section 111(d), by contrast, is "ancillary." *Id.* at 710. If a three-year deadline is sufficient to protect the environment under Section 110—which regulates emissions of the most common and dangerous air pollutants—then an 18-month deadline under Section

111(d), which only regulates "emissions not already controlled" by other programs, cannot be justified as environmentally necessary. *Id.*

If anything, EPA's unjustifiably tight deadline will *harm* efforts to reduce emissions. That deadline will force States to rush to develop plans, increasing the risk that the plans are legally or technically flawed. Class of '85 Comment, J.A.__-__ [CI-93 at 2-3]. Those state plans will inevitably do a worse job regulating existing sources than more comprehensive state plans prepared on a reasonable timeline. The only alternative is to prepare a legally and environmentally sound plan but miss the submission deadline.

And although EPA could then promulgate a federal plan, that unilateral move would not produce "emission reductions" more quickly. As EPA well knows, it does not promulgate plans in 18 months or less, either. *See, e.g.*, *California v. EPA*, 978 F.3d 708, 711-12 (9th Cir. 2020) (noting EPA had not promulgated a federal plan under 111(d), even though over three years had passed since the deadline for state plan submissions). The more States that submit unsatisfactory plans, the greater the regulatory burden on EPA— and the longer EPA's delays—will be. *See* ODEQ Comment, J.A.__ [CI-65 at 3]. The Final Rule therefore means that existing sources will go unregulated even longer than if EPA created a reasonable state deadline to begin with.

EPA admits that it must give *itself* enough time to review state plans, lest inadequate time "compromise[s] the EPA's ability to ensure that the public health and welfare objectives" of the Act are satisfied. 88 Fed. Reg. at 80,492. Its refusal to grant States the same consideration is unjustifiable. As

in *ALA*, EPA has failed to adequately consider whether the new deadlines would produce "added environmental and public health damage." 985 F.3d at 993. EPA's selection of an 18-month deadline therefore "runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43.

**B.    EPA unlawfully relied on materially different statutory deadlines in the Clean Air Act than the ones Congress directed.**

Section 111(d) specifies that the "procedure" for submitting state plans under Section 111(d) should be "similar to that provided by" Section 110, §7411(d)(1), which affords States 36 months to submit state plans, §7410(a)(1). Yet EPA has given States half that time. EPA justified that decision by arguing that the Clean Air Act "contains numerous, long-standing requirements under *other*," materially different parts of the Act that require "states to develop and submit plans within 18 months (or fewer)." 88 Fed. Reg. at 80,488 (emphasis added). In other words, EPA pushed aside the factors to which Congress mandated it hew in favor of factors wholly absent from Section 111(d). That was error.

**1.** Congress established the statutory deadlines in Section 110 as the primary reference point for implementing regulations under Section 111(d) by requiring a procedure "similar to that provided by" Section 110 for submitting state plans. §7411(d)(1). True, that language does not require deadlines under Section 111(d) that "necessarily mimic or exceed timeframes" under Section 110. *ALA*, 985 F.3d at 992. But all agree the statutory provisions "reflect generally similar state-federal interactions." *Id.*; *see* 88 Fed. Reg. at

80,529 ("[T]he cooperative federalism structure of [Clean Air Act] section 110 also applies to section 111(d)."). EPA would likely balk if a State said its plan "reflects" application of EPA's best system of emission reduction but set wildly different standards tracking a different statute instead. EPA's choice to cut Section 110's timeframes in half merits the same skepticism.

At various points, EPA does draw heavily from deadlines and procedures in Section 110 to justify its new implementing regulations for Section 111(d). For example, Section 110 gives EPA one year to approve or disapprove a state plan, § 7410(k)(2), and EPA has adopted the same deadline for itself under Section 111(d), 88 Fed. Reg. at 80,486. EPA also interprets the "'similar' clause" to refer "to all the procedural provisions provided in [Section 110] which serve the same purposes in providing useful flexibilities to states and EPA actions to help ensure emission reductions are appropriately and timely implemented." *Id.* at 80,503; *see also id.* (explaining that Section 111(d) calls for a "set of essential procedural requirements for state and Federal plan development and implementation and enforcement that generally reflect[s] the essential procedural requirements for [state plans] and [federal plans] in section 110"); *id.* at 80,529 (emphasizing the "structural similarities between … sections 110 and 111(d)").

Despite this, EPA contends that it need not use the 36-month state plan submission deadline in Section 110 as an analogue because, in *ALA*, this Court "faulted the EPA for adopting the … section 110 timelines without accounting for the differences in scale and scope" between state plans under

Sections 110 and 111(d). *Id.* at 80,488. But *ALA* did not hold that Section 110 was an inappropriate comparator or that its deadlines were inherently inappropriate for use in Section 111(d)—nor could it, because Congress made Section 110 the *only* express (and required) comparator in this context. Rather, *ALA* held that citing Section 110 alone was insufficient to carry EPA's "burden of justification" for the "compliance timeframes" it adopted. 985 F.3d at 992-993. This Court faulted EPA for providing an "incomplete explanation for [the adopted] compliance timeline" by focusing only on "regulatory symmetry" and "align[ing] the timing of Section 7411(d) [plans] with the compliance schedule under Section 7410," while ignoring other important aspects of the problem. *Id.* at 994-95.

But real-world data now confirm that plans under Section 110 and 111(d) require similar amounts of time to prepare. *See supra* II.A. As EPA's data reveal, States have on average required 45 months to prepare Section 111(d) plans. States routinely require a "similar" amount of time to prepare plans under Section 110.[6] And commenters have since explained why States require that time. *See supra* II.A.2. EPA did not have evidence like that when

_____

[6] For example, when preparing Section 110 plans addressing the Interstate Transport of Air Pollution for the 2018 8-Hour Ozone National Ambient Air Quality Standards, numerous States required over 40 months to prepare their plans. *See* 87 Fed. Reg. 9,545, 9,554 (Feb. 22, 2022) (Mississippi plan took at 47); 87 Fed. Reg. 9,798, 9,303 (Feb. 22, 2022) (Arkansas plan took approximately 48 months); *id.* at 9,811 (same for Louisiana); 87 Fed. Reg. 9,838, 9,845 (Feb. 22, 2022) (Illinois plan took 43).

it issued the rule *ALA* reviewed, so EPA cannot rely on *ALA* to justify ignoring the record before it now. To the contrary, just as EPA previously "failed to engage meaningfully with the different scale of the two types of plans," *ALA*, 985 F.3d at 993, EPA failed to meaningfully explain why a deadline half of what Section 110 provides is reasonable.

The Final Rule's 18-month deadline is especially arbitrary because EPA has given *itself* the same twelve-month period to review state plans as it has under Section 110. By refusing to meaningfully consider Section 110's deadline for state plan submissions, EPA failed both to comply with Congress's directive to use Section 110 as its model and to consider an important aspect of the problem. *State Farm*, 463 U.S. at 43.

**2.** EPA doubled its error by choosing to "closely evaluate[] *other* statutory deadlines" that involve state plans that are far less analogous to Section 111(d). 88 Fed. Reg. at 80,488 (emphasis added). Like in *ALA*, EPA has blindly pursued "regulatory symmetry" with non-analogous provisions of the Clean Air Act without "engag[ing] meaningfully" with the "different scale" of those other provisions. 985 F.3d at 993, 995.

First, EPA argued that the Final Rule's 18-month deadline was reasonable because "a significant number of states" have "submitted plans [within] 14-17 months" under Section 129 of the Clean Air Act. But this grossly misrepresents the data. 88 Fed. Reg. at 80,487. Only <u>10 of the 54</u> Section 129 plans EPA catalogued were submitted within 14-17 months. Historical SIP Timeline Spreadsheet, J.A.__ [CI-3]. The large majority of state plans under

Section 129 have been submitted much later—States take, on average, 29.5 months to prepare those plans. *Id.*

And even if EPA's data *did* show that States can typically submit Section 129 plans within 17 months, EPA admits States need more time for Section 111(d) plans. Unlike under Section 111(d), Section 129 state plans may not adjust standards of performance to account for source-specific characteristics, 42 U.S.C. §7429(b)(2), so state plans apply the same standards to all existing sources. Indeed, EPA's data reveals that States require, on average, 15 months longer to submit Section 111(d) plans compared to Section 129 plans. Historical SIP Timeline Spreadsheet, J.A.__ [CI-3]. Giving States only 18 months to submit a Section 111(d) plan when States require almost twice that time to submit less-complicated Section 129 plans is arbitrary. EPA thus again "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

EPA also analogizes to Section 189. *See* 88 Fed. Reg. at 80,488. It is true that Congress gave States an 18-month deadline to submit plans establishing permit programs for construction and operation of new and modified major sources of particulate matter. *See* 42 U.S.C. §7513a(a)(2)(B). But, in practice, States have far longer than 18 months to prepare those plans.

To start, state plans under Section 189 are not due until around 54 months after EPA promulgates a new or revised national air quality standard, and States can start considering how they might structure their Section 189 permit programs as soon as the standards are promulgated. The 18-

month deadline begins after EPA makes attainment designations, *id.*, which happens only after (1) States propose designations (within 12 months of when EPA issues new standards), §7407(d)(1)(A), and (2) EPA finalizes the designations (24 months later), §7407(d)(1)(B)(i).

Take the 2012 National Ambient Air Quality Standards for particulate matter. States knew as early as January 15, 2013—when the standards were finalized—that they had areas EPA might later designate as in nonattainment. 78 Fed. Reg. 3,086 (Jan. 15, 2013). States were required to propose designations within one year. §7407(d)(1)(A). EPA notified the States of EPA's preliminary response to their designation recommendations on August 19, 2014. *See* 80 Fed. Reg. 2,206, 2,209 (Jan. 15, 2015). But EPA did not finalize its attainment designations until April 15, 2015. *See id.* States therefore knew about the revised standards for particulate matter as early as January 2013 (45 months before the deadline). They knew at least by early 2014 (33 months) whether they likely had areas in nonattainment. And they knew in August 2014 (26 months) whether EPA was likely to require them to submit a state plan.

Under Section 111(d), however, States do not have years of advance notice that they will have to submit a state plan—they have no knowledge of what standard of performance EPA will settle on until EPA promulgates it, which triggers the Section 111(d) state plan submission deadline.

EPA therefore improperly rejected Section 110's state-plan deadline as an appropriate baseline, and instead relied on other, far less analogous

statutory provisions that Section 111(d) never mentions. The agency arbitrarily and capriciously both "relied on factors which Congress has not intended it to consider" and "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

### C. The deadlines in the Final Rule violate Section 111(d)'s structure of cooperative federalism.

EPA's rush for state plan submissions and related actions eviscerates the States' role in setting standards of performance under Section 111(d). While EPA suffers no immediate consequences for missing the generous deadlines it gives itself, States under the Rule are stripped of their sovereign prerogatives when EPA imposes a federal plan after a State misses their submission deadline. By minimizing the States' ability to set standards at every step, the Final Rule operates to maximize EPA's ability to impose federal standards, such that States are no longer "set[ting] the actual rules." *West Virginia*, 597 U.S. at 710.

To aggrandize its own power, EPA has set States up to fail. It set deadlines it knows the States have not met and cannot meet. *Supra* II.A.1. It refuses to allow States to ask for extensions of their deadline. 88 Fed. Reg. at 80,489. And it disclaims any requirement to notify States that it thinks their plans are incomplete or insufficient—much less give them a chance to remedy perceived faults. Instead, EPA will promulgate a federal plan whenever states "have not submitted a plan by the submission deadline" or it deems the plans unsatisfactory. *Id.* at 80,493; § 7411(d)(2)(A).

Notably, under the similar procedures in Section 110, EPA's deadline to promulgate a federal plan begins running when EPA "*finds* that a state fails to submit a required plan … or *finds* that the plan or plan revision does not satisfy the minimum criteria under" the statute. 88 Fed. Reg at 80,497 (emphasis added) (citation omitted). That procedure ensures that States have an opportunity to correct issues identified by EPA and therefore eliminate the need for a federal plan.

But, in the Final Rule, EPA has chosen to "chang[e] the starting point for its Federal plan clock" under Section 111(d) "from a finding of failure to submit to the day after state plan submissions are due." *Id.* at 80,498. EPA contends this change will allow it to "promulgate the Federal plan more expeditiously." *Id.* at 80,497. As commenters noted, the "finding of failure" provides critical "notification to the States" that their submission has been rejected as incomplete. *Id.* In place of a requirement that EPA issue a finding that a state plan is incomplete, EPA concluded that when EPA misses its deadline to conduct its completeness determination, state plans will be deemed complete "by operation of law." *Id.* at 80,490. EPA is not, however, bound by that deeming because it says it can later find the plan "incomplete." *Id.* at 80,498.

Thus, under the Final Rule, a State might submit a plan it believes is complete. Then, EPA will inevitably miss its deadline to conduct its completeness determination. *See id.* at 80,491 (admitting that EPA may not provide a "timely completeness determination"); *id.* at 80,497 (same). Many state

plan submissions will therefore be deemed complete by operation of law. If EPA later concludes that the plan is incomplete, it has no obligation to notify the State. *See id.* at 80,498 (merely promising that EPA "will notify the states … expeditiously"). EPA could therefore issue a federal plan shortly after (or even simultaneously) with informing the state their submission was incomplete. In that scenario, a State would have had no notice EPA rejected their submission as incomplete, and no ability to cure that problem before becoming subject to a federal plan.

In fact, while EPA denies that it will "use the time before it has made a finding of failure to submit to start working on a Federal plan," *id.*, it admits elsewhere that it does not intend to "wait for its Federal plan obligation to be 'triggered' before developing such a plan." *Id.* at 80,494. EPA has repeatedly prepared federal plans before rejecting state plans. *Compare, e.g.*, 87 Fed. Reg. 9,798 (proposing to disapprove four state plans under Section 110) *with* 87 Fed. Reg. 20,036 (Apr. 6, 2022) (proposing a federal plan for those and other states less than two months later, before EPA finalized the state plan disapprovals); *see also* 89 Fed. Reg. 12,666 (Feb. 16, 2024) (simultaneously proposing to disapprove state plans submitted under Section 110 and proposing a federal plan).

Thus, EPA has structured the process with a singular goal: minimize state ability to set the Section 111(d) performance standards and maximize federal power. But that is not a goal the Act permits. Section 111(d) in particular and the statutory structure more broadly codify state prerogatives

and demand EPA respect that discretion. *Supra* Statement I. By effectively sidelining states, the Final Rule erases the distinction between Section 111(b) (where EPA sets the rules) and Section 111(d) (where States set the rules). EPA's rejection of cooperative federalism through tight, rigid, and game-of-gotcha deadlines, set in conflict with the rulemaking record, is thus not only arbitrary and capricious, but also exceeds the agency's statutory role.

III.  **EPA lacks authority to import the state-plan-call and error-correction processes from Section 110 into Section 111(d).**

In the Final Rule, EPA grants itself two new substantive powers. First, it may "call for a plan revision" when EPA "find[s] that a previously approved state plan does not meet the applicable requirements of the [Act] or of the relevant [emissions guideline]." 88 Fed. Reg. at 80,506. Second, EPA may "revise its prior" approval of a state plan whenever EPA determines the approval "was in error." *Id.* at 80,508 (citation omitted). But Section 111 does not give EPA these powers or authorize EPA to bestow them upon itself.

**1.** "An agency … 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (citation omitted). EPA's creation of these new *substantive* powers to reject state plans after submission and approval is not authorized by Section 111(d)(1), which gives EPA only the power to "prescribe regulations which shall establish a *procedure* … under which each State shall *submit* a plan."

The Final Rule also seizes "the authority to promulgate a Federal plan for the state" whenever a state fails "to submit necessary revisions by the date set in the call for state plan revisions." 88 Fed. Reg. at 80,507. Yet nothing in Section 111(d) empowers EPA to require States to submit multiple satisfactory plans, much less grants EPA the substantive authority to impose a federal plan after it makes a demand for state plan revisions. This new power greatly increases EPA authority at State expense.

Likewise with EPA's new error-correction authority, which gives EPA new *post-hoc* power to reject state plans it once approved. EPA describes this new power as subject to the same "intrinsic limits" as under Section 110(k)(6). *Id.* at 80,508. But EPA has recently (and unlawfully) relied on Section 110(k)(6) when attempting to withdraw the approval of a state plan that was *valid* when promulgated, arguing that it may withdraw its prior approvals of state plans because EPA "would not have approved" the submissions if "updated" data had been available in the past. *See, e.g.*, 89 Fed. Reg. at, 12,694. This attempt to reimagine §7410(k)(6) to give EPA authority to withdraw state plan approvals and issue its own federal plan whenever EPA deems circumstances have changed, now imported to Section 111(d), adds powers to EPA's arsenal nowhere authorized by the Act.

**2.** EPA's justifications for giving itself these new substantive powers fail. EPA "interprets" Section 111(d)(1) and (d)(2) as "collectively providing the authority to provide for procedures for ensuring that state plans remain 'satisfactory.'" 88 Fed. Reg. at 80,507. Despite refusing to draw *procedural*

*deadlines* from Section 110, *supra* II.B.1, EPA believes it is "reasonable to look to other mechanisms" that Congress has established in other sections of the Act and "incorporat[e]" those "mechanisms" into the Final Rule, even if Congress did not include those provisions in Section 111(d). *Id.* It's not.

First, EPA contends it may establish them through regulation because Section 111(d)(1) directs EPA "to prescribe regulations establishing a procedure similar to that provided by … section 110 for the submission of state plans." *Id.* at 80,506. But EPA authority to "establish a *procedure*" governing "*submi[ssion]*" of state plans to EPA, § 7411(d)(1) (emphasis added), does not authorize EPA to promulgate regulations giving EPA *substantive* power to revisit state plans potentially years after submission and approval. *See* 88 Fed. Reg. at 80,506 (describing changed "legal or technical conditions" and inadequate "implementation" as justifications for a state plan call, both of which could arise long after EPA approves an initial plan). Those kinds of regulations neither establish "procedures" nor involve State's "submi[ssion]" of plans to EPA.

Further, EPA's interpretation renders part of Section 111(d) superfluous. If Section 111(d)(1) did, in fact, require "EPA to promulgate procedures for section 111(d) that are comparable to [Section 110] procedures for the overall state plan process," *id.* at 80,503, Section 111(d)(2)(A) would be unnecessary. There would be no need for another provision granting EPA the "same authority" to promulgate federal plans as it has in Section 110(c), like Section 111(d)(2)(A) does. "When a statutory construction … 'render[s] an

entire subparagraph meaningless,' … the canon against surplusage applies with special force." *Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024) (citation omitted). Section 111(d)(1) therefore cannot authorize EPA to promulgate regulations mirroring all of Section 110's provisions for "the entire state plan process." 88 Fed. Reg. at 80,503.

EPA likewise relies on Section 111(d)(2), which grants EPA "the same authority" to "*prescribe*" a federal plan when States do not "submit a satisfactory plan" as Section 110(c) authorizes when States fail to "submit an implementation plan" under that Section. § 7411(d)(2)(A) (emphasis added). But Section 111(d)(2) says nothing about "other mechanisms" adding to EPA's power unrelated to promulgating federal plans found outside Section 110(c). 88 Fed. Reg. at 80,507. Indeed, the error-correction and call-for-plan-revision powers EPA wants to import are codified in Section 110(k)(5) and (6)—which Section 111(d) does not cross-reference. Likewise with Section 111(d)(2)(B), which incorporates specific enforcement powers found in Sections 113 and 114 that have nothing to do with error correction or calls for plan revisions.

These references to particular sections of the Act do not authorize EPA to wield powers from *unreferenced* sections. Again, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress" did so "intentionally." *Russello*, 464 U.S. at 23 (quotation marks and citation omitted). Congress granted EPA these powers under Section 110 but chose not to

under Section 111. EPA may not delegate to itself "power based solely on the fact that there is not an express withholding of such power," *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995), especially when it was "explicitly" granted that power in other provisions of the same statute, *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020).

## CONCLUSION

This Court should vacate the Final Rule.

Dated: June 7, 2024

Respectfully submitted,
*/s/ Mithun Mansinghani*

PATRICK MORRISEY
   ATTORNEY GENERAL
Michael R. Williams
  *Principal Deputy Solicitor General*
Spencer J. Davenport
  *Assistant Solicitor General*
Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
   ATTORNEY GENERAL
Edmund G. LaCour Jr.
  *Solicitor General*

GENTNER DRUMMOND
   ATTORNEY GENERAL
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102
(512) 693-8350

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

TREG TAYLOR
   ATTORNEY GENERAL
Garrison Todd
  *Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
garrison.todd@alaska.gov

*Counsel for State of Alaska*

CHRISTOPHER M. CARR
   ATTORNEY GENERAL
Stephen J. Petrany
  *Solicitor General*
Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Ste 700
Washington, DC 20001

Drew F. Waldbeser
Adeline Kenerly Lambert
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*Counsel for State of Oklahoma*

TIM GRIFFIN
   ATTORNEY GENERAL
Nicholas J. Bronni
  *Solicitor General*
Dylan Jacobs
  *Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007 (main)
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for State of Arkansas*

RAÚL R. LABRADOR
   ATTORNEY GENERAL
Joshua N. Turner
  *Acting Solicitor General*
Scott L. Campbell

THEODORE E. ROKITA
   ATTORNEY GENERAL
James A. Barta
  *Solicitor General*
Office of the Attorney General of
Indiana
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

KRIS KOBACH
   ATTORNEY GENERAL
Anthony J. Powell
  *Solicitor General*
Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 368-8197
anthony.powell@ag.ks.gov

*Counsel for State of Kansas*

LIZ MURRILL
   ATTORNEY GENERAL
J. Benjamin Aguiñaga
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
AguinagaB@ag.louisiana.gov

  *Deputy Attorney General*
  *Chief, Energy and Natural*
  *Resources Division*
Office of the Attorney General of
Idaho P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
josh.turner@ag.idaho.gov

*Counsel for State of Idaho*

BRENNA BIRD
   ATTORNEY GENERAL
Eric H. Wessan
  *Solicitor General*
Office of the Attorney General of
Iowa
1305 E. Walnut Street
Des Moines, IA 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RUSSELL COLEMAN
   ATTORNEY GENERAL
Matthew F. Kuhn
  *Solicitor General*
Office of Kentucky Attorney
General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for State of Louisiana*

ANDREW BAILEY
  ATTORNEY GENERAL
Joshua M. Divine
  *Solicitor General*
Samuel C. Freedlund
  *Deputy Solicitor General*
Missouri Attorney General's Office
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for State of Missouri*

MICHAEL T. HILGERS
  ATTORNEY GENERAL
Lincoln J. Korell
  *Assistant Solicitor General*
Office of the Attorney General of
Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
lincoln.korell@nebraska.gov

*Counsel for State of Nebraska*

DAVE YOST
  ATTORNEY GENERAL
T. Elliot Gaiser
  *Solicitor General*

*Counsel for the Commonwealth of
Kentucky*

LYNN FITCH
  ATTORNEY GENERAL
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

AUSTIN KNUDSEN
  ATTORNEY GENERAL
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for State of Montana*

DREW H. WRIGLEY
  ATTORNEY GENERAL

Mathura Sridharan
  *Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 466-8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for State of Ohio*

MARTY J. JACKLEY
   ATTORNEY GENERAL
Steven Blair
  *Deputy Attorney General*
South Dakota Attorney General's
Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

KEN PAXTON
   ATTORNEY GENERAL
Brent Webster
  *First Assistant Attorney General*
James Lloyd
  *Deputy Attorney General for Civil
  Litigation*
Kellie E. Billings-Ray
  *Chief, Environmental Protection
  Division*
Clayton Smith

Philip Axt
  *Solicitor General*
Office of Attorney General of
North Dakota
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

ALAN WILSON
   ATTORNEY GENERAL
Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*
Joseph D. Spate
  *Assistant Deputy Solicitor General*
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for State of South Carolina*

JONATHAN SKRMETTI
   ATTORNEY GENERAL AND REPORTER
Whitney Hermandorfer
  *Director of Strategic Litigation*

*Assistant Attorney General*
Office of the Attorney General of
Texas Environmental Protection
Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
Clayton.Smith@oag.texas.gov

*Counsel for State of Texas and the Texas
Commission on Environmental Quality*

JASON MIYARES
   ATTORNEY GENERAL
Kevin M. Gallagher
 *Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of
Virginia*

WARREN PETERSON
   PRESIDENT OF THE ARIZONA STATE
   SENATE
By counsel:
Rusty D. Crandell
 *Majority General Counsel*
Arizona State Senate
1700 W. Washington St.
Phoenix, Arizona 85007

Office of the Attorney General
and Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*

SEAN REYES
   ATTORNEY GENERAL
Christopher A. Bates
 *Deputy Solicitor General*
Utah Attorney General's Office
160 East 300 South, 6th Floor
P.O. Box 140854
Salt Lake City, UT 84114
(801) 366-0260
chrisbates@agutah.gov

*Counsel for State of Utah*

BRIDGET HILL
   ATTORNEY GENERAL
D. David DeWald
 *Deputy Attorney General*
Office of the Attorney General of
Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*

(602) 926-3137
rcrandell@azleg.gov

*Counsel for Arizona Legislature*

B<small>EN</small> T<small>OMA</small>
   S<small>PEAKER OF THE</small> A<small>RIZONA</small> H<small>OUSE OF</small>
   R<small>EPRESENTATIVES</small>
By counsel:
Linley Wilson
  *Majority General Counsel*
Arizona House of Representatives
1700 W. Washington St.
Phoenix, Arizona 85007
(602) 926-5418
LWilson@azleg.gov

*Counsel for Arizona Legislature*

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Palatino Linotype, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of 13,000 words imposed by this Court's April 24, 2024 order concerning the briefing format in this case, Document No. 2051259, *West Virginia v. EPA*, No. 24-1009 (D.C. Cir.), because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 12,993 words according to the count of Microsoft Word.


/s/ *Mithun Mansinghani*
Mithun Mansinghani

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2024, I electronically filed the foregoing using the Court's CM/ECF system, which will send notification of such filing to the Parties.

*/s/ Mithun Mansinghani*
Mithun Mansinghani