UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF WEST VIRGINIA, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

Petition for Review of Action of the
U.S. Environmental Protection Agency

**FINAL BRIEF FOR RESPONDENTS**

TODD KIM
Assistant Attorney General

TSUKI HOSHIJIMA
Environment and Natural Resources
 Division
U.S. Department of Justice
P.O. Box 7411
Washington, D.C. 20044
(202) 532-3285
tsuki.hoshijima@usdoj.gov

Of Counsel:

STEPHANIE L. HOGAN
NORA GREENGLASS
U.S. Environmental Protection
 Agency

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Respondents submits this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this Court are listed in the opening brief for Petitioners.

Texas Oil and Gas Association was granted leave to participate as amicus curiae. Order (June 26, 2024), ECF#2061750.

### B.    Rulings Under Review

The agency action under review is EPA's rule titled "Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations Under Clean Air Act Section 111(d)," 88 Fed. Reg. 80480 (Nov. 17, 2023).

### C.    Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Tsuki Hoshijima*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
      RELATED CASES.............................................................i

TABLE OF AUTHORITIES....................................................iv

GLOSSARY ...........................................................................xi

INTRODUCTION ................................................................... 1

STATEMENT OF THE ISSUES............................................... 3

PERTINENT STATUTES AND REGULATIONS ..................... 3

STATEMENT OF THE CASE ................................................. 3

I.      Clean Air Act section 7411................................................ 3

II.     Previous implementing regulations ................................. 6

III.    The Rule............................................................................ 9

SUMMARY OF THE ARGUMENT ........................................ 10

STANDARD OF REVIEW..................................................... 15

ARGUMENT ........................................................................ 16

I.      EPA appropriately revised its regulations to clarify its
      long-standing framework governing when a state plan
      may deviate from EPA's emission guidelines. ............... 16

      A.    EPA's approach is consistent with the best
            reading of the statute and is reasonable............................ 17

      B.    EPA's approach has been consistent for decades. ................ 27

      C.    West Virginia's remaining counterarguments lack
            merit. ........................................................................ 31

II.   EPA established a reasonable default deadline for state
      plan submission. ............................................................... 42

      A.   Consistent with this Court's prior decision, EPA
           reasonably balanced competing considerations. .................... 43

      B.   West Virginia's remaining counterarguments
           about the state plan submission deadline lack
           merit. ................................................................................ 51

      C.   West Virginia's argument about the federal plan
           deadline is misdirected and lacks merit. .............................. 58

III.  The Rule adopts commonsense procedures for state
      plan calls and error correction. ...................................................... 62

CONCLUSION ........................................................................................ 68

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004) ....................................................................... 26

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011) ................................................................... 5, 29

*Am. Lung Ass'n v. EPA,*
985 F.3d 914 (D.C. Cir. 2021) ....................... 8, 9, 42, 43, 53, 54, 62

*Branch v. Smith,*
538 U.S. 254 (2003) ....................................................................... 37

*California v. EPA,*
360 F. Supp. 3d 984 (N.D. Cal. 2018) ........................................... 56

*Catawba Cnty. v. EPA,*
571 F.3d 20 (D.C. Cir. 2009) ......................................................... 65

*EME Homer City Generation, L.P. v. EPA,*
795 F.3d 118 (D.C. Cir. 2015) ....................................................... 67

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v.
EPA,*
94 F.4th 77 (D.C. Cir. 2024) .................................................... 31, 33

*EPA v. EME Homer City Generation, L.P.,*
572 U.S. 489 (2014) ....................................................................... 61

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ....................................................................... 19

*George v. McDonough,*
596 U.S. 740 (2022) ....................................................................... 38

*Kucana v. Holder*,
    558 U.S. 233 (2010) .................................................. 37, 38

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................... 15, 16, 18, 27

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ............................... 15

*Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000) ................................ 67

*Mississippi v. EPA*,
    744 F.3d 1334 (D.C. Cir. 2013) .............................. 49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................... 15

*Nat'l-Southwire Aluminum Co. v. EPA*,
    838 F.2d 835 (6th Cir. 1988) ................................ 34

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ......................................... 20

*Sierra Club v. Leavitt*,
    355 F. Supp. 2d 544 (D.D.C. 2005) .......................... 56

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................... 15

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013) ............................... 67

*Train v. NRDC*,
    421 U.S. 60 (1975) ....................................... 32, 33

*Union Elec. Co. v. EPA*,
    427 U.S. 246 (1976) ......................................... 33

*United States v. Knauer,*
 707 F. Supp. 2d 379 (E.D.N.Y. 2010) ................................ 39

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
 435 U.S. 519 (1978) ............................................................ 66

*West Virginia v. EPA,*
 597 U.S. 697 (2022) .................... 1, 4, 5, 9, 17, 21, 22, 30, 31, 36, 41

*Weyerhaeuser Co. v. Costle,*
 590 F.2d 1011 (D.C. Cir. 1978) ........................................ 40

**Statutes**

5 U.S.C. § 553(b)(4)(B) ........................................................ 67

16 U.S.C. § 460cc-2(f) .......................................................... 39

42 U.S.C. § 6924(m)(1) ........................................................ 41

42 U.S.C. § 7410 ............................................................ 32, 54

42 U.S.C. § 7410(a) .............................................................. 14

42 U.S.C. § 7410(a)(1) .......................................................... 52

42 U.S.C. § 7410(c)(1) ...................................................... 54, 61

42 U.S.C. § 7410(k)(5)-(6) .................................................... 64

42 U.S.C. § 7411(a)(1) ............................... 4, 21, 22, 34, 36

42 U.S.C. § 7411(a)(2) .......................................................... 48

42 U.S.C. § 7411(a)(6) .......................................................... 48

42 U.S.C. § 7411(b)(1)(A) ...................................................... 3

42 U.S.C. § 7411(b)(1)(B) ...................................................... 4

42 U.S.C. § 7411(d) ................................................... 11, 14, 36

42 U.S.C. § 7411(d)(1) .................................... 4, 5, 14, 16, 20, 22, 33, 62, 64

42 U.S.C. § 7411(d)(2) ................................................... 38

42 U.S.C. § 7411(d)(2)(A) ...................... 1, 5, 14, 16, 21, 36, 61, 62, 64, 67

42 U.S.C. § 7416 ................................................... 20, 54

42 U.S.C. § 7429(b)(2) ................................................... 45

42 U.S.C. § 7475(a)(4) ................................................... 26

42 U.S.C. § 7475(e)(3) ................................................... 36

42 U.S.C. § 7479(3) ................................................... 26

42 U.S.C. § 7491(b)(1) ................................................... 36

42 U.S.C. § 7491(b)(2) ................................................... 36

42 U.S.C. § 7513a(a)(2)(B) ................................................... 46

42 U.S.C. § 7513a(b)(2) ................................................... 46

42 U.S.C. § 7543(e)(2)(A) ................................................... 36

42 U.S.C. § 7601(a)(1) ................................................... 66

42 U.S.C. § 7604(a)(2) ................................................... 56

42 U.S.C. § 7607(b)(1) ................................................... 42

42 U.S.C. § 7607(d) ................................................... 15

42 U.S.C. § 7607(d)(1)(V) ................................................... 15

42 U.S.C. § 7607(d)(9) ................................................... 15

42 U.S.C. § 13201 ................................................ 35

42 U.S.C. § 13235(a)(1) ........................................ 35

Clean Air Act Amendments of 1977, Pub. L. No. 95-95,
    § 109(b)(1),
     90 Stat. 685 ................................................... 7

Pub. L. No. 100-4, sec. 306(a), 101 Stat. 7, 35 (1987) (codified
    at 33 U.S.C. § 1311(n)) ..................................... 40

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, tit.
    I, § 108(e)-(g), tit. III, § 302(a), (b), tit. IV, § 403(a), 104
    Stat. 2399 ....................................................... 7

**Rules**

Fed. R. Civ. P. 24(a) ............................................ 19

**Regulations**

40 C.F.R. part 60, subpart B ................................. 6

40 C.F.R. part 60, subpart Ba ............................. 8, 9

40 C.F.R. § 60.23(a) ............................................ 6

40 C.F.R. § 60.23(a)(1) ............................. 42, 48, 49

40 C.F.R. § 60.24(c) ........................................ 28, 34

40 C.F.R. § 60.24(d) ............................................ 7

40 C.F.R. § 60.24(f) ........................................ 7, 28

40 C.F.R. § 60.24(f)(1)-(3) ................................... 29

40 C.F.R. § 60.27 ............................................... 66

40 C.F.R. § 60.27(c) ........................................... 61

40 C.F.R. § 60.20a(a)(1) ................................................ 10, 50

40 C.F.R. § 60.22a(b)(5) ................................................. 5, 21

40 C.F.R. § 60.23a ........................................................... 64

40 C.F.R. § 60.24a ...................................................... 25, 41

40 C.F.R. § 60.24a(c) ........................................................ 34

40 C.F.R. § 60.24a(e)(1)(i)-(iii) ...................................... 29

40 C.F.R. § 60.24a(e)(2) .................................................. 23

40 C.F.R. § 60.24a(f)(1) ................................................... 24

40 C.F.R. § 60.27a(c)(1) .................................................. 51

40 C.F.R. § 60.27a(c)(1)-(2) ........................................... 60

40 C.F.R. § 60.27a(g) ....................................................... 58

40 C.F.R. § 60.27a(g)(1) ................................................... 59

40 C.F.R. § 60.27a(i) ........................................................ 62

40 C.F.R. § 60.27a(j) .................................................. 51, 64

40 C.F.R. § 60.1570 .......................................................... 47

40 C.F.R. § 60.1575 .......................................................... 47

40 C.F.R. § 60.2996-.2997 .............................................. 47

40 C.F.R. § 268.44 ............................................................ 40

## Federal Register

40 Fed. Reg. 53340 (Nov. 17, 1975).................. 6, 7, 27, 28, 29, 33, 34, 53, 66.......................................................................................

63 Fed. Reg. 57356 (Oct. 27, 1998) ........................................................ 67

76 Fed. Reg. 48208 (Aug. 8, 2011) .......................................................... 67

84 Fed. Reg. 32520 (July 8, 2019) ................................. 8, 29, 41, 53, 60, 61

88 Fed. Reg. 9336 (Feb. 13, 2023) .......................................................... 53

88 Fed. Reg. 80480 (Nov. 17,
    2023)...........................................................................................
    .....……..1, 5, 6, 7, 9, 10, 15, 16, 17, 19, 21, 22, 23, 24, 25, 26, 29, 30,
    32, 38, 39, 40, 42, 43, 44, 45, 46, 49, 50, 51, 53, 54, 55,
    56, 57, 58, 59, 60, 61, 62, 63, 64, 66, 67, 68

89 Fed. Reg. 16820 (Mar. 8, 2024) .................................................... 47, 50

89 Fed. Reg. 39798 (May 9, 2024).......................................................... 50

**Legislative History**

H.R. Rep. No. 91-1146 (1970)..................................................................... 44

**Other Authorities**

Fed. R. Civ. P. 24 advisory committee's note to 1966
    amendment ......................................................................................... 19

Webster's Third New International Dictionary 1908 (Philip
    Babcock Gove et al. eds., 1968 ed.) ................................................ 34

# GLOSSARY

EPA           U.S. Environmental Protection Agency

**INTRODUCTION**

Under Clean Air Act section 7411(d), EPA and the States each have roles to play in regulating existing sources of air pollution. EPA, which has the "primary regulatory role," promulgates emission guidelines in which it "decides the amount of pollution reduction that must ultimately be achieved." *West Virginia v. EPA*, 597 U.S. 697, 710 (2022). States develop plans to implement and enforce standards in accordance with EPA's emission guidelines, and States submit those plans to EPA. *Id.* EPA then reviews the plans to ensure that they are "satisfactory." 42 U.S.C. § 7411(d)(2)(A). EPA's implementing regulations have long governed how this process works.

In the Rule at issue, EPA revised those implementing regulations. 88 Fed. Reg. 80480 (Nov. 17, 2023). Petitioners (collectively, "West Virginia") challenge three discrete aspects of the Rule. All three challenges lack merit.

First, EPA appropriately revised its regulations governing when a state plan may deviate from EPA's emission guidelines. EPA did so consistent with the best reading of the statute, as well as the approach that it has taken for nearly fifty years. West Virginia's objections are

based on an alternative vision of the statute that departs from the plain text and would reduce EPA's regulatory determinations to mere suggestions that States could freely ignore. That vision would upend the statutory allocation of responsibilities and hinder the achievement of the statute's pollution-reduction requirements.

Second, EPA set a default deadline for state plan submission that balances two competing considerations: giving States enough time to develop satisfactory plans and ensuring the prompt achievement of pollution reductions that the statute requires. EPA reasonably exercised its judgment in striking that balance. Plus, this deadline is merely a default that can be superseded in particular emission guidelines, and there are no sanctions for States that miss the deadline.

Third, EPA added several commonsense mechanisms to its procedures. The two mechanisms challenged here ensure the proper functioning of the statutory framework by allowing EPA to call for the revision of state plans that no longer meet legal requirements and by allowing EPA to correct errors that it made when initially reviewing state plans.

The petition should be denied.

## STATEMENT OF THE ISSUES

1.      Whether EPA appropriately revised its regulations to clarify its long-standing framework governing when a state plan may deviate from EPA's emission guidelines.

2.      Whether EPA reasonably balanced competing considerations to establish a default deadline of eighteen months for States to submit their plans.

3.      Whether EPA appropriately adopted commonsense procedures to call for States to revise noncompliant plans and to correct EPA's own errors.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations, other than those already included in West Virginia's statutory addendum, are contained in a separately filed addendum.

## STATEMENT OF THE CASE

### I.      Clean Air Act section 7411

Section 7411(b) of the Clean Air Act directs EPA to identify categories of stationary sources that cause or contribute significantly to dangerous air pollution. 42 U.S.C. § 7411(b)(1)(A). EPA must establish federal standards of performance that apply directly to new sources in

those categories. *Id.* § 7411(b)(1)(B). Standards of performance must reflect the degree of emission limitation that can be achieved by applying the "best system of emission reduction" that (considering certain specified factors) EPA determines has been adequately demonstrated. *Id.* § 7411(a)(1).

Once EPA has promulgated a new-source standard, the statute requires EPA to address emissions from existing sources that, if they were new, would be subject to the new-source standard. *Id.* § 7411(d)(1) (excluding certain pollutants from these sources that are regulated under other provisions). The statute directs EPA to "prescribe regulations" that "establish a procedure similar to that provided by [42 U.S.C. § 7410]" under which each State will submit a plan to EPA that establishes standards of performance for existing sources in that State. *Id.* § 7411(d)(1).

Although States promulgate the standards that directly govern existing-source emissions, EPA retains the "primary regulatory role." *West Virginia*, 597 U.S. at 710. "The Agency, not the States, decides the amount of pollution reduction that must ultimately be achieved." *Id.* State plans must not "exceed the permissible level of pollution

established by EPA." *Id.* But EPA's "[r]egulations . . . shall permit"
States to set less stringent standards if justified by source-specific
circumstances, such as a source's "remaining useful life." 42 U.S.C.
§ 7411(d)(1).

EPA meets its section 7411(d) obligation to "establish a procedure"
both by promulgating general implementing regulations that govern
state plan submission and EPA's review, as in this Rule, and by
promulgating "emission guidelines" for specific source categories. 88
Fed. Reg. at 80482. In emission guidelines, EPA identifies the best
system of emission reduction for existing sources, as well as the degree
of emission limitation achievable by applying that system. *Id.* at 80483;
40 C.F.R. § 60.22a(b)(5). Once EPA establishes emission guidelines for a
source category, States develop plans to regulate existing sources "in
compliance with those guidelines and subject to federal oversight." *Am.
Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). As part of its
oversight role, EPA must ensure that state plans are "satisfactory." 42
U.S.C. § 7411(d)(2)(A). EPA must prescribe a federal plan for any State
that does not submit a satisfactory plan. *Id.*

## II.    Previous implementing regulations

EPA first promulgated section 7411(d) implementing regulations nearly fifty years ago. 40 Fed. Reg. 53340 (Nov. 17, 1975) (codified at 40 C.F.R. part 60, subpart B). The 1975 regulations gave States nine months to submit plans that implement EPA's emission guidelines. *Id.* at 53347 (40 C.F.R. § 60.23(a)).

The 1975 implementing regulations also established criteria for when state plans could deviate from EPA's emission guidelines. For health-related pollutants (pollutants that may endanger public health), States generally had to set standards that were "no less stringent than" the emission guidelines. *Id.* (40 C.F.R. § 60.24(c)). Although EPA recognized that the statute at the time did not expressly contemplate States deviating from emission guidelines, EPA explained that it was permissible to allow variances to account for source-specific issues, such as economic hardship. *Id.* at 53344; *see also* 88 Fed. Reg. at 80509 & n.67. EPA thus included a regulatory variance provision that allowed States to apply less stringent standards based on cost, physical impossibility, or other source-specific factors that make a less stringent standard significantly more reasonable. 40 Fed. Reg. at 53344 (40

C.F.R. § 60.24(f)). For welfare-related pollutants (pollutants that may endanger public welfare but are not known to harm public health), the regulations gave States more flexibility to deviate from emission guidelines. *Id.* at 53344, 53347 (40 C.F.R. § 60.24(d)).

In 1977, Congress amended the statute to codify EPA's authority to allow state plans to vary from EPA's emission guidelines. Congress did so by adding language to section 7411(d)(1) stating that EPA's "[r]egulations . . . shall permit" States to "take into consideration, among other factors, the remaining useful life of the existing source." Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 109(b)(1), 91 Stat. 685, 699.

EPA did not revise its regulatory variance provision following the 1977 statutory amendment. That was because EPA concluded that its existing regulations were already consistent with the amended statute. 88 Fed. Reg. at 80509. Congress subsequently amended other parts of section 7411, including in 1990, with no indication that Congress considered EPA's regulations to be out of step with its 1977 "shall permit" directive. *See* Clean Air Act Amendments of 1990, Pub. L. No.

101-549, tit. I, § 108(e)-(g), tit. III, § 302(a), (b), tit. IV, § 403(a), 104 Stat. 2399, 2467, 2574, 2631.

EPA did not significantly revise the implementing regulations until 2019. 84 Fed. Reg. 32520 (July 8, 2019) (codified at 40 C.F.R. part 60, subpart Ba). In 2019, EPA extended the default state plan submission deadline from nine months to three years. *Id.* at 32567-68, 32576. EPA also updated the provisions governing when state plans may deviate from EPA's emission guidelines. *Id.* at 32570-71. The revisions eliminated the 1975 distinction between health-related and welfare-related pollutants. *Id.* The 2019 regulations otherwise retained the language of the 1975 regulations by providing that for all pollutants, a State may deviate from emission guidelines based on cost, physical impossibility, or other source-specific factors that make a less stringent standard significantly more reasonable. *Id.* at 32577.

In 2021, the D.C. Circuit vacated several provisions of the 2019 regulations related to timelines, including the three-year deadline for state plan submission. *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 991-95

(D.C. Cir. 2021).[1] The D.C. Circuit concluded that when extending the deadlines, EPA did not consider the environmental and public health effects of delaying emission reductions. *Id.* No party petitioned for the Supreme Court's review of that part of the D.C. Circuit's opinion, and the Supreme Court did not address it when it reversed on other grounds. *See West Virginia*, 597 U.S. 697; Amended Judgment, *Am. Lung Ass'n*, No. 19-1140 (D.C. Cir. Oct. 27, 2022), ECF#1970898.

## III.   The Rule

The Rule revises several aspects of the section 7411(d) implementing regulations in 40 C.F.R. part 60, subpart Ba. The individual regulatory provisions have independent justifications and are severable from one another. 88 Fed. Reg. at 80482.

As relevant here, the Rule revises the existing implementing regulations to clarify when state plans may deviate from EPA's emission guidelines based on a source's remaining useful life or other factors. *Id.* at 80508-31, 80543. It also establishes a default eighteen-

---

[1]    Many of the States challenging this Rule intervened in defense of the 2019 regulations. *See* Mot. of West Virginia and Other States to Intervene as Respondents, *Am. Lung Ass'n v. EPA*, No. 19-1140 (D.C. Cir. Sept. 12, 2019), ECF#1806337.

month deadline for state plan submissions. *Id.* at 80487-90, 80543.

Finally, the Rule streamlines the processes for EPA review and action on state plans by adopting various procedural mechanisms that exist in section 7410. Those procedures allow for: EPA's partial approval and partial disapproval of state plans; EPA's conditional approval of state plans; EPA's parallel processing of a state plan submission while a State completes its full process to adopt the plan; EPA's call for revision of state plans that are substantially inadequate; and EPA's correction of its own errors made when previously reviewing state plans. *Id.* at 80502-08, 80544-55.

The revised implementing regulations apply to emission guidelines published after June 2019, except that an emission guideline may supersede any provision in the implementing regulations. 88 Fed. Reg. at 80485; 40 C.F.R. § 60.20a(a)(1).

## SUMMARY OF THE ARGUMENT

**I.** The Rule revises the existing implementing regulations to clarify when state plans may deviate from EPA's emission guidelines. It does so consistent with both the best reading of the statute and EPA's consistent approach for nearly fifty years.

Under section 7411(d), EPA's "[r]egulations . . . shall permit" States to consider source-specific factors. The Rule does just that. West Virginia argues that EPA's regulations, in doing so, may not limit States' discretion to consider source-specific circumstances. That view is not supported by the statutory text, statutory structure, or history. West Virginia would rewrite the statute to guarantee the discretion of States to consider source-specific factors in whatever manner they please. But in fact, Congress left room for EPA to fill up the details for how States can consider such factors.

West Virginia's reading, moreover, ignores the statutory text that surrounds the "shall permit" language. As the Supreme Court has recognized, the statute assigns the primary regulatory role to EPA. EPA determines the best system of emission reduction that has been adequately demonstrated, as well as the degree of emission limitation achievable by applying the best system. The statute also assigns EPA the task of prescribing regulations that govern States' consideration of source-specific factors, as well as the task of substantively reviewing States' standards to ensure that they are "satisfactory." States establish standards based on EPA's determinations, unless States can justify a

less stringent standard based on source-specific factors. West Virginia's reading of the "shall permit" provision to give essentially unbounded discretion to States would undermine that entire statutory framework.

The statute authorizes EPA to determine by regulation how States can consider source-specific factors, and West Virginia has not shown that the way that EPA did so was arbitrary or capricious. Because EPA makes its regulatory determinations based on information about the whole industry, its determinations will be appropriate for most facilities in the source category. It would be inconsistent with the statute if a State were to deviate from EPA's determinations without identifying something specific about the source that is fundamentally different from the information that EPA considered in making its determinations.

The Rule's approach is consistent with the approach that EPA has taken for nearly fifty years. EPA's 1975 implementing regulations established substantive criteria for States' consideration of source-specific factors. So did EPA's 2019 regulations. The Rule merely restates and clarifies those long-standing criteria, and it should be upheld.

**II.** The Rule establishes an eighteen-month default deadline for states to submit plans, based on a reasonable balance between two competing considerations. EPA made sure to give States enough time to develop satisfactory plans, while also ensuring the prompt achievement of pollution reductions that Congress required. In doing so, EPA followed the Court's admonishment in *American Lung Ass'n* to consider both sides of the issue.

EPA relied primarily on Congress's judgments about reasonable timeframes for state plans under comparable Clean Air Act provisions. Many long-standing statutory deadlines require States to submit plans in eighteen months or less. EPA considered those provisions, and how they compare to section 7411(d), in setting the Rule's deadline for state plan submission.

EPA reasonably relied on those congressional judgments rather than focusing on how much time States have historically taken to submit Clean Air Act plans. How long States have taken in the past does not necessarily represent how long States actually need. And what the data does show is that enough States have submitted section 7411(d) plans in less than eighteen months to show that it is possible to

do so. EPA also did not carry over the three-year deadline for state plan submission under section 7410(a), which accounts for a level of state effort that is not comparable to state plans generally under section 7411(d).

The new default deadline of eighteen months is longer than the deadline in the 1975 implementing regulations, which was in place for decades. And eighteen months is especially reasonable because it can be superseded as necessary in a particular emission guideline. Further, there are no sanctions for States that do not meet the deadline.

**III.** The Rule adopts several commonsense procedures to ensure the proper functioning of the statutory framework. West Virginia challenges only two of them: a procedure for EPA to call for States to revise previously approved plans that are substantially inadequate, and a procedure for EPA to correct its own errors made when previously reviewing state plans. EPA has authority under sections 7411(d)(1) and (2)(A) to establish those procedures. That authority is not limited to establishing a procedure only for the initial step of state plan submission. Instead, EPA has the authority to establish procedures that govern the entire section 7411(d) process.

## STANDARD OF REVIEW

The Rule is subject to the rulemaking provisions in 42 U.S.C.
§ 7607(d). 88 Fed. Reg. at 80481 (making determination under
§ 7607(d)(1)(V)). Under those provisions, the Court may reverse EPA's
action only if it was "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9). The
Court applies "the same standard of review" as in Administrative
Procedure Act cases. *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir.
2020). This standard is narrow, and the Court cannot substitute its
policy judgment for EPA's. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.
Auto. Ins.*, 463 U.S. 29, 43 (1983).

An agency's statutory interpretation, made in pursuance of official
duty and based on specialized experience, constitutes a "'body of
experience and informed judgment to which courts and litigants [could]
properly resort for guidance,' even on legal questions." *Loper Bright
Enters. v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (alteration in
original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).
"[I]nterpretations issued contemporaneously with the statute at issue,

and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* at 2262.

## ARGUMENT

## I. EPA appropriately revised its regulations to clarify its long-standing framework governing when a state plan may deviate from EPA's emission guidelines.

Since 1975, EPA's implementing regulations have established criteria for when state plans may deviate from emission guidelines based on source-specific considerations. Those criteria give advance notice to States and the public of how EPA will determine whether a state plan is "satisfactory," 42 U.S.C. § 7411(d)(2)(A), and thus approvable. In this Rule, EPA revised those long-standing rules to clarify the framework for source-specific considerations. 88 Fed. Reg. at 80508. EPA did so to provide greater clarity and to ensure the predictable and equitable treatment of States and sources. *Id.* at 80512.

The Rule's approach is consistent with the best reading of the statute and with EPA's longtime practice. West Virginia's objections are based on an alternative vision of the statute that departs from the plain text and would reduce EPA's regulatory determinations to mere suggestions that States could freely ignore. That vision disregards

EPA's "primary regulatory role," *West Virginia*, 597 U.S. at 710, and would undermine the statute's pollution-reduction requirements.

## A. EPA's approach is consistent with the best reading of the statute and is reasonable.

EPA has long complied with the statutory directive that its "[r]egulations . . . shall permit" States to consider remaining useful life and other source-specific factors. 42 U.S.C. § 7411(d)(1). In fact, EPA's implementing regulations have permitted States to do so since before that statutory directive even existed.

EPA continues to comply with the statutory directive because the Rule *does* permit States to consider source-specific factors. EPA merely clarified its existing provisions about how States may do so. 88 Fed. Reg. at 80512-31. EPA also added several new provisions, such as a procedure for calculating a less stringent standard and a provision that States may not apply a less stringent standard if a source can reasonably achieve the degree of emission limitation determined by EPA using some means other than the EPA-determined best system. *Id.*

West Virginia's challenge is not so much to those specific revisions, as it is a broad and atextual objection to the basic premise that EPA can establish rules that govern States' consideration of

source-specific factors. Under West Virginia's view, States essentially have carte blanche to set source-specific standards that depart from EPA's emission guidelines, subject only to a general reasonableness standard. Pet. Br. 16-23. West Virginia does not clearly articulate what, if any, regulations it thinks EPA may permissibly establish to govern States' consideration of source-specific factors. West Virginia seems to suggest that at most, EPA can regulate only the States' procedures for considering source-specific factors and that EPA cannot impose any substantive criteria for that consideration. *See id.* at 17-18.

West Virginia's view is not supported by the statutory text. West Virginia would rewrite the statute to guarantee the discretion of States to consider source-specific factors in whatever manner they please. But there is no language in the statute that confers such unbounded discretion on States. Rather, by directing EPA to promulgate these regulations, Congress gave EPA the discretion—subject to ordinary arbitrary-or-capricious review—to "fill up the details" of how States could consider source-specific factors. *Loper Bright*, 144 S. Ct. at 2263.

West Virginia counters by relying on a broad reading of "shall permit" to mean to allow unconditionally. Pet. Br. 23-24. But implicit

within the ordinary use of "permit" is the notion that there are parameters or conditions associated with allowing something to be done. 88 Fed. Reg. at 80510. A building permit, for instance, contains conditions and requirements such as mandatory compliance with safety codes. *Id.* West Virginia tries to sidestep that example by contriving a distinction between "permit" as a noun and as a verb. Pet. Br. 24. But the ordinary use of "permit" as a verb does not connote a blank check, either. A federal district court "must permit" certain persons to intervene, Fed. R. Civ. P. 24(a), but that does not mean that a court cannot impose reasonable conditions on the scope of intervention, *see* Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment ("An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.").

West Virginia's reading ignores the statutory text surrounding the phrase "shall permit." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("fundamental canon" that "words of a statute must be read in their context"). The best reading of that phrase in context is that Congress intended for EPA to fill up the details for how

States consider source-specific factors. There are three pieces of relevant statutory context.

The first piece of relevant context is that, in section 7411(d)(1)(A), Congress directed EPA to "prescribe regulations" that "shall permit" States to consider source-specific factors. 42 U.S.C. § 7411(d)(1). If Congress had not intended for EPA's regulations to govern that consideration, then Congress "could easily have chosen clearer language" that directly confers discretion on States—rather than language that speaks to EPA. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017). Or Congress would have expressly reserved the unbounded discretion of States to consider source-specific factors. *E.g.*, 42 U.S.C. § 7416 ("[N]othing in this chapter shall preclude or deny the right of any State . . . to adopt or enforce" more stringent requirements.).

Instead, Congress chose to assign EPA a role to play by directing EPA to prescribe regulations that define the "permi[ssible]" use of such considerations by States. In insisting that "shall permit" serves only as a "limit on EPA," Pet. Br. 23, West Virginia fails to recognize how Congress added that language to an existing authorization for EPA to prescribe regulations that govern the section 7411(d) process.

The second piece of relevant context is that the statute assigns to EPA, not States, the primary regulatory role. EPA considers the available systems of emission reduction, identifies the best of them, and determines the degree of emission limitation achievable by applying the best system. 42 U.S.C. § 7411(a)(1); 40 C.F.R. § 60.22a(b)(5); *West Virginia*, 597 U.S. at 710; 88 Fed. Reg. at 80483, 80509. There would be no reason for Congress to direct EPA to make that determination if States could disregard it at will.

The third piece of relevant context is that the statute directs EPA to substantively review state plans to ensure that they are "satisfactory." 88 Fed. Reg. at 80522; 42 U.S.C. § 7411(d)(2)(A). To be satisfactory, the standards in state plans must be consistent with the statute. 88 Fed. Reg. at 80511. It would be pointless for EPA to review state plans if the statute gave States unbounded discretion to set source-specific standards. EPA must ensure that consideration of source-specific factors does not undermine the "statutory purpose of reducing dangerous air pollution" and "the statutory framework . . . to achieve that purpose." *Id.* at 80512. The text of section 7411(d) contemplates States "applying . . . standard[s] of performance to . . .

particular sources," and as EPA explained, variances from environmental standards still require a "best effort to achieve the generally applicable standard." *Id.* at 80520.

Thus, "shall permit" must be read in the context of a statutory framework in which EPA has the primary authority to make regulatory determinations for the industry in general, EPA must prescribe regulations that govern States' consideration of source-specific factors, and EPA must substantively review the standards that States set. Allowing States to have limitless discretion to deviate from EPA's emission guidelines would undermine this statutory framework. The best reading of the statute is that EPA can determine by regulation when States may deviate.

The way that EPA did so was not arbitrary or capricious. EPA promulgates emission guidelines in which it determines the best system that is "reasonable for sources broadly within the source category." 88 Fed. Reg. at 80514. EPA considers information about "representative, average units" and "average values for the set of designated facilities." *Id.* at 80515. Because EPA's inquiry is based on information about the whole industry, it follows that "most designated facilities within the

source category" will be able to implement the best system at reasonable cost. *Id.* at 80514. Thus, the statutory default is that States must establish standards in their plans based on the determinations in EPA's emission guidelines. 42 U.S.C. § 7411(a)(1), (d)(1); *West Virginia*, 597 U.S. at 710.

It would be inconsistent with the statutory framework if a State were able to deviate from EPA's determinations without identifying a source-specific factor that EPA did not already take into account. Sometimes, deviation may be justified because EPA cannot "know and consider the idiosyncrasies" of each individual source or because "the circumstances of individual facilities [can] change after the EPA determined the [best system of emission reduction]." 88 Fed. Reg. at 80511. But there is no reason for a State to make a source-specific deviation if it cannot show that "something about the EPA's determination does not hold true for" that source. *Id.* at 80515.[2]

---

[2] For purposes of this Rule and the question of when States may deviate from emission guidelines, the reasonableness of emission guidelines should be taken as a given. A State can challenge EPA's emission guidelines, as West Virginia and other States are doing in this Court for recently promulgated emission guidelines. *West Virginia v. EPA*, No. 24-1120; *Texas v. EPA*, No. 24-1054.

The Rule thus requires that, to apply a standard that is less stringent than EPA's emission guidelines, a State must show "fundamental differences" between a source's circumstances and the information about the industry that EPA considered in establishing the guidelines. *Id.* at 80513-17, 80543 (40 C.F.R. § 60.24a(e)(2)). If a State were to establish a standard that is less stringent than EPA's emission guidelines when there is only an insubstantial difference, then that would undermine the determinations that Congress assigned to EPA under section 7411(a)(1). *Id.* at 80526-27. The fundamental-difference standard ensures that when States establish less stringent standards, they do so consistent with the statute and that the resulting plans are thus "satisfactory."

EPA also reasonably required that, to meet the "satisfactory" standard, a State that applies a less stringent standard based on a fundamental difference must apply a standard that is no less stringent than is necessary to address that fundamental difference. 88 Fed. Reg. at 80520. To that end, a State must evaluate systems of emission reduction using the "factors and evaluation metrics" that EPA used to evaluate those systems in the emission guidelines. *Id.* at 80521, 80543

(40 C.F.R. § 60.24a(f)(1)). Doing so is necessary "to be able to compare the information relevant to the source category . . . with the facility-specific information" to ensure that the State is applying a standard that is consistent with the statutory framework. *Id.* at 80521 & nn.129-30. This provision does not preclude a State from considering additional factors; in fact, the Rule recognizes that States may do so. 88 Fed. Reg. at 80521 (allowing States to consider "facility-specific circumstances and factors that the EPA did not anticipate and consider in the applicable [emission guideline]"). *Contra* Pet. Br. 22.

By clarifying when States may deviate from EPA's emission guidelines, the Rule informs States and the public in advance of the criteria by which EPA will conduct its substantive review of state plans under section 7411(d)(2)(A). Establishing the criteria ahead of time ensures that EPA's review of state plans is "predictable," 88 Fed. Reg. at 80512, as well as "fair and equitable," *id.* at 80511. But nothing in the Rule mandates uniformity across States, regardless of differences across sources. *See id.* at 80543 (40 C.F.R. § 60.24a). *Contra* Pet. Br. 29-30. The Rule merely promotes transparency and an even playing field

by laying out in advance the fixed criteria by which EPA will review all state plans.

West Virginia concedes that EPA may review state plans at least for reasonableness. Pet. Br. 15, 21 (citing *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 485, 487, 490 (2004)). But *Alaska Department of Environmental Conservation* does not establish that EPA's review of state plans under section 7411(d) must be limited to ensuring reasonableness. That case was about a different statutory program under which state permitting authorities determine the "best available control technology" "on a case-by-case basis." 42 U.S.C. §§ 7475(a)(4), 7479(3). That program provides States more discretion than section 7411(d), under which EPA determines the best system of emission reduction and the degree of emission limitation that must be achieved, and which specifically directs EPA to substantively review state plans to ensure that they are satisfactory.

But even if EPA's review of section 7411(d) plans were limited to ensuring reasonableness, the Rule would still be a valid way of implementing such review. As EPA explained, it is not reasonable for a State to deviate from the determinations that the statute directed EPA

to make unless there is a fundamental difference between source-specific information and what EPA already considered. 88 Fed. Reg. at 80526-27. West Virginia never explains why, in the context of section 7411(d)'s assignment of roles to EPA and States, a State could reasonably deviate from EPA's determinations in other circumstances.

## B. EPA's approach has been consistent for decades.

The Rule's approach to source-specific considerations is consistent with the approach that EPA has been taking since it first promulgated implementing regulations in 1975. Since Congress first enacted the statutory language at issue in 1977, EPA has interpreted the statute to allow that approach. Respect for an agency's statutory interpretation is "especially warranted" when, as here, "an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 144 S. Ct. at 2258.

In its 1975 rulemaking, EPA reviewed the history of the 1970 enactment of section 7411(d). 40 Fed. Reg. at 53342-43. EPA explained that Congress was dissatisfied with air-pollution control efforts to date and intended for EPA and States to take "swift and aggressive action."

*Id.* That required EPA to be able to review the substance of State plans because otherwise, "States could set extremely lenient standards—even standards permitting greatly increased emissions." *Id.* at 53343. And if EPA is to perform substantive review of state plans, then it benefits States, regulated entities, and the public "that the criteria be made known in advance." *Id.*

The 1975 implementing regulations thus established a procedure, as well as substantive criteria, for EPA's review of state plans. For health-related pollutants, the 1975 regulations required States to set standards that are "no less stringent" than EPA's emission guidelines. 40 Fed. Reg. at 53347 (40 C.F.R. § 60.24(c)). States could apply less stringent standards only if they showed: "(1) Unreasonable cost of control resulting from plant age, location, or basic process design; (2) Physical impossibility of installing necessary control equipment; or (3) Other factors specific to the facility (or class of facilities) that make application of a less stringent standard or final compliance time significantly more reasonable." 40 Fed. Reg. at 53347 (codified at 40 C.F.R. § 60.24(f)).

The Supreme Court recognized that under the 1975 regulations, States regulate existing sources "in compliance with [EPA's] guidelines and subject to federal oversight," except that "EPA may permit state plans to deviate from generally applicable emissions standards upon demonstration that costs are '[u]nreasonable.'" *Am. Elec. Power*, 564 U.S. at 424, 427 (quoting 40 C.F.R. § 60.24(f)).

EPA did not revise these regulations following the 1977 statutory amendment. That was because EPA concluded that its existing regulations were already consistent with the amended statute. 88 Fed. Reg. at 80509.

The 2019 regulations maintained the same approach. EPA extended the substantive criteria to all pollutants, whether or not they may endanger public health. Otherwise, EPA retained the criteria in the 1975 regulations. 84 Fed. Reg. at 32577.

The Rule merely restates and clarifies EPA's long-standing approach. *See* 88 Fed. Reg. at 80511 (explaining how both the previous and revised regulations "prescribe the series of steps and considerations states must undertake"). The Rule retains the language that has been in EPA's regulations since 1975 about "[u]nreasonable cost of control

resulting from plant age, location, or basic process design," "[p]hysical impossibility . . . of installing necessary control equipment," and other circumstances "specific to the facility." *Compare* 88 Fed. Reg. at 80543 (40 C.F.R. § 60.24a(e)(1)(i)-(iii)), *with* 40 Fed. Reg. at 53347 (40 C.F.R. § 60.24(f)(1)–(3)). EPA's revisions to the implementing regulations are clarifications of, not significant departures from, EPA's decades-long approach.

In particular, the fundamental-difference standard merely clarifies the existing standard that States had to meet to deviate from EPA's emission guidelines. 88 Fed. Reg. at 80513. EPA clarified the standard because prior language about "significantly more reasonable" was "vague and potentially open-ended." *Id.* at 80514. The revised standard "provides greater specificity." *Id.* at 80515. West Virginia does not explain why that clarification was impermissible. West Virginia instead makes a broader claim that essentially any restriction on state discretion is unlawful. But that view conflicts with EPA's consistent approach for decades.

### C. West Virginia's remaining counterarguments lack merit.

*First*, West Virginia articulates an alternative vision of the statute's cooperative-federalism scheme based on a selective reading of *West Virginia v. EPA*. West Virginia insists that EPA overstepped its bounds because "States set the actual rules." Pet. Br. 15 (quoting *West Virginia*, 597 U.S. at 710). But West Virginia does not even acknowledge other key language from the same paragraph in the Supreme Court's opinion. West Virginia simply tries to wish away the Supreme Court's recognition that EPA has "the primary regulatory role in Section [7411](d)." *West Virginia*, 597 U.S. at 710. EPA, "not the States, decides the amount of pollution reduction that must ultimately be achieved." *Id.* States must submit plans that do not "exceed the permissible level of pollution established by EPA." *Id.* All that inconvenient language is conspicuously absent from West Virginia's brief.

In articulating its alternative vision of unbounded state discretion, West Virginia hopes to revert to a time before the modern Clean Air Act, when States "generally retained wide latitude" over air-pollution regulation. *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v.*

*EPA*, 94 F.4th 77, 84 (D.C. Cir. 2024) (quoting *Train v. NRDC*, 421 U.S. 60, 64 (1975)). But in 1970, "frustrated with the states' lack of progress toward cleaner air," Congress "changed the regulatory paradigm" away from "the old, state-centered model." *Id.* Section 7411(d) is an instance in which Congress specifically designed a greater federal role in combatting air pollution.

Section 7411(d)'s provision for States' consideration of source-specific factors must be read consistent with that statutory design, rather than in a way that wholly undermines it. West Virginia's understanding of the statute would give States open-ended discretion to deviate from EPA's emission guidelines, altering EPA's role from the primary regulatory role to a mere advisory one. Under West Virginia's view, States could set any standards that they consider reasonable— even standards that allow a source to emit more pollution than EPA's emission guidelines when a source could meet those guidelines, and even standards that would allow a source to increase its emissions. To avoid allowing the "remaining useful life" provision to swallow the rest of the statute, EPA must ensure that States' consideration of source-specific factors does not "undermine" the general requirement that state

plans meet the level of protectiveness determined by EPA. 88 Fed. Reg. at 80512.

West Virginia also mistakenly relies on broad language about state discretion in cases addressing other Clean Air Act provisions, particularly section 7410. Pet. Br. 3-6, 20-23, 27-29. But there are critical differences between the cooperative-federalism schemes in sections 7410 and 7411(d). Section 7410 addresses pollutants for which EPA has established national ambient air quality standards. 42 U.S.C. § 7410. Within certain limitations and subject to EPA approval, States may decide how to regulate to achieve the air quality standards. *See Train*, 421 U.S. at 79. In general, States "determine which sources would be burdened by regulation and to what extent." *Union Elec. Co. v. EPA*, 427 U.S. 246, 269 (1976); *see also Env't Comm. of Fla. Elec. Power Coordinating Grp.*, 94 F.4th at 93.

In contrast, section 7411(d) leaves no room for States to decide which sources must be regulated, and EPA (not States) determines the best system that can be applied to existing sources and the emission reductions that can be achieved. To be sure, there are parallels between the two sections in how States submit plans and how EPA reviews

them. 42 U.S.C. § 7411(d)(1) (referencing a "procedure similar to that provided by section 7410"). But States have a greater role under section 7410 in designing the emission-control strategy. General statements about States' discretion under section 7410 thus have no bearing here.[3]

*Second*, West Virginia tries to locate additional state discretion in section 7411(a)'s command that a standard of performance must "reflect[]" EPA's determinations. Pet. Br. 14, 17 (quoting 42 U.S.C. § 7411(a)(1)). West Virginia, though, does not offer any definition of "reflect" other than to baldly assert that it implies wide discretion for States. In fact, "reflect" usually means to "mirror." *See* Webster's Third New International Dictionary 1908 (Philip Babcock Gove et al. eds., 1968 ed.). So state plans must generally mirror EPA's determinations,

---

[3] West Virginia relies on one section 7411 case with language about States' discretion, but its reliance is misplaced. Pet. Br. 5, 21 (citing *Nat'l-Southwire Aluminum Co. v. EPA*, 838 F.2d 835 (6th Cir. 1988)). West Virginia points out language in that case about States having "substantial latitude . . . in setting emission standards for welfare-related pollutants." *Nat'l-Southwire Aluminum*, 838 F.3d at 838. That language accurately describes the 1975 implementing regulations, which distinguished between health-related and welfare-related pollutants and gave States more flexibility as to the latter. 40 Fed. Reg. at 53340. But it does not accurately describe the statute, which does not provide any extra latitude to States for certain pollutants. Neither have the implementing regulations since EPA revised them in 2019.

not loosely abide by them or ignore them altogether. Indeed, EPA's regulations have long required that States' standards must generally be "no less stringent" than EPA's emission guidelines. 40 Fed. Reg. at 53347 (40 C.F.R. § 60.24(c)); *see also* 40 C.F.R. § 60.24a(c).

*Third*, West Virginia points out the mandatory "*shall* permit" in section 7411(d)(1). Pet. Br. 15. Again, the Rule complies with that directive by permitting States to consider source-specific circumstances, within parameters that ensure that such consideration does not subvert the rest of the statutory framework. When read in context of the entire statute, this particular use of "shall" does not require EPA to give States free rein in ways that would nullify the federal role.

West Virginia tries to compare the "shall permit" language to other provisions that, it says, more expressly authorize EPA to restrict States' discretion.[4] Pet. Br. 16-17. Those provisions are differently structured and do not lend themselves to the comparisons that West Virginia tries to draw. West Virginia says that its best example, Pet. Br.

---

[4]    West Virginia mistakenly claims, Pet. Br. 16, that 42 U.S.C. § 13235(a)(1) directs EPA to establish guidelines for state incentives for alternative fuels. That provision, which is not part of the Clean Air Act, is directed to the Secretary of Energy and not EPA. *See* 42 U.S.C. § 13201.

16-17, 27, is a regional-haze provision that directs EPA to provide guidelines for States' determinations of emission limitations. 42 U.S.C. § 7491(b)(1). Those guidelines are binding on States' determinations for certain large power plants, but not for other sources. *Id.* § 7491(b)(2). West Virginia argues that section 7411(d) does not include such language giving EPA the authority to bind States.

But the regional-haze provisions are inapposite. Unlike section 7491(b)(2), which does not subject smaller power plants to EPA's binding regulations, section 7411(d)(1) expressly commands that EPA prescribe regulations governing States' consideration of remaining useful life and other factors, and section 7411(d)(2)(A) requires EPA to review such consideration in state plans. The regional-haze provisions bear little structural resemblance to the way that section 7411(a)(1) and (d), read together, assign the "primary regulatory role" to EPA. *See West Virginia*, 597 U.S. at 710. Section 7491 thus has little value as an interpretive guide for section 7411. So too with 42 U.S.C. § 7543(e)(2)(A) and § 7475(e)(3), which use different language in different contexts from section 7411. *Contra* Pet. Br. 16.

*Fourth*, West Virginia errs in reading section 7411(d)'s history as evidence of congressional intent to confer expansive discretion on States. Pet. Br. 18-20. EPA's 1975 implementing regulations allowed States to deviate from EPA's emission guidelines based on certain source-specific considerations. Congress subsequently added the "remaining useful life" provision to section 7411(d) in the 1977 Clean Air Act amendments. West Virginia reads the 1977 legislation as codifying state discretion while "rejecting" EPA's authority to establish parameters on that discretion. Pet. Br. 19. But if that was Congress's intention, then Congress would have said so. Nothing in the statutory text or the legislative history of the 1977 Clean Air Act amendments, or any subsequent congressional action, indicates a rejection of EPA's 1975 approach. Just as an implied repeal of a statute is disfavored, *see Branch v. Smith*, 538 U.S. 254, 273 (2003), a congressional disapproval of an existing regulation should not be inferred from silence.

In fact, West Virginia has the history backwards: Congress in 1977 endorsed, rather than repudiated, EPA's existing approach. West Virginia cites *Kucana v. Holder*, 558 U.S. 233 (2010), Pet. Br. 19, but that case refutes West Virginia's position. The Court there concluded

that where Congress codifies one part of an existing regulation, "the Legislature's silence" on other issues addressed in the regulation means "that Congress left the matter where it was." *Kucana*, 558 U.S. at 250; *see also George v. McDonough*, 596 U.S. 740, 753 (2022). Here too, Congress acknowledged and chose to leave undisturbed EPA's authority to establish reasonable substantive criteria for how States consider source-specific factors.

That is why EPA did not revise its 1975 regulations following the 1977 statutory amendments. The 1975 regulations did not require revision because Congress left intact EPA's authority to set criteria governing States' consideration of source-specific factors. 88 Fed. Reg. at 80509. Under West Virginia's view, EPA's 1975 regulations would have been unlawful since 1977, and EPA's 2019 regulations would have been unlawful from the outset. But Congress has never expressed such a view despite having ample opportunity to do so when it subsequently amended other parts of section 7411, including in 1990. *Supra* pp.7-8.

The 1977 statutory amendments also required EPA itself to consider remaining useful life and other factors when promulgating a federal plan, but that does not support West Virginia's view either. Pet.

Br. 19-20 (citing 42 U.S.C. § 7411(d)(2)). All that means is that Congress required federal plans, like state plans, to account for source-specific considerations where warranted. It does not mean that States have unfettered discretion to consider source-specific factors whenever and however they choose.

West Virginia is also wrong when it accuses EPA of not imposing the same criteria on itself for considering source-specific factors when adopting a federal plan. Pet. Br. 20. EPA expressly stated that its regulations on remaining useful life and other factors would also "provide a framework for the EPA to use . . . when the Agency is promulgating a Federal plan." 88 Fed. Reg. at 80515; *see also id.* at 80508 n.63, 80510.

*Fifth*, West Virginia challenges EPA's statutory interpretation based on an out-of-circuit district court decision about a different statute. Pet. Br. 24-25 (citing *United States v. Knauer*, 707 F. Supp. 2d 379, 385 (E.D.N.Y. 2010)). The statute at issue there, 16 U.S.C. § 460cc-2(f), provides that the Secretary of the Interior "shall permit" hunting in the Gateway National Recreation Area but also that the Secretary "may designate" certain limitations on hunting. Whereas the statutory

framework there defaulted to allowing hunting, the statutory default here is that EPA makes the primary regulatory determinations—with States permitted to deviate when justified. The Illinois state statute that West Virginia cites, which is about visitor policies for correctional institutions, is irrelevant for similar reasons. Pet. Br. 25.

*Sixth*, West Virginia attacks EPA for referring to regulations under the Clean Water Act and the Resource Conservation and Recovery Act when it adopted the fundamental-difference standard in the Rule. Pet. Br. 25-27. But EPA reasonably drew on those examples as a guide for how to articulate an administrable regulatory standard for a variance. 88 Fed. Reg. at 80515, 80519-20. Those examples also confirm that EPA may establish such a standard by regulation. In the Clean Water Act example, this Court upheld EPA's establishment of a fundamental-difference standard in a regulation. *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1037-42 & n.37 (D.C. Cir. 1978). That decision predated Congress's addition to the Clean Water Act of a provision allowing EPA to establish an alternative requirement for a facility that is fundamentally different. Pub. L. No. 100-4, § 306(a), 101 Stat. 7, 35 (1987) (codified at 33 U.S.C. § 1311(n)). So West Virginia is wrong that

the lack of express "fundamentally different" language in section 7411(d) precludes EPA from using that standard in its regulatory implementation of the statute. The Resource Conservation and Recovery Act variance provision, 40 C.F.R. § 268.44, also does not reflect express variance language in the statute, 42 U.S.C. § 6924(m)(1). 88 Fed. Reg. at 80519-20. The fundamental-difference provision in the Rule, like those other regulations, is a reasonable regulatory implementation of EPA's statutory authority.

* * *

In sum, the Rule clarifies and restates criteria for States' consideration of source-specific factors that have been part of EPA's regulations for nearly fifty years. West Virginia's arguments lack a sound textual basis and conflict with decades of consistent practice. West Virginia's arguments are also generally based on an alternative view of the cooperative-federalism scheme that is at odds with *West Virginia*, 597 U.S. at 710.

The breadth of West Virginia's arguments also means that even a successful challenge to this Rule would not offer much practical relief. Vacatur of the "remaining useful life" provisions in this Rule would

merely resurrect those provisions in the 2019 regulations, which provide similar criteria for when States could deviate from EPA's emission guidelines. 84 Fed. Reg. at 32576-77 (40 C.F.R. § 60.24a). Those 2019 provisions are no longer open to challenge. *See* 42 U.S.C. § 7607(b)(1) (sixty-day bar). In fact, many of the States challenging this Rule intervened to defend the 2019 regulations rather than challenging them when they had a chance. *Supra* p.9 n.1.

## II. EPA established a reasonable default deadline for state plan submission.

EPA finalized a default deadline of eighteen months for States to submit plans. 88 Fed. Reg. at 80486; 40 C.F.R. § 60.23a(a)(1). EPA struck a reasonable balance between giving States enough time to develop satisfactory plans and ensuring the prompt achievement of pollution reductions that the statute requires. EPA considered both those competing considerations, consistent with this Court's decision in *American Lung Ass'n*, and exercised its judgment to determine the minimum time reasonably necessary for States. The default deadline is especially reasonable given that it can be superseded in particular emission guidelines and that there are no sanctions for States that do not meet the deadline.

## A. Consistent with this Court's prior decision, EPA reasonably balanced competing considerations.

Establishing a state plan submission deadline requires balancing two competing considerations. On one hand, States need time to develop satisfactory plans. On the other hand, as this Court recognized in *American Lung Ass'n*, there is also a "need for prompt reduction of . . . emissions," and there are real "human and environmental costs" to delay. 985 F.3d at 993. The "need for speed" is, "indeed, arguably the most important" aspect of the problem for EPA to consider because "[c]ontrol of emissions from existing sources before they harm people and the environment is the central purpose of Section 7411(d)." *Id.* at 993, 995. This Court vacated the three-year deadline for state plan submission in EPA's 2019 implementing regulations because of EPA's failure to consider both sides of the issue. *Id.* at 995-96.[5]

Recognizing the Court's admonition in *American Lung Ass'n*, EPA explained that it would establish deadlines "based on the minimum

---

[5] West Virginia mischaracterizes the Court's decision when it says that the vacatur of the prior deadline was because EPA did not consider "the actual workload involved." Pet. Br. 31 (quoting *Am. Lung Ass'n*, 985 F.3d at 993). The language that West Virginia quotes was the Court's recitation of the environmental groups' comments to EPA and does not represent the Court's holding.

administrative time reasonably necessary." 88 Fed. Reg. at 80486. That approach accounts for the competing considerations by "minimizing impacts on public health and welfare by proceeding as expeditiously as reasonably possible while accommodating the time needed for states or the EPA to develop an effective plan." *Id.*

In making this judgment, EPA did not make allowances for "any and all unique state procedures." *Id.* at 80489. States have different processes for adopting plans, *id.* at 80487, and accounting for every single one "would inappropriately delay reductions in emissions," *id.* at 80489. Under a lowest-common-denominator approach, the idiosyncrasies of certain state procedures could result in nationwide delays of pollutant reductions that Congress determined are necessary to protect human health and the environment. That would undermine Congress's aim in the Clean Air Act, which was to promote "the more expeditious imposition" of emission standards because prior approaches to air-pollution controls had been too slow and ineffective. H.R. Rep. No. 91-1146 at 1, 5 (1970). EPA reasonably chose not to set a deadline for all States based on longer processes that some States have chosen to

impose on themselves (and which those States could choose to shorten).
Pet. Br. 34-37.[6]

Instead, EPA placed greater weight on Congress's judgments about reasonable timeframes for state plans under comparable Clean Air Act provisions. Many long-standing statutory deadlines require States to submit plans in eighteen months or less. 88 Fed. Reg. at 80488. Respecting those congressional judgments, EPA determined that it should be reasonably possible for States to submit typical section 7411(d) plans within eighteen months. In doing so, EPA carefully considered how those other provisions compare to section 7411(d).

As part of its review of comparable Clean Air Act provisions, EPA considered the one-year deadline in 42 U.S.C. § 7429(b)(2) for submission of state plans to implement EPA's guidelines for existing solid waste incineration units. Section 7429(b) references section 7411(d), "creating considerable overlap in the functionality of the

---

[6] The Rule also provides conditional approval and parallel processing mechanisms, which could be used to accommodate the needs of state plan development processes in certain situations. 88 Fed. Reg. at 80504–06. No party challenges those mechanisms. EPA reasonably decided to provide States with as-needed flexibility through those mechanisms rather than extending the default deadline across the board.

programs." 88 Fed. Reg. at 80487. In both programs, EPA establishes guidelines and States implement and enforce them. But EPA also recognized that a "section [7411](d) plan could involve more complicated analyses than a [Clean Air Act] section [7429] plan" because the former allows States to set less stringent standards based on source-specific considerations, while the latter does not. 88 Fed. Reg. at 80487. So a longer timeframe than the one-year deadline in section 7429(b)(2) was reasonable.

EPA also considered the eighteen-month deadlines in 42 U.S.C. § 7513a(a)(2)(B) and (b)(2). Those deadlines are for States to submit plans to improve air quality in areas that EPA has designated as having excess levels of particulate matter pollution. Those plans are generally "more complicated" than a typical section 7411(d) plan, yet "there is a record of successful state submittals" in less than eighteen months. 88 Fed. Reg. at 80488. Under section 7513a, States must consider emissions of multiple pollutants from a wide range of pollution sources, each with various control options, and conduct complex technical demonstrations, usually through air-quality modeling, to show that the required controls will reduce the pollution in an area's ambient

air to required levels. *Id.*; Response to Comments 43, JA147. In contrast, a typical section 7411(d) plan addresses only one type of source and one type of designated pollutant and does not require complex air-quality modeling. 88 Fed. Reg. at 80488; Response to Comments 43, JA147. Moreover, the information that EPA provides in a section 7411(d) emission guideline usually makes state implementation "relatively straightforward." Response to Comments 43, JA147. For instance, EPA's guidelines generally provide presumptive standards for regulated sources, sometimes in the form of a model rule that a State can choose simply to adopt. *E.g.*, 89 Fed. Reg. 16820, 16829, 16999-17000 (Mar. 8, 2024); 40 C.F.R. §§ 60.1570, 60.1575, 60.2996-.2997.

West Virginia argues that section 7513a does not support an eighteen-month deadline for section 7411(d) plans because in practice, States have more than eighteen months to prepare plans under section 7513a. Pet. Br. 44-45. While possibly true to some extent, that does not undercut EPA's rationale. The deadlines in section 7513a run from when EPA finalizes designations of areas that are not attaining the air quality standard. West Virginia points out that designations come well after EPA promulgates the air quality standard, and West Virginia

argues that States can begin planning as soon as that standard is established. But States will not necessarily know at that time what areas will be designated as being in nonattainment of that standard.

To the extent that States could begin section 7513a plans based on assumptions about what areas will be designated nonattainment, "there is a comparable opportunity for such early planning" under section 7411(d) once EPA proposes an emission guideline. Response to Comments 44, JA148. Elsewhere in section 7411, Congress recognized the principle that a mere proposal can give notice to those affected. *See* 42 U.S.C. § 7411(a)(2), (6) (drawing line between existing and new sources based on the publication of proposed regulations). Proposed emission guidelines give notice to States that they will need to develop plans, even if they do not know for sure what will be in the final guidelines—much as an air quality standard gives notice to States that they will need to develop nonattainment plans, even if they do not know for sure which areas will be designated nonattainment. Because the opportunity for States to begin preparing section 7411(d) plans before the deadline starts to run is akin to their opportunity to do so under

section 7513a, EPA reasonably relied on the statutory deadlines in section 7513a.

Informed by these congressional judgments about appropriate deadlines for state plan development, EPA initially proposed a fifteen-month state plan submission deadline. That proposal was already significantly longer than the nine-month deadline in the 1975 implementing regulations, which governed until 2019. 40 C.F.R. § 60.23(a)(1). In the final Rule, EPA extended the deadline to eighteen months to account for the Rule's meaningful-engagement requirements, which EPA acknowledged may require more time. 88 Fed. Reg. at 80488. EPA's conclusion that eighteen months is "a reasonable balance" between giving States enough time and ensuring expeditious pollution reduction, *id.*, is the exact type of agency policy judgment that courts are not well positioned to second-guess, *see Mississippi v. EPA*, 744 F.3d 1334, 1355 (D.C. Cir. 2013).

Various commenters, including States, supported EPA's judgment that eighteen months is an appropriate state plan submission deadline. 88 Fed. Reg. 80488; Utah Comment at 2, EPA-HQ-OAR-2021-0527-0059, JA431 (explaining that Utah's administrative process requires at

least four months after a one-year period for plan development); North Carolina Comment at 1, EPA-HQ-OAR-2021-0527-0082, JA433 (suggesting 18 months); Alaska Comment at 2, EPA-HQ-OAR-2021-0527-0089, JA438 (same); Class of '85 Comment at 6, EPA-HQ-OAR-2021-0527-0093, JA366 (comment by coalition of electric generators suggesting a "default deadline of 18 months"); *see also* Indiana Comment at 1, EPA-HQ-OAR-2021-0527-0054, JA440 (suggesting "18 to 24 months"). EPA's balancing of the competing considerations was a reasonable exercise of its judgment.

Eighteen months is especially reasonable given that it is a default deadline that can be superseded as warranted by circumstances that are specific to an emission guideline. 88 Fed. Reg. at 80485-87; 40 C.F.R. § 60.20a(a)(1). In fact, EPA recently finalized two emission guidelines to which these implementing regulations apply, and both superseded these regulations with longer state plan submission timeframes. 89 Fed. Reg. at 17010 (crude oil and natural gas sector); 89 Fed. Reg. 39798, 39997 (May 9, 2024) (fossil fuel-fired electric generating units). Each of these emission guidelines justified why it is reasonable to provide more time for States to develop those plans. Texas

Oil and Gas Association is thus wrong that States' need for extra time to implement those two emission guidelines undermines the default deadline in this Rule. Amicus Br. 11-18.

The deadline is additionally reasonable given that there are no sanctions for States that miss the deadline. If a State were to miss the deadline, the only consequence is that EPA would promulgate a federal plan. 40 C.F.R. § 60.27a(c)(1); 88 Fed. Reg. at 80493 ("[T]here are no sanctions associated with failing to timely submit an approvable plan or with the implementation of a Federal plan."). A State remains free to submit a plan even after eighteen months, and EPA must act on that submission in its ordinary timeframe. 88 Fed. Reg. at 80495, 80498. Approval of a state plan will displace any corresponding federal plan. Because a State retains its ability to submit a plan at any time, there is no merit to West Virginia's accusation that these deadlines violate state sovereignty. Pet. Br. 46.

**B.    West Virginia's remaining counterarguments about the state plan submission deadline lack merit.**

*First*, West Virginia argues that States have historically taken an average of 45 months to submit plans under section 7411(d). Pet. Br.

32-33. But that data represents how long States have taken, which does not necessarily represent how long States actually needed. States do not always act as fast as they are capable of acting. The average is also skewed by some plans that were submitted over ten years late, which is more than three times the length of the deadline that the Court vacated in *American Lung Ass'n*. *See* State Plan Submissions, EPA-HQ-OAR-2021-0527-0003, JA104. Such lengthy delay suggests that States may be late for various reasons other than how much time they would actually need if they were proceeding diligently. And what the data does show, as even West Virginia acknowledges, is that enough States have submitted section 7411(d) plans in less than eighteen months to show that it is possible to do so. *Id.*; Pet. Br. 32-33. To give any more weight than that to States' historical practices does not adequately consider the need for deadlines that push for timely emission reductions.

*Second*, West Virginia argues that EPA should have carried over the three-year deadline for state plan submission under 42 U.S.C. § 7410(a)(1), Pet. Br. 40-43, but the Court has already rejected that exact argument. In the 2019 implementing regulations, EPA analogized section 7411(d) to section 7410 to justify a three-year state plan

submission deadline. 84 Fed. Reg. at 32568. In *American Lung Ass'n*,

this Court held that EPA had not meaningfully addressed the higher

level of effort generally required for section 7410 plans as compared to

section 7411(d) plans. 985 F.3d at 992-93. After all, EPA has recognized

since the original 1975 implementing regulations that "Section [7411](d)

plans will be much less complex than the [state implementation plans]

required under Section 7410." *Id.* at 992 (alterations in original)

(quoting 40 Fed. Reg. at 53315). Section 7411(d) plans apply only to a

single source category, while section 7410 plans typically cover multiple

types of sources and can involve complex air quality modeling that is

not needed under section 7411(d). *Id.* at 992-93. Section 7410 plans

addressing interstate transport, Pet. Br. 42 n.6, are particularly

complex. *See, e.g.*, 88 Fed. Reg. 9336, 9338-43 (Feb. 13, 2023)

(describing four-step framework by which EPA evaluates States'

interstate transport plans, which includes complex air quality

modeling).[7]

---

[7]    To suggest that EPA has more closely identified section 7411(d)
with section 7410, West Virginia misrepresents a statement in the
Rule's preamble. Pet. Br. 40–41 (quoting 88 Fed. Reg. at 80529). The
preamble, in explaining that EPA may approve a state plan that is
more stringent than federal requirements, stated that a Supreme Court

That section 7411(d) directs EPA to establish "a procedure similar to that provided by section 7410" does not mean that EPA can ignore obvious differences between the two sections. It does not even mean that section 7410 provides a "primary reference point" when it comes to deadlines. Pet. Br. 40. This Court has expressed doubt that section 7411(d)'s "procedure similar to" language "even speaks to timing rules." *Am. Lung Ass'n*, 985 F.3d at 992.

Although EPA set the same twelve-month deadline for its own review of state plans under section 7411(d) as the deadline under section 7410(k)(2), EPA did not justify that decision by equating the two sections. Rather, EPA arrived at twelve months by estimating the time necessary for each step in its state plan review process. 88 Fed. Reg. at 80491-92. And EPA set a shorter deadline for federal plan promulgation under section 7411(d) than under section 7410. *Compare* 88 Fed. Reg. at 80486, 80544 (one year), *with* 42 U.S.C. § 7410(c)(1) (two years). That negates West Virginia's accusation, Pet. Br. 43, that EPA gave itself the

---

decision about the interaction between 42 U.S.C. § 7410 and § 7416 "also applies to [Clean Air Act] section [7411](d)." 88 Fed. Reg. at 80529. West Virginia omits the first part of EPA's sentence to construct a different sentence that equates sections 7410 and 7411(d) more generally.

benefit of deadlines equivalent to those under section 7410 but deprived States of the same.

*Third*, West Virginia is wrong that the state plan submission deadline is unreasonable as compared to other deadlines in the Rule. West Virginia points to EPA's twelve-month deadline for reviewing state plan submissions. Pet. Br. 37-38. West Virginia faults EPA for constructing that deadline by adding up the estimated time needed at each step, while not doing the same for state plan development. *Id.* at 37 (citing 88 Fed. Reg. at 80491-92). But that is because EPA knows all the steps that it will take to review a state plan submission, whereas the steps that States will take to develop plans will vary significantly among the many States. *See* 88 Fed. Reg. at 80487-88.

West Virginia also argues that because preparing state plans requires more time than reviewing them, the eighteen-month deadline for States to develop plans is unreasonable as compared to the sixteen months that EPA might take to review them. Pet. Br. 37. To be clear, EPA gave itself a deadline of twelve months, not sixteen, to review state plan submissions. 88 Fed. Reg. at 80492. EPA can and does regularly act on state plans within twelve months. *Id.* Having set a twelve-month

deadline for itself to review state plan submissions, EPA reasonably gave States eighteen months to make the submissions. The differential between those deadlines recognizes that preparing state plans can take longer than reviewing them. But the differential did not need to be any greater, since reviewing a state plan is not such light work that those deadlines are unbalanced. EPA's review of a state plan can be highly technical, and EPA often reviews multiple state plans at the same time while ensuring consistent treatment. 88 Fed. Reg. at 80492. That EPA has sometimes taken longer to review a state plan, Pet. Br. 37-38, does not mean that EPA acted unreasonably in imposing deadlines on both itself and States that promote timely achievement of pollution reductions.[8]

West Virginia also points out the twelve-month deadline for States to respond to a state plan call and argues that it was unreasonable for EPA to give States only six months longer for initial plan development than for a plan revision. Pet. Br. 38. West Virginia makes no effort to

---

[8] West Virginia is incorrect that EPA suffers no consequences for missing its own deadlines. Pet. Br. 46. Regulatory deadlines for EPA action have been enforced through citizen suits. 42 U.S.C. § 7604(a)(2); *see, e.g.*, *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 553–57 (D.D.C. 2005); *California v. EPA*, 360 F. Supp. 3d 984, 990–91 (N.D. Cal. 2018).

engage with EPA's explanation for that. 88 Fed. Reg. at 80507. EPA acknowledged that a revision will not require the same amount of time as an initial submission, and the default deadlines reasonably reflect that distinction. *Id.* But a plan revision still requires public outreach and state processes, and twelve months reasonably accommodates those needs. *Id.*

*Fourth*, West Virginia argues that the deadline will force States to rush, causing them to adopt flawed plans that harm—rather than advance—emission-reduction efforts. Pet. Br. 39. In fact, EPA did recognize that giving States enough time "ultimately helps ensure more timely implementation of an [emission guideline]." 88 Fed. Reg. at 80489. For the reasons above, including congressional judgments about how promptly States can be expected to act under analogous Clean Air Act provisions, EPA concluded that eighteen months *is* enough time for States to prepare satisfactory plans.

West Virginia further argues that EPA deliberately imposed a short deadline that EPA "knows the States have not met and cannot meet" to "nullif[y] the States' role under Section [7411](d)." Pet. Br. 32, 46. But again, EPA reasonably explained why eighteen months is

enough time. And Congress decided that similar deadlines in analogous Clean Air Act provisions were enough to give States a fair opportunity to perform their role.

### C. West Virginia's argument about the federal plan deadline is misdirected and lacks merit.

West Virginia makes an additional argument that is misdirected because it is not actually about the state plan submission deadline. West Virginia claims that EPA will not notify States of incomplete or unsatisfactory plans, depriving them of a chance to correct a deficient submission. Pet. Br. 46-48. West Virginia also claims that EPA has deprived States of notice by changing how the federal plan promulgation deadline is triggered. *Id.* at 47. These arguments are based on a misunderstanding of the Rule.

EPA will always notify a State when it determines that a submission is incomplete or unsatisfactory. Once a State submits a plan, EPA will review the submission for completeness within sixty days. 40 C.F.R. § 60.27a(g). If EPA determines that the submission is incomplete, it will notify the State by letter. 88 Fed. Reg. at 80490, 80498 n.37. If a submission is considered complete—either because EPA affirmatively determines completeness or because the submission is

deemed complete after sixty days by operation of law, 40 C.F.R.
§ 60.27a(g)(1)—then EPA will act on the submission through notice-
and-comment rulemaking. 88 Fed. Reg. at 80490. That rulemaking
would inform a State of any disapproval.

West Virginia asserts that even if EPA misses the sixty-day
deadline for a completeness determination and the state plan
submission is deemed complete by operation of law, EPA is not bound
by that deemed completeness and can later determine that a
submission is incomplete. Pet. Br. 47. Not so. Once a state plan
submission is deemed complete, EPA will act on the submission through
notice-and-comment rulemaking and approve, conditionally approve,
partially approve and partially disapprove, or disapprove the state plan.
88 Fed. Reg. at 80490. In any event, regardless of whether EPA finds a
state plan submission incomplete or unsatisfactory, EPA will give a
State notice and the State will be able to submit a plan revision.

West Virginia objects to the Rule's revision of the trigger that
starts EPA's clock to promulgate a federal plan. Under the 2019
implementing regulations, EPA's federal plan deadline started from:
(1) EPA's finding of a failure to submit or of incompleteness, or

(2) EPA's disapproval. 84 Fed. Reg. at 32578 (40 C.F.R. § 60.27a(c)(1)-

(2)). If a State did not submit any plan, then the federal plan timeline

would not start running until EPA formally published a finding of

failure to submit. *Id.* at 32569. In the Rule, EPA reverted to its pre-

2019 approach under which, when a State submits no plan at all, the

federal plan deadline starts from the missed state plan submission

deadline rather than from EPA's formal publication of a finding of

failure to submit. 88 Fed. Reg. at 80497, 80544. EPA explained that the

interim step of issuing a formal finding can sometimes result in a lag

between when a State misses its plan submission deadline and when

EPA must promulgate a federal plan. *Id.* Eliminating the requirement

for a formal finding of failure to submit, which EPA did to streamline

the process, does not deprive States of notice because a State does not

need notice from EPA to know that it has not made a submission.[9] *Id.*

at 80497-98. It also does not deprive States of the opportunity to submit

a plan for EPA's review at any time—even after EPA has promulgated a

federal plan. *Id.* at 80493.

--------

[9] The revised trigger for the federal plan deadline does not affect the
explanation above that if a State does submit a plan and EPA finds it
incomplete or unsatisfactory, EPA will notify the State accordingly.

West Virginia complains about the possibility that EPA might promulgate a federal plan shortly after, or simultaneously with, a finding of incompleteness or a disapproval. Pet. Br. 48. But nothing in the statute requires EPA to give States another bite at the apple before promulgating a federal plan. *See* 42 U.S.C. § 7411(d)(2)(A); *cf. id.* § 7410(c)(1); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (holding that under section 7410, EPA need not wait "even a single day" after disapproving a state implementation plan to issue a federal implementation plan). Nor did the prior versions of the implementing regulations require EPA to wait until its deadline to promulgate a federal plan after finding a state plan submission to be incomplete or insufficient. *See* 40 C.F.R. § 60.27(c); 84 Fed. Reg. at 32578. Contrary to West Virginia's unfounded accusations, neither the state plan submission deadline nor the federal plan deadline in the Rule improperly aggrandizes EPA's authority.

* * *

In sum, eighteenth months for state plan submission is "an expeditious but reasonable schedule." 88 Fed. Reg. at 80489. It balances the States' need for time against the Act's need for speed. At bottom,

West Virginia's disagreement is based on its view that States' interest in more time deserves more weight than the timely achievement of pollution reduction. But the Court has already rejected the view, Pet. Br. 38-39, that the public health and environmental protections of section 7411(d) can be subordinated in the way that West Virginia advocates. *Am. Lung Ass'n*, 985 F.3d at 993-95.

## III. The Rule adopts commonsense procedures for state plan calls and error correction.

The Rule includes several procedures to ensure the proper functioning of the statutory framework, and West Virginia challenges two of them. First, EPA may call for revision of a previously approved state plan that it finds is "substantially inadequate." 88 Fed. Reg. at 80506-07, 80545 (codified at 40 C.F.R. § 60.27a(i)). Second, EPA may correct an error in its prior action on a state plan without requiring any further submission from the State. *Id.* at 80508, 80545 (codified at 40 C.F.R. § 60.27a(j)). These commonsense procedures are within EPA's statutory authority to "establish a procedure similar to that provided by section 7410" to regulate existing sources and to ensure that state plans are "satisfactory." 42 U.S.C. § 7411(d)(1), (2)(A).

The state plan call procedure helps ensure that approved plans continue to meet the applicable requirements over time. This is important because section 7411(d) plans "may be implemented over many years." 88 Fed. Reg. at 80506. EPA identified two general circumstances in which a state plan call would be appropriate. *Id.* at 80506-07. First, a change in circumstances arising after plan approval—such as a new court decision or a change in technical conditions—might undermine the basis for a prior approval. *Id.* Second, a State might fail to adequately implement a plan due to, for instance, changes in available funding, resources, or state legal authorities. *Id.* Either circumstance may result in a state plan that no longer meets applicable requirements. A state plan call ensures compliance with legal requirements throughout a plan's sometimes-lengthy implementation period. And it does so by giving States a chance to correct a deficiency themselves.

The error-correction procedure allows EPA to fix an error that it made when acting on a state plan submission. EPA might correct a technical or clerical error, or it might correct an erroneous approval or disapproval. *Id.* at 80508. The procedure allows EPA to correct such

errors without a State having to go through all the required steps to submit a revised plan, such as holding a public hearing. *Id.* (citing 40 C.F.R. § 60.23a). EPA's action to correct an error must be "in the same manner as the approval, disapproval, or promulgation" that it is correcting. *Id.* at 80545 (codified at 40 C.F.R. § 60.27a(j)).

These procedures are analogues of those under section 7410. *See* 42 U.S.C. § 7410(k)(5)-(6). Under section 7411(d)(1), EPA must "establish a procedure similar to that provided by section 7410" to regulate existing-source pollution. 42 U.S.C. § 7411(d)(1). Under subsection (d)(2)(A), EPA has the same authority as under section 7410(c) to adopt a federal plan when a State fails to submit a "satisfactory" plan. *Id.* § 7411(d)(2)(A). Together, these provisions allow EPA to adopt procedures for the submission and review of state plans under section 7411(d) that are analogous to those under section 7410. 88 Fed. Reg. at 80506-08.

West Virginia advances a cramped reading of EPA's statutory authority under which EPA may establish a procedure only for the initial step of state plan submission. Pet. Br. 51. Even under that

reading, EPA's procedure for state plan calls is permissible since it addresses when and how States must submit plan revisions.

But EPA's authority is not so limited. Section 7411(d)(1) authorizes EPA to establish a procedure like that in section 7410 for the regulation of existing sources. Section 7411(d)(1) specifically addresses the state plan submission step of that procedure, but it does not specify how EPA should exercise its authority under section 7411(d)(2)(A) to review those submissions and promulgate federal plans. That does not mean that EPA is limited to establishing a procedure only for state plan submission. Rather, it means that Congress left more room for EPA to determine the procedures for the remaining steps. *See Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009).

Section 7411(d)(1) and (2) are best read together to authorize EPA to establish procedures that govern the entire process—from state plan submission to EPA's review of state plans and, if necessary, EPA's promulgation of a federal plan and EPA's enforcement of plans. The statutory framework could not function if EPA could not establish procedures governing the entire process. And it would hinder the achievement of the statutorily required emission reductions if there

were no way to correct a state plan that is no longer "satisfactory" under section 7411(d)(2), or if EPA could not correct its own error. This conclusion is reinforced by the long-standing principle that agencies may adopt procedures to implement their statutory authorities. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 525-26 (1978); 42 U.S.C. § 7601(a)(1).

West Virginia's logic would undercut regulations that have been in place since 1975 for how EPA will act on state plans. 88 Fed. Reg. at 53348 (codified at 40 C.F.R. § 60.27). West Virginia's logic would also cast doubt on other parts of this Rule's procedures for EPA action on state plans—such as partial approval, conditional approval, and parallel processing—that West Virginia does not challenge. *Id.* at 80503-06.

West Virginia complains that the state plan call and error-correction mechanisms are substantive, not procedural. Pet. Br. 49. But those mechanisms do not establish substantive criteria for EPA's review of plan revisions or for EPA's corrected action on previously approved plans. Rather, they establish procedural avenues for States and EPA to revisit a plan when necessary. In any event, the statute allows EPA to

substantively review state plans to ensure that they are satisfactory. 42 U.S.C. § 7411(d)(2)(A); 88 Fed. Reg. at 80522. So EPA's authority to establish those mechanisms does not turn on the potentially blurry line between what is procedural and substantive.

Finally, States have adequate recourse if they disagree with EPA's use of these procedures. Under section 7410, state implementation plan calls and error corrections are generally notice-and-comment rulemakings that allow for public participation and judicial review.[10] *E.g.*, 63 Fed. Reg. 57356 (Oct. 27, 1998) (NOx SIP call); *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) (reviewing NOx SIP call); *Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013) (reviewing error-correction rule). EPA's use of these procedures in the section 7411(d) context will generally align with its use of state implementation plan calls and error correction under section 7410. *See* 88 Fed. Reg. at 80506-08.

\* \* \*

---

[10] EPA has foregone notice-and-comment rulemaking only in limited circumstances based on good cause. 5 U.S.C. § 553(b)(4)(B); *e.g.*, 76 Fed. Reg. 48208, 48211–22 (Aug. 8, 2011). Even then, the final action was subject to judicial review. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 133–35 (D.C. Cir. 2015).

For the reasons above, West Virginia's arguments on all three issues are meritless. Alternatively, any relief should be limited to the portions of the Rule that West Virginia has successfully challenged. *See* 88 Fed. Reg. at 80482 (explaining that individual provisions of the Rule are severable).

## CONCLUSION

The petition should be denied.

Respectfully submitted,

/s/ *Tsuki Hoshijima*

Of Counsel:                                    TODD KIM
                                               Assistant Attorney General
STEPHANIE L. HOGAN
NORA GREENGLASS                                TSUKI HOSHIJIMA
U.S. Environmental Protection                  Environment and Natural Resources
 Agency                                         Division
                                               U.S. Department of Justice

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 13,000 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Tsuki Hoshijima*